# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRESIDIO COMPONENTS INC., | CASE NO. 08-CV-335 - IEG (NLS) |
| Plaintiff, | ORDER: |
| | (1) DENYING PRESIDIO'S MOTION FOR PERMANENT INJUNCTION [Doc. No. 306]; |
| | (2) GRANTING IN PART AND DENYING IN PART PRESIDIO'S MOTION FOR POST TRIAL REMEDIES [Doc. No. 307]; |
| vs. | (3) DENYING ATC'S MOTION FOR JMOL OR FOR A NEW TRIAL WITH RESPECT TO PRESIDIO'S FALSE MARKING BEFORE OCTOBER 24, 2008 [Doc. No. 308]; |
| | (4) GRANTING IN PART AND DENYING IN PART ATC'S MOTION FOR JMOL AND FOR A NEW TRIAL [Doc. No. 309]; |
| | (5) GRANTING IN PART AND DENYING IN PART ATC'S MOTION FOR ENTRY OF ATC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO PRESIDIO'S FINES FOR FALSE MARKING [Doc. No. 310]; |
| AMERICAN TECHNICAL CERAMICS CORP., | (6) DENYING ATC'S MOTION FOR ENTRY OF ATC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING INDEFINITENESS [Doc. No. 311]; and |
| Defendant. | (7) DENYING ATC'S MOTION FOR ENTRY OF ATC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING UNENFORCEABILITY OF THE '356 PATENT FOR INEQUITABLE CONDUCT  [Doc. No. 312]. |

Currently before the Court are the parties' post-trial motions. Having considered the parties' arguments, and for the reasons set forth below, the Court issues the following order.

## BACKGROUND

### I.      The Technology

In this patent infringement case, Presidio Components Inc. ("Presidio") alleges American Technical Ceramics Corp. ("ATC") infringed U.S. patent number 6,816,356 ("the '356 patent"), titled "Integrated Broadband Ceramic Capacitor Array." A capacitor is a device conventionally comprising two metal plates separated by a non-conductor of electric current. This non-conductive material is known as the "dielectric," which is usually composed of air or ceramic.

Capacitors are passive electronic components used in cellular phones, video cassette recorders, televisions, general purpose computers, and audio amplifiers. These devices use capacitors in one of two ways: (1) to filter out undesirable ripples or spikes in a power supply, or (2) to store energy and provide charge to transistors on a printed circuit board.[1]

A capacitor is charged by coupling its plates to an electrical source. Since electricity passes easily through the conductors, but not the dielectric, a positive electrical charge accumulates on one plate and a negative charge accumulates on the other plate. When charged, the capacitor stores energy that can be released by connecting the plates via an external path, permitting current to flow from one plate to the other.  The electrons flow off the negatively charged plate and onto the positively charged plate, bringing the two plates to equal relative voltage. The amount of energy a capacitor stores is its "capacitance," which  depends on the orientation and spacing of the conductive plates, and the properties of the dielectric material.

Frequently, multiple capacitors are connected to form a capacitive network. One way to create a capacitive network is to build a "multilayer capacitor," which is formed by layering multiple conductive and non-conductive materials. Each individual layer has a separate capacitance that effects the overall capacitance of the multilayer capacitor.

///

---

[1] A "transistor" is essentially a switch that turns on and off to regulate the flow of current or voltage in electrical circuits.

## II.     The '356 Patent

The '356 patent discloses and claims a multilayer capacitor consisting of a network of capacitors. The '356 patent has a total of thirty-four claims, but only claims 1-5, 16, and 18-19 are the asserted claims in this case. Out of those, only asserted claim 1 is an independent claim.[2] The rest of the asserted claims are dependent claims.[3] Asserted claim 1 of the '356 patent claims:

> A capacitor comprising:
>
> a substantially monolithic dielectric body;
>
> a conductive first plate disposed within the dielectric body;
>
> a conductive second plate disposed within the dielectric body and forming a capacitor with the first plate;
>
> a conductive first contact disposed externally on the dielectric and electrically connected to the first plate; and
>
> a conductive second contact disposed externally on the dielectric body and electrically connected to the second plate, and the second contact being located sufficiently close to the first contact to form a first fringe-effect capacitance with the first contact.

('356 patent, col. 12:58-13:5.) Asserted claims 2 and 4 also add one or two "insulating layer[s]" disposed between the external contacts and "inhibiting electrical conduction" between those contacts. (Id. col. 13:6-13:9, 13:17-13:25.)

## III.    Factual Background

The application process for the '356 patent spanned over two years. On May 17, 2002, Presidio submitted a parent application to patent the technology underlying the '356 patent with the United States Patent and Trademark Office ("USPTO" or "PTO"). This parent application resulted in U.S. patent number 6,587,327 ("the '327 patent"). On April 14, 2003, Presidio submitted the base application for the '356 patent, which was a continuation in part of the parent application. The USPTO issued the '356 patent on November 9, 2004.

---

[2] An "independent" claim stands and falls on its own. A "dependent" claim, on the other hand, includes all of the requirements of a particular independent claim *plus* additional requirements of its own. As a result, if a particular independent claim is found not to be infringed, the dependent claims corresponding to it cannot be infringed. On the other hand, if an independent claim has been infringed, a separate determination is still necessary to determine whether the additional requirements of its dependent claims have also been infringed.

[3] While all of the asserted dependent claims depend on claim 1, the asserted claims 4 and 5 also depend on claim 3.

1    During the pendency of Presidio's patent application, ATC initiated development of the 545L

2    series of monolithic, multilayered capacitors. In September 2002, ATC engineers first expressed

3    interest in developing a monolithic capacitor. During development, in April 2003, ATC allegedly

4    dissected and analyzed Presidio's Buried Broadband Capacitors ("BB capacitors"). The BB capacitors

5    were monolithic, multilayered capacitors developed for broadband usage. During the litigation,

6    Presidio conceded the BB capacitors do not embody the claims of the '356 patent. Nonetheless,

7    Presidio asserts the BB capacitors at the very least employ the "substantially monolithic dielectric

8    body" as used in the claims of the '356 patent, and as such served as the background to the inventions

9    ultimately claimed in the '356 patent.

10    In September 2003, ATC substantially completed the 545L capacitor's design and filed a

11    provisional patent application. In March 2004, ATC reviewed Presidio's published patent application.

12    The parties dispute the importance of ATC's review.  Presidio asserts ATC engineers believed the

13    patent application covered their capacitor. ATC asserts the engineers believed the '356 patent was

14    both invalid and inapplicable to the 545L capacitor.

15    In September 2004, ATC filed a non-provisional patent application for the 545L capacitor. In

16    February 2006, the USPTO rejected the application, citing the '356 patent as prior art.

17    Notwithstanding this rejection, ATC began selling the 545L capacitor in June 2006. In August 2006,

18    ATC requested the USPTO reconsider the application, arguing the '356 patent does not have

19    orientation insensitivity, which is a feature of the 545L capacitor. That same month, the USPTO

20    reconsidered and held the '356 patent did not bar ATC's application. On July 2007, the USPTO issued

21    U.S. Patent No. 7,248,458 ("the '458 patent") for the 545L capacitor.

22    Beginning in May 2007, Presidio began marking its BB capacitors with the '356 patent

23    number. On October 24, 2008, Presidio admitted the BB capacitors were not covered by the '356

24    patent, but claims it marked the capacitors with a mistaken belief they embodied the patent. Prior to

25    the marking, Presidio did not perform a legal analysis. Presidio continued to mark the BB capacitors

26

27

28

1    with the '356 patent until some time in April 2009.[4]

2          On May 17, 2007, Presidio filed an action in this Court against ATC, alleging infringement

3    of the '356 patent (the "2007 action"). On June 9, 2008, the Court granted a joint motion to dismiss

4    the 2007 action without prejudice for lack of standing.

5    **IV.    Procedural Background**

6          Presidio filed the complaint in this case on February 21, 2008, alleging ATC is infringing

7    claims 1-5, 16, and 18-19 ("asserted claims") of the '356 patent by producing the 545L capacitor.

8    [Doc. No. 1]. ATC answered on May 28, 2008, bringing numerous counterclaims against Presidio.

9    [Doc. No. 10]. On June 20, 2008, Presidio filed an answer to ATC's counterclaims. [Doc. No. 21].

10         On June 11, 2008, the Court issued a Claim Construction Order, construing many of the

11   disputed terms of the'356 patent. [Doc. No. 24]. Among others, the Court construed the term "a

12   substantially monolithic dielectric body" as "a dielectric body largely but not wholly without seams

13   from the inclusion of plates within the dielectric body." The Court construed the term "the second

14   contact being located sufficiently close to the first contact to form a first fringe-effect capacitance with

15   the first contact" as "an end of the first conductive contact and an end of the second conductive contact

16   are positioned in an edge-to-edge relationship in such proximity as to form a determinable

17   capacitance." On July 30, 2009, the Court granted ATC's Motion to Resolve a Fundamental Dispute

18   over Claim Scope, finding "determinable capacitance" to mean "a capacity that is capable of being

19   determined in terms of a standard unit." (Order Resolving Fund. Dispute, at 5.) In doing so, the Court

20   rejected Presidio's interpretation that attempted to use the term "insertion loss" as a proxy for a

21   previously rejected term "high frequency performance." (Id. at 4.)

22         On August 25, 2008, the Court issued an order denying ATC's summary judgment motion for

23   a declaration of indefiniteness. [Doc. No. 32]. The parties then filed cross-motions for summary

24   judgment. On April 30, 2009, the Court issued an order on the cross-motions for summary judgment,

25   granting some and denying others. As relevant here, the Court granted summary judgment in favor

26   _____

27         [4] Presidio asserts the end date of false marking should be April 23, 2009, which was the date
     of the hearing on the parties' cross-motions for summary judgment at which Presidio's counsel
     represented that Presidio had, prior to that hearing, discontinued any marking utilizing the '356 patent.
28   (See Pl. Opp. to Def. Findings & Conclusions on False Marking, at 1 & n.2; accord Trial Tr. Apr. 23,
     2009, at 29-31.) ATC does not appear to dispute this end date.

of ATC on its counterclaim 5 with regard to false marking that occurred after October 24, 2008, and denied summary judgment for false marking that occurred before October 24, 2008. (MSJ Order, at 9-11.) In determining Presidio's potential liability for false marking, the Court adopted the "continuous act" test set forth in London v. Everet H. Dunbar Corp., 179 F. 506 (1st Cir. 1910), concluding that "each time Presidio marked a shipment, it committed a false marking offense." (MSJ Order, at 12-13.)

On July 23, 2009, ATC submitted to the USPTO a replacement request for reexamination of the '356 patent. On October 20, 2009, the USPTO granted the request for reexamination, noting there were substantial new questions of patentability with respect to all of the asserted claims in light of nine prior art references identified by ATC. The reexamination proceedings are still ongoing.

The case was tried to a jury in December 2009. The jury returned a verdict finding all of the asserted claims to be valid and infringed. The jury awarded Presidio $1,048,677 in lost profits. The jury also found that Presidio has proven by clear and convincing evidence that ATC's infringement was willful. Finally, the jury found that Presidio's false marking of the BB capacitors prior to October 24, 2008 was not done for the purpose of deceiving the public.

The Court heard oral argument on the parties' post-trial motions on March 12, 2010. After the motions were taken under submission, ATC filed two notices with the Court. First, ATC alerted the Court to the Federal Circuit's recent *en banc* decision in Ariad Pharms., Inc. v. Eli Lilly & Co., — F.3d —, 2010 WL 1007369 (Fed. Cir. Mar. 22, 2010) (en banc), arguing it supported ATC's motion for judgment as a matter of law and motion for a new trial with respect to invalidity for lack of written description in the '356 patent. [Doc. No. 343]. Second, ATC notified the Court of the First Office Action by the USPTO in the reexamination proceedings, which rejected all of the asserted claims of the '356 patent based on anticipation and obviousness. [Doc. No. 346]. Presidio filed responses in opposition to both of these notices. [Doc. Nos. 345, 347].

## LEGAL STANDARD

For issues not unique to patent law, such as sufficiency of the evidence on issues tried to the jury, the Court applies the law of the regional circuit in which it sits, here the Ninth Circuit. See Duro-Last, Inc. v. Custom Seal, Inc., 321 F.3d 1098, 1106 (Fed. Cir. 2003) (citations omitted). Otherwise,

1  for all substantive issues of patent law, the Court applies the law of the Court of Appeals for the

2  Federal Circuit. See id. (citations omitted).

3       In the Ninth Circuit, a judgment as a matter of law ("JMOL") pursuant to Federal Rule of Civil

4  Procedure 50(a) is proper only "if the evidence, construed in the light most favorable to the

5  nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's

6  verdict." Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002) (citation omitted). Phrased otherwise, a

7  JMOL should be granted only if "'there is no legally sufficient evidentiary basis for a reasonable jury

8  to find for that party on that issue'" and the verdict reached by the jury is "'against the great weight

9  of the evidence.'" Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1005 (9th Cir. 2004)

10 (citations omitted). "'Although the court should review the record as a whole, it must disregard

11 evidence favorable to the moving party that the jury is not required to believe, and may not substitute

12 its view of the evidence for that of the jury.'" Payao, 307 F.3d at 918 (citation omitted). Thus, the

13 Court must keep in mind that "credibility determinations, the weighing of the evidence, and the

14 drawing of legitimate inferences from the facts are jury functions, not those of a judge." Hangarter,

15 373 F.3d at 1005 (internal quotation marks and citations omitted).

16       The Court may grant a new trial pursuant to Federal Rule of Civil Procedure 59(a) only if "'the

17 verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false,'" or

18 if a new trial is necessary "'to prevent . . . a miscarriage of justice.'" Hangarter, 373 F.3d at 1005

19 (citation omitted). The Court "has the duty to weigh the evidence as the court saw it, and to set aside

20 the verdict of the jury, even though supported by substantial evidence, where, in the court's

21 conscientious opinion, the verdict is contrary to the clear weight of the evidence." Moski v. M.J.

22 Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation marks and citations omitted).

**DISCUSSION**

23

24 **I.    Validity**

25       A.    Preliminary matters

26       As an initial matter, the Court addresses ATC's arguments that Dr. Ewell was unqualified to

27 render an opinion as a person of ordinary skill in the art, that he relied on his undisclosed opinion, and

28 that in any event his testimony was legally irrelevant and could not support the verdict of no invalidity.

1  The Court also addresses ATC's argument that Presidio improperly referred to "insertion loss" in its

2  closing argument.

3      The parties have previously agreed that "[t]he level of ordinary skill in the art of the '356

4  patent is medium. The ordinary artisan would hold a masters or similar degree, or the experiential

5  equivalent thereof, in Electrical Engineering or a similar field, and would have at least two years of

6  industry experience in designing multilayer capacitors." (Pretrial Order, at 5 [Doc. No. 182].) ATC

7  argues Dr. Ewell does not meet this criteria because he admitted that he has "never from scratch

8  designed" a capacitor in his entire career. (See Trial Tr. Day 7, at 93:8-93:9.) Presidio responds that

9  Dr. Ewell is well-qualified as an expert witness because he has more than three decades of work

10  experience relating to capacitors, including experience relating to the review of and consultation

11  regarding designs of multilayer capacitors. (See id. at 69:14-73:5.) Moreover, Presidio argues ATC

12  did not object or attempt to voir dire Dr. Ewell at trial.

13      ATC correctly notes that one who is not qualified in the pertinent art may not testify as an

14  expert on technical issues such as validity, anticipation, or scope of the prior  art. See Sundance, Inc.

15  v. DeMonte Fabricating Ltd., 550 F.3d 1356, 1364 (Fed. Cir. 2008). However, the Court retains

16  considerable discretion in allowing testimony if the expert witness has "sufficient relevant technical

17  expertise." See SEB S.A. v. Montgomery Ward & Co., Inc., 594 F.3d 1360, 1373 (Fed. Cir. 2010).

18  In the present case, although Dr. Ewell does not meet the requirement agreed to by the parties that a

19  person qualified in the art "would have at least two years of industry equivalent in *designing*

20  multilayer capacitors," Dr. Ewell clearly has "sufficient relevant technical experience." See id. Dr.

21  Ewell testified that he has been working in the field of electronic components, of which the primary

22  component has been multilayer ceramic capacitors, for over thirty years, including ten years at the

23  Hughes Aircraft Company and twenty-five years at the Aerospace Corporation. (Trial Tr. Day 7, at

24  69:16-70:7.) As part of his job, Dr. Ewell served on the technical audit team which evaluated

25  manufactured multilayer capacitors, "along with the designs used to produce the parts and the testing

26  given them to ensure that they were adequately reliable." (See id. at 70:23-71:3.) Accordingly, Dr.

27  Ewell is more than qualified to render an opinion in the pertinent art of designing multilayer ceramic

28  capacitors. Moreover, Presidio correctly points out that ATC did not object or attempt to voir dire Dr.

1  Ewell at trial.[5] For the foregoing reasons, the Court denies ATC's objections to Dr. Ewell's testimony.

2      Likewise, there is no merit to ATC's argument that the Court should ignore Dr. Ewell's

3  testimony as legally irrelevant. ATC argues Dr. Ewell's testimony should be excluded because: (1)

4  he improperly injected an additional requirement limiting the Court's construction of the term "fringe

5  effect capacitance" from a "determinable capacitance" to a "determinable *fringe-effect* capacitance;"

6  (2) he improperly limited "determinable capacitance" to the measurement of a *physical capacitor*; and

7  (3) he improperly required testing of actual samples for determining whether capacitance exists.

8  However, in light of the fact that the '356 patent discusses both parallel capacitance and fringe-effect

9  capacitance, there was no error in referring to "determinable *fringe-effect* capacitance" when

10  discussing the specific limitations of claim 1. Likewise, even assuming as true ATC's allegations that

11  Dr. Ewell limited "determinable capacitance" to the testing of actual physical samples, whether any

12  such limitation was proper in this context was for the jury to determine, not the Court. See Hangarter,

13  373 F.3d at 1005 (noting that at the JMOL stage, the credibility determinations, weighing of the

14  evidence, and drawing of legitimate inferences is the province of the jury, not the judge). Nothing

15  prevented ATC from cross-examining Dr. Ewell as to his allegedly idiosyncratic views, and indeed

16  ATC did so extensively. (See, e.g., Trial Tr. Day 7, at 94:18-98:15, 108:7-112:17, 113:17-116:21.)

17      The Court also rejects ATC's argument that Dr. Ewell relied on undisclosed expert opinion

18  during his testimony. ATC argues Dr. Ewell never opined in his report on the propriety of Dr.

19  Dougherty's testing of the August 2000 capacitors, or that there would be only a "parallel-plate

20  capacitor left" in the fragment after shaving. However, there is sufficient analysis in Dr. Ewell's expert

21  report on the impropriety of the testing done by Dr. Dougherty and why that fails to demonstrate

22  fringe-effect capacitance. (See Pl. Rebuttal Expert Report of Gary J. Ewell, at 65-78 [Doc. No. 320-

23  8].) Dr. Ewell's report also sufficiently covers the other issues objected to by ATC.

24      Finally, there is also no merit to ATC's argument that Presidio improperly referred to

25  ────────────

26  [5] In its reply, ATC notes it did object to Dr. Ewell's qualifications and fitness as an expert at the summary judgment stage. The Court rejected those objections at that time, noting that "[w]hile Dr.

27  Ewell stated he does not design multi-layer capacitors in his current position, his long experience regarding capacitors, including evaluating capacitor reliability and compliance with a particular specification, qualify him to opine on how a skilled artisan would apply the claim language." (See

28  Order Denying Defendant's Motion for Summary Judgment of Indefiniteness, at 8 [Doc. No. 32].) To the extent ATC seeks reconsideration, the Court now reaffirms its prior ruling.

1    "insertion loss" in its closing argument. (See Trial Tr. Day 8, at 59:18-59:24.) Contrary to ATC's

2    argument, Presidio did not attempt to *define* "fringe-effect capacitance" with the term "insertion loss"

3    contrary to the Court's claim construction and *in limine* ruling. Rather, Presidio merely indicated that

4    "insertion loss" has been mentioned during the trial. In light of the fact that the specifications of the

5    '356 patent extensively discuss "insertion loss," there was no error in referring to this term. Moreover,

6    the reference to "insertion loss" was so minute and isolated, there is no reason to believe it was even

7    noticed by the jury, not to mention influenced its decision. Accordingly, the Court denies ATC's

8    objection on this ground as well.

9         **B.**    Anticipation[6]

10        ATC seeks a judgment as a matter of law that certain prior art anticipated the asserted claims

11   of the '356 patent. Anticipation under 35 U.S.C. § 102 "requires a single prior art reference which

12   discloses each and every element of the claimed invention."[7] Dickson Indus., Inc. v. Patent

13   Enforcement Team, L.L.C., 333 Fed. App'x 514, 517 (Fed. Cir. 2009) (citing Akzo N.V. v. U.S. Int'l

14   Trade Comm'n, 808 F.2d 1471, 1479 (Fed. Cir. 1986)). Anticipation is an affirmative defense, which

15   the defendant must demonstrate by clear and convincing evidence. i4i Ltd. Partnership v. Microsoft

16   Corp., — F.3d —, 2010 WL 801705, at **9-10 (Fed. Cir. 2010) (citations omitted). In an anticipation

17   analysis, what a prior art reference discloses is a factual determination that the Court will not overturn

18   unless it was not supported by substantial evidence. Dickson Indus., 333 Fed. App'x at 517-18.

19              *i.    ATC's argument that fringe-effect capacitance is always present*

20        First, ATC argues there is nothing new about "fringe-effect capacitance" because, according

21   to the laws of physics, it is always present in multilayer capacitors wherever two conductive contacts

22   are positioned in an edge-to-edge relationship. Thus, one can always use the universally known

---

[6] ATC challenges the jury verdict of no invalidity as to all of the asserted claims 1-5, 16, and 18-19. However, as already mentioned, only claim 1 is truly independent. All of the other seven claims are dependent at least on claim 1 (and in case of claims 4-5, also on claim 3). Accordingly, in the discussion that follows, the Court will focus mostly on whether ATC has shown that claim 1 is invalid. If legally sufficient evidence is present to find that claim 1 is not invalidated, that necessarily means there is sufficient evidence to find that none of the other claims are invalidated.

[7] The statute provides that "A person shall be entitled to a patent unless . . . the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. §102(b).

1   equation of C=kA/d to measure the capacitance, no matter how small.[8] ATC contends this was even

2   acknowledged by Dan Devoe and Dr. Ewell.[9]

3       Despite ATC's arguments to the contrary, there was substantial evidence before the jury to

4   conclude that "fringe-effect capacitance" is *not* always present–i.e., that it is not always *determinable*

5   or "*capable of being determined* in terms of a standard unit" as required by the Court's claim

6   construction. For example, Dr. Huebner testified that in order to demonstrate whether this claim

7   limitation is met, one could and should analyze the thickness of the external contacts, the separation

8   distance, and the dielectric. (Trial Tr. Day 4, at 77:14-85:7.) Likewise, Dr. Ewell testified that even

9   if fringe-effect capacitance is always present, such capacitance is not always determinable. (Trial Tr.

10   Day 7, at 108:18-109:9.)

11          *ii.   Figueroa patent*

12       ATC argues the capacitor described in Figure 12 of the Figueroa patent, U.S. patent number

13   6,483,692 ("Figueroa patent") anticipates the asserted claims. ATC points to the "striking

14   resemblance" of the Figure 12 of the Figueroa patent to Figure 15A of the '356 patent. According to

15   ATC, "[i]f fringe-effect capacitance is reportedly created in the 2 mil gap of the '356 patent **[132]**,

16   without the thickness of contacts or any of the other parameters being disclosed, then a comparable

17   disclosure of a gap of 2.56 mils or less in Figueroa must also result in fringe-effect capacitance." (Def.

18   Motion for JMOL or New Trial, at 24.)

19

20

21

22

23       [8] In the C=kA/d equation, "k" represents the dielectric constant of the insulating material between the plates, "A" represents the area of each of the opposed plates in square meters, "d" represents the distance between the plates, and "C" is the resulting capacitance in farads.

24

25       [9] ATC also argues another Presidio patent, the Trinh and Daniel Devoe patent, U.S. patent number 6,545,854 ("Trinh patent" or "the '854 patent") unequivocally states that "fringe-effect capacitance is always present . . . ." (See Def. Motion for JMOL or New Trial, Ex. ABP, col. 9:49-9:50.) However, ATC takes this phrase out of context. The '854 patent goes on to state that when the voltage is small, that fringe-effect capacitance is "negligible" in comparison to the overall capacitance, and accordingly is "disregarded." (Id. col. 9:52-9:56.) Thus, a reasonable jury could have concluded that, even if "always present," such fringe-effect capacitance is not always *determinable* as required by the Court's claim construction.

26

27

28



FIG. 12

FIG. 15A

There was legally sufficient evidence before the jury to conclude the Figueroa patent did not anticipate all of the elements of the asserted claims. As Presidio notes, the Figueroa patent never mentions "fringe-effect capacitance" or provides the necessary information needed to conclude whether any such capacitance in Figure 12 exists and/or is determinable. ATC's argument that fringe-effect capacitance must exist in the 2.56 mils or less gap in Figure 12, since it exists in the 2 mil gap in Figure 15A of the '356 patent, is unavailing. Viewing the evidence in favor of the verdict, the jury was free to accept Dr. Ewell's detailed explanation as to why there was insufficient data on whether there was determinable capacitance in Figure 12. (See Trial Tr. Day 7, at 108:7-116:21.)

The cases relied upon by ATC are inapposite. First, in the part of Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1569 (Fed. Cir. 1988), cited by ATC, the Federal Circuit only decided whether a prior reference was enabling. Answering this question in the affirmative, the court noted that the disclosure in the prior art was "at least at the same level of technical detail as the disclosure in the [patent-in-suit]." Id. Similarly, in the part of SRI Int'l, Inc. v. Internet Sec. Sys., Inc., 511 F.3d 1186, 1193-94 (Fed. Cir. 2008), cited by ATC, the court was only concerned with whether a particular reference qualified as a "prior art." In the present case, there has been no suggestion that the Figueroa patent is not enabling or that it does not qualify as prior art. Rather, the issue here is whether the Figueroa patent anticipates the asserted claims of the '356 patent because it teaches or describes "fringe-effect capacitance." See id. at 1192 ("'A patent claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference.'" (citation omitted)). As already noted, the Figueroa patent nowhere mentions the "fringe-effect capacitance," nor does it provide the necessary information needed to conclude whether any such capacitance in Figure 12 exists and/or is determinable.

1        Accordingly, there was legally sufficient evidence for the jury to conclude that the Figueroa

2    patent does not anticipate the asserted claims of the '356 patent because it does not by itself describe

3    each and every limitation of the asserted claim 1. See Dickson Indus., 333 Fed. App'x at 517.

4            *iii.*     *Heron patent*

5        ATC next argues the capacitor described in Figure 7 of the Heron patent, U.S. patent number

6    4,931,901 ("Heron patent") anticipates the asserted claims of the '356 patent, at least as illustrated in

7    Figure 10A of the '356 patent. Heron measured fringe-effect capacitance on actual capacitors and also

8    used the standard capacitance formula to estimate capacitance during the design. The fringe-effect

9    capacitance between *internal* electrodes 54a and 54b (and 50a and 50b) was expressly acknowledged

10    by the Heron patent. According to ATC, this anticipates claim 1 of the '356 patent because the internal

11    electrodes in Figure 7 are in turn connected to C-shaped plates that are "arranged on an external

12    surface portion" of the dielectric body as required by the Court's claim construction in this case.



23        Nonetheless, there was substantial evidence for the jury to find that the Heron patent does not

24    anticipate claim 1 of the '356 patent. First, the Heron patent itself describes only fringe-effect

25    capacitance between *internal* electrodes. There is nothing in Heron that would, by itself, teach fringe-

26    effect capacitance between the *external* points of the C-shaped plates. Moreover, Presidio presented

27    testimony of Dr. Ewell that the Heron patent did not teach fringe-effect capacitance between external

28    contacts. (See Trial Tr. Day 7, at 89:24-90:6, 128:19-128:24, 129:8-129:13, 130:9-130:23.) Although

1    this testimony was contradicted by Dr. Dougherty, the Court must disregard that testimony in

2    determining whether there is "substantial evidence" supporting the jury's verdict. See Pavao, 307 F.3d

3    at 918. Accordingly, in light of Dr. Ewell's testimony, the Court finds there was substantial evidence

4    for the jury to find that the Heron patent does not anticipate the asserted claims of the '356 patent

5    because it does not by itself describe each and every limitation of the asserted claim 1.

6                        *iv.*     *August 2000 capacitors*

7         ATC next argues the capacitors from Presidio's Lot No. 00126-18A that were sold to JDS

8    Uniphase ("JDSU") in August 2000 ("August 2000 capacitors") also anticipate all of the asserted

9    claims, except claims 2 and 4. Dr. Dougherty confirmed that fringe-effect capacitance existed in the

10   August 2000 capacitors by using three different methods (Walker formula, C=kA/d formula, and

11   capacitance meter). However, to test the capacitance, Dr. Dougherty admitted that he had to "polish

12   back and cut away" almost all of the capacitor, so as to leave only the area where the fringe-effect

13   capacitance was supposed to exist. (See Trial Tr. Day 5, at 159:3-159:22.) By doing so, Dr. Dougherty

14   in effect shaved off almost 90% of the August 2000 capacitor. (See Trial Tr. Day 6, at 42:3-45:11.)

15   In light of this, Presidio argues Dr. Dougherty did not really test the August 2000 capacitor itself, but

16   rather some other new part with different structure and electrical performance. (See Trial Tr. Day 7,

17   at 87:7-88:13.) Moreover, according to Presidio, only parallel capacitance–if any–would have

18   remained in the August 2000 capacitor after the shaving. (See Trial Tr. Day 7, at 88:14-88:23.)

19        Once again, it was up to the jury to decide how much weight to give to the respective

20   testimony by Dr. Dougherty and Dr. Ewell. By finding no anticipation by the August 2000 capacitors,

21   the jury must have believed Dr. Ewell that Dr. Dougherty's method of testing for capacitance in the

22   August 2000 capacitor was improper. Or they could have credited Dr. Ewell's testimony that only

23   parallel capacitance–if any–would have remained in the August 2000 capacitor after shaving. In any

24   event, Dr. Ewell's testimony provides legally sufficient evidence to support either of those

25   conclusions, and it is not the job of the Court to second-guess the jury on the issues of credibility of

26   the witnesses or the weighing of the evidence. See Hangarter, 373 F.3d at 1005. Accordingly, there

27   was legally sufficient evidence for the jury to find that the August 2000 capacitors do not anticipate

28   the asserted claims of the '356 patent. See Dickson Indus., 333 Fed. App'x at 517.

C.      Obviousness

ATC next argues the asserted claims of the '356 patent were obvious to a person of ordinary skill in the art in light of the prior art. Obviousness is a legal question, whereby the court must determine whether the subject matter of the claimed invention "would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a); see also KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 415-16 (2007); Lucent Tech., Inc. v. Gateway, Inc., 580 F.3d 1301, 1310 (Fed. Cir. 2009). "Underpinning that legal issue are factual questions relating to the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and any relevant secondary considerations [of non-obviousness], such as commercial success, long-felt need, and the failure of others." PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1359-60 (Fed. Cir. 2007) (citations omitted); accord Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966).

The burden at trial is on the patent challenger to show by clear and convincing evidence that "a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so." PharmaStem, 491 F.3d at 1360 (citations omitted). Thus, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." KSR, 550 U.S. at 418 (citing United States v. Adams, 383 U.S. 39 (1966)). Rather, the court must "look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having  ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." Id.

> i.      Was there a reason to combine the known elements in the fashion claimed by the '356 patent, and a reasonable expectation of success in doing so?

ATC argues there is no dispute that prior art teaches: (1) multilayer ceramic capacitors having the first five elements of claim 1; (2) the additional elements of dependent claims 5, 16, 18, and 19; (3) presence of fringe-effect capacitance wherever two conductive contacts are positioned in an edge-to-edge relationship; and (4) use of insulating layers as an optional feature partially or completely covering contacts (or parts thereof) to prevent electrical sparking. Thus, wouldn't it be obvious to

combine the first five elements of the asserted claim 1 with fringe-effect capacitance between edges, knowing that the capacitance gets larger as the gap gets closer? Also, wouldn't it be obvious that the fringe-effect capacitance, which is disclosed for *internal* contacts 50a and 50b of the Heron patent, would similarly apply to the *external* pair of C-shaped terminations based on the same edge-to-edge geometry? Wouldn't it be obvious to bring those contacts to the surface? Wouldn't it be obvious that if fringe-effect capacitance existed in a 1 mil gap as disclosed in the Gowen patent,[10] that it would also exist in the 2.56 mils or less gap shown in the Figueroa patent? Wouldn't a person of ordinary skill in the art apply an insulating layer if he wanted to prevent arcing across the surface? According to ATC, knowledge and common sense, as well as market pressure–rather than innovation–would have been the motivation for these combinations.

However, the issue before the Court is much narrower than ATC makes it appear. At trial, the jury was asked only: (1) whether all of the asserted claims of the '356 patent were obvious in light of the combination of the Heron patent with the Aoyagi patent,[11] and (2) whether claims 2 and 4 were obvious in light of the combination of the August 2000 capacitors with the Aoyagi patent. (See Verdict Form, at 3-4 [Doc. No. 298].) Seeing as the Aoyagi patent only teaches an insulating layer across the surface,[12] the combination of it with either the Heron patent or the August 2000 capacitors would not have rendered the '356 patent obvious because, as discussed above, there is sufficient evidence to support the jury finding that neither of those patents teaches a fringe-effect capacitance between the external contacts that is "capable of being determined in terms of a standard unit." Accordingly, if neither the Heron patent nor the August 2000 capacitors by itself teaches such fringe-effect capacitance, a combination with the Aoyagi patent would not have made that any more obvious.

In any event, even if ATC's request for a JMOL as to obviousness based on other combinations is procedurally proper, ATC has not carried its burden of demonstrating that a person of ordinary skill in the art would have had the reason to combine the known elements *and* would have had a reasonable expectation of success in doing so. See PharmaStem, 491 F.3d at 1360. Notably, ATC does not point

---

[10] U.S. patent number 3,304,475 ("Gowen patent").

[11] U.S. patent number 5,978,205 ("Aoyagi patent").

[12] See Trial Tr. Day 5, at 164:11-165:1, 176:9-178:24.

to any testimony at trial that would suggest any reason to extend the fringe-effect capacitance to the external contacts in Figure 7 of the Heron patent or any motivation to bring the internal contacts to the surface. As the Supreme Court has recently stated, the fact that both of those concepts were "obvious" independently does not make their ultimate combination obvious. See KSR, 550 U.S. at 418-19. Rather, it is

> important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.

Id. In the present case, ATC's rhetorical questions notwithstanding, there was no testimony presented at trial to show any reason for combining those elements.[13] Accordingly, ATC failed to carry its burden of demonstrating obviousness by clear and convincing evidence. See In re Dembiczak, 175 F.3d 994, 999 (Fed. Cir. 1999), abrogated on other grounds by In re Gartside, 203 F.3d 1305 (Fed. Cir. 2000) ("Our case law makes clear that the best defense against the subtle but powerful attraction of a hindsight-based obviousness analysis is rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references." (citations omitted)); In re Rouffet, 149 F.3d 1350, 1359 (Fed. Cir. 1998) (noting that the patent challenger must identify specifically and explain "the reasons one of ordinary skill in the art would have been motivated to select the references and to combine them to render the claimed invention obvious" (citation omitted)).

### ii. Obviousness due to contemporaneous conception by others.

In the alternative, ATC argues obviousness is demonstrated by the fact that similar edge-to-edge design was conceived by Charles Rosier, a JDSU engineer, no later than January 15, 2001, and ATC's engineer Richard Monsorno in August 2001. (See Def. Motion for JMOL, Exs. CL, AGN.) Presidio responds there is no evidence that Mr. Rosier conceived all of the limitations of all of the claims, and, in any event, the jury already rejected any such argument. Likewise, according to

---

[13] As already noted, the only testimony offered at trial by ATC on combining known elements was Dr. Dougherty's testimony on combining the Aoyagi patent with either the Heron patent or the August 2000 capacitors. (See Trial Tr. Day 5, at 164:11-165:1, 176:9-178:24.) However, neither of those combinations would overcome the Court's prior finding that legally sufficient evidence supports the jury's conclusion that *these* references do not anticipate the asserted claims because they do not teach fringe-effect capacitance between external contacts. (See supra Part I.B.iii-iv.)

1  Presidio, there is no evidence that anything conceived by Dr. Monsorno was "remarkably similar to

2  the capacitors in the '356 patent," and, in any event, those designs were presented to the USPTO

3  during the prosecution of the '356 patent, and the USPTO proceeded to issue the '356 patent.

4          The testimony pointed to by ATC is insufficient to establish by clear and convincing evidence

5  that the asserted claims of the '356 patent are rendered obvious by the Rosier and Monsorno drawings.

6  There was extensive testimony by Alan Devoe that raised doubts as to any "contemporaneous

7  conception" by Charles Rosier and whether he invented anything related to the '356 patent. (See, e.g.,

8  Trial Tr. Day 3, at 182:9-185:22; Trial Tr. Day 4, at 3:21-9:1, 15:18-20:19, 25:20-26:5; 32:20-33:3.)

9  As for the Monsorno drawing, ATC fails to point to any testimony at trial that discussed whether it

10  rendered obvious all of the asserted claims. Rather, the only testimony concerned the drawing's

11  alleged "single-piece" construction. (See Trial Tr. Day 5, at 49:19-50:12.) Finally, the only testimony

12  about "fringe-effect capacitance" concerned the Monsorno patent from 1996[14] and *not* the Monsorno

13  drawing from August 22, 2001, depicted in ATC's Exhibit CL. (See Trial Tr. Day 5, at 47:3-48:22.)

14  There is no dispute that the Monsorno *patent* was disclosed to the USPTO during the prosecution of

15  the '356 patent. (See '356 patent, at 1 (listing the Monsorno '926 patent among the "References

16  Cited").) Accordingly, the Rosier and Monsorno drawings are insufficient to establish obviousness.[15]

17          D.      Reexamination proceedings

18          The conclusion that ATC has failed to prove anticipation and obviousness by clear and

19  convincing evidence is not affected by the USPTO's recent reexamination proceedings. As previously

20  noted, on July 23, 2009, ATC submitted a replacement Request for Reexamination of the '356 patent.

21  On October 20, 2009, the USPTO granted the request, noting there were substantial new questions of

22  patentability with respect to the asserted claims in light of nine prior art references identified by ATC.

23  Then, on March 23, 2009, the USPTO issued a First Office Action on the merits, rejecting all of the

24  asserted claims on the grounds of anticipation and obviousness. However, just like its name implies,

25  the First Office Action is only a *preliminary* determination by the USPTO–it is not a "final" action,

26

27  [14] U.S. patent number 5,576,926 ("Monsorno patent").

28  [15] ATC's claim of "contemporaneous conception" is further undermined by the jury's express finding that ATC failed to meet its burden of showing that the '356 patent does not "name all actual inventors and only the actual inventors." (See Verdict Form, at 4 [Doc. No. 298].)

- 18 -

1   and the examiner could still change his decision or completely reverse it before issuing the final

2   action. See 37 C.F.R. §§ 1.112, 1.550; accord Heinl v. Godici, 143 F. Supp. 2d 593, 598-99 (E.D. Va.

3   2001). Accordingly, any such determination is *not* persuasive evidence of anticipation or obviousness.

4   See Medtronic, Inc. v. Catalyst Research Corp., 547 F. Supp. 401, 410 (D. Minn 1982); accord

5   Cimcore Corp. v. Faro Techs., Inc., Civil No. 03 CV 2355-B (WMc), 2007 WL 935665, at *2 (S.D.

6   Cal. Mar. 12, 2007) ("The office action is a first office action, not a final rejection by the USPTO.

7   Even if it were a final rejection, until the patentee addresses the rejections with argument or claim

8   amendments and the reexamined patent issues, the prosecution history is incomplete and estoppel has

9   yet to be determined.").

10          E.      Enablement

11          ATC next argues the asserted claims are invalid due to lack of enablement. The enablement

12   requirement is set forth in Section 112, which provides that the patent's specification shall describe

13   "the manner and process of making and using [the invention], in such full, clear, concise, and exact

14   terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly

15   connected, to make and use [the invention]." 35 U.S.C. § 112. "The enablement requirement is

16   satisfied when one skilled in the art, after reading the specification, could practice the claimed

17   invention without undue experimentation." AK Steel Corp. v. Sollar & Ugine, 344 F.3d 1234, 1244

18   (Fed. Cir. 2003) (citation omitted). Factors to be considered in determining whether undue

19   experimentation would be required include: "(1) the quantity of experimentation necessary, (2) the

20   amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the

21   nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the

22   predictability or unpredictability of the art, and (8) the breadth of the claims." In re Wands, 858 F.2d

23   731, 737 (Fed. Cir. 1988) (citations omitted).

24                  i.      "Substantially monolithic"

25          First, ATC argues there is no definition of the phrase "substantially monolithic" provided in

26   the specifications of the '356 patent, the term was never heard of or applied before by any of the

27   technical experts in this case, and even if a dielectric body can be "monolithic," there can be no

28   degrees of "monolithicness." ATC argues it would take great time, cost, and effort to determine what

1   the '356 patent means by "substantially monolithic," especially in light of the medium level of skill,

2   and the fact that the '356 patent does not disclose a working example or that Presidio never produced

3   a single capacitor practicing the asserted claims. Thus, according to ATC, undue experimentation

4   would be required, making the asserted claims invalid. See <u>AK Steel</u>, 344 F.3d at 1243-45.

5        ATC, however, cannot show by clear and convincing evidence that the phrase "substantially

6   monolithic" is not sufficiently enabled, let alone that the jury verdict is "'against the great weight of

7   the evidence.'" See <u>Hangarter</u>, 373 F.3d at 1005 (citation omitted). As previously noted, at the JMOL

8   stage, the Court has to disregard evidence favorable to the moving party and must determine if the jury

9   verdict is supported by legally sufficient evidence. See <u>Payao</u>, 307 F.3d at 918. In the present case,

10   Dr. Ewell testified that the phrase "substantially monolithic" is both "definite" and "clear and

11   understandable" to one of ordinary skill in the art. (<u>See</u> Trial Tr. Day 7, at 73:21-74:9.) According to

12   Dr. Ewell, one of ordinary skill in the art could use an objective test to determine whether a multilayer

13   capacitor is substantially monolithic by measuring its reliability when subjected to thermal cycling

14   or to vibration and shocks. (<u>Id.</u> at 74:10-75:2.) Similarly, the phrase was clear and understandable to

15   Dr. Huebner, who would have relied on measuring the multilayer capacitor's durability and its ability

16   to perform as a capacitor. (<u>See</u> Trial Tr. Day 4, at 129:2-130:22.)

17        ATC's objection on the ground that the '356 patent does not mention anything about reliability

18   or durability misses the mark. Section 112 does not require the patent to define each and every word

19   used–for if it did, then every patent would have to be "written as a comprehensive tutorial and treatise

20   for the generalist, instead of a concise statement for persons in the field." <u>See</u> <u>Verve, LLC v. Crane</u>

21   <u>Cams, Inc.</u>, 311 F.3d 1116, 1119 (Fed. Cir. 2002). Rather, a patent is sufficiently enabled if a person

22   of ordinary skill in the art could make and use the invention without undue experimentation. <u>See</u> 35

23   U.S.C. § 112; <u>AK Steel</u>, 344 F.3d at 1244. In the present case, the jury was entitled to believe Drs.

24   Ewell and Huebner in that little, if any, experimentation would be necessary to determine what the

25   '356 patent meant by "substantially monolithic." (<u>See, e.g.</u>, Trial Tr. Day 4, at 129:2-130:22; Trial Tr.

26   Day 7, at 74:10-75:2.) The '356 patent also has a very detailed background section listing specific

27   examples of known capacitors and explaining the industry's knowledge of their design and

28   application, including detailed technical information, which would help one of ordinary skill in

1   determining what the phrase "substantially monolithic" meant. Moreover, once the Court construed

2   the phrase "substantially monolithic," all of the experts in this case were able to apply the definition

3   to the capacitors and prior art at issue. Cf. Aero Products Int'l, Inc. v. Intex Recreation Corp., 466 F.3d

4   1000, 1016 (Fed. Cir. 2006) ("If a claim is amenable to construction, 'even though the task may be

5   formidable and the conclusion may be one over which reasonable persons will disagree,' the claim is

6   not indefinite." (citation omitted)). Indeed, having reviewed all of the In re Wands factors, only one

7   of them–absence of working examples–potentially weighs in ATC's favor. See 858 F.2d at 737. In

8   light of the above, this is insufficient by itself to find lack of enablement.

9       Finally, the use of the word "substantially" does not make the phrase "substantially

10   monolithic" less enabling. As Presidio notes, the use of the claim term "substantially" has repeatedly

11   been held to be proper, and definite. See, e.g., Kinzenbaw v. Case LLC, 179 Fed. App'x 20, 29-31

12   (Fed. Cir. 2006) ("substantially uniformly distributed" and "substantially on the center line"); Verve,

13   311 F.3d at 119-20 ("substantially constant wall thickness"); Ecolab, Inc. v. Envirochem, Inc., 264

14   F.3d 1358, 1366-67 (Fed. Cir. 2001) ("substantially uniform"); Andrew Corp. v. Gabriel Elec., Inc.,

15   847 F.2d 819, 821-22 (Fed. Cir. 1988) ("substantially equal"). As the Federal Circuit has noted, the

16   term "substantially" is a descriptive term used in patent claims to "avoid a strict numerical boundary

17   to the specified parameter." Ecolab, 264 F.3d at 1367 (term "substantially" used to avoid "the strict

18   100% nonuniformity boundary"); accord Verve, 311 F.3d at 1120 ("Expressions such as

19   'substantially' are used in patent documents when warranted by the nature of the invention, in order

20   to accommodate the minor variations that may be appropriate to secure the invention."). Such usage

21   may indeed be necessary "to provide the inventor with the benefit of his invention" as well as "to

22   distinguish the claimed subject matter from the prior art." See Verve, 311 F.3d at 1120. In the present

23   case, the term "substantially" avoids the strict 100% "monolithicness" of the dielectric, which Dr.

24   Ewell testified is not possible to achieve. (See Trial Tr. Day 4, at 130:4-131:4.)

25       ii.      "Sufficiently close . . . to form a first fringe-effect capacitance"

26       Second, ATC argues the '356 patent lacks enabling information with respect to the phrase:

27   "sufficiently close . . . to form a first fringe-effect capacitance" because the patent does not disclose

28   the thickness of the contacts, the voltage rating, the dielectric, or the dielectric constant. According

1    to ATC, due to lack of this information, a person of ordinary skill in the art would not be able to tell

2    whether any given capacitor fell within the scope of the asserted claims. Moreover, ATC argues that

3    Presidio's failure to build a single capacitor practicing the asserted claims, as well as the four years

4    it took ATC to develop its allegedly infringing 545L capacitor, demonstrate that this element cannot

5    be practiced without undue experimentation.

6         Although ATC raises some good arguments, they are nonetheless insufficient to demonstrate

7    that the jury's verdict was "'against the great weight of the evidence.'" See Hangarter, 373 F.3d at

8    1005 (citation omitted). Both Dr. Ewell and Dr. Huebner testified that the disputed term was clear and

9    ascertainable. For example, Dr. Huebner testified that to determine whether the contacts were

10   "sufficiently close" to form a fringe-effect capacitance, a person of ordinary skill in the art would

11   analyze the thickness of the external contacts, the separation distance, the dielectric itself, and the

12   dielectric constant. (See Trial Tr. Day 4, at 81:8-81:22.) Similarly, Dr. Ewell testified that one could

13   readily determine by actual physical testing whether this claim limitation was satisfied. (See, e.g.,

14   Trial Tr. Day 7, at 111:23-112:3, 114:12-114:17, 115:15-116:21, 119:23-120:12.) Moreover, as

15   already noted, the '356 patent sets forth a very detailed background section listing specific examples

16   of known capacitors and explaining the industry's knowledge of their design and application,

17   including detailed technical information, which would help one of ordinary skill in determining what

18   the disputed phrase meant. Finally, the fact that the Court was able to construe the term to mean

19   "positioned in an edge-to-edge relationship in such proximity as to form a capacity that is capable of

20   being determined in terms of a standard unit" weighs against any indefiniteness. Cf. Aero Products,

21   466 F.3d at 1016. Thus, similar to the phrase "substantially monolithic," there is really only one In re

22   Wands factor–absence of working examples–weighing in ATC's favor. See 858 F.2d at 737. However,

23   just like with that phrase, this is insufficient by itself to find lack of enablement.

24        ATC's insistence that Presidio cannot "have its cake and eat it too" by requiring specific

25   details from the prior art references and then ignoring those details when it comes to the '356 patent

26   is misplaced. As Dr. Ewell explained on cross-examination, the details were not necessary for the '356

27   patent because it expressly claimed that a fringe-effect capacitance was there. (See Trial Tr. Day 7,

28   at 114:3-115:14.) On the other hand, the details were necessary to confirm whether that fringe-effect

1  capacitance was also formed in the allegedly anticipating prior art because those references did *not*

2  expressly claim fringe-effect capacitance between external contacts. (See id.) Accordingly, the jury

3  was entitled to credit this testimony, and ATC has failed to demonstrate that the jury's decision was

4  "'against the great weight of the evidence.'" See Hangarter, 373 F.3d at 1005 (citation omitted).

5         Finally, as was discussed with regard to the term "substantially," the use of the term

6  "sufficiently close" does not make the whole claim term less enabling. Just like the terms "about" or

7  "substantially," the term "sufficiently close" appears to be a descriptive term that can be used in patent

8  claims to "avoid a strict numerical boundary to the specified parameter." See Ecolab, 264 F.3d at

9  1367; accord Verve, 311 F.3d at 1120. Indeed, the use of the term may be necessary "to provide the

10  inventor with the benefit of his invention" as well as "to distinguish the claimed subject matter from

11  the prior art." See Verve, 311 F.3d at 1120. In the present case, there was substantial evidence

12  presented to find that the novelty of the '356 patent was precisely the fact that once the external

13  contacts are arranged "sufficiently close," a fringe-effect capacitance is formed. How "sufficiently

14  close" they should be arranged would necessarily depend on the thickness of those external contacts

15  and the type of dielectric used. (See Trial Tr. Day 4, at 81:8-81:22.) To specify any particular distance

16  between the contacts would have been mere "guesswork" and would have unnecessarily limited the

17  scope of the claimed invention. See Verve, 311 F.3d at 1120.

18              *iii.*    *Conclusion*

19         Accordingly, ATC has not shown by clear and convincing evidence that the use of the phrases

20  "substantially monolithic" and "sufficiently close . . . to form a first fringe-effect capacitance" made

21  the '356 patent invalid due to lack of enablement. ATC has not shown that the jury's verdict in this

22  regard was against the great weight of the evidence.

23         F.    Written description

24         Section 112 also requires that the patent's specification contain a "written description of the

25  invention." 35 U.S.C. § 112. This requirement is independent of the enablement requirement, and is

26  necessary "'so that one skilled in the art can recognize what is claimed.'" Univ. of Rochester v. G.D.

27  Searle & Co., Inc., 358 F.3d 916, 920-23 (Fed. Cir. 2004) (citations omitted). While excessive

28  description is not required, "generalized language may not suffice if it does not convey the detailed

1  identity of an invention." <u>Id.</u> at 923. The purpose of the written description is to ensure that "the

2  patentee had possession of the claimed invention at the time of the application, i.e. that the patentee

3  invented what is claimed." <u>LizardTech, Inc. v. Earth Res. Mapping, Inc.</u>, 424 F.3d 1336, 1344-45

4  (Fed. Cir. 2005) (citations omitted); <u>accord</u> <u>Ariad</u>, 2010 WL 1007369, at *12 ("In other words, the test

5  for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those

6  skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."

7  (citations omitted)).

8         As the Federal Circuit sitting *en banc* recently stated, "the hallmark of written description is

9  disclosure." <u>Ariad</u>, 2010 WL 1007369, at *12. The test requires the court to look to the four corners

10  of the specification from the perspective of a person of ordinary skill in the art and inquire whether

11  the specification describes an invention understandable to that skilled artisan and shows that the

12  inventor actually invented the invention claimed. <u>Id.</u> This inquiry is a question of fact and will

13  necessarily vary depending on the context. <u>Id.</u> However, there are "a few broad principles that hold

14  true across all cases." <u>Id.</u> at *13. Thus, "the written description requirement does not demand either

15  examples or an actual reduction to practice; a constructive reduction to practice that in a definite way

16  identifies the claimed invention can satisfy the written description requirement." <u>Id.</u> (citation omitted).

17  Conversely, "a description that merely renders the invention obvious does not satisfy the requirement."

18  <u>Id.</u> (citation omitted). Finally, the Federal Circuit cautioned that "although written description and

19  enablement often rise and fall together, requiring a written description of the invention plays a vital

20  role in curtailing claims that do not require undue experimentation to make and use, and thus satisfy

21  enablement, but that have not been invented, and thus cannot be described." <u>Id.</u> at *14.

22         In the present case, there is substantial evidence to support the jury's verdict finding no lack

23  of written description. As already noted, the '356 patent has a very detailed background section listing

24  specific examples of known capacitors and explaining the industry's knowledge of their design and

25  application, including detailed technical information. The '356 patent also provides a very detailed

26  description of the invention, accompanied by twenty-three separate figures, that describes how the

27  conductive contacts can be extended to the exterior, how that would affect the overall insertion loss

28  and frequency performance of the capacitor, and what effect it would have on the overall capacitance.

1    (See '356 patent, col. 6:19-12:57.) The claims that follow focus on these innovations by claiming the

2    method of extending conductive contacts to the exterior and positioning them in such proximity to

3    each other so as to form fringe-effect capacitance. (See '356 patent, col. 12:58-16:32.) Thus, unlike

4    Ariad, upon which ATC relies, the scope of the claims in the '356 patent does not "overreach the

5    scope of the inventor's contribution to the field of art as described in the patent specification." See

6    2010 WL 1007369, at **15, 19 (finding lack of written description where the patent-in-suit used broad

7    language to claim "methods comprising the single step of reducing NF-kB activity," while the

8    specification "at best describe[d] decoy molecule structures and hypothesize[d] with no accompanying

9    description that they could be used to reduce NF-kB activity").

10         Finally, ATC's focus on "functional language" in the context of the written description

11   requirement is misplaced.[16] ATC asserts the Federal Circuit in Ariad held that "a vague functional

12   description and an invitation for further research does not constitute written disclosure." See id. at *17.

13   However, the Ariad court in other places indicated that functional language and prophetic examples

14   can in certain circumstances satisfy the written description requirement.[17] See, e.g., id. at *11 ("We

15   have also held that functional claim language can meet the written description requirement when the

16   art has established a correlation between structure and function." (citation omitted)); id. at *18

17   ("Prophetic examples are routinely used in the chemical arts, and they certainly can be sufficient to

18   satisfy the written description requirement."). Moreover, the statement quoted by ATC was made in

19   a context where the only evidence supporting written description was the ex post facto testimony of

20   an expert that a specific inhibitor existed during the relevant time period and "that one of ordinary skill

21   could through experimentation" isolate the necessary inhibitor. See id. at *17 (emphasis added). In

22   contrast, the detailed description section in the present case and the accompanying figures provide

23   sufficient "correlation" between the structure and function to satisfy the written description

24   ─────────────────

25        [16] The use of "functional language" is addressed in more detail below in the context of ATC's argument that the '356 patent is invalid due to indefiniteness. (See infra Part I.G.ii.)

26        [17] In addition, to the extent ATC argues the written description requirement is not met because
27   Presidio never reduced the '356 patent to practice, the Federal Circuit unequivocally rejected that
     argument. See Ariad, 2010 WL 1007369, at *13 ("We have made clear that the written description
     requirement does not demand either examples or an actual reduction to practice; a constructive
28   reduction to practice that in a definite way identifies the claimed invention can satisfy the written
     description requirement." (citation omitted)).

requirement. See id. at *11. Accordingly, ATC failed to show by clear and convincing evidence that the jury's verdict finding no lack of written description was "'against the great weight of the evidence.'"[18] See Hangarter, 373 F.3d at 1005 (citation omitted).

G.    Indefiniteness

The Court previously denied ATC's motion for summary judgment of indefiniteness. [See Doc. No. 32]. ATC now renews its argument, stating that the Court should find the asserted claims indefinite as a matter of law. Whether the claims are indefinite is a legal issue for the court, and not the jury. Biomedino, LLC v. Waters Tech. Corp., 490 F.3d 946, 949 (Fed. Cir. 2007). The definiteness requirement is contained in paragraph 2 of Section 112, which requires that a patent specification conclude with one or more claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. A patent claim is sufficiently definite "[i]f one skilled in the art would understand the bounds of the claim when read in light of the specification." Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (citation omitted). A claim need not be plain on its face to avoid condemnation for indefiniteness; rather, all that is required is that the claim be "amenable to construction." Id. As the Federal Circuit has reiterated:

> If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite. If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.

Id. (citations omitted). "By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity, and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." Id. (internal citation omitted).

///

---

[18] The Court also rejects ATC's argument that it is entitled to a new trial because the Jury Instructions only asked the jury to consider whether the inventors were in "possession of the invention" without specifying that what is required for compliance with the written description is "possession as shown in the disclosure." See Ariad, 2010 WL 1007369, at *12. As Presidio points out, the Jury Instructions made it clear that the possession of the invention is to be judged by the disclosures in the patent application when filed. (See Jury Instructions, at 47-48 [Doc. No. 297].)

1                   *i.        ATC's motion is procedurally proper.*

2       As an initial matter, the Court rejects Presidio's argument that ATC's motion is procedurally

3 improper. Presidio argues the current motion is untimely and improper because: (1) the Court

4 previously deferred judgment on the issue of indefiniteness when it adopted ATC's construction of

5 the disputed claim terms; (2) the Court subsequently denied ATC's motion for summary judgment on

6 the issue of indefiniteness; and (3) after the close of all the evidence, the Court denied ATC's Rule

7 50(a) motion on the issue of indefiniteness. However, Rule 50(b) provides that where the court does

8 not grant a motion under Rule 50(a), which was the case here, "the court is considered to have

9 submitted the action to the jury *subject to the court's later deciding the legal questions raised by the*

10 *motion*." Fᴇᴅ. R. Cɪᴠ. P. 50(b) (emphasis added). Accordingly, ATC's current motion on the issue of

11 indefiniteness–which is a question of law–is properly before the Court.

12                 *ii.     ATC has not met its burden of showing by clear and convincing evidence that*
                            *the challenged claim terms are indefinite as a matter of law.*

13

14       ATC argues the claim terms "substantially monolithic" and "sufficiently close . . . to form a

15 first fringe-effect capacitance" are indefinite. First, ATC argues the '356 patent does not disclose a

16 workable, objective test for measuring either of those terms. Second, ATC argues the tests proposed

17 by Presidio would cause the same capacitor to be "sometimes infringing and sometimes not"

18 depending on how the capacitor is used and tested. Third, ATC argues the patent fails to differentiate

19 itself from the prior art identified in Figure 2A. Fourth, ATC argues the claim "sufficiently close . .

20 . to form a first fringe-effect capacitance" is indefinite because the patent in effect uses "functional

21 language" to define the alleged point of novelty.

22                   a.      "Substantially monolithic"

23       To the extent ATC's first ground of indefiniteness raises the same arguments as with respect

24 to enablement and written description, those arguments are rejected for the same reasons as set forth

25 above. Specifically, as already noted, the use of the claim term "substantially" has repeatedly been

26 held to be proper and definite. See, e.g., Kinzenbaw, 179 Fed. Appx. at 29-31 ("substantially

27 uniformly distributed" and "substantially on the center line"); Verve, 311 F.3d at 119-20

28 ("substantially constant wall thickness"); Ecolab, 264 F.3d at 1366-67 ("substantially uniform");

Andrew Corp., 847 F.2d at 821-22 ("substantially equal"). As the Federal Circuit has noted, the term

1   "substantially" is a descriptive term used in patent claims to "avoid a strict numerical boundary to the

2   specified parameter." Ecolab, 264 F.3d at 1367 (term "substantially" used to avoid "the strict 100%

3   nonuniformity boundary"); accord Verve, 311 F.3d at 1120 ("Expressions such as 'substantially' are

4   used in patent documents when warranted by the nature of the invention, in order to accommodate the

5   minor variations that may be appropriate to secure the invention."). In the present case, the term

6   "substantially" avoids the strict 100% "monolithicness" of the dielectric, which Dr. Ewell testified is

7   not possible in any case.[19] (See Trial Tr. Day 4, at 130:4-131:4.)

8        ATC next argues Dr. Ewell's "fracture test" does not cure the indefiniteness of the claim term,

9   but rather confuses it even further. "The scope of claim language cannot depend solely on the

10  unrestrained, subjective opinion of a particular individual purportedly practicing the invention."

11  Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1350 (Fed. Cir. 2005) (citation omitted).

12  Rather, "[s]ome objective standard must be provided in order to allow the public to determine the

13  scope of the claimed invention." Id. According to ATC, these criteria are not satisfied with respect to

14  the term "substantially monolithic" because it is not based on an objective standard, but rather depends

15  on a questionable "fracture test" pursuant to which a capacitor may infringe when used in one activity,

16  but not infringe when used in another. See Paragon Solutions, LLC v. Timex Corp., 566 F.3d 1075,

17  1090-91 (Fed. Cir. 2009); Halliburton Energy Services, Inc. v. M-I LLC, 514 F.3d 1244, 1254-55

18  (Fed. Cir. 2008) ("When a proposed construction requires that an artisan make a separate infringement

19  determination for every set of circumstances in which the composition may be used, and when such

20  determinations are likely to result in differing outcomes (sometimes infringing and sometimes not),

21  that construction is likely to be indefinite.").

22        However, contrary to ATC's arguments, a claim term is not indefinite just because it was

23

24        [19] ATC's argument that none of the experts in this case have heard of the term "substantially monolithic" prior to this case misses the point. Whether or not the phrase existed is not the issue;
25  rather, the question is whether "one skilled in the art would understand the bounds of the claim when read in light of the specification." See Exxon, 265 F.3d at 1375 (citation omitted). In the present case,
26  both Dr. Ewell and Dr. Huebner testified that the term was clear and understandable to persons of ordinary skill in the art. Moreover, a claim term is not indefinite as long as the meaning of the claim
27  is discernible through construction, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree." Id. (citations omitted). In the present case, the
28  Court was able to construe the term "substantially monolithic" by adopting the definition proposed by ATC. In light of this, whether or not the term was "new" or "unheard of" is legally irrelevant.

1    "intended to cover the use of the invention with various types of [end products]." See Orthokinetics,

2    Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1575-76 (Fed. Cir. 1986) ("That a particular chair

3    on which the claims read may fit within some automobiles and not others is of no moment. The phrase

4    'so dimensioned' is as accurate as the subject matter permits, automobiles being of various sizes."

5    (citation omitted)). In the present case, one skilled in the art can easily use Dr. Ewell's objective

6    "fracture test" to determine whether any resulting capacitor is "substantially monolithic."[20] See id.

7    More importantly, unlike the cases relied upon by ATC, this does not mean that the *same* capacitor

8    will be infringing in one case and not infringing in another; rather, once built, a particular capacitor

9    designed for a particular use will be either "substantially monolithic" or not. (See Trial Tr. Day 4, at

10   129:2-130:22; Trial Tr. Day 7, at 74:10-75:2.) Indeed, in light of Dr. Ewell's testimony that 100%

11   "monolithicness" is not possible in any case, the phrase "substantially monolithic" might very well

12   be "as accurate as the subject matter permits." See Orthokinetics, 806 F.2d at 1576 .

13                          b.      "Sufficiently close . . . to form a first fringe-effect capacitance"

14             Similarly, to the extent ATC's first ground of indefiniteness raises the same arguments as with

15   respect to enablement and written description, those arguments are rejected for the same reasons as

16   set forth above. Specifically, the use of the term "sufficiently close" does not make the whole claim

17   term less definite. Just like the terms "about" or "substantially," the term "sufficiently close" appears

18   to be a descriptive term used in patent claims to "avoid a strict numerical boundary to the specified

19   parameter." See Ecolab, 264 F.3d at 1367; accord Verve, 311 F.3d at 1120. Moreover, there was

20   sufficient evidence presented at trial to find that the novelty of the '356 patent was precisely the fact

21   that once the external contacts are arranged "sufficiently close," a fringe-effect capacitance is formed.

22   How "sufficiently close" they should be arranged would necessarily depend on the thickness of those

23   contacts and the type of dielectric used. (See Trial Tr. Day 4, at 81:8-81:22.) To specify any particular

24   distance between the contacts would have unnecessarily limited the scope of the claimed invention,

25   _____

26        [20] In this context, the Court rejects ATC's argument that the Court cannot rely on Dr. Ewell's
     testimony at trial because it constitutes extrinsic evidence that contradicts the intrinsic record. See
27   Phillips v. AWH Corp., 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("[A] court should discount any expert
     testimony 'that is *clearly at odds* with the claim construction mandated by the claim themselves, the
     written description, and the prosecution history . . . .'" (citation omitted) (emphasis added)). In light
28   of the fact that the '356 patent does not anywhere define "substantially monolithic," Dr. Ewell's
     testimony regarding his "fracture test" cannot be "clearly at odds" with the intrinsic record. See id.

1   thereby depriving the inventors of the "benefit of [their] invention." See Verve, 311 F.3d at 1120.

2        ATC next argues Dr. Ewell's proposed "test" for whether a fringe-effect capacitance is

3   "determinable" compounds rather than clarifies the ambiguity. As previously noted,  "[t]he scope of

4   claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual

5   purportedly practicing the invention." Datamize, 417 F.3d at 1350 (citation omitted). Rather, "[s]ome

6   objective standard must be provided in order to allow the public to determine the scope of the claimed

7   invention." Id. In the present case, that requirement is satisfied because Dr. Ewell testified that one

8   of ordinary skill in the art can use a capacitance meter–an objective test–to measure whether

9   "determinable" fringe-effect capacitance is present between a particular set of external contacts.[21]

10  (See, e.g., Trial Tr. Day 7, at 111:23-112:3, 114:12-114:17, 115:15-116:21, 119:23-120:12.) Likewise,

11  Dr. Huebner testified that to determine whether the contacts were "sufficiently close" to form a

12  determinable fringe-effect capacitance, a person of ordinary skill in the art could analyze the thickness

13  of the external contacts, the separation distance, the dielectric itself, and the dielectric constant–all of

14  which are objective details. (See Trial Tr. Day 4, at 81:8-81:22.) ATC's own expert, Dr. Dougherty,

15  confirmed the propriety of both of these methods. (See, e.g., Trial Tr. Day 5, at 144:17-146:17.)

16       ATC has also failed to show by clear and convincing evidence that the '356 patent fails to

17  differentiate itself from the prior art identified in Figure 2A. "[W]hether the patent expressly or at least

18  clearly differentiates itself from specific prior art . . . is an important consideration in the definiteness

19  inquiry because in attempting to define a claim term, a person of ordinary skill is likely to conclude

20  that the definition does not encompass that which is expressly distinguished as prior art." Halliburton,

21  514 F.3d at 1252. In the present case, the '356 patent adequately differentiates what is claimed from

22  the prior art depicted in Figure 2A. For example, in describing Figure 10A, which depicts an

23  embodiment of the claimed capacitor, the '356 patent notes that as compared to the capacitor in Figure

24  2A, "the external conductive plates **72** and **74** in the lower section **62** of the device have been extended

25  toward each other so as to create a capacitance between plates **72** and **74** based upon fringe electric

---

[21] ATC argues Dr. Ewell's test is indefinite because the same fringe-effect capacitance would
27  be sometimes infringing and sometimes not depending on the "sensitivity" of the capacitance
meter used to measure it. See Halliburton, 5143 F.3d at 1254-55. However, the mere fact that one
28  capacitance meter might be more or less sensitive than the other does not make this a situation where
the *same capacitor* will be infringing in one case and not infringing in another.

field extending to and from the adjacent edges of those plates." ('356 patent, col. 7:22-7:26.) In contrast, there is no discussion of any fringe-effect capacitance, much less capacitance that is "determinable," with respect to prior art depicted in Figure 2A. (See id., col. 2:17-2:44.) Likewise, with respect to Figure 2A, there is no discussion of any "external contacts" that are "sufficiently close" to each other. (See id.) Accordingly, the '356 patent sufficiently differentiates the prior art depicted in Figure 2A from what is claimed in the asserted claim 1.



PRIOR ART
FIG. 2A

FIG. 10A

Finally, ATC's "functional language" argument fares no better. Particular scrutiny is required where a claim is defined "'by what it does rather than what it is.'" Halliburton, 514 F.3d at 1255. The vice of such "functional claiming" occurs "'when the inventor is painstaking when he recites what has already been seen, and then uses conveniently functional language at the exact point of novelty.'" Id. (quoting Gen. Elec. Co. v. Wabash Appliance Corp., 304 U.S. 364, 371 (1938)). The Federal Circuit, however, has held that claim language is not necessarily indefinite for using functional language. See, e.g., Microprocessor Enhancement Corp. v. Texas Instruments Inc., 520 F.3d 1367, 1375 (Fed. Cir. 2008). There is nothing intrinsically wrong with using functional language in claims, unless it fails to "provide a clear-cut indication of the scope of the subject matter embraced by the claim." Id. (internal quotation marks and citation omitted). In the present case, the '356 patent differentiates its invention from the prior art by requiring that there be external contacts that are located in such proximity to each other as to form a fringe-effect capacitance. In light of Dr. Ewell's testimony, this provides sufficient description of the scope of the asserted claims. See Halliburton, 514 F.3d at 1256.

1

         *iii.*    *Conclusion*

2         Accordingly, ATC has failed to show by clear and convincing evidence that the phrases

3  "substantially monolithic" and "sufficiently close . . . to form a first fringe-effect capacitance" are

4  indefinite as a matter of law.

5       H.     Inequitable conduct

6         Finally, ATC argues the '356 patent is unenforceable due to inequitable conduct. "'A patent

7  may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or

8  deceive the examiner, fails to disclose material information or submits materially false information

9  to the PTO during prosecution.'" McKesson Info. Solutions, Inc. v. Bridge Med., Inc., 487 F.3d 897,

10  913 (Fed. Cir. 2007) (citation omitted); see also 37 C.F.R. § 1.56(a) ("Each individual associated with

11  the filing and prosecution of a patent application has a duty of candor and good faith in dealing with

12  the Office, which includes a duty to disclose to the Office all information known to that individual to

13  be material to patentability as defined in this section.").

14         The "materiality" of information withheld during prosecution is judged by the "reasonable

15  examiner" standard, which embraces "'any information that a reasonable examiner would substantially

16  likely consider important in deciding whether to allow an application to issue as a patent.'" McKesson,

17  487 F.3d at 913 (citations omitted). Information concealed from the PTO may be material "even

18  though it would not invalidate the patent." Id. (citation omitted). It is well-established, however, that

19  information or a reference is not material if it is merely cumulative to other information or references

20  considered by the examiner. See id.

21         As for the "intent" element of the offense, it is "'in the main proven by inferences drawn from

22  facts, with the collection of inferences permitting a confident judgment that deceit has occurred.'" Id.

23  (citation omitted). "'However, inequitable conduct requires not intent to withhold, but rather intent

24  to deceive. Intent to deceive cannot be inferred simply from the decision to withhold information

25  where the reasons given for the withholding are plausible.'" Id. (citation omitted). "In addition, 'a

26  finding that particular conduct amounts to "gross negligence" does not of itself justify an inference

27  of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence

28  indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.'"

1   Id. (citing Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed. Cir.1988) (en

2 banc in relevant part)). "Whenever evidence proffered to show either materiality or intent is

3 susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference

4 in favor of another equally reasonable inference." Scanner Tech. Corp. v. ICOS Vision Sys. Corp., 528

5 F.3d 1365, 1376 (Fed. Cir. 2008).

6      Determination of inequitable conduct is a two-step process. The party asserting inequitable

7 conduct must first prove a threshold level of "materiality" and "intent" by clear and convincing

8 evidence. McKesson, 487 F.3d at 913. The court must then balance the levels of "materiality" and

9 "intent"–with the greater showing of one factor allowing a lesser showing of the other–to determine

10 whether the applicant's conduct before the PTO was "egregious enough to warrant holding the entire

11 patent unenforceable." Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1365 (Fed.

12 Cir. 2008); McKesson, 487 F.3d at 913. "Thus, even if a threshold level of both materiality and intent

13 to deceive are proven by clear and convincing evidence, the court may still decline to render the patent

14 unenforceable." Star Scientific, 537 F.3d at 1365.

15         i.    Alleged "point of novelty"

16      The Court first addresses ATC's continued insistence that the "point of novelty" of the '356

17 patent was the "fringe-effect capacitance" between the capacitor contacts. Contrary to ATC's

18 arguments, in allowing the asserted claim 1, the patent examiner stated:

19        The prior art does not teach or fairly suggest (taken in combination with the other
claimed features) a capacitor comprising a conductive second contact disposed
20        externally on the dielectric body and electrically connected to the second plate, and the
second contact being located sufficiently close to the first contact to form a first fringe-
21        effect capacitance with the first contact . . . .

22 (See Pl. Opp. to Def. Findings & Conclusions on Inequitable Conduct, Ex. C.) The plain meaning of

23 the above sentence is that the patent examiner considered the combination of all of the limitations of

24 claim 1 to be the point of novelty, not just the "fringe-effect capacitance." Moreover, as Section

25 1302.14 of the USPTO's Manual of Patent Examining Procedures submitted by ATC provides, "[t]he

26 statement [of allowance] is not intended to necessarily state all the reasons for allowance or all the

27 details why claims are allowed and should not be written so specifically or impliedly state that all the

28 reasons for allowance are set forth." (Def. Reply, Ex. 2 [Doc. No. 331-2].) Indeed, it would have been

improper for the examiner to unilaterally limit claim 1 to just "fringe-effect capacitance." See id. ("Where specific reasons are recorded by the examiner, care must be taken to ensure that statements of reasons for allowance (or indication of allowable subject matter) are accurate, precise, and do not place unwarranted interpretations, whether broad or narrow, upon the claims.").

Accordingly, the Court rejects ATC's erroneous interpretation of the examiner's reasons for allowance of claim 1 as well as ATC's arguments that rely upon that interpretation.[22]

### ii.    The Devoe '430 patent

The first reference relied upon by ATC in support of its inequitable conduct charge is the Devoe patent, U.S. patent number 5,367,430 ("Devoe '430 patent"). The Devoe '430 patent is titled "Monolithic Multiple Capacitor," and describes that "it is impossible to eliminate all stray capacitance between pairs of electrical conductors in a monolithic ceramic capacitor" and that "[i]t is a further object of the present invention to provide a monolithic multiple capacitor in which stray capacitance between pairs of terminals is used to form useful circuit elements."[23] (See Def. Findings & Conclusions on Inequitable Conduct, Ex. ABS, col. 2:68-3:2, 3:30-3:33 [Doc. No. 312-4].)

In granting the reexamination of the '356 patent, the USPTO noted that "a reasonable Examiner would consider [the Devoe '430 patent] important in making a decision as to the patentability of claim 1 of the '356 patent."[24] (Id., Ex. AKI_0022.) This preliminary determination by the USPTO, while not relevant to the issue of patent validity, is surely probative of *materiality*. See

---

[22] Indeed, in its recent grant of reexamination, the USPTO identified the following as the point of novelty of the '356 patent: "a capacitor comprising a conductive second contact disposed externally on the dielectric body and electrically connected to the second plate, and the second contact being located sufficiently close to the first contact to form a first fringe-effect capacitance with the first contact." (See Def. Findings & Conclusions on Inequitable Conduct, Ex. AKI_0008.)

[23] According to ATC, "stray capacitance" is another term for "fringe-effect capacitance."

[24] Presidio challenges ATC's reliance on the reexamination proceedings and on Exhibit AKI, which is the USPTO's Decision Granting Ex Parte Reexamination, arguing that doing so contradicts the Court's prior exclusion of that evidence at the motions *in limine* stage. However, contrary to Presidio's argument, the Court only precluded the use of the reexamination proceedings before the jury, concluding that even if relevant, the grant of reexamination would likely confuse the jury. (See Order on Pl. MIL: Reexamination of the '356 Patent, at 3 [Doc. No. 252].) Moreover, the question at this stage is not whether a prior reference is relevant to patentability or validity, which were the issues addressed in the Court's ruling on Presidio's motion *in limine*, but rather whether "a reasonable examiner would substantially likely consider [it] important in deciding whether to allow an application to issue as a patent." See McKesson, 487 F.3d at 913 (citations omitted). Accordingly, the Court rejects Presidio's objections on this ground.

1    McKesson, 487 F.3d at 913 ("'[I]nformation concealed from the PTO may be material even though

2    it would not invalidate the patent.'" (citation omitted)). Indeed, as ATC correctly points out, the

3    standard used by the examiner in granting the reexamination ("a reasonable Examiner would consider

4    [the patent] important in making a decision as to the patentability") is almost identical to the standard

5    for materiality ("information that a reasonable examiner would substantially likely consider important

6    in deciding whether to allow an application to issue as a patent"). Accordingly, there is a substantial

7    likelihood that a reasonable examiner would have considered the Devoe '430 patent material to the

8    application. See McKesson, 487 F.3d at 913.

9         Nonetheless, ATC did not meet its burden of showing intent to deceive by clear and

10   convincing evidence. First, ATC argues that necessary intent can be drawn from the materiality of the

11   '430 patent combined with the fact that Alan Devoe allegedly thought in June 2001 that the capacitors

12   made for JDSU were covered by the '430 patent. (See Def. Findings & Conclusions on Inequitable

13   Conduct, Ex. PM.) However, "the fact that information later found material was not disclosed cannot,

14   by itself, satisfy the deceptive intent element of inequitable conduct." Star Scientific, 537 F.3d at 1366

15   (citation omitted). Rather, ATC had the burden of separately demonstrating intent to deceive during

16   the relevant time. See id. Moreover, the fact that information was known years ago does not mean that

17   it was necessarily recognized as being material at the time the application was filed. In the present

18   case, the fact that the Devoes were allegedly "concerned" about the '430 patent in June 2001 but then

19   forgot to cite it during the patent application process in 2002, without more, amounts at most to "gross

20   negligence" on their part, which is insufficient by itself to support intent to deceive.[25] See Kingsdown,

21   863 F.2d at 876 (en banc in relevant part).

22        More importantly, the Devoes testified at trial that they believed the '430 patent was not

23   relevant to the asserted claims of the '356 patent. For example, Daniel Devoe testified that the '430

24   patent was a "totally different kind of animal" because it dealt with a hearing-aid circuit device

25   intended to operate at a range of a few cycles to 10,000 cycles, while the '356 patent was aimed at the

26   _____

27        [25] ATC's continued reference to the words "conflict - existing patent" in Daniel Devoe's
     notebook is not persuasive. (See Def. Findings & Conclusions on Inequitable Conduct, Ex. UL.) There
     is nothing on the page where those words appear to indicate whether this refers to a perceived conflict
28   with any of the patents relied upon by ATC in its inequitable conduct charge, or whether it refers to
     the '356 patent at all. (See, e.g., Trial Tr. Day 2, at 23:5-24:4, 29:1-30:3, 34:15-34:19.)

much higher range of up to 40 billion cycles. (See, e.g., Trial Tr. Day 2, at 29:13-29:23; 55:24-56:10, 56:24-57:8, 57:20-57:24.) Likewise, Alan Devoe testified that by the time the patent application was finally drafted, the Devoes did not believe the '430 patent was relevant. (See, e.g., Trial Tr. Day 3, at 176:15-177:1.) While the inference of intent to deceive may properly be drawn from indirect and circumstantial evidence, it "must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the *single most reasonable inference* able to be drawn from the evidence to meet the clear and convincing standard." Star Scientific, 537 F.3d at 1366 (citation omitted) (emphasis added). In the present case, the above testimony by the Devoes prevents the Court from concluding that the only inference that can be drawn is that there must have been an intent to deceive the USPTO when the patent applications were filed. The Court cannot say with confidence that ATC has proven by clear and convincing evidence that culpable intent existed at *that* time.[26] See McKesson, 487 F.3d at 913 ("'The intent element of the offense is ... in the main proven by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred.'" (citation omitted)); see also Scanner Tech., 528 F.3d at 1376 ("Whenever evidence proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference.").

### iii.    The Devoe '443 patent

The next reference relied upon by ATC is the Devoe patent, U.S. patent number 6,366,443 ("Devoe '443 patent"). The Devoe '443 patent deals with a "ceramic chip capacitor of conventional volume and external form having increased capacitance from use of closely-spaced interior conductive planes reliably connecting to positionally-tolerant exterior pads through multiple redundant vias." (See Def. Findings & Conclusions on Inequitable Conduct, Ex. ABT.) Among other things, the Devoe '443 patent discloses the aforementioned C=kA/d formula for measuring capacitance between parallel

---

[26] ATC relies on Elk Corp. of Dallas v. GAF Bldg. Materials Corp., 168 F.2d 28, 32 (Fed. Cir. 1999), where the Federal Circuit affirmed the district court's conclusion that intent to deceive existed where the patentee ran a patentability search, discovered a patent that was "of special interest," but never disclosed that patent to the USPTO. That case is inapposite because there the patentee specifically ran the patentability search *with the patent application in mind*. In the present case, however, the reference to the '430 patent occurred a year before the '327 patent application was filed and referred only to the capacitors sold to JDSU, which Presidio contends are different from the invention claimed in the '356 patent and which the jury found did not anticipate the '356 patent.

1    plates.[27] (See id., col. 4:48-4:53.)

2        ATC's sole argument that the Devoe '443 patent was material is that it discloses "fringe-effect

3    capacitance," which is the alleged "point of novelty" of the '356 patent. However, as noted above, the

4    Court rejects ATC's insistence that the "fringe-effect capacitance" *by itself* is the point of novelty.

5    (See supra Part I.H.i.) Nonetheless, even if not a "point of novelty," a prior reference with a potential

6    fringe-effect capacitance would likely be material to a reasonable examiner. See, e.g., Hoffmann-La

7    Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1367 (Fed. Cir. 2003) (finding material patentee's

8    failure to disclose purity results, even though purity was not a claim limitation). In the present case,

9    there was sufficient testimony presented to demonstrate that there might be fringe-effect capacitance

10   between the external electrical connections in Figure 2b of the '443 patent. (See, e.g., Trial Tr. Day

11   2, at 33:1-33:12; Trial Tr. Day 5, at 186:8-188:5.) Accordingly, there is a substantial likelihood that

12   a reasonable examiner would have considered the Devoe '443 patent material to the application. See

13   McKesson, 487 F.3d at 913. However, because this does not relate to any "point of novelty," and

14   because it does not invalidate the '356 patent, there is at most only a medium level of materiality.

15

16

17   

18

19

Fig. 2b

20       Moreover, there was likely knowledge, at least on behalf of Daniel Devoe, that the '443 patent

21   was relevant so as to give rise to an inference of intent. There was inconsistent testimony at trial

22   regarding potential relevance of the '443 patent. On the one hand, Alan Devoe testified that the Devoe

23   '443 patent was not relevant because it was not intended for "broadband" use, the resulting capacitors

24   were "not surface mountable," and the external vias were merely used for beneficial purposes without

25   really recognizing the "novelty of the invention" that would later crystalize. (See Trial Tr. Day 3, at

26   178:6-178:21.) Likewise, Daniel Devoe testified that the Devoe '443 patent was "a different kind of

27   animal" because although it also uses a high-frequency capacitor, "it is disconnected from the

28

_____

[27] The C=kA/d formula does not appear in the '356 patent.

broadband part that we're arguing about." (See Trial Tr. Day 2, at 60:6-60:15.) On the other hand, Daniel Devoe also testified that the structure of Figure 2b above resembles the structure claimed in the '356 patent. (See id. at 32:4-33:12.) Indeed, Daniel Devoe testified that the '443 patent discloses how to arrange "two connections on the top" and then bring them "close together" to achieve a "better frequency performance." (See id. 61:17-62:3.) At the very least, this presents a close case where Daniel Devoe recognized that the structure of the '443 patent was similar to what is claimed in the '356 patent, and yet decided not to disclose it because he believed it not to be relevant. If that is the case, he had the duty to disclose it to the examiner, and let the examiner determine whether or not the reference was material. See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1257 (Fed. Cir. 1997) ("It is axiomatic that 'close cases should be resolved by disclosure, not unilaterally by applicant.'" (citation omitted)). Accordingly, ATC has shown the threshold level of intent. However, in light of the conflicting testimonies as to the relevance the Devoes attached to the '443 patent, there is at most only a low level of intent.

### iv.    The Trinh '854 patent

The next reference put forth by ATC is the Trinh '854 patent, which is titled "Fringe-Field Non-Overlapping-Electrodes Discoidal Feed-Through Ceramic Filter Capacitor with High Breakdown Voltage." (See Def. Findings & Conclusions on Inequitable Conduct, Ex. AAG.) The Trinh '854 patent teaches that "[f]ringe-effect capacitance is always present" between exterior metal terminations of opposite polarity. (Id., col. 9:49-9:52.) It also teaches that when the voltage is small, that fringe-effect capacitance is "negligible" in comparison to the overall capacitance, and is "disregarded." (Id., col. 9:52-9:56.) On the other hand, in a high voltage multi-layer ceramic capacitor, the '854 patent teaches that "the fringe capacitance commences to be a sizable, measurable, portion of the total capacitance." (Id., col. 9:56-9:59.)

As with the Devoe '430 patent, the USPTO's grant of reexamination noted that "a reasonable Examiner would consider [the Trinh '854 patent] important in making a decision as to the patentability of claim 1 of the '356 patent." (Def. Findings & Conclusions on Inequitable Conduct, Ex. AKI_0015.) Accordingly, even though it might not be relevant to patent validity, this demonstrates the Trinh '854 patent would likely be material to a reasonable examiner. See McKesson, 487 F.3d at 913.

1    Nonetheless, ATC cannot show the threshold level of intent by clear and convincing evidence.

2    First, as already noted, there is very little basis to ATC's argument that the words "conflict - existing

3    patent" found in Daniel Devoe's notebook referred to any conflict due to the Trinh '854 patent, or

4    were even related to the '356 patent application. (See, e.g., Trial Tr. Day 2, at 23:5-24:4, 29:1-30:3,

5    34:15-34:19.) Moreover, the mere fact that there is fringe-effect capacitance disclosed between

6    *internal* plates in the '854 patent does not mean it was or should have been recognized as material to

7    what is claimed in the '356 patent. On the contrary, the Devoes and their patent attorney testified that

8    they believed the '854 patent not to be relevant to the '356 application, in part because it was designed

9    to deal with reliability of voltage breakdown and because it would not make sense to use that invention

10   with the high frequencies at which the BB capacitor and the 545L capacitor operate. (See, e.g., id. at

11   51:5-53:3; Trial Tr. Day 3, at 70:12-70:18.) In light of this testimony, the Court cannot conclude that

12   the only inference that can be drawn is that there must have been an intent to deceive the USPTO

13   when the patent applications were filed. See Star Scientific, 537 F.3d at 1366. Accordingly, the Court

14   cannot say with confidence that ATC has proven by clear and convincing evidence that culpable intent

15   existed at the relevant time. See McKesson, 487 F.3d at 913.

16                    *v.      The Seaman '884 patent*

17   The last patent relied upon by ATC is the Seaman patent, U.S. patent number 4,661,884

18   ("Seaman '884 patent"). The Seaman '884 patent was filed by Harry V. Seaman of ATC on March

19   10, 1986, and is titled "Miniature, Multiple Layer, Side Mounting High Frequency Blocking

20   Capacitor." (See Def. Findings & Conclusions on Inequitable Conduct, Ex. ABU.) The '884 patent

21   was one of the patents cited by the Devoes in their '430 patent. Notably, the Devoe '430 patent

22   acknowledged that the '884 patent "teaches a single capacitor in which external conductive terminals

23   are brought out to be soldered to a circuit board." (Id., Ex. ABS, col. 1:66-2:1.)

24   Although it is a close question, the Court believes the Seaman '884 patent would have been

25   material to a reasonable examiner. While it is unclear whether the '884 patent discloses fringe-effect

26   capacitance as claimed in the '356 patent, the Devoes' own patent (the '430 patent) acknowledges that

27   the '884 patent teaches about bringing out conductive terminals to the outside of the capacitor, which

28   is an integral part of the '356 patent's claim limitations. Accordingly, there is a substantial likelihood

1    that a reasonable examiner would have considered the Seaman '884 patent material to the application.

2    See Hoffmann-La Roche, 323 F.3d at 1367 (finding material patentee's failure to disclose purity

3    results, even though purity was not a claim limitation).

4              Nonetheless, ATC has not shown the necessary level of intent by clear and convincing

5    evidence. ATC argues there was intent to deceive because the '884 patent was cited in the '430 patent,

6    the Devoes were apparently "concerned" about it, and Daniel Devoe admitted the '884 patent discloses

7    fringe-effect capacitance between the contacts. However, as Daniel Devoe testified, the reason the

8    '884 patent was cited in the '430 patent and the reason the Devoes were "concerned" with it was the

9    little groove in the '884 patent that was somewhat similar to the grooves being cut in the '430 patent.

10   (See Trial Tr. Day 2, at 58:4-58:25.) None of that is applicable to the '356 patent. Likewise, it is

11   unclear whether the '884 patent discloses fringe-effect capacitance as claimed in the '356 patent. (See

12   id. at 59:11-59:22.) Accordingly, the Court cannot say with confidence that ATC has proven by clear

13   and convincing evidence that there was intent to deceive. See McKesson, 487 F.3d at 913.

14                      *vi.    August 2000 capacitors*

15             ATC also argues the Devoes should have disclosed the sale of the August 2000 capacitors to

16   the USPTO. First, ATC argues that the August 2000 capacitors were material because they anticipate

17   most of the asserted claims as determined by Dr. Dougherty. However, even without deference to the

18   jury's verdict on this issue, it is unclear whether the August 2000 capacitors anticipate the '356 patent.

19   (See, e.g., Trial Tr. Day 6, at 42:3-45:11; Trial Tr. Day 7, at 87:7-88:23.) Moreover, there was

20   testimony that the August 2000 capacitors were merely "generic" capacitors that Presidio makes in

21   large quantities for a number of customers. (See Trial Tr. Day 2, at 63:10-63:18, 64:10-65:2.) In

22   addition, there was testimony that the August 2000 capacitors *were* disclosed to the USPTO through

23   prior art and figures identified as prior art, in particular Figure 2A. (See id. at 64:18-64:22; Trial Tr.

24   Day 7, at 151:10-152:22, 156:25-157:1.) It is well-established that information or a reference is not

25   material if it is merely cumulative to other information or references considered by the examiner.

26   McKesson, 487 F.3d at 913. Accordingly, there is no substantial likelihood that a reasonable examiner

27   would have considered the sale of the August 2000 capacitors material to the application. See id.

28   ///

1              vii.     The inventorship dispute

2              ATC next argues that there was inequitable conduct due to Presidio's failure to disclose the

3    existence of an inventorship dispute with regard to Chuck Rosier. Misinformation about inventorship

4    can be the basis for a claim of inequitable conduct. See, e.g., PerSeptive Biosystems, Inc. v. Pharmacia

5    Biotech, Inc., 225 F.3d 1315, 1321-22 (Fed. Cir. 2000) (finding material patentee's "intentional

6    'misrepresentations, omissions and half-truths to the PTO,' made as a 'persistent course' of conduct"

7    regarding inventorship). In the present case, however, the jury has rejected any improper inventorship

8    claim, and the Court has already denied ATC's motion for JMOL on that issue. (See Verdict Form,

9    at 4; see also supra Part I.C.ii.) Moreover, as previously noted, there was extensive testimony by Alan

10   Devoe that raised doubts as to whether Charles Rosier invented anything related to the '356 patent.

11   (See, e.g., Trial Tr. Day 3, at 182:9-185:22; Trial Tr. Day 4, at 3:21-9:1, 15:18-20:19, 25:20-26:5;

12   32:20-33:3.) Accordingly, it is very unlikely that a reasonable examiner would have considered this

13   issue material to the application. See McKesson, 487 F.3d at 913.

14             Furthermore, even if material, ATC cannot show by clear and convincing evidence the

15   threshold level of intent.  Relying on piecemeal portions of the exhibits, ATC argues the Devoes knew

16   of the potential inventorship dispute and therefore should have disclosed it. (See Def. Findings &

17   Conclusions on Inequitable Conduct, Exs. PI, PL, UK, UL.) However, the most that can be concluded

18   from these exhibits is that *at one point* there was talk between the parties about a joint cooperation or

19   ownership agreement, but it was then rejected by Presidio as being unfair. (See, e.g., Trial Tr. Day 4,

20   at 3:21-9:1, 25:20-30:5.) Accordingly, because ATC has failed to show by clear and convincing

21   evidence that the Devoes believed there was any inventorship dispute at the time the patent application

22   was filed, the Court finds there was no intent to deceive. See McKesson, 487 F.3d at 913.

23             viii.    Alleged misrepresentations in the specifications

24             Finally, ATC argues inequitable conduct charge is supported by the misrepresentations in the

25   specifications of the '356 patent. Use of past tense or prophetic examples to describe an experiment,

26   when that experiment was never actually performed as described, may be a misrepresentation

27   actionable as inequitable conduct. See, e.g., Hoffman-La Roche, 323 F.3d at 1363-66 (upholding a

28   finding of inequitable conduct where "Example VI [was] written in the past tense" and "[f]rom the

1   language used, a reader of the patent would conclude that the protocol was performed and that the

2   [described] results were actually achieved"). In the present case, ATC first argues the use of phrases

3   such as "have been extended" and "have been found" with respect to Figures 10A and 15A of the '356

4   patent suggests that the described steps were actually undertaken and that the described results were

5   actually obtained. According to ATC, this is misleading because Presidio has conceded that it "has

6   not previously designed or manufactured capacitors in accordance with [those figures]." (See Def.

7   Findings & Conclusions on Inequitable Conduct, Ex. ABU.) ATC also argues the failure to disclose

8   the presence of fringe-effect capacitance in Figure 2A amounted to a material misrepresentation.

9        The Court finds that the misrepresentations, if any, in the specifications of the '356 patent

10  would not have been considered material by a reasonable examiner. With respect to the past tense

11  language used, the instances in this case are significantly different from the charged conduct in

12  Hoffman on which ATC relies. In Hoffman, each step of the disputed Example VI, over more than two

13  columns of the patent, was described in the same fashion, using the past tense. 323 F.3d at 1363-64.

14  Indeed, the past tense was used to describe the steps of Example VI on more than 75 occasions, and

15  the patent provided specific numeric measurements used and results obtained, even though it was later

16  admitted that Example VI was never performed as described. Id. In contrast, the '356 patent merely

17  states that in Figure 10A, as opposed to Figure 9A, "the external conductive plates **72** and **74** in the

18  lower section **62** of the device *have been extended* toward each other so as to create a capacitance

19  between plates **72** and **74** based upon fringe electric field extending to and from the adjacent edges

20  of those plates." ('356 patent, col. 7:21-7:26 (italics added).) As Mr. Humphrey testified, a comparison

21  of Figures 9A and 10A from the original application confirms that this is indeed the case–i.e., the

22  conductive plates *in the drawing* "have been extended" from where they were in Figure 9A to where

23  they appear in Figure 10A. (See Trial Tr. Day 3, at 92:1-94:15, 95:2-96:21; see also Pl. Opp. to Def.

24  Findings & Conclusions on Inequitable Conduct, Ex. E.)

25

26

27

28



Similarly, it is very unlikely that a reasonable examiner would have considered the use of past tense in the following sentence, which describes Figure 15A, material: "While the fringe effect capacitances **127**, **129** may be relatively small compared to other overlapping parallel plate capacitances **75** within the capacitor **120**, the fringe effect capacitances **127**, **129** *have been found* to effect the high frequency performance of the capacitor **120**." (See '356 patent, col. 10:3-10:8 (italics added).) Presidio argues that in this context, the phrase "have been found" refers more to a technical theory of operation of the capacitor shown, rather than to any alleged experiments. This is a reasonable inference that the Court is entitled to credit. See Star Scientific, 537 F.3d at 1366; Scanner Tech., 528 F.3d at 1376. Accordingly, the Court cannot say with confidence that ATC has proven by clear and convincing evidence that these phrases would have been considered material by a reasonable examiner.[28] See McKesson, 487 F.3d at 913.

Finally, even if these alleged misrepresentations were material, there has been no showing of intent to deceive the USPTO. Contrary to Hoffman, 323 F.3d at 1363-64, on which ATC relies, this is not the case where the patent describes extensive experiments with specific details that were never conducted as described. Likewise, there was no consistent effort by the Devoes to "hide the ball" as was the case in Semiconductor Energy, also relied upon by ATC. See Semiconductor Energy Lab. Co. v. Samsung Elec. Co., 204 F.3d 1368, 1373, 1377-78 (Fed. Cir. 2000) (upholding a finding of inequitable conduct where the patentee provided a misleadingly incomplete, partial translation of one of the references and a narrow and incomplete concise statement). Rather, as Mr. Humphrey testified,

---

[28] For the reasons discussed previously, the Court also rejects ATC's argument that failure to indicate that there is fringe-effect capacitance in Figure 2A amounted to a misrepresentation.

1   the past tense was used solely to denote what was done to the drawings and to indicate where fringe-

2   effect capacitance would technically be present. Accordingly, ATC has failed to demonstrate by clear

3   and convincing evidence any intent to deceive. See McKesson, 487 F.3d at 913.

4               ix.     Conclusion

5           Having considered the materiality and intent associated with each one of the grounds relied

6   upon by ATC, the Court must next determine whether the '356 patent as a whole should be declared

7   unenforceable. As previously stated, with respect to each asserted ground, ATC must first prove a

8   threshold level of "materiality" and "intent" by clear and convincing evidence. See McKesson, 487

9   F.3d at 913. In the present case, only with respect to the Devoe '443 patent are both factors satisfied.

10  Accordingly, the Court must next balance the levels of "materiality" and "intent"–with the greater

11  showing of one factor allowing a lesser showing of the other–to determine whether the failure to

12  disclose the '443 patent was "egregious enough to warrant holding the entire patent unenforceable."

13  See Star Scientific, 537 F.3d at 1365; McKesson, 487 F.3d at 913.

14          In the present case, the Court concludes that on balance the equities do not make the Devoes'

15  conduct before the USPTO "egregious enough to warrant holding the entire patent unenforceable."

16  See Star Scientific, 537 F.3d at 1365 (citation omitted). There is only a medium level of materiality

17  based on the alleged similarity between Figure 2b in the '443 patent and the asserted claims of the

18  '356 patent. There is also only a low level of intent because both the Devoes and their patent counsel

19  testified that they believed the '443 patent not to be relevant to the invention claimed in the '356

20  patent, even if some of them recognized the similarities in the structure. (See, e.g., Trial Tr. Day 2,

21  at 60:6-60:15; Trial Tr. Day 3, at 91:1-91:19, 178:6-178:21.) Accordingly, even though threshold

22  levels of both materiality and intent have been shown, the Court exercises its discretion in **DENYING**

23  ATC's motion to hold the '356 patent unenforceable due to inequitable conduct. See Star Scientific,

24  537 F.3d at 1365 ("Thus, even if a threshold level of both materiality and intent to deceive are proven

25  by clear and convincing evidence, the court may still decline to render the patent unenforceable.").

26  **II.    Infringement**

27          A.     Sufficiency of the evidence supporting the jury's verdict of infringement

28          ATC also moves for a JMOL on the issue of infringement. Because the Court previously

granted ATC summary judgment on the issue of infringement under the doctrine of equivalents and on induced and contributory infringement, (see MSJ Order, at 17-18 [Doc. No. 165]), the only issue submitted to the jury was that of literal infringement. Literal infringement first requires the court to interpret the claims to determine their scope and meaning. Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1273 (Fed. Cir. 2004). The court must then compare the properly construed claims to the allegedly infringing device. Id. The patentee must prove that the accused device contains each limitation of the asserted claims. Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1247 (Fed. Cir. 2000). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." Id. (citation omitted).

First, ATC argues there was no sufficient evidence to demonstrate that the 545L capacitor had a "substantially monolithic dielectric body" as required by the '356 patent, which the Court defined as "a dielectric body largely but not wholly without seams from the inclusion of plates within the dielectric body." ATC argues that Dr. Huebner allegedly admitted "there are no seams" in the 545L capacitor. (See Trial Tr. Day 4, at 112:24-113:14.) However, taking Dr. Huebner's testimony as a whole, he was only indicating that the word "seams" is not used by persons skilled in the art and that the word "substantially" is necessary only because no capacitor can be 100% monolithic. (See, e.g., id. at 100:18-101:8, 102:19-103:5, 105:17-105:23, 112:18-112:23.) Moreover, assuming the word "seam" referred to a boundary between a plate and the dielectric, as contended by ATC, Dr. Huebner testified there would be 140 seams in the 545L capacitor, and therefore it would be "substantially, but not wholly, without seams."[29] (See id. at 116:18-117:17.) Likewise, assuming the word "seams" referred to defects and/or porosity, Dr. Huebner agreed there were seams in the 545L capacitor, and therefore it was once again "substantially, but not wholly, without seams."[30] (See id. at 128:23-

---

[29] Assuming each plate has corresponding 2 seams, Dr. Huebner's testimony was consistent with the specifications in the '356 patent, which contemplate a capacitor with 30 to 100 layers, and therefore with 60 to 200 seams. (See '356 patent, col. 2:2-2:5.)

[30] There was nothing improper with Dr. Huebner defining the word "seam" as referring to a defect and/or porosity. As Presidio correctly points out, this Court never defined the word "seam." Accordingly, both ATC and Presidio were within their right to offer at trial conflicting expert opinions defining that term. Moreover, even if the exact words "gaps," "voids," and "porosity" did not appear in Dr. Huebner's report, ATC cannot show any prejudice because Dr. Huebner also testified that the 545L capacitor was "substantially, but not wholly, without seams" according to ATC's own proposed

132:20.) Finally, Dr. Huebner testified that despite his view on the appropriateness of the word "seams," he faithfully applied the Court's claim construction. Accordingly, there was sufficient evidence for the jury to credit Dr. Huebner's opinion and to find that the 545L capacitor was "substantially monolithic."[31]

Second, ATC argues there was no sufficient evidence to demonstrate that the 545L capacitor had a "fringe-effect capacitance," which the Court initially defined as "a determinable capacitance" and then further defined as "a capacity that is capable of being determined in terms of a standard unit." Presidio, however, points to Dr. Huebner's detailed dissection and analysis of the 545L capacitor in arguing that he *did* conclude there was fringe-effect capacitance that was "determinable." (See Trial Tr. Day 4, at 56:1-67:5, 75:15-85:7.) The Court agrees. Notably, Dr. Huebner testified that he took detailed micrographs of the 545L capacitor, and that he also measured a determinable fringe-effect capacitance in the 545L capacitor by using the C=kA/d formula and inputting the actual thickness of the external contact, the actual separation distance, and a lower and upper boundary for what the dielectric constant might be. (See id. at 120:24-121:24.) Accordingly, there was sufficient evidence for the jury to credit Dr. Huebner's opinion and to find that the 545L capacitor had a "fringe-effect capacitance" between the external contacts.

For the foregoing reasons, and because ATC makes no objections with respect to any other claim terms, the Court finds there was sufficient evidence for the jury to conclude that Presidio demonstrated by preponderance of the evidence that the 545L capacitor infringes all of the asserted claims of the '356 patent.

B.    Willfulness

ATC next challenges the jury's finding of willful infringement. To demonstrate willful

definition of the word "seam." (See Trial Tr. Day 4, at 116:18-117:17.)

[31] The extent to which Dr. Huebner's testimony on cross-examination allegedly contradicted his testimony on direct was for the jury to decide. Cf. Doan v. United States, 202 F.2d 674, 680 (9th Cir. 1953) ("It was for the jury who observed him and the manner and emphasis with which he gave his answers on direct and cross-examination to weigh and evaluate his testimony and to say whether the quoted statement . . . amounted, as appellant argues, to a withdrawal of his direct testimony . . . ."). As long as the verdict is supported by sufficient evidence, which is the case here, the Court will not overturn it "even if it is possible to draw two inconsistent conclusions from the evidence." Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987) (citation omitted).

infringement, a patentee must show at least "objective recklessness," which is a two-part process:

> [First], a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. The state of mind of the accused infringer is not relevant to this objective inquiry. If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer.

In re Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc) (internal citations omitted). The Court evaluates the totality of the circumstances to determine whether an infringement is "willful." ACCO Brands, Inc. v. ABA Locks Mfr. Co., 501 F.3d 1307, 1312-13 (Fed. Cir. 2007).

In the present case, even if ATC "acted despite an objectively high likelihood that its actions constituted infringement of a valid patent," Presidio failed to show by clear and convincing evidence that ATC did so with the necessary subjective intent. See Seagate, 497 F.3d at 1371. At trial, ATC presented uncontested testimony from Robert Grossbach, ATC's Vice President of RF Engineering, and John Mruz that they independently concluded there was "nothing new" in the '356 patent. (See Trial Tr. Day 5, at 62:11-64:10; Trial Tr. Day 6, at 85:14-86:9.) Likewise, although the USPTO initially rejected the Mruz patent for the 545L capacitor in light of the '356 patent, the USPTO later reconsidered and allowed the Mruz patent, U.S. patent number 7,248,458 ("Mruz patent"). (See Trial Tr. Day 5, at 39:15-40:7, 64:17-65:10.) None of the arguments made by Presidio are sufficient to demonstrate that the jury's finding of willful infringement was supported by substantial evidence.

### i. Alleged "affirmative duty of due care"

Presidio's first argument is that ATC had a duty to investigate and determine whether it had a good faith belief to market the 545L capacitors in light of the '356 patent. However, Presidio relies solely on pre-Seagate case law in support of this proposition. Prior to Seagate, a potential infringer who had actual notice of another's patent rights had "an affirmative duty to exercise due care to determine whether or not he is infringing." See Underwater Devices Inc. v. Morrison-Knudsen Co., 717 F.2d 1380, 1389-90 (Fed. Cir. 1983) (citation omitted); accord nCube Corp. v. Seachange Int'l, Inc., 436 F.3d 1317, 1324 (Fed. Cir. 2006); John Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1364 (Fed. Cir. 1998). In Seagate, the Federal Circuit abandoned this approach and overruled the prior cases, concluding that a finding of willfulness "requires at least a showing of objective recklessness."

497 F.3d at 1371 ("Accordingly, we overrule the standard set out in <u>Underwater Devices</u> and hold that

proof of willful infringement permitting enhanced damages requires at least a showing of objective

recklessness. . . . [W]e abandon the affirmative duty of due care . . . ."); <u>accord</u> <u>Eastman Kodak Co.</u>

<u>v. Agfa-Gevaert N.V.</u>, 560 F. Supp. 2d 227, 302 (W.D. N.Y. 2008). Accordingly, there was no

"affirmative duty of due care" imposed on ATC in this case; rather, the only duty it had to comply

with was the duty to not act with objective recklessness. <u>See</u> <u>Seagate</u>, 497 F.3d at 1371.

> ii.    *Alleged copying*

Likewise, there is little merit to Presidio's argument that willfulness is demonstrated by ATC's

copying of Presidio's *unpatented* BB capacitors. Evidence of copying may be relevant to <u>Seagate</u>'s

second prong, "as it may show what the accused infringer knew or should have known about the

likelihood of its infringement." <u>DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.</u>, 567 F.3d 1314,

1336 (Fed. Cir. 2009). At trial, however, Mr. Mruz adamantly denied any copying of the BB

capacitors. (<u>See, e.g.</u>, Trial Tr. Day 5, at 65:11-65:20.) Presidio has failed to point to any contrary

testimony.[32] Rather, the only testimony before the jury was that ATC at most *tested* Presidio's BB

capacitors, as well as DLI's Opti-Caps, while developing its 545L capacitors. (<u>See</u> Trial Tr. Day 6,

at 90:19-91:8.) However, as Presidio's own witnesses confirmed, monitoring the marketplace and

testing products developed by competitors is a standard practice in the industry. (<u>See, e.g.</u>, Trial Tr.

Day 2, at 44:20-44:24, 84:21-85:4, 87:19-88:23.) Accordingly, this factor cannot support the jury's

finding of willful infringement.

> iii.    *Failure to obtain opinion of counsel*

Finally, ATC's failure to present an opinion of a patent attorney–while a relevant factor–is not

clear and convincing evidence of willfulness. Contrary to ATC's objections, the failure to obtain an

---

[32] Unable to point at what exactly ATC copied, Presidio alleges it was "Presidio's idea of a one-piece, substantially monolithic construction." (<u>See</u> Pl. Opp. to Motion for JMOL, at 30.) However, Mr. Mruz provided extensive testimony on how ATC came up with one-piece design for the 545L capacitors. (<u>See</u> Trial Tr. Day 5, at 49:19-50:12, 52:9-59:20.) Because Presidio has failed to point to any contrary testimony, there is no basis for Presidio's argument that there was "egregious copying" or "sudden emergence" of an infringing product. <u>See</u> <u>Trading Tech. Int'l, Inc. v. eSpeed, Inc.</u>, No. 04 C 5312, 2008 WL 63233, at *2 (N.D. Ill Jan. 3, 2008) ("We agree with plaintiff that in some circumstances pre-patent conduct is relevant to a determination of willfulness, significantly when that pre-patent conduct consists of egregious copying." (citations omitted)); <u>Afros S.p.A. v. Krauss-Maffei Corp.</u>, 671 F. Supp. 1402, 1436-38 (D. Del. 1987) (inferring copying from the "sudden emergence" of the infringing device that had a "nearly identical design" to the patented invention).

opinion of counsel *is* a relevant factor post-<u>Seagate</u>. In <u>Seagate</u>, the Federal Circuit noted that over the years, its case law has erroneously established that accused infringer's failure to obtain an opinion of counsel gave rise to an "adverse inference" as to willfulness of infringement. 497 F.3d at 1370. The <u>Seagate</u> court conclusively rejected any such inference, concluding instead that "there is no affirmative obligation to obtain opinion of counsel." <u>Id.</u> at 1370-71. However, the Federal Circuit did *not* hold that failure to obtain opinion of counsel was legally irrelevant. Rather, the court noted that the issue of willfulness must be analyzed under the "totality of the circumstances" approach. <u>Id.</u> at 1369. Notably, the Federal Circuit stated that "[a]lthough an infringer's reliance on favorable advice of counsel, or conversely his failure to proffer any favorable advice, is not dispositive of the willfulness inquiry, *it is crucial to the analysis*." <u>Id.</u> (emphasis added).

Case law post-<u>Seagate</u> is split as to whether lack of opinion of counsel is still a valid factor that can be considered by the jury in determining willfulness of infringement. Many courts seem to have concluded that, while there is no longer any "adverse inference" from the failure to obtain opinion of counsel, it is still a factor to be considered in the "totality of the circumstances" approach.[33] A number of courts, however, have interpreted <u>Seagate</u> differently, concluding that lack of opinion of counsel cannot be considered by the jury at all.[34] Having considered the issue, the Court agrees with what

---

[33] <u>See, e.g.</u>, <u>Finjan Software, Ltd. v. Secure Computing Corp.</u>, C.A. No. 06-369 (GMS), 2009 WL 2524495, at *15 (D. Del. Aug. 18, 2009) ("While there is no longer an affirmative duty of care that requires an accused infringer to obtain an opinion of counsel, the fact that Secure did not seek any such opinion may be considered in the totality of circumstances surrounding its willful infringement."); <u>Creative Internet Adver. Corp. v. YahooA Inc.</u>, No. 6:07cv354, 2009 WL 2382132, at *5 (E.D. Tex. July 30, 2009) (noting that while it is not determinative, "the lack of opinion of counsel is one factor of many that the jury could have taken into account in determining whether Defendant willfully infringed"); <u>GSI Group, Inc. v. Sukup Mfg. Co.</u>, 591 F. Supp. 2d 977, 981 (C.D. Ill. 2008) ("An alleged infringer's decision not to secure an opinion is relevant to show willfulness, but an alleged infringer is not required to secure an attorney opinion letter before marketing a device to avoid a claim of willfulness."); <u>Energy Transp. Group, Inc. v. William Demant Holding AS</u>, C.A. No. 05-422 GMS, 2008 WL 114861, at *1 (D. Del. Jan. 7, 2008) (denying accused infringer's motion in limine and concluding that "nothing in <u>Seagate</u> forbids a jury to consider whether a defendant obtained advice of counsel as part of the totality of the circumstances in determining willfulness"); <u>Cohesive Techs., Inc. v. Waters Corp.</u>, 526 F. Supp. 2d 84, 103 (D. Mass 2007) (noting that "whether the infringer solicited or followed the advice of counsel" was one of the factors to be considered in determining willfulness), <u>vacated in part & rev'd in part on other grounds</u>, 543 F.3d 1351, 1374 (Fed. Cir. 2008).

[34] <u>See, e.g.</u>, <u>Spectralytics, Inc. v. Cordis Corp.</u>, No. 05-CV-1464 (PJS/RLE), 2009 WL 3851314, at *4 (D. Minn. Jan. 13, 2009) (granting motion in limine excluding evidence and argument regarding opinion of counsel, including with respect to the issue of willful infringement); <u>Anascape. Ltd. v. Microsoft Corp.</u>, No. 9:06-CV-158, 2008 WL 7182476, at *4 (E.D. Tex. Apr. 25, 2008) (noting

1    appears to be the majority view post-Seagate that lack of opinion of counsel, while not giving rise to

2    an adverse inference, is still a factor that the jury *can* consider when applying the "totality of the

3    circumstances" approach with respect to willfulness of infringement.

4         This one factor, however, is insufficient to demonstrate by clear and convincing evidence that

5    ATC's infringement was willful–i.e., that the objectively-defined risk "was either known or so obvious

6    that it should have been known" to ATC. See Seagate, 497 F.3d at 1371. Moreover, since there is no

7    longer any affirmative duty to investigate, see id., ATC had no reason to obtain an opinion of counsel

8    once two of its engineers have independently concluded that there was "nothing new" to the '356

9    patent. (See Trial Tr. Day 5, at 62:11-64:10; Trial Tr. Day 6, at 85:14-86:9.)

10                        *iv.*     Conclusion

11        For the foregoing reasons, the jury's finding that Presidio demonstrated willful infringement

12   by clear and convincing evidence is not supported by substantial evidence. Accordingly, because the

13   jury's verdict on this issue was "'against the great weight of the evidence,'" the Court **GRANTS**

14   ATC's motion for JMOL on the issue of willfulness. See Hangarter, 373 F.3d at 1005.

15   **III.   Damages**

16        ATC next moves for a JMOL on the issue of damages. [Doc. No. 309]. Presidio opposes

17   ATC's motion, [Doc. No. 320], and separately moves for: (1) supplemental damages for ATC's

18   continued infringement; (2) enhanced damages due to ATC's willful infringement; (3) pre-judgment

19   and post-judgment interest; (4) recovery of costs; and (5) attorney's fees. [Doc. No. 307]. With respect

20   to recovery of damages, Section 284 provides:

21        Upon finding for the claimant the court shall award the claimant damages adequate to
          compensate for the infringement, but in no event less than a reasonable royalty for the
22        use made of the invention by the infringer, together with interest and costs as fixed by
          the court.
23
24   35 U.S.C. § 284. With regard to attorney's fees, Section 285 provides that "[t]he court in exceptional

     cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.
25
26        A.      Sufficiency of the evidence supporting the jury's award of damages

27        At trial, Presidio advanced a lost-profits theory under the four-factor Panduit test, which

28   ─────────────────────

     that "the failure to obtain opinion of counsel is not a factor supporting willful infringement").

1   requires a showing of: "(1) demand for the patented product, (2) absence of acceptable noninfringing

2   substitutes, (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of

3   profit that would have been made." <u>DePuy Spine</u>, 567 F.3d at 1329 (citing <u>Panduit Corp. v. Stahlin</u>

4   <u>Bros. Fibre Works, Inc.</u>, 575 F.2d 1152, 1156 (6th Cir. 1978)). At the conclusion of the trial, the jury

5   awarded Presidio $1,048,677 in lost profits. In its motion, ATC only challenges the sufficiency of the

6   evidence on the first two <u>Panduit</u> factors, as well as the overall amount of damages awarded.

7                    *i.      Demand for the patented product*

8            ATC first argues the award of lost profits was improper because the BB capacitors do not

9   practice the '356 patent, and the '356 patent itself cannot qualify as the patented *product*. The first

10  <u>Panduit</u> factor, however, is not limited to just patented products, but rather asks whether demand

11  existed for a product that is "covered by the patent in suit" *or* that "directly competes with the

12  infringing device." <u>See</u> <u>DePuy Spine</u>, 567 F.3d at 1330 (citing <u>Rite-Hite Corp. v. Kelley Co.</u>, 56 F.3d

13  1538, 1548-49 (Fed. Cir. 1995) (en banc)). The main inquiry is whether the patentee can demonstrate

14  a "but for" causation traceable to patent infringement. <u>See</u> <u>Rite-Hite</u>, 56 F.3d at 1548.

15           In the present case, substantial evidence supported the jury's finding that demand existed for

16  the BB capacitors, which compete with the 545L capacitors.[35] For example, Mr. Newman testified

17  about the "head-to-head" competition of these two products, as well as his conclusion that it was

18  essentially a two-competitor market. (Trial Tr. Day 4, at 155:20-156:13, 162:17-162:23, 194:19-197:1,

19  199:5-201:21.) He indicated that he was aware that the BB capacitors were not covered by the '356

20  patent. (<u>Id.</u> at 156:14-157:6.) According to Mr. Newman, demand existed for the BB capacitors during

21  the relevant time, primarily due to their "one-piece design." (<u>Id.</u> at 157:10-157:20, 158:14-162:23.)

22  Other evidence at trial supported Mr. Newman's testimony that both customers and manufacturers

23

24

25

26  ─────────────────

27           [35] ATC argues Mr. Newman's analysis was improper because it treated the '356 patent itself
    as the patented product, even though the '356 patent is neither a capacitor nor a product. However,
    a review of Mr. Newman's entire testimony demonstrates that he was actually referring to the demand
28  for the *innovations* covered by the '356 patent–such as the BB capacitors' and the 545L capacitors'
    "one-piece design." (<u>See, e.g.</u>, Trial Tr. Day 5, at 157:10-157:20, 158:14-162:23.)

were looking for more reliability provided by a one-piece design.[36] (See, e.g., Pl. Opp. to Def. Motion for JMOL, Ex. G.) Likewise, other evidence supported Mr. Newman's testimony that both ATC and its customers were dissatisfied with the 540L capacitor's two-piece design, and that the sales of the 540L capacitors were already declining when ATC started to produce the 545L capacitors. (See, e.g., Trial Tr. Day 2, at 140:3-140:17; Trial Tr. Day 3, at 116:18.)

ATC argues it was improper to consider the BB capacitors because they and the 545L capacitors serve different markets. See BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218-19 (Fed. Cir. 1993) ("The first Panduit factor–demand for the patented product–presupposes that demand for the infringer's and patent owner's products is interchangeable. . . . This analysis assumes that the patent owner and the infringer sell substantially the same product."). According to ATC, the BB capacitors have a higher insertion loss of 0.9 dB at 40 GHz and were designed to compete in the lower level of performance market, while the 545L capacitors have a lower insertion loss of 0.3 dB at 40GHz and were designed to compete in the higher performance market. As an initial matter, however, it is questionable whether the Court can determine consumer demand based solely on specific features of the device at issue. See DePuy Spine, 567 F.3d at 1330 ("[The first Panduit] factor does not require any allocation of consumer demand among the various limitations recited in a patent claim."). There was also substantial evidence before the jury for it to conclude that the BB capacitors and the 545L capacitors competed in the same "one-piece design" market, despite their different insertion loss statistics. (See, e.g., Trial Tr. Day 4, at 155:20-157:6, 162:17-162:23.) Accordingly, the Court finds the first Panduit factor satisfied.

### ii. Absence of acceptable noninfringing substitutes

ATC next argues that in the hypothetical "but for" market, the consumers would have chosen the noninfringing 540L capacitors over the BB capacitors due to: (1) better insertion loss of the 540L capacitors (0.5 dB at 40 GHz) versus the BB capacitors (0.9 dB at 40 GHz); and (2) standard industry size of the 540L capacitors (0402) versus non-standard size of the BB capacitors (0502). Moreover,

---

[36] For example, at trial, Presidio introduced one of ATC's own documents that set forth five reasons for embracing ATC's next generation ultra-broadband capacitor, the 545L. (See Pl. Opp. to Def. Motion for JMOL, Ex. G.) Among those five reasons were: (1) "[o]ne-piece construction, with its inherently higher reliability" and (2) "smaller size than all counterparts (consumes less space; reduces propensity to launch surfaces modes)." (See id.)

1   according to ATC, consumers looking for lower insertion loss could have also resorted to purchasing

2   DLI's Opti-Caps, or ATC's 520L or 530L capacitors. Consumers looking for a one-piece design could

3   have resorted to purchasing ATC's one-piece Monsorno 500S capacitors.

4        However, the "[m]ere existence of a competing device does not make that device an acceptable

5   substitute." <u>TWM Mfg. Co. v. Dure Corp.</u>, 789 F.2d 895, 901 (Fed. Cir. 1986). In the present case,

6   most of the alternatives identified by ATC assume that consumers would have preferred a two-piece

7   design with lower insertion loss over a one-piece design with higher insertion loss. However, there

8   was substantial evidence presented for the jury to conclude that this might not be the case, that the

9   desirability of ATC's 540L capacitors was declining, and that the market was moving toward the use

10  of one-piece capacitors. (<u>See, e.g.</u>, Trial Tr. Day 4, at 163:23-173:20.) Moreover, a product lacking

11  the advantages of the infringing device "can hardly be termed a substitute acceptable to the customer

12  who wants those advantages." <u>Kalman v. Berlyn Corp.</u>, 914 F.2d 1473, 1484 (Fed. Cir. 1990) (internal

13  quotation marks and citations omitted). In the present case, other drawbacks were identified at trial

14  that–if accepted by the jury–would have made many of the capacitors identified by ATC not very

15  desirable alternatives. (<u>See, e.g.</u>, Trial Tr. Day 2, at 140:3-140:17; Trial Tr. Day 3, at 116:18; Trial Tr.

16  Day 5, at 5:1-5:16, 110:24-110:25; Pl. Opp. to Def. Motion for JMOL, Ex. J.)

17       Finally, "[a] patentee need not negate every possibility that the purchaser might not have

18  purchased a product other than its own, absent the infringement." <u>Rite-Hite</u>, 56 F.3d at 1545 (citation

19  omitted); <u>accord</u> <u>King Instrument Corp. v. Otari Corp.</u>, 767 F.2d 853, 864 (Fed. Cir. 1985) ("[A

20  patentee] need not meet the impossible burden of negating every possibility that a purchaser might not

21  have bought another product or might not have bought any comparable product at all."). Rather, "[t]he

22  patentee need only show that there was a *reasonable probability* that the sales would have been made

23  'but for' the infringement." <u>Rite-Hite</u>, 56 F.3d at 1545; <u>accord</u> <u>King Instrument</u>, 767 F.3d at 864. In

24  the present case, for the reasons set forth above, Presidio has met its burden of showing "reasonable

25  probability" that "but for" the 545L capacitors, the consumers would have purchased the one-piece

26  BB capacitors. Accordingly, the Court finds the second <u>Panduit</u> factor satisfied.

27            *iii.    Calculating lost profits*

28       ATC next alleges a number of errors committed by Mr. Newman in calculating Presidio's lost

- 53 -

1   profits: (1) he did not account for the impact on the sales of BB capacitors caused by the recession;

2   (2) he should have reduced the final amount by 10-20% to reflect the sales of the 545L capacitors that

3   were made to ATC's largest customer, Richardson Electronics, with which ATC has an exclusive

4   agreement; (3) lost profits should be reduced to account for any 540L capacitors that would have been

5   sold in the hypothetical "but for" market at the 2006 manufacturing capacity level of 100,000; (4) it

6   was improper to exclude large customers, rather than large shipments, from the calculations; and (5)

7   based on Presidio's own financial statements, the miscellaneous incremental costs would have

8   accounted for 10% as opposed to Mr. Newman's arbitrary selection of 3%.

9          The Court rejects all of these objections because there was sufficient evidence presented to the

10   jury to support its lost profits verdict. For example, with respect to Richardson Electronics, although

11   it is true that it buys exclusively from ATC, Mr. Newman testified that the focus should be on the

12   customers that are buying the capacitors from Richardson. (See Trial Tr. Day 4, at 201:22-202:15.)

13   Accordingly, there was evidence for the jury to conclude that with 545L capacitors unavailable, those

14   customers could have purchased directly from Presidio rather from ATC through Richardson. (See id.)

15   Likewise, as was already noted, it was for the jury to decide whether customers in the hypothetical

16   "but for" market would have purchased any additional 540L capacitors. As for excluding largest

17   customers, instead of largest shipments, ATC's own expert testified that this was not necessarily

18   improper. (See Trial Tr. Day 6, at 121:6-121:18.) Finally, the jury was presented with two different

19   ways to adjust for miscellaneous costs, and therefore could reasonably choose to apply Presidio's

20   proposed selection of 3% instead of ATC's selection of 10%.

21          For the foregoing reasons, substantial evidence in the record supports both the application of

22   the first two Panduit factors and the overall amount of damages awarded. Accordingly, the Court

23   **DENIES** ATC's motion for JMOL with respect to the jury's verdict on lost profits.

24          B.     Supplemental damages

25          Presidio moves unopposed for supplemental damages in light of ATC's continued

26   infringement. Under Section 284, a finding of infringement requires the Court to award damages that

27   are "adequate to compensate" the plaintiff. 35 U.S.C. § 284. "'[S]upplemental damages are calculated

28   consistent with the damages awarded in the jury verdict.'" Bard Peripheral Vascular, Inc. v. W.L. Gore

& Assocs., Inc., No. CV-03-0597-PHX-MHM, 2009 WL 920300, at *3 (D. Ariz. Mar. 31, 2009) (citation omitted). Accordingly, the Court **ORDERS** that ATC provide an accounting for any sales of 545L capacitors occurring after December 1, 2009. Such accounting shall be submitted to the Court no later than **May 10, 2010**.

### C.    Enhanced damages

In light of the jury's finding of willful infringement, Presidio also moves for enhancement of damages. Upon a finding of infringement, Section 284 requires the court to award "damages adequate to compensate for the infringement." 35 U.S.C. § 284. The same section also gives the court discretion to "increase the damages up to three times the amount found or assessed." Id. However, for the damages award to be increased, the fact-finder must first determine "whether an infringer is guilty of conduct upon which increased damages may be based," such as an act of willful infringement or bad faith. Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 (Fed. Cir. 1996); see also In re Seagate Tech., LLC, 497 F.3d 1360, 1368 (Fed. Cir. 2007) (en banc) ("Absent a statutory guide, we have held that an award of enhanced damages requires a showing of willful infringement." (citations omitted)). Only once culpable conduct is established, "the court then determines, exercising its sound discretion, whether, and to what extent, to increase the damages award given the totality of the circumstances." Jurgens, 80 F.3d at 1570 (citation omitted). Moreover, "an infringer may generally avoid enhanced damages with a meritorious good faith defense and a substantial challenge to infringement." Delta-X Corp. v. Baker Hughes Prod. Tools, Inc., 984 F.2d 410, 413 (Fed. Cir. 1993) (citation omitted).

In the present case, in light of the JMOL on the issue of willfulness, the Court finds that Presidio is not entitled to enhanced damages. Prior to Seagate, the Federal Circuit has explicitly held that "'enhancement of damages *must be* premised on willful infringement or bad faith.'" See Beatrice Foods Co. v. New England Printing & Lithographing Co., 923 F.2d 1576, 1578 (Fed. Cir. 1991) (citations omitted) (emphasis added). The majority of the *en banc* court in Seagate did not elect to overrule Beatrice Foods, and this Court remains bound by that decision. See Cohesive Tech., Inc. v. Waters Corp., 543 F.3d 1351, 1374 (Fed. Cir. 2008). But see Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1574 (Fed. Cir. 1996) (suggesting that whether to enhance damages despite a finding of non-willfulness is discretionary). Moreover, the Federal Circuit recently reaffirmed that "[a] finding

of willful infringement is a *prerequisite* to the award of enhanced damages." i4i Ltd., 2010 WL 801705, at *19 (citing Seagate, 497 F.3d at 1368) (emphasis added); accord DePuy Spine, 567 F.3d at 1337. Accordingly, in light of the Court's conclusion that ATC's infringement was *not* willful, the Court **DENIES** Presidio's request for enhanced damages.

D.    Pre-judgment interest

Presidio moves for award of pre-judgment interest. Section 284 allows the Court to award pre-judgment interest "where necessary to afford the plaintiff full compensation for the infringement." Gen. Motors Corp. v. Devex Corp., 461 U.S. 648, 654 (1983) (citing 35 U.S.C. § 284). According to the Supreme Court, "prejudgment interest should ordinarily be awarded" to compensate the plaintiff for the "use of the money between the time of infringement and the date of the judgment." Id. at 655-56 (citing 35 U.S.C. § 284). The interest rate to be used, and whether to use simple or compounded interest, is left fully to the discretion of the court. Bio-Rad Labs., Inc. v. Nicolet Instrument Corp., 807 F.2d 964, 969 (Fed. Cir. 1986). Finally, the court also retains discretion to limit or even deny pre-judgment interest "where the patent owner has been responsible for undue delay in prosecuting the lawsuit." Gen. Motors, 461 U.S. at 656-57 (citations omitted).

As an initial matter, the Court rejects ATC's argument of "undue delay." According to ATC, pre-judgment interest is inappropriate because despite knowing that ATC began selling its 545L capacitors in June 2006, Presidio did not bring the suit until May 17, 2007, and even when it did bring the suit, Presidio did not have standing to enforce the '356 patent until May 8, 2008. ATC, however, fails to point to any evidence showing that Presidio knew of ATC's sales as soon as they commenced. Presidio also argues persuasively that its position has always been that it was appropriately named as the plaintiff in this matter from the beginning, and that ATC has not demonstrated otherwise. Accordingly, ATC has failed to demonstrate any "undue delay."

Likewise, the Court rejects ATC's argument that the interest should be awarded at the prime rate of 5.9%, rather than the statutory rate of 7%. ATC alleges that "courts routinely award pre-judgment interest at the prime rate, which approximates the actual interest cost of borrowing money for businesses much better than the inflexible statutory rate requested by Presidio," but fails to cite any support for that proposition. (See Def. Opp. to Pl. Motion for Post-Trial Remedies, at 16-17.) On

1  the contrary, California courts have found that a simple interest rate of 7% is usually appropriate to

2  fully compensate the plaintiff for the infringement.[37] See, e.g., In re Hayes Microcomputer Prod., Inc.

3  Patent Litig., 766 F. Supp. 818, 824 (N.D. Cal. 1991).

4        Accordingly, the Court awards Presidio pre-judgment interest in the amount of **simple interest**

5  **at seven percent** accruing from the date of first infringement, which in this case is June 2006.

6        E.    Post-judgment interest

7        The parties agree that pursuant to 28 U.S.C. § 1961, "[i]nterest shall be allowed on any money

8  judgment in a civil case recovered in a district court." Post-judgement interest is "calculated from the

9  date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity

10  Treasury yield, as published by the Board of Governors of the Federal Reserve System." 28 U.S.C.

11  § 1961; accord  Wordtech Sys., Inc. v. Integrated Network Solutions, Inc., No. 2:04-cv-01971-MCE-

12  EFB, 2009 WL 981843, at *7 (E.D. Cal. Apr. 13, 2009). Accordingly, Presidio is entitled to post-

13  judgment interest at the current rate.

14        F.    Attorney's fees

15        Presidio also argues it is entitled to attorney's fees pursuant to Section 295, which provides

16  that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35

17  U.S.C. § 285. A determination whether to award attorney fees is a two-step process. Forest Labs., Inc.

18  v. Abbott Labs., 339 F.3d 1324, 1327 (Fed. Cir. 2003). First, the Court must determine whether the

19  prevailing party has proved by clear and convincing evidence that the case is "exceptional." Id.

20  Second, if the Court finds the case to be exceptional, it must then determine whether an award of

21  attorney fees is "appropriate." Id. at 1328. The Federal Circuit, however, cautioned that Section 285

22  is an *exception* to the American Rule, and as such is "limited to circumstances in which it is necessary

23  to prevent 'a gross injustice.'" Id. at 1329 (reversing the district court's award of attorney fees that was

24  based on "patentee's bad-faith business conduct toward an accused infringer prior to litigation")

25  (citation omitted). Thus, a case is typically considered "exceptional" only if it involves "'inequitable

26  conduct before the Patent Office; litigation misconduct; vexatious, unjustified, and otherwise bad faith

27  

28        [37] In California, "[i]n the absence of any legislative act to the contrary, the rate of prejudgment interest is 7 percent." Pacific-Southern Mortgage Trust Co. v. Ins. Co. of North Am. 166 Cal. App. 3d 703, 716 (1985) (citing CAL. CONST. art. XV, § 1).

1   litigation; a frivolous suit or willful infringement.'" Id. (citations omitted).

2           None of the above factors are present here. As the Court already concluded, there was no

3   willful infringement. Likewise, although "[l]itigation misconduct and unprofessional behavior are

4   relevant to the award of attorney fees, and may suffice to make a case exceptional under § 285,"

5   Sensonics, 81 F.3d at 1574 (citations omitted), Presidio has failed to demonstrate this by clear and

6   convincing evidence. The circumstances in the present case do not rise to the level of vexatious,

7   unjustified, or frivolous litigation that have been found to satisfy an award of attorney's fees.[38] See,

8   e.g., Aptix Corp. v. Quickturn Design Sys., Inc., 269 F.3d 1369, 1374075 (Fed. Cir. 2001) (affirming

9   an award of attorney's fees under § 285 for the "extreme litigation misconduct" of falsifying

10  evidence); Eltech Sys. Corp. v. PPG Indus., Inc., 903 F.2d 805, 810-11 (Fed. Cir. 1990) (affirming an

11  award of attorney's fees where the suit was brought and maintained in bad faith). Accordingly,

12  because Presidio failed to show that the present case is "exceptional" as required by Section 285, the

13  Court **DENIES** Presidio's motion for award of attorney's fees.

14          G.      Recovery of costs

15          A successful plaintiff in a patent action may be entitled to recovery of its costs. See 35 U.S.C.

16  § 284; FED. R. CIV. P. 54(d); CIV. L. R. 54.1. ATC does not oppose Presidio's recovery of costs,

17  although it does challenge the propriety of some of the items for which Presidio seeks recovery.

18  Accordingly, the Court **GRANTS** Presidio award of its costs, subject to a later determination of

19  propriety of any specific item of recovery.

20  **IV.    False marking**

21          A.      Intent to deceive prior to October 24, 2008

22          ATC separately moves for a JMOL with respect to the jury's finding that Presidio did not have

23  the "intent to deceive" the public with its false marking prior to October 24, 2008. "Intent to deceive

24  _____

25          [38] The only case the Court found that awarded attorney's fees on somewhat similar facts was
    Cargill, Inc. v. Sears Petroleum & Transport Corp., 388 F. Supp. 2d 37, 77 (N.D. N.Y. 2005) (finding
26  the case "exceptional" where, among other things, the losing party "engaged in a strategy designed
    to drive up litigation expenses which, given its relative size, it [was] in a much better position to
27  absorb than the [patentee]"). However, in that case, the litigation misconduct was far more
    "overreaching"and involved a far greater lack of "candor and responsiveness" than what has been
    demonstrated in this case. See, e.g., id. at 77-79 (listing a multitude of reasons supporting the finding
28  of "vexatiousness," including filing multiple motions, making arguments of little or no legal
    significance, and continued failure to respond to requests for production of documents).

1   is a state of mind arising when a party acts with sufficient knowledge that what it is saying is not so

2   and consequently that the recipient of its saying will be misled into thinking that the statement is true."

3   Clontech Labs., Inc. v. Invitrogen Corp., 406 F.3d 1347, 1352 (Fed. Cir. 2005) (citation omitted). The

4   Federal Circuit has set forth the following standard:

> Intent to deceive, while subjective in nature, is established in law by objective criteria.
> Thus, "objective standards" control and "the fact of misrepresentation coupled with
> proof that the party making it had knowledge of its falsity is enough to warrant
> drawing the inference that there was a fraudulent intent." Thus, under such
> circumstances, the mere assertion by a party that it did not intend to deceive will not
> suffice to escape statutory liability. Such an assertion, standing alone, is worthless as
> proof of no intent to deceive where there is knowledge of falsehood. But in order to
> establish knowledge of falsity the plaintiff must show by a preponderance of the
> evidence that the party accused of false marking did not have a reasonable belief that
> the articles were properly marked (i.e., covered by a patent). Absent such proof of lack
> of reasonable belief, no liability under the statute ensues.

11   Id. at 1352-53 (internal citations omitted).

12       ATC argues that because the Devoes formed *no* belief as to whether they were properly

13   marking the BB capacitors, there is no way the jury could have found the Devoes had *a* "reasonable

14   belief" that BB capacitors were properly marked. See id. ATC, however, fails to recognize that as a

15   party alleging false marking, it has the burden of establishing "knowledge of falsity" by preponderance

16   of the evidence. See id. ATC can satisfy its burden by affirmatively demonstrating "*lack* of reasonable

17   belief." See id. (emphasis added). Notably, and fatal to ATC's motion, Presidio did not have to show

18   anything, much less that it *did* have a "reasonable belief," unless ATC first met its burden.

19       In any event, there was substantial evidence in the present case to support the jury's finding

20   that the Devoes *did* form a reasonable belief that BB capacitors were covered by the '356 patent. For

21   example, Dan Devoe testified that although he did not inquire as to whether the BB capacitors

22   practiced any of the claims of the '356 patent, he believed that they *did* practice the '356 patent. (Trial

23   Tr. Day 2, at 44:7-44:19.) Likewise, although Lambert Devoe initially testified that Presidio did not

24   "form a belief or understanding whether any particular claim of the '356 patent covered the BB

25   capacitor," he later clarified that Presidio "thought those [marking] decisions were correct," especially

26   in light of a cross-sectional diagram on the front cover of the '356 patent which "looks remarkably

27   similar" to the BB capacitors. (Trial Tr. Day 2, at 131:24-132:3; Trial Tr. Day 3, at 21:18-24:19.)

28   Similarly, Gunter Vorlop testified at his deposition that he believed that Presidio had a patent on its

1  BB capacitors, and that one of those patents was the '356 patent. (Vorlop Dep., at 207-08 (Jan. 6,

2  2009), <u>attached to</u> Def. Motion for JMOL on False Marking, Ex. 5.)

3        For the foregoing reasons, there was sufficient evidence for the jury to find that the Devoes

4  did not understand the intricacies of the marking process at the time the false marking took place, and

5  that they actually believed they *had* to mark their products in order to assert their patents and to protect

6  their rights. In light of this, there was substantial evidence before the jury to find that ATC has failed

7  to demonstrate that prior to October 24, 2008, the Devoes lacked a "reasonable belief" that the '356

8  patent covered the BB capacitors. <u>See</u> <u>Clonetech</u>, 406 F.3d at 1352-53. Accordingly, the Court

9  **DENIES** ATC's motion for JMOL on the issue of false marking.

10         B.      Amount of the fine

11        Section 292 provides: "Whoever marks upon, or affixes to, or uses in advertising in connection

12  with any unpatented article, the word 'patent' or any word or number importing that the same is

13  patented, for the purpose of deceiving the public . . . [s]hall be fined not more than $ 500 for every

14  such offense." 35 U.S.C. § 292(a). This Court previously adopted the "continuous act" test set forth

15  in <u>London</u>, 179 F. 506, concluding that "each time Presidio marked *a shipment*, it committed a false

16  marking offense." (MSJ Order, at 12-13 (emphasis added).) The Federal Circuit subsequently clarified

17  that Section 292 provides for false marking fines of any amount up to $500 *per article*. <u>See</u> <u>Forest</u>

18  <u>Group, Inc. v. Bon Tool Co.</u>, 590 F.3d 1295, 1304 (Fed. Cir. 2009). The <u>Bon Tool</u> court noted,

19  however, that the statute gives the court discretion to strike an appropriate balance "between

20  encouraging enforcement of an important public policy and imposing disproportionately large

21  penalties for small, inexpensive items produced in large quantities." <u>Id.</u> For example, the Federal

22  Circuit explained that "[i]n the case of inexpensive mass-produced articles, a court has the discretion

23  to determine that a fraction of a penny per article is a proper penalty." <u>Id.</u>

24        At this stage of the proceedings, the Court is faced with two questions: (1) how many of the

25  BB capacitors were "falsely marked" in violation of the statute, and (2) what should be the amount

26  of the fine for each violation. With regard to the first question, the Court rejects ATC argument that

27  there was a million BB capacitors shipped between October 24, 2008 and April 23, 2009. This figure

28  is based mostly on a single statement made by Lambert Devoe on cross-examination. (<u>See</u> Trial Tr.

1    Day 2, at 123:14-123:17.) Rather, the Court adopts Presidio's figure of 483,385, which is based on

2    Presidio's statements of the actual number of capacitors shipped.[39] (See Pl. Opp. to Def. Findings &

3    Conclusions on False Marking, Ex. D.) However, because the document submitted by Presidio only

4    has data starting from December 10, 2008, the Court will adjust this number proportionally to account

5    for the capacitors sold between October 24, 2008 and December 9, 2008. By Court's calculations, that

6    would be 168,290 additional capacitors sold,[40] bringing the total to 651,675 units.

7         In this context, the Court also rejects Presidio's proposal that the Court only assess fines for

8    those capacitors that were *shipped* with a falsely marked label. As ATC correctly points out, during

9    the relevant time, Presidio also advertised the BB capacitors in its catalog and on its website as

10   practicing the '356 patent. (See, e.g., Trial Tr. Day 2, at 125:16-126:18; Def. Findings & Conclusions

11   on False Marking, Exs. 12, RD, AHY_0004). Under Section 292, liability is imposed for "mark[ing]

12   upon," "affix[ing] to," as well as for "us[ing]" the patent in advertising. See 35 U.S.C. § 292(a).

13   Accordingly, just because Presidio did not *mark* all of the shipped BB capacitors with the '356 patent

14   does not change the fact that it violated the statute by *using* the '356 patent in advertising all of those

15   BB capacitors.[41] Accordingly, the Court finds that Presidio committed **651,675 separate offenses** for

16

17        [39] ATC does not really challenge the accuracy of this figure. The only objection comes from
     the fact that the figure only covers the BB capacitors shipped from December 10, 2009 until April 23,
18   2009. As is discussed further, this omission is easily correctable by adjusting the 483,385 figure
     proportionally for the 47 missing days between October 24, 2009 and December 9, 2009.
19
          [40] The parties appear to agree that the figure "483,385" corresponds to the time period between
20   December 10, 2009 and April 23, 2009, which amounts to 135 days. The parties also appear to agree
     that the figure does not include the 47 days between October 24, 2009 and December 9, 2009.
21   Accordingly, by dividing 483,385 units by 135 days, and then multiplying by 47 days, the Court
     determines that a proportional number of units sold during the earlier period amounts to 168,290.
22
          [41] To be used "in advertising," the false marking must have occurred in a medium or through
23   a channel designed to promote the unpatented product to consumers. See, e.g., Inventorprise, Inc. v.
     Target Corp., No. 09-CV00380, 2009 WL 3644076, at *4 (N.D. N.Y. Nov. 2, 2009) ("The term
24   'advertising' implies an act soliciting the general public regarding the product." (citation omitted));
     Chamilia, LLC v. Pandora Jewelry, LLC, No. 04-CV-6017 (KMK), 2007 WL 2781246, at *10 (S.D.
25   N.Y. Sept. 24, 2007) ("'Advertising' is defined as 'the action of calling something ... to the attention
     of the public especially by means of printed or broadcast paid announcements.'" (quoting WEBSTER'S
26   THIRD NEW INTERNATIONAL DICTIONARY (1993)); Accent Designs, Inc. v. Jan Jewelry Designs, Inc.,
     824 F. Supp. 957, 968-69 (S.D. N.Y. 1993) ("If every word and clause in the statute is to be given
27   effect, the expression 'uses in advertising' cannot refer to any and all documents by which the word
     'patent' is brought to the attention of the public; it can only refer to use of the word 'patent' in
28   publications which are designed to promote the allegedly unpatented product, namely,
     advertisements."). In the present case, there can be no doubt that using the '356 patent in connection

the 651,675 BB capacitors shipped between October 24, 2008 and April 2009.

Finally, with respect to the amount of the fine, the Court rejects the suggestions from both of the parties.[42] In determining the amount of the fine, the Court must strike an appropriate balance between enforcing the public policy embodied in the statute and not imposing a disproportionately large fine for relatively small violations. See Forest Group, 590 F.3d at 1304. In the present case, the Court believes a fine of $0.35 per unit suggested by ATC's own expert, Dr. Kennedy, appears to do just that. (See Def. Findings & Conclusions on False Marking, Ex. AIJ_0009.) On the one hand, by penalizing Presidio at a rate of about 32% of Presidio's overall average sales price of $1.07 per BB capacitor, (see id.), the fine is substantial enough to enforce the public policy embodied in the statute and to deter any similar violations in the future. On the other hand, by not imposing a disproportional liability for what appears to be an "inexpensive mass-produced article," the fine serves its deterrent function without over-penalizing Presidio. Accordingly, the Court adopts a fine of **$0.35 per unit**, which brings the total amount of the fine for false marking to **$228,086.25**.

## V.     Permanent injunction

Presidio next moves for a permanent injunction in light of the jury's verdict finding the '356 patent to be valid and infringed. The decision to grant or deny injunctive relief rests within the equitable discretion of the district court, and such discretion "must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 394 (2006). Accordingly, to be entitled to a permanent injunction, a plaintiff must satisfy the traditional four-factor test by demonstrating:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Id. at 391 (citations omitted). A patentee who does not practice the claimed invention can still obtain

---

with the BB capacitors in a catalog and on the website was designed to help promote the BB capacitors to the public, and therefore amounts to "advertising."

[42] ATC suggests punishing Presidio with a hefty fine of $1.00 for each BB capacitor shipped, while Presidio argues the fine should be literally "a fraction of a penny" per article.

1   an injunction, provided the above four-factor test is satisfied. See Broadcom Corp. v. Qualcomm Inc.,

2   543 F.3d 683, 703 (Fed. Cir. 2008) (citations omitted).

3          A.     Irreparable injury

4                 i      Presumption of irreparable injury

5          In their moving papers, the parties appear to dispute whether Presidio is entitled to a

6   presumption of irreparable injury in light of the jury's finding that the '356 patent is valid and

7   infringed. Presidio alleges numerous courts have granted permanent injunctions in similar

8   circumstances, by following the Federal Circuit's pronouncement that "[i]n matters involving patent

9   rights, irreparable harm has been presumed when a clear showing has been made of patent validity and

10  infringement." See Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1247 (Fed. Cir. 1989) ("This

11  presumption derives in part from the finite term of the patent grant, for patent expiration is not

12  suspended during litigation, and the passage of time can work irreparable harm."). ATC  argues that

13  many of those cases were decided before the Supreme Court clarified the state of the law with respect

14  to permanent injunctions in eBay, 547 U.S. 388.

15         The parties also cite to conflicting post-eBay Federal Circuit case law on this issue. On the one

16  hand, Presidio argues the Federal Circuit has recently indicated that "[i]t remains an open question

17  'whether there remains a rebuttable presumption of irreparable harm following eBay.'" See Broadcom

18  Corp. v. Qualcomm Inc., 543 F.3d 683, 702 (Fed. Cir. 2008) (quoting Amado v. Microsoft Corp., 517

19  F.3d 1353, 1359 n.1 (Fed. Cir. 2008)). On the other hand, ATC argues that in a more recent, but

20  nonprecedential, decision the Federal Circuit stated that the old presumption "is no longer the law."

21  See Automated Merchandising Sys., Inc. v. Crane Co., 2009 WL 4878643, at *3 (Fed. Cir. Dec. 16,

22  2009) (unpublished opinion); see accord Graceway Pharms., LLC v. Perrigo Co., — F. Supp. 2d —,

23  2010 WL 892195, at *3 (D. N.J. Mar. 8, 2010) (noting the split). At oral argument, however, Presidio

24  conceded that it was not relying on any presumption of irreparable injury in this case. Accordingly,

25  the Court need not decide this question.

26                ii.    No irreparable injury

27         The question of presumption aside, Presidio's assertion of irreparable injury can be broken

28  down into several distinct arguments. First, Presidio alleges that ATC and it are direct competitors

who compete in the same market for some of the same customers. As previously noted, however, there

was conflicting testimony at trial on whether the BB capacitors and the 545L capacitors competed for

the same customers, and whether this was solely a two-competitor market. At most, Presidio has only

shown that: (1) *some* of ATC's customers for the 545L capacitors are the same as Presidio's customers

for the BB capacitors; (2) the two products are sold in *some* of the same markets; and (3) Presidio was

*at times* seen as ATC's only true competitor. In opposition, ATC has presented evidence that: (a) the

BB capacitors are only competitive at the lower level of performance market (i.e., insertion loss of 0.9

dB at 40GHz) at lower prices; (b) at that level they really compete only with DLI's Opticap and

Millicap; and (c) ATC's 545L capacitors are more superior (insertion loss of 0.3 dB at 40GHz), and

ATC offers them at a higher price. In light of this testimony, the Court cannot say that Presidio has

carried its burden of demonstrating that ATC and it were direct competitors. See Adv. Cardiovascular

Sys., Inc. v. Medtronic Vascular, Inc., 579 F. Supp. 2d 554, 558 (D. Del. 2008) ("Courts awarding

permanent injunctions typically do so under circumstances where plaintiff practices its invention and

is a direct market competitor."); Amado v. Microsoft Corp., Case No. SA CV 03-242 DOC (ANx),

2007 U.S. Dist. LEXIS 96487, at *39 (C.D. Cal. May 13, 2007) (finding no irreparable injury where

the evidence at trial demonstrated that the patentee did not compete with the alleged infringer, did not

sell a product covered by the patent, and was no longer even attempting to commercialize or license

the patent), affirmed in relevant part, 517 F.3d 1353, 1360-61 (Fed. Cir. 2008).

Second, even if the Court accepts Presidio's allegations of a two-competitor market, that does

not automatically lead to the conclusion that there is irreparable injury. Rather, Presidio still has to

provide at least some data on any specific sales or customers lost, or what its share of the market is.

See, e.g., Adv. Cardiovascular Sys., 579 F. Supp. 2d at 558 (finding no irreparable injury where, *inter*

*alia*, the patentee "has not identified any specific customers it has lost, or stands to lose, directly as

a result of [the infringing sales]"); Am. Calcar, Inc. v. Am. Honda Motor Co., Case No. 06cv2433

DMS (CAB), 2008 U.S. Dist. LEXIS 106476, at **2-3 (S.D. Cal. Nov. 18, 2008) (finding no

irreparable injury where the patentee's arguments were purely speculative and where the patentee

failed to submit any evidence to support its assertion that "'it has not been able to pursue relationships

with other companies'" (citation omitted)); Praxair, Inc. v. ATMI, Inc., 479 F. Supp. 2d 440, 443-44

1  (D. Del. 2007) (finding no irreparable injury, despite a jury finding of validity and infringement, where

2  the patent holder "has not provided or described any specific sales or market data to assist the court,

3  nor has it identified precisely what market share, revenues, and customers [the patentee] has lost to

4  [the infringer]" (citations omitted)). In the present case, aside from vague and conclusory allegations,

5  Presidio has provided no such data.[43] (See generally Pl. Motion for Perm. Inj., at 15-18.) Likewise,

6  Presidio has not provided any support for its alleged loss of good will and reputation in the

7  marketplace. See, e.g., Am. Calcar, 2008 U.S. Dist. LEXIS 106476, at *3 (finding no irreparable

8  injury where the alleged reputation harm was "purely speculative"); Praxair, 47 F. Supp. 2d at 444

9  (concluding that the patentee's "desire to become a monopoly supplier in its product's market is hardly

10 unique, and is not conclusive evidence of any factor").

11     Third, to the extent Presidio argues that irreparable injury can be established solely on the basis

12 of the statutory right to exclude, see 35 U.S.C. § 154(a)(1), that argument is foreclosed by the Supreme

13 Court's decision in eBay. See 547 U.S. at 392 (rejecting the Federal Circuit's approach, pursuant to

14 which the "statutory right to exclude alone justifies its general rule in favor of permanent injunctive

15 relief"); accord IMX, Inc. v. LendingTree, LLC, 469 F. Supp. 2d 203, 225 (D. Del. 2007).

16     Finally, Presidio's unwillingness to license the '356 patent does not change the Court's

17 determination. In eBay, 547 U.S. at 393, the Supreme Court stated that the patentee's "willingness to

18 license its patents" and "its lack of commercial activity in practicing the patents" cannot be used as

19 categorical bars to finding irreparable injury. However, nothing in eBay precludes the Court from

20 considering these as part of the totality of factors in determining whether the plaintiff carried its

21 burden in demonstrating that it will suffer an irreparable injury. In the present case, Presidio's failure

22 to practice the '356 patent weighs against the finding of irreparable injury. On the other hand,

23 Presidio's unwillingness to license the '356 patent weighs in favor of finding irreparable injury. See

24 Adv. Cardiovascular Sys., 579 F. Supp. 2d at 560-61 ("[P]ermanent injunctions are typically granted

25 in two-competitor situations where the patentee has demonstrated an unwillingness to part with the

26

27      [43] In this regard, Presidio's reliance on I-Flow Corp. v. Apex Med. Techs., Inc., No. 07cv1200 DMS (NLS), 2010 WL 141402 (S.D. Cal. Jan. 8, 2010), is misplaced. In that case, Judge Sabraw expressly found that "Plaintiff has demonstrated it lost market share, the right to control its patent

28 license agreement, and its competitive advantage as a result of Defendants' conduct," which was sufficient to find irreparable injury. Id. at *1. Presidio failed to demonstrate those things here.

1   exclusive right" (citations omitted)). However, the "unwillingness to license" is not sufficient by itself

2   to outweigh the other factors discussed above that weigh against the finding of irreparable injury.

3           B.       Adequacy of money damages

4           Section 283 provides that "[t]he several courts having jurisdiction of cases under this title *may*

5   grant injunctions in accordance with the principles of equity to *prevent* the violation of any right

6   secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283 (emphases added).

7   "Under some circumstances, awarding an ongoing royalty for patent infringement in lieu of an

8   injunction may be appropriate." Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1314 (Fed. Cir.

9   2007). However, the decision to award an ongoing royalty would usually come *after* the court has

10  applied the four-factor test and determined that an injunction should not issue. Id. at 1314-15.

11          "While money damages are generally considered inadequate to compensate for the violation

12  of a patentee's right to exclude, [the patentee] nonetheless [has] a burden to iterate *specific reasons*

13  why [the] infringement can not be compensated for with a money award." Praxair, 479 F. Supp. 2d

14  at 444 (citation omitted) (emphasis added). In the present case, Presidio has not carried its burden.

15  Presidio argues that the effects of future infringement cannot be fully measured in dollars, but fails

16  to explain why money damages would not adequately compensate it for any alleged "lost market

17  share" or any future lost opportunities. See id. (rejecting similar arguments). As already noted,

18  Presidio's "desire to become a monopoly supplier [of innovative solutions] in its product's market is

19  hardly unique, and is not conclusive of any factor." See id. In addition, "'loss of market share and

20  price erosion are *economic* harms and *are* compensable by money damages.'" See Graceway, 2010

21  WL 892195, at *6 (citation omitted).

22          Many of Presidio's arguments to the contrary are based on its assertion that injury to

23  "tangential benefits"–such as reputation and good will–cannot be compensated with monetary

24  damages. See, e.g., Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 975-76 (Fed. Cir. 1996) (" Years

25  after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's)

26  exclusive position by an award of damages and a permanent injunction."); Atlas Powder Co. v. Ireco

27  Chems., 773 F.2d 1230, 1233 (Fed. Cir. 1985) ("The patent statute further provides injunctive relief

28  to preserve the legal interests of the parties *against future infringement* which may have market effects

1   never fully compensable in money."); Fisher-Price, Inc. v. Safety 1st, Inc., 279 F. Supp. 2d 526, 528

2   (D. Del. 2003) ("In addition, there are certain tangential benefits associated with patent rights, such

3   as a marketplace reputation for enforcing one's patents, the value of which cannot be quantified in

4   monetary damages." (citation omitted)). However, as previously noted, Presidio provides no evidence

5   that it lost or will lose any specific customers or sales due to ATC's infringement, or that it has

6   suffered any "lost market share" or "price erosion." Likewise, there is no evidence demonstrating that

7   Presidio's reputation as a provider of unique solutions has been damaged by the infringement. In any

8   event, the Court believes that Presidio can be adequately compensated for any "tangential benefits

9   associated with patent rights," including any damage to reputation and good will, by an "ongoing

10  royalty," which is appropriate in cases where the patentee does not practice the patent in suit or the

11  infringing product serves the public interest, both of which are true here. See Paice, 504 F.3d at 1314.

12        Finally, the Court is not persuaded by Presidio's argument that awarding it damages instead

13  of an injunction would essentially force Presidio to grant a license to ATC after it has made a strategic

14  choice not to license its patent. See 3M Innovative Props. Co. v. Avery Dennison Corp., Case No. 01-

15  1781 (JRT/FLN), 2006 WL 2735499, at *1 (D. Minn. Sept. 25, 2006) (noting that the court would "not

16  disturb [patentee's] determination that its business interests will not be served by the licensing of this

17  product"). If this was the unequivocal rule in every case, then the Court would be forced to grant every

18  request for a permanent injunction whenever the patentee refused to license the claimed invention.

19  Rather, this is at most only one factor that the Court can consider in determining the adequacy of

20  monetary damages. In the present case, even if the Court agrees with Presidio that an ongoing royalty

21  would amount to a de facto "license," that by itself does not outweigh the other factors discussed

22  above that weigh in favor of finding adequacy of monetary damages.

23        C.        Balance of hardships

24        The balance of hardships in this case tips in Presidio's favor. On the one hand, in light of the

25  fact that Presidio does not practice the '356 patent or has any intention to do so in the future, the only

26  harm that it will suffer is based on the already-rejected "tangential benefits." On the other hand, ATC

27  asserts that an abrupt termination of the 545L capacitor product line would be detrimental to its

28  business and to the business of its customers. However, as Presidio correctly points out, "'[o]ne who

elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.'" Broadcom, 543 F.3d at 704 (citation omitted). Accordingly, the Court cannot accept as a hardship the mere fact that ATC would have to abruptly stop selling its infringing 545L capacitors. Moreover, if ATC's argument is to be believed, with 545L capacitor off the market, its 540L capacitor should generate a good demand, thereby minimizing potential damages to ATC.

D.     Public interest

The public interest factor in this case tips in ATC's favor. "Successful exploitation" of the patent by the infringer does not allow the infringer to avoid a permanent injunction. See Broadcom, 543 F.3d at 704. Rather, public interest is implicated only where the product at issue is of unusual social benefit. See Adv. Cardiovascular Sys., 579 F. Supp. 2d at 560. In the present case, ATC argues persuasively that enjoining the sale of 545L capacitors will hurt important government, military, space, and infrastructure projects, as well as many critical civilian industries. Presidio's arguments to the contrary are unavailing. According to Presidio, the grant of an injunction would serve the following three public interests: (1) "[t]he interest in maintaining a strong patent system;" (2) "the interest in fair and healthy competition;" and (3) "the interest in discouraging future wrongdoing." I-Flow Corp., 2010 WL 141402, at *7. However, those three public interests are always present in a patent case! If they were sufficient by themselves for an injunction to issue, then a patentee would be entitled to an injunction any time a patent is found to be valid and infringed. The Supreme Court has rejected any such notion, noting that each of the factors in the traditional four-factor test must be separately analyzed. See eBay, 547 U.S. at 391-94.

E.     Conclusion

Accordingly, because Presidio has failed to carry its burden in demonstrating that it will suffer an irreparable injury in the absence of an injunction or that money damages are inadequate to compensate it, and because the public interest tips in ATC's favor, the Court **DENIES** Presidio's motion for a permanent injunction.

Having declined to issue an injunction, the Court must next consider whether an imposition of an "ongoing royalty" will be appropriate. "Under some circumstances, awarding an ongoing royalty

1   for patent infringement in lieu of an injunction may be appropriate." <u>Paice</u> 504 F.3d at 1314. However,

2   such a remedy is not always warranted. <u>See id.</u> at 1314-15 ("But, awarding an ongoing royalty where

3   'necessary' to effectuate a remedy, . . . does not justify the provision of such relief as a matter of

4   course whenever a permanent injunction is not imposed."). Rather, "the district court may wish to

5   allow the parties to negotiate a license amongst themselves regarding future use of a patented

6   invention before imposing an ongoing royalty. Should the parties fail to come to an agreement, the

7   district court could step in to assess a reasonable royalty in light of the ongoing infringement." <u>Id.</u>

8          Accordingly, the Court **ORDERS** that the parties submit supplemental briefing on whether

9   the Court should allow them to negotiate their own license agreement, or whether the Court should

10  impose a specific amount of "ongoing royalty." Because this is Presidio's motion, Presidio shall file

11  the first brief no later than **April 26, 2010**. ATC shall file a response no later than **May 10, 2010**.

12  Presidio shall file any reply no later than **May 17, 2010**.

13                                    **CONCLUSION**

14         To the extent ATC also seeks a new trial on the issues of validity, infringement, lost profit

15  damages, [Doc. No. 309], and false marking before October 24, 2008, [Doc. No. 308], the Court

16  **DENIES** those motions for the same reasons as set forth above. Having reviewed the parties'

17  arguments and the evidence adduced at trial, the Court cannot say that "'the verdict is contrary to the

18  clear weight of the evidence, or is based upon evidence which is false,'" or that a new trial is

19  necessary "'to prevent . . . a miscarriage of justice.'" <u>See</u> <u>Hangarter</u>, 373 F.3d at 1005.

20         For the foregoing reasons, the Court rules as follows:

21         (1)    Presidio's Motion for Permanent Injunction is **DENIED**. Presidio shall file a

22  supplemental brief no later than **April 26, 2010** on whether the Court should allow the parties to

23  negotiate their own license agreement, or whether the Court should impose a specific amount of

24  "ongoing royalty." ATC shall file a response no later than **May 10, 2010**. Presidio shall file any reply

25  no later than **May 17, 2010**.

26         (2)    Presidio's Motion for Post Trial Remedies is **GRANTED IN PART and DENIED IN**

27  **PART**. Specifically, the Court **DENIES** Presidio's request for enhanced damages and attorney's fees.

28  On the other hand, the Court **GRANTS** Presidio's request for supplemental damages, and for award

of pre-judgement and post-judgment interest and costs. With respect to supplemental damages, the Court **ORDERS** that ATC provide an accounting for any sales of 545L capacitors occurring after December 1, 2009. Such accounting shall be submitted to the Court no later than **May 10, 2010**. With respect to the pre-judgment interest, the Court awards Presidio pre-judgment interest in the amount of **simple interest at seven percent** accruing from the date of first infringement, which in this case is June 2006. The Court also awards Presidio post-judgment interest at the currently applicable rate.

(3)     ATC's Motion for JMOL or for New Trial with Respect to Presidio's False Marking Before October 24, 2008 is **DENIED**.

(4)     ATC's Motion for JMOL and for New Trial is **GRANTED IN PART and DENIED IN PART**. Specifically, the Court **GRANTS** ATC's motion with respect to willfulness of infringement. In all other respects, the Court **DENIES** ATC's motion.

(5)     ATC's Motion for Entry of ATC's Proposed Findings of Fact and Conclusions of Law with Respect to Presidio's False Marking is **GRANTED IN PART and DENIED IN PART**. The Court finds that Presidio committed **651,675 separate offenses** between October 24, 2008 and April 2009 for the 651,675 BB capacitors shipped during that time, and that the appropriate fine should be **$0.35 per unit**. Accordingly, the total amount of the fine for false marking is **$228,086.25**.

(6)     ATC's Motion for Entry of ATC's Proposed Findings of Fact and Conclusions of Law Regarding Indefiniteness is **DENIED**.

(7)     ATC's Motion for Entry of ATC's Proposed Findings of Fact and Conclusions of Law Regarding Unenforceability of the '356 Patent for Inequitable Conduct is **DENIED**.

**IT IS SO ORDERED.**

**DATED:  April 13, 2010**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**