1   Daniel T. Pascucci, Esq. (SBN 166780)
    dpascucci@mintz.com
2   Nathan R. Hamler, Esq.  (SBN 227765)
    nhamler@mintz.com
3   MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO PC
    3580 Carmel Mountain Road, Suite 300
4   San Diego, CA 92130
    Telephone: (858) 314-1500
5   Facsimile:  (858) 314-1501

6   Marvin S. Gittes, Esq. (*pro hac vice in case no. 3:07-cv-00893-IEG(NLS)*)
    E-mail: mgittes@mintz.com
7   Timur E. Slonim, Esq. (*pro hac vice in case no. 3:07-cv-00893-IEG(NLS)*)
    tslonim@mintz.com
8   Peter F. Snell, Esq. (*pro hac vice in case no. 3:07-cv-00893-IEG(NLS)*)
    E-mail: psnell@mintz.com
9   MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO PC
    666 Third Avenue
10  New York, NY 10017
    Telephone:  (212) 935-3000
11  Facsimile:   (212) 983-3115

12  Attorneys for Defendant/Counter-Claimant
    AMERICAN TECHNICAL CERAMICS CORP.

13

14                      UNITED STATES DISTRICT COURT

15                    SOUTHERN DISTRICT OF CALIFORNIA

16

17   PRESIDIO COMPONENTS, INC.,

18                    Plaintiff,

19            v.                                 Case No. 3:08-cv-00335-IEG-NLS

20   AMERICAN TECHNICAL CERAMICS CORP.,          **AMENDED NOTICE OF APPEAL**

21                    Defendant.

22   ─────────────────────────────────
     AMERICAN TECHNICAL CERAMICS CORP.,
23
                      Counter-Claimant,
24                                               Chief Judge Irma E. Gonzalez
              v.
25
     PRESIDIO COMPONENTS, INC.,
26
                      Counter-Defendant.
27

28

Pursuant to Fed. R. App. P. 3 and 4(a)(4)(B)(i)-(iii) and 28 U.S.C. § 1291, Amended Notice of Appeal is hereby given that Defendant American Technical Ceramics Corp. ("ATC") appeals to the United States Court of Appeals for the Federal Circuit from:

this Court's Order dated October 26, 2010 denying ATC's motion to amend judgment or for a new trial regarding anticipation and obviousness based on newly discovered evidence and Presidio's failure to disclose it to ATC (Dkt. No. 388);

Judgment (Dkt. No. 387);

Order dated October 26, 2010 directing the Clerk to enter judgment, *inter alia*, against ATC and in favor of Presidio (Dkt. No. 386);

Order dated August 25, 2010 denying ATC's motion to amend judgment or for a new trial regarding Presidio's false marking prior to October 24, 2008 based on intervening law (Dkt. No. 377);

Order dated August 5, 2010 setting supplemental damages for the period between December 1, 2009 and April 13, 2010 and setting ongoing royalty rate for the period after April 13, 2010, both adversely to ATC (Dkt. No. 367);

Order dated April 13, 2010 (Dkt. No. 348) denying in part, *inter alia*, ATC's motions for judgment as a matter of law and/or for a new trial [Doc. No. 309] and with respect to Presidio's false marking before October 24, 2008 [Doc. No. 308], and denying ATC's motion for entry of ATC's proposed findings of fact and conclusions of law regarding indefiniteness [Doc. No. 311], unenforceability of the '356 patent for inequitable conduct [Doc. No. 312], and Presidio's fines for false marking [Doc. No. 310];

Orders denying ATC's oral motions pursuant to Rule 50 (Dkt. Nos. 283, 287, 290, 292)

Order denying ATC's request that plaintiff produce original documents for reproduction (Dkt. No. 275);

Order granting Presidio's Motion in Limine to Preclude Evidence of Reexamination of the '356 Patent (Dkt. No. 252);

Order denying ATC's motions in limine and granting Presidio's motions in limine (Dkt. No. 250);

Order denying ATC's Argument Regarding Proposed Additional Admitted and Uncontested Facts (Dkt. No. 198);

Order denying ATC's Motion to Compel Plaintiff to Comply with Court's Order and to Produce Documents (Dkt. No. 178);

Order denying ATC's Motion for Leave to Amend Answer and Counterclaims (Dkt. No. 177);

Order denying in part ATC's Motion for Leave to Take Deposition of Presidio's Expert Witnesses (Dkt. No. 98);

Order granting in part Presidio's motion to compel (Dkt. No. 69);

Order granting Presidio's Motion to Quash ATC's Objections to Disclosure to Experts; Denying ATC's Motion to Disqualify Dr. Ewell (Dkt. No. 59);

Order denying in part ATC's Motion To Compel Plaintiff To Produce Documents And Respond To Interrogatories (Dkt. No. 58);

Order denying ATC's Motion For Summary Judgment Of Indefiniteness (Dkt. No. 32);

Claim Construction Order (Dkt. No. 24);

Any future Order(s) awarding any costs to Presidio; and

any and all other orders, rulings, findings, and/or conclusions of the Court adverse to ATC.

The amount of $455 for the $450 fee for docketing a case on appeal specified in 28 U.S.C. § 1913 and the $5 fee for filing a Notice of Appeal specified in 28 U.S.C. § 1917 has been previously paid with the original notice of appeal, Receipt No. CAS013351. (Dkt. No. 357). "No additional fee is required to file an amended notice." Fed. R. App. P. 4(a)(4)(B)(iii).

1    Dated:  November 24, 2010                Respectfully submitted,

2                                             MINTZ, LEVIN, COHN, FERRIS,
                                              GLOVSKY AND POPEO, P.C.
3

4                                             By:____/s/ Timur E. Slonim_____
5                                                  Daniel T. Pascucci, Esq.
                                                   dpascucci@mintz.com
6                                                  Nathan R. Hamler, Esq.
                                                   nhamler@mintz.com
7                                                  Ben Wagner, Esq.
                                                   bwagner@mintz.com
8                                                  Marvin S. Gittes, Esq. (*pro hac vice*)
                                                   mgittes@mintz.com
9                                                  Timur E. Slonim, Esq. (*pro hac vice*)
                                                   tslonim@mintz.com
10                                                 Peter F. Snell, Esq. (*pro hac vice*)
                                                   psnell@mintz.com
11                                                 **MINTZ, LEVIN, COHN, FERRIS,**
                                                      **GLOVSKY AND POPEO, P.C.**
12                                                 666 Third Avenue
                                                   New York, NY 10017
13                                                 Telephone:  (212) 692-6800
                                                   Facsimile:   (212) 983-3115
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED NOTICE OF APPEAL                                    Case No. 3:08-cv-00335-IEG-NLS

1

**CERTIFICATE OF SERVICE**

2

3          I, the undersigned, certify and declare that I am over the age of 18 years, employed in the

4   County of New York, State of New York, and am not a party to the above-entitled action.

5          On November 24, 2010, I caused a copy of the following document(s):

6          **AMENDED NOTICE OF APPEAL**

7   to be served by electronically filing the foregoing with the Clerk of the Court using the CM/ECF

8   system which will send notification of such filing to the following:

9

10         Miles D. Grant, Esq.                          Attorneys for Plaintiff
           **Grant & Zeko, APC**                         PRESIDIO COMPONENTS, INC.
11         1331 India Street
           San Diego, CA  92101                          Email:  mgrant@grantandzeko.com
12
           Brett A. Schatz, Esq.                         Attorneys for Plaintiff
13         Gregory F. Ahrens, Esq.                       PRESIDIO COMPONENTS, INC.
           **Wood Herron and Evans**
14         441 Vine Street                               Email:  bschatz@whepatent.com
           2700 Carew Tower                                       gahrens@whepatent.com
15         Cincinnati, OH  45202

16

17         Executed on November 24, 2010, in New York, New York.

18

19                                        /s/ Timur E. Slonim
                                          Timur Slonim
20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

11

PRESIDIO COMPONENTS, INC.,

12

Plaintiff,

13

vs.

14

AMERICAN TECHNICAL CERAMICS
CORP.,

15

Defendant.

16

CASE NO. 08cv335-IEG(NLS)

Order Denying Defendant ATC's
Motion to Amend Judgment or for
New Trial [Doc. No 369]

17
18

Defendant American Technical Ceramics Corp. ("ATC") moves the Court under Fed. R.

19

Civ. P. 60(b) and Civ. L.R. 7.1(i)(2) to amend that portion of its April 13, 2010 order denying

20

ATC's motion for JMOL, or for a new trial, with respect to anticipation and obviousness of the

21

'356 patent. Plaintiff Presidio Components, Inc. ("Presidio") filed an opposition and ATC filed a

22

reply. Thereafter, Presidio submitted additional evidence relating to the motion and ATC

23

submitted a supplemental reply.

24

The Court found ATC's motion appropriate for submission on the papers and without oral

25

argument, and previously vacated the hearing. For the reasons explained herein, ATC's motion is

26

DENIED.

27

## ***Background***

28

The case was tried to a jury in December 2009, resulting in a verdict finding all of the

Plaintiff's asserted patent claims to be valid and infringed. The jury found ATC failed to prove, by clear and convincing evidence, that any of the claims of the '356 patent were anticipated or obvious.[1]

In its post-trial motions, ATC sought judgment as a matter of law that certain prior art anticipated the claims of the '356 patent and that the asserted claims of the '356 patent were obvious to a person of ordinary skill in light of the prior art. The Court denied ATC's motion by order filed on April 13, 2010. [Doc. No. 348, pp. 18.]

ATC now moves the Court for an order vacating that portion of its April 13, 2010 order denying ATC's post-trial motions on anticipation and obviousness, or in the alternative for a new trial on such issues. ATC argues there is newly discovered evidence, of which Presidio knew but failed to disclose the evidence during trial. ATC argues the new evidence shows as a matter of law that the claims of the '356 patent were anticipated by, and made obvious in light of, prior art.

The new evidence upon which ATC relies is the "Sprague publication." [Fabricius, J.H. and Olsen, A.G., *Monolithic Structure – A New Concept for Ceramic Capacitors*, Sprague Technical Paper No. 58-6 "Wescon" Western Electric Show and Convention, Los Angeles, California, August 21, 1958, attached as Exhibit 1 to ATC's motion.] Presidio learned of the Sprague publication during trial, when a Presidio employee obtained it through a third party. ATC learned of the Sprague publication in May of 2010 when Presidio cited it to the U.S. Patent and Trademark Office in the ongoing reexamination proceedings.

### *Discussion*

ATC argues it is entitled to relief under Fed. R. Civ. P. 60(b)(2) or (3). Rule 60(b)(2) provides for relief from judgment based upon newly discovered evidence. Rule 60(b)(3) provides for relief from a judgment based upon "fraud, ... misrepresentation, or misconduct by an opposing party." While Rule 60(b)(2) is aimed at correcting judgments which are factually incorrect, Rule 60(b)(3) is aimed at judgments which were unfairly obtained. Bunch v. United States, 680 F.2d

---

[1] The jury was asked to determine whether claims 1-5, 16, 18, and 19 of the '356 patent were obvious in light of the combination of the Heron patent (U.S. Patent No. 4,931,901) with the Aoyagi patent (U.S. Patent No. 5,978,205), or whether claims 2 or 4 of the '356 patent were obvious in light of the combination of the August 2000 capacitors which Presidio sold to JDS Uniphase with the Aoyagi patent. [Doc. No. 298, pp. 3-4.]

08cv335

1271, 1283 (9ᵗʰ Cir. 1982).

*A.*    *Rule 60(b)(2)*

The court may grant relief under Rule 60(b)(2) where

(1) the moving party can show the evidence relied on in fact constitutes "newly discovered evidence" within the meaning of Rule 60(b); (2) the moving party exercised due diligence to discover this evidence; and (3) the newly discovered evidence [is] of "such magnitude that production of it earlier would have been likely to change the disposition of the case."

Feature Realty, Inc. v. City of Spokane, 331 F.3d 1082, 1093 (9ᵗʰ Cir. 2003) (quoting Coastal Transfer Co. v. Toyota Motor Sales, U.S.A., Inc., 833 F.2d 208, 211 (9ᵗʰ Cir. 1987)).  ATC argues the Sprague publication is newly discovered, which could not have been discovered earlier, and would most certainly have changed the disposition of the case.

1.  New evidence and diligence

Although ATC only learned of the Sprague publication in May of 2010, Presidio argues it is not "newly discovered" because it was, and always has been, publicly available.  The Sprague publication was presented at the Western Electronic Show and Convention in 1958, and republished in 2002 in Passive Component Industry Magazine, "a high-end online publication dedicated to the promotion of the passive electronic component industry." http://www.passivecomponentmagazine.com.  Presidio argues ATC could have located the publication by diligently searching the internet.

Newly discovered evidence for purposes of Rule 60(b)(2) is evidence that was not "in the moving party's possession at the time of trial or could [not] have been discovered with reasonable diligence."  Coastal Transfer Co., 833 F.2d at 212.  Readily available public information typically cannot constitute "newly discovered evidence" within the meaning of Rule 60(b)(2).  PageMasters, Inc. v. Oce-Technologies, B.V., 2007 WL 2696854 (D. Ariz. 2007) (citing Scutieri v. Paige, 808 F.2d 785, 794 (11ᵗʰ Cir. 1987)).  Here, however, it is not apparent that the Sprague publication was readily available to the public such that ATC could have discovered it upon a diligent search of the internet.  In opposition to ATC's motion, Presidio attaches the results of an internet search it performed, which contains a link to the Sprague publication.  Presidio, however, performed its search on a less-than-mainstream search engine, using search terms contained in the title of the

publication rather than terms that were relevant and in dispute in this case. The search revealed 56,400 results, and the Sprague publication was on the page containing results 91-100. [Presidio's Opposition, Exhibit B.] ATC used the same terms to conduct a search on Google, and the Sprague article did not appear among the first 100 results. [Reply Declaration of Peter Snell, Exhibit 2.] Presidio, itself, was not aware of the Sprague publication until after the start of trial. Therefore, the Sprague publication was not readily available to the public and constitutes newly discovered evidence within the meaning of Rule 60(b)(2).

Furthermore, ATC engaged in extensive efforts to uncover relevant prior art to the '356 patent. Counsel for ATC spent over 200 hours searching for relevant prior art, and ATC hired three outside search firms to perform prior art searches. [Declaration of Peter Snell in Support of Motion, Exhibit 3 to ATC's motion, ¶ 2.] ATC has shown it exercised due diligence but nonetheless did not learn of the Sprague publication until after conclusion of the trial in this case.

## 2. Importance of the Sprague publication

ATC is entitled to relief based upon the newly discovered Sprague publication, however, only if ATC demonstrates the article is of such a magnitude that its earlier discovery likely would have changed the disposition of this case. ATC argues it is entitled to relief under Rule 60(b)(2) because the Sprague publication inherently anticipates the "fringe-effect capacitance" described in claims 1, 3, 5, 16, and 18-19 of the '356 patent, and renders all of the asserted claims obvious in combination with other prior art references. The Court disagrees.

As explained by the Court in its April 13, 2010 order, anticipation under 35 U.S.C. § 102 is an affirmative defense, which the defendant must demonstrate by clear and convincing evidence. i4i Ltd. Partnership v. Microsoft Corp., 598 F.3d 831, 847 (Fed. Cir. 2010). "A patent claim is deemed anticipated when every element and limitation of the claim is found in a single prior art reference, either explicitly or inherently." PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1369 (Fed. Cir. 2007). What a prior art reference discloses, for purposes of anticipation analysis, is a factual determination; therefore, the Court will not disturb a jury's finding so long as it was supported by substantial evidence. i4i Ltd. Partnership, 598 F.3d at 848.

ATC argues the Sprague publication proves that since 1958 a capacitor designer has known

1    that "*the obvious way to increase the capacity*" of a multilayer capacitor is to "*extend[] [the*

2    *contacts] over the body of the capacitor to form two additional electrodes*." [ATC's motion, p. 1.]

3    ATC argues the capacitor contacts disclosed in the Sprague publication and claimed in the '356

4    patent are identical.  Two external contacts are positioned in an edge-to-edge relationship and

5    extended closer together from an undefined point A to an undefined point B.  The natural result of

6    this extension is the formation of fringe-effect capacitance.  Thus, ATC argues claim 1 is

7    inherently anticipated by the Sprague publication.

8            However, the Court found in its April 13, 2010 order, "there was substantial evidence

9    before the jury to conclude that 'fringe-effect capacitance' is *not* always present – i.e. that it is not

10   always *determinable* or '*capable of being determined* in terms of a standard unit' as required by

11   the Court's claim construction."  [Doc. No. 348, p. 11.]  The Sprague publication does not disclose

12   "fringe effect capacitance" or disclose or teach that "fringe effect capacitance" would result from

13   extending external electrodes close together or that such a capacitance would be "determinable."

14   At best, the Sprague publication is cumulative of the references ATC relied upon at trial to argue

15   that the prior art discloses the existence of fringe effect capacitance and a fringe effect capacitance

16   that is determinable.  Therefore, the Sprague publication would not have likely changed the

17   outcome of the jury's determination that the '356 patent was not anticipated by the prior art, or the

18   Court's denial of ATC's post-trial motion on that question.

19           Similarly, the Sprague publication is not of such a magnitude that it would likely change

20   the outcome of the obviousness inquiry.  As with anticipation, the patent challenger has the burden

21   to demonstrate by clear and convincing evidence that "a person of ordinary skill in the art would

22   have had reason to attempt to make the composition or device, or carry out the claimed process,

23   and would have had a reasonable expectation of success in doing so."  PharmaStem, 491 F.3d at

24   1360.  The court must "look to interrelated teachings of multiple patents; the effects of demands

25   known to the design community or present in the marketplace; and the background knowledge

26   possessed by a person having ordinary skill in the art, all in order to determine whether there was

27   an apparent reason to combine the known elements in the fashion claimed by the patent at issue."

28   KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 418 (2007).

At trial, ATC argued the claims of the '356 patent were obvious in light of the combination of the Heron patent with the Aoyagi patent and the combination of the August 2000 capacitors with the Aoyagi patent. As the Court noted in its April 13, 2010 order, however, neither the Heron patent nor the August 2000 capacitors by itself teaches fringe-effect capacitance, such that a combination with the Aoyagi patent would not have made that more obvious. [Doc. No. 348. p. 16.] The Sprague publication does not teach or disclose fringe effect capacitance or how such capacitance would result from extending external electrodes close together. The Sprague publication also does not disclose or teach that a determinable fringe effect capacitance would result from extending external electrodes close together. There was sufficient evidence at trial to show that electrodes with ends close together do not necessarily create a fringe-effect capacitance that is "capable of being determined in terms of a standard unit," such that the Sprague publication's reference to the separation distance between the contacts is, by itself, insufficient to demonstrate the existence of such fringe effect capacitance.

In light of these deficiencies in the Sprague publication, ATC cannot show the publication, combined with reference to Heron and/or Aoyagi, render the asserted claims obvious to a person of ordinary skill in the art. The Court noted in its April 13, 2010 order that the Aoyagi patent "only teaches an insulating layer across the surface" such that its combination with Heron and/or the August 2000 capacitors would not have made the teaching of fringe-effect capacitance any more obvious. Similarly, combination of the Aoyagi patent with the Sprague publication would not render the claims of the patent obvious. The Heron patent is directed to the use of additional internal electrodes to achieve value capacitance and does not teach many of the claim limitations found in the asserted claims. Therefore, the Heron patent does not supply information missing from the Sprague publication or make the asserted claim limitations obvious in combination. The Sprague publication does not, in combination with the other prior art evidence presented at trial, constitute clear and convincing evidence that a person of ordinary skill in the art would have "had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so." PharmaStem, 491 F.3d at 1360. ATC has not demonstrated that with the Sprague publication, the outcome of the obviousness inquiry at

1    trial or in its post-trial motion would likely have been different.  ATC's motion for relief under

2    Rule 60(b)(2) is DENIED.

3    **_B._**        **_Rule 60(b)(3)_**

4           To prevail on a motion under Rule 60(b)(3), "the moving party must prove by clear and

5    convincing evidence that the verdict was obtained through fraud, misrepresentation, or other

6    misconduct and the conduct complained of prevented the losing party from fully and fairly

7    presenting the defense."  DeSaracho v. Custom Food Machinery, Inc., 206 F.3d 874, 880 (9th Cir.

8    2000).  "Misconduct" within the meaning of Rule 60(b)(3) "does not demand proof of nefarious

9    intent or purpose as a prerequisite to redress."  Jones v. Aero/Chem Corp., 921 F.2d 875, 879 (9th

10   Cir. 1990).  However, if the moving party fails to demonstrate that the opponent knowingly or

11   deliberately withheld evidence in discovery, he must demonstrate the nondisclosure "worked some

12   substantial interference with the full and fair preparation or presentation of the case."  Anderson v.

13   Cryovac, Inc., 862 F.2d 910, 926 (1st Cir. 1988).

14          ATC argues the Sprague article fell squarely within ATC's discovery requests for all prior

15   art or potential prior art to the '356 patent, as well as all documents relating to the analysis, design,

16   testing, operation, or use of multilayer capacitors of which anyone involved with the prosecution

17   of the '356 patent was aware.  After trial commenced, on December 5, 2009, Alan Devoe, one of

18   the named inventors and co-owner of Presidio, requested that a third party provide him with

19   information relating to capacitors, and also with articles authored by Dr. Dougherty.  In response,

20   on the following day, the third party provided Mr. Devoe with the Sprague publication.  Presidio

21   does not identify the third party from whom Mr. Devoe obtained the Sprague publication, and does

22   not indicate when or whether Mr. Devoe shared the Sprague publication with Presidio's counsel.

23          Upon review, the Court concludes Presidio's failure to disclose the Sprague publication did

24   not constitute misconduct, and did not deprive ATC of a full and fair opportunity to present its

25   defense.  The burden is upon the moving party to show, by clear and convincing evidence, that the

26   opposing party engaged in misconduct.  Here, notwithstanding the fact ATC knew of the Sprague

27   article in May of 2010 and inquired of Presidio in June of 2010 regarding the circumstances of its

28   discovery, ATC took no steps to secure additional discovery of information of misconduct before

filing its Rule 60 motion. Although ATC believes the Sprague publication conclusively demonstrates the invalidity of the '356 patent, as discussed above, the importance and relevance of the Sprague publication is not obvious. In light of the extensive prior art disclosed in discovery and presented at trial, the Sprague publication is not the type of "smoking gun" evidence which Mr. Devoe or Presidio's counsel would necessarily have concluded they needed to produce in discovery. ATC was not deprived of a full and fair opportunity to present its defense, and its motion for relief under Rule 60(b)(3) is DENIED.

### *Conclusion*

For the reasons set forth herein, ATC's motion for relief from judgment under Fed. R. Civ. P. 60(b)(2) and 60(b)(3) is DENIED.

**IT IS SO ORDERED**.

**DATED: October 26, 2010**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

AO 450 Judgment in a Civil Case

# United States District Court

**SOUTHERN DISTRICT OF CALIFORNIA**

FILED

OCT 2 6 2010

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Presidio Components, Inc.

v.

American Technical Ceramics Corp

## JUDGMENT IN A CIVIL CASE

**CASE NUMBER:** 08cv335-IEG(NLS)

[X] **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[ ] **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

that based upon the jury's verdict of December 16, 2009, Court's April 13, 2010 Order regarding post-trial motions, and Court's August 5, 2010 Order setting supplemental damages, judgment is entered in favor of Plaintiff Presidio Components, Inc. and against Defendant American Technical Ceramics on Plaintiff's claim that Defendant's 545L capacitors infringe the asserted claims of the '356 patent. Judgment in favor of Defendant and against Plaintiff on Plaintiff's claim for willful infringement. Judgment is in favor of Plaintiff and against Defendant on Defendant's invalidity defenses of anticipation, obviousness, inventorship, written description requirement, and enablement. Judgment is in favor of Plaintiff and against Defendant for $1,048,677.00 in lost profits through December 1, 2009. Judgment is favor of Plaintiff and against Defendant for $235,172.68 in supplemental damages for Defendant's infringement from December 1, 2009 to April 13, 2010. Judgment is favor of Plaintiff and against Defendant for ongoing royalty after April 13, 2010 at a rate of 12% of the wholesale price for each infringing 545L capacitor sold by Defendant. Judgment is in favor of Defendant and against Plaintiff in the amount of $228,086.25 on Defendant's claim of false markings. Case is closed.................................................

| October 26, 2010 | W. Samuel Hamrick, Jr. |
|---|---|
| Date | Clerk |

J. Haslam
(By) Deputy Clerk

ENTERED ON October 26, 2010

08cv335-IEG(NLS)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

PRESIDIO COMPONENTS, INC.,

                               Plaintiff,

      vs.

AMERICAN TECHNICAL CERAMICS
CORP.,

                              Defendant.

CASE NO. 08cv335-IEG(NLS)

Order Directing Clerk to
Enter Judgment

      Based upon the jury's verdict of December 16, 2009, the Court's April 13, 2010 order regarding post-trial motions, and the Court's August 5, 2010 order setting supplemental damages, The Clerk is directed to enter judgment as follows:

      1.     In favor of Plaintiff Presidio Components, Inc. and against Defendant American Technical Ceramics Corp. ("ATC") on Presidio's claim that ATC's 545L capacitors infringe the asserted claims of the '356 patent;

      2.     In favor of Defendant American Technical Ceramics Corp. and against Presidio Components, Inc. on Presidio's claim for willful infringement;

      3.     In favor of Plaintiff Presidio Components, Inc. and against Defendant American Technical Ceramics Corp. on ATC's invalidity defenses of anticipation, obviousness, inventorship, written description requirement, and enablement;

08cv335

4.  In favor of Plaintiff Presidio Components, Inc. and against Defendant American Technical Ceramics Corp. for $1,048,677 in lost profits through December 1, 2009;

5.  In favor of Plaintiff Presidio Components, Inc. and against Defendant American Technical Ceramics Corp. for $235,172.68 in supplemental damages for ATC's infringement from December 1, 2009 to April 13, 2010;

6.  In favor of Plaintiff Presidio Components, Inc. and against Defendant American Technical Ceramics Corp. for ongoing royalty after April 13, 2010 at a rate of 12% of the wholesale price for each infringing 545L capacitor sold by ATC;

7.  In favor of American Technical Ceramics Corp. and against Presidio Components, in the amount of $228,086.25 on ATC's claim of false marking.

**IT IS SO ORDERED**.

**DATED:  October 26, 2010**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

08cv335

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

PRESIDIO COMPONENTS INC.,

Plaintiff,

vs.

AMERICAN TECHNICAL CERAMICS CORP.,

Defendant.

CASE NO. 08-CV-335 - IEG (NLS)

ORDER DENYING ATC'S MOTION FOR RECONSIDERATION.

[Doc. No. 366]

Currently before the Court in this patent infringement case is ATC's Rule 60 Motion, Based on Intervening Law, to Amend Judgment or for a New Trial Regarding Presidio's False Marking Prior to October 24, 2008. [Doc. No. 366]. Having considered the parties' arguments, and for the reasons set forth below, the Court **DENIES** the motion.

**BACKGROUND**

The factual and procedural history of this case is set forth in great detail in this Court's prior order and need not be repeated herein. See Presidio Components, Inc. v. Am. Technical Ceramics Corp., — F. Supp. 2d —, 2010 WL 1462757, at **2-4 (S.D. Cal. 2010). As relevant to this Order, Presidio Components, Inc. ("Presidio") sued American Technical Ceramics Corporation ("ATC") for patent infringement, and ATC counterclaimed. The patent at issue is U.S. patent number 6,816,356 ("the '356 patent"), which discloses and claims a substantially monolithic, multilayer capacitor with

fringe-effect capacitance between its external contacts. Presidio alleged ATC's manufacture of its 545L series of monolithic, multilayer capacitors infringed the '356 patent. In its counterclaim, ATC alleged that Presidio falsely marked its Buried Broadband Capacitors ("BB capacitors") with the '356 patent in violation of 35 U.S.C. § 292. The BB capacitors are monolithic, multilayered capacitors developed for broadband usage. During the litigation, Presidio conceded the BB capacitors do not embody the claims of the '356 patent. Nonetheless, Presidio asserts the BB capacitors at the very least employ the "substantially monolithic dielectric body" as used in the claims of the '356 patent, and as such served as the background to the inventions ultimately claimed in the '356 patent.

The case was tried to a jury in December 2009. The jury returned a verdict finding all of the asserted claims to be valid and infringed. The jury also found that Presidio's false marking of the BB capacitors prior to October 24, 2008, was not done for the purpose of deceiving the public. After hearing argument on the parties' post-trial motions, the Court upheld the jury's verdict in most respects, including in regards to Presidio's false marking prior to October 24, 2008.

## LEGAL STANDARD

A motion for reconsideration can be filed "as may be allowed under Rules 59 and 60 of the Federal Rules of Civil Procedure." CIV. L.R. 7.1(i)(2). "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." Sch. Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993) (citation omitted). "A motion for reconsideration 'may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation.'" Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 880 (9th Cir. 2009) (citation omitted).

## DISCUSSION

In its motion for reconsideration, ATC argues the Federal Circuit's recent decision in Pequignot v. Solo Cup Co., 608 F.3d 1356 (Fed. Cir. 2010), constitutes an intervening change in controlling law. According to ATC, the Federal Circuit in Solo Cup "established a new, two-pronged framework" for determining whether the accused false marker acted "for the purpose of deceiving the public" in violation of 35 U.S.C. § 292: (1) the court must first determine whether there is *objective*

evidence of the marker's "knowledge of falsity" to give rise to an inference of "intent to deceive," and (2) the court must then inquire whether the marker can rebut that presumption with sufficient *subjective* evidence of no intent to deceive. (See Def. Rule 60 Motion, at 1.) ATC contends that because this Court failed to follow this two-pronged framework, and instead applied a "single totality of the circumstances test," it should reconsider and vacate its earlier ruling on Presidio's false marking intent prior to October 4, 2008. (See id. at 2 (emphasis in original).)

Contrary to ATC's arguments, however, the Federal Circuit in Solo Cup expressly *reaffirmed* its prior framework as stated in Clontech Labs., Inc. v. Invitrogen Corp., 406 F.3d 1347 (Fed. Cir. 2005). See Solo Cup, 608 F.3d at 1362-63. Accordingly, the Solo Cup decision does not represent "an intervening change in controlling law," and ATC is not entitled to a reconsideration.

Moreover, even if Solo Cup arguably constitutes "a new, two-pronged framework" for determining whether the accused false marker acted "for the purpose of deceiving the public" in violation of 35 U.S.C. § 292, the Court followed that exact framework when ruling on ATC's post-trial motion challenging the jury's finding that Presidio did not have the "intent to deceive" the public prior to October 24, 2008. Specifically, the Court then stated that:

> "Intent to deceive, while subjective in nature, *is established in law by objective criteria*. Thus, '*objective standards' control* and 'the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent.' Thus, under such circumstances, the mere assertion by a party that it did not intend to deceive will not suffice to escape statutory liability. Such an assertion, standing alone, is worthless as proof of no intent to deceive where there is knowledge of falsehood. But in order to establish knowledge of falsity *the plaintiff must show by a preponderance of the evidence that the party accused of false marking did not have a reasonable belief that the articles were properly marked* (i.e., covered by a patent). Absent such proof of lack of reasonable belief, no liability under the statute ensues."

(Order on Post-Trial Motions, at 59 (quoting Clontech, 406 F.3d at 1252-53) (emphases added) [Doc. No. 348].) As can be seen, the Court expressly noted that the "intent to deceive" inquiry is established by *objective* criteria, with the burden on ATC to show "by a preponderance of the evidence that [Presidio] did not have a *reasonable belief* that the [BB capacitors] were properly marked." (See id. (emphasis added).) Having reviewed the parties' arguments, the Court then concluded that ATC failed to meet its burden because "there was substantial evidence before the jury to find that ATC has failed to demonstrate that prior to October 24, 2008, the Devoes lacked a 'reasonable belief' that the '356 patent covered the BB capacitors." (See id. at 60 (citing Clontech, 406 F.3d at 1252-53).)

- 3 -

Furthermore, the Federal Circuit in <u>Solo Cup</u> specifically cautioned that "[t]he bar for proving deceptive intent here is particularly high, given that the false marking statute is a criminal one, despite being punishable only with a civil fine." 608 F.3d at 1363 (citations omitted). Accordingly, "*a purpose of deceit*, rather than simply knowledge that a statement is false, is required." <u>Id.</u> (emphasis added). "Thus, mere knowledge that a marking is false is insufficient to prove intent if [the marker] can prove that it did not consciously desire the result that the public be deceived." <u>Id.</u> In this case, the jury has found,[1] and the Court has agreed, that ATC has failed to demonstrate such intent to deceive on behalf of Presidio. Accordingly, ATC has failed to meet its burden under <u>Solo Cup</u>'s first objective prong.

Finally, to the extent any presumption of intent to deceive the public applies in this case, such presumption is rebuttable in nature. <u>See Solo Cup</u>, 608 F.3d at 1362-63. In the present case, just like in <u>Solo Cup</u>, 608 F.3d at 1363, the Court found that Presidio effectively rebutted the presumption when it "provided credible evidence that its purpose was not to deceive the public" with its marking. For example, Dan Devoe testified that although he did not inquire as to whether the BB capacitors practiced any of the claims of the '356 patent, he believed that they *did* practice the '356 patent. (Trial Tr. Day 2, at 44:7-44:19.) Likewise, although Lambert Devoe initially testified that Presidio did not "form a belief or understanding whether any particular claim of the '356 patent covered the BB capacitor," he later clarified that Presidio "thought those [marking] decisions were correct," especially in light of a cross-sectional diagram on the front cover of the '356 patent which "looks remarkably similar" to the BB capacitors. (Trial Tr. Day 2, at 131:24-132:3; Trial Tr. Day 3, at 21:18-24:19.) Similarly, Gunter Vorlop testified at his deposition that he believed that Presidio had a patent on its BB capacitors, and that one of those patents was the '356 patent. (Vorlop Dep., at 207-08 (Jan. 6, 2009), <u>attached to</u> Def. Motion for JMOL on False Marking, Ex. 5.) In light of this substantial evidence, the Court reaffirms its prior finding that Presidio effectively rebutted any inference of "intent to deceive" the public that might have arisen. <u>See Solo Cup</u>, 608 F.3d at 1364 ("Thus, a good

---

[1] For the same reasons, the Court concludes that the jury instructions in this case were not erroneous in light of <u>Solo Cup</u>. For example, the Jury Instruction No. 37 specifically told the jurors that "[i]ntent to deceive, while subjective in nature, *is established in law by objective criteria*. Thus, *objective standards control* and the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent. Thus, under such circumstances, the mere assertion by a party that it did not intend to deceive will not suffice to escape liability." (Jury Instructions, at 63 (emphases added) [Doc. No. 297].)

1  faith belief that an action is appropriate, especially when it is taken for a purpose other than deceiving

2  the public, can negate the inference of a purpose of deceiving the public.").

3  **CONCLUSION**

4  For the foregoing reasons, ATC's motion for reconsideration in light of the Federal Circuit's

5  recent decision in Solo Cup, 608 F.3d 1356, is **DENIED**.

6  **IT IS SO ORDERED.**

7  **DATED:  August 25, 2010**

8  **IRMA E. GONZALEZ, Chief Judge**

9  **United States District Court**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRESIDIO COMPONENTS INC., | CASE NO. 08-CV-335 - IEG (NLS) |
| Plaintiff, | ORDER: |
| vs. | (1) SETTING SUPPLEMENTAL DAMAGES FOR PERIOD BETWEEN DECEMBER 1, 2009 AND APRIL 13, 2010; and |
| AMERICAN TECHNICAL CERAMICS CORP., | (2) SETTING ONGOING ROYALTY RATE FOR PERIOD AFTER APRIL 13, 2010. |
| Defendant. | |

Currently before the Court in this patent infringement case are the parties' supplemental briefings on the issues of supplemental damages and the ongoing royalty rate, filed pursuant to the Court's previous Order on the post-trial motions. Having considered the parties' arguments, and for the reasons set forth below, the Court **SETS** the supplemental damages at **$235,172.68** for the period between December 1, 2009 and April 13, 2010, and **SETS** the ongoing royalty at the rate of **12 % of the wholesale price** for each infringing 545L capacitor for the period after April 13, 2010.

## BACKGROUND

The factual and procedural history of this case is set forth in great detail in this Court's prior order and need not be repeated herein. See Presidio Components, Inc. v. Am. Technical Ceramics Corp., — F. Supp. 2d —, 2010 WL 1462757, at **2-4 (S.D. Cal. 2010). As relevant to this Order,

Presidio Components, Inc. ("Presidio") sued American Technical Ceramics Corporation ("ATC") for patent infringement, and ATC counterclaimed. The patent at issue is U.S. patent number 6,816,356 ("the '356 patent"), which discloses and claims a substantially monolithic, multilayer capacitor with fringe-effect capacitance between its external contacts. Presidio alleged ATC's manufacture of its 545L series of monolithic, multilayer capacitors infringed the '356 patent.

The case was tried to a jury in December 2009. The jury returned a verdict finding all of the asserted claims to be valid and infringed. The jury awarded Presidio $1,048,677 in lost profits. After hearing argument on the parties' post-trial motions, the Court upheld the jury's verdict in most respects and its award of damages in full. The Court also agreed with Presidio that it was entitled to supplemental damages for the period after December 1, 2009, when the jury trial started, and through the consideration of the post-trial motions. Accordingly, the Court ordered ATC to provide an accounting for any sales of 545L capacitors occurring during that time. On the other hand, the Court denied Presidio's motion for a permanent injunction, finding that Presidio has failed to demonstrate an irreparable injury in the absence of an injunction or that money damages are inadequate to compensate it, and because the public interest tipped in ATC's favor. The Court then ordered the parties to submit supplemental briefing on whether the Court should allow them to negotiate their own license agreement, or whether the Court should impose a specific amount of "ongoing royalty."

## DISCUSSION

### I. Supplemental damages

At the post-trial motions stage, Presidio moved for supplemental damages in light of ATC's continued infringement. ATC did not oppose the motion at that time. (See Def. Opp. to Pl. Motion for Post Trial Remedies, at 15 [Doc. No. 321].) The Court accordingly granted Presidio's motion, finding that supplemental damages ought to be calculated consistent with the damages awarded in the jury verdict. ATC now objects to this determination, arguing instead that supplemental damages for the time period not considered by the jury be calculated on an ongoing royalty basis.

Under Section 284, a finding of infringement requires the Court to award damages that are "adequate to compensate" the plaintiff. See 35 U.S.C. § 284. As the Court previously noted, "'supplemental damages are calculated consistent with the damages awarded in the jury verdict.'" See

1   <u>Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.</u>, No. CV-03-0597-PHX-MHM, 2009 WL

2   920300, at *3 (D. Ariz. Mar. 31, 2009); <u>accord</u> <u>Aero Prods. Int', Inc. v. Intex Recreation Corp.</u>, No.

3   02 C 2590, 2005 WL 1498667, at *2 (N.D. Ill. June 9, 2005) (setting supplemental damages for the

4   period between the jury verdict and the imposition of permanent injunction at 13.5% based upon

5   extrapolation from the jury's general verdict); <u>Stryker Corp. v. Davol, Inc.</u>, 75 F. Supp. 2d 746, 746-

6   47 (W.D. Mich. 1999) (setting supplemental damages for the period between the jury verdict and the

7   imposition of a permanent injunction at 20%, which was the reasonable royalty found by the jury for

8   the period of infringement); <u>Oscar Mayer Foods Corp. v. Conagra, Inc.</u>, 869 F. Supp. 656, 668 (W.D.

9   Wis. 1994) (setting additional damages for post-judgment infringing sales at the ratio of damages to

10  sales determined from the jury's verdict). In the present case, the jury awarded Presidio $1,048,677

11  in lost profits based on the 782,000 545L capacitors sold by ATC between mid-2006 and September

12  30, 2009. (Trial Tr. Day 4, at 177:6-178:24.) Accordingly, based on the ratio of damages to sales, the

13  Court can extrapolate that the jury awarded Presidio approximately $1.34 per 545L capacitor sold.

14       Finally, to determine the full amount of Presidio's supplemental damages, the Court will

15  multiply the average lost profit per 545L capacitor by the total number of 545L capacitors sold by

16  ATC between the commencement of the trial (December 1, 2009) and the Court's ruling on Presidio's

17  motion for a permanent injunction (April 13, 2010).[1] Based on the additional sales information

18  submitted by ATC, that number comes out to approximately **175,502** 545L capacitors.[2] Thus, Presidio

19  is entitled to **$235,172.68** in supplemental damages for ATC's continued infringement.

20  _____

21      [1] In this context, the Court declines to award Presidio supplemental damages for the period between September 30, 2009 and December 1, 2009, which arguably was not included in the sales data

22  produced on the eve of trial. The jury is presumed to have compensated Presidio for all of its lost profits leading up to the trial. During trial, Presidio could have–but did not–argue to the jury that its

23  suggested amount of $1,048,000 should be proportionally increased for the two months not accounted in the sales data. <u>See</u> <u>Oscar Mayer Foods</u>, 869 F. Supp. at 668 (noting there was no justification for

24  awarding additional damages to plaintiff for that period of time prior to trial for which plaintiff could have offered–but did not–evidence of lost profits). Under these circumstances, awarding additional

25  amounts of damages incurred before trial would be "an improper invasion of the jury's province to determine actual damages and an inappropriate use of 35 U.S.C. § 284 to enhance inadequate

26  compensatory damages." <u>See id.</u> (citing <u>Beatrice Foods v. New England Printing</u>, 923 F.2d 1576, 1579 (Fed. Cir. 1991), and <u>Dimick v. Scheidt</u>, 293 U.S. 474, 486-87 (1953)).

27      [2] The additional sales data submitted by ATC covers the period between December 1, 2009 and May 6, 2010, and indicates that ATC sold 206,502 545L capacitors. (<u>See</u> Notice of Filing of

28  ATC's Add. Sales Info., Ex. A [Doc. No. 359].) To determine the total sales for the period between December 1, 2009 and April 13, 2010, the Court subtracted from that amount all of the sales for May 2010 (2,000 capacitors) and half of the sales for April 2010 (29,000 capacitors).

## II.    Ongoing royalty

In <u>eBay v. MercExchange, LLC</u>, the Supreme Court reiterated that "in patent disputes no less than in other cases" to be entitled to a permanent injunction, the plaintiff must satisfy the traditional four-factor test. 547 U.S. 388, 391 (2006). Where an injunction is not proper, however, the district court must next consider imposing a reasonable ongoing royalty in lieu of an injunction. <u>Paice LLC v. Toyota Motor Corp.</u> (<u>Paice II</u>), 504 F.3d 1293, 1314 (Fed. Cir. 2007). Such a remedy, however, is not always warranted. <u>Id.</u> ("But, awarding an ongoing royalty where 'necessary' to effectuate a remedy . . . does not justify the provision of such relief as a matter of course whenever a permanent injunction is not imposed."). Moreover, "the district court may wish to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty. Should the parties fail to come to an agreement, the district court could step in to assess a reasonable royalty in light of the ongoing infringement." <u>Id.</u>

In this case, the Court's prior Order asked the parties to discuss whether the Court should allow them to negotiate their own license agreement, or whether the Court should impose a specific amount of "ongoing royalty." Not surprisingly, however, the parties could not agree on the course of action. On the one hand, ATC submits the Court should order the parties to have "reasonable" negotiations as between a reasonable licensor and licensee. On the other hand, Presidio indicates it is not likely that the parties would be able to reach an agreement on the terms of such a license agreement and accordingly urges the Court to impose a specific amount of ongoing royalty. In light of the parties' strongly held positions in this case, and in light of their extremely divergent views as to the appropriate royalty rate,[3] the Court is convinced that requiring them to negotiate is not likely to be fruitful. Accordingly, with the benefit of the parties' supplemental briefing, the Court will proceed to determine a specific amount of ongoing royalty that should be imposed in this case.

The Federal Circuit has approved the use of the <u>Georgia-Pacific Corp. v. U.S. Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D. N.Y. 1970), analysis for determining reasonable royalty damages. <u>See Micro Chem., Inc. v. Lextron, Inc.</u>, 317 F.3d 1387, 1393 (Fed. Cir. 2003). The <u>Georgia-Pacific</u> court set forth fifteen factors to be considered in a reasonable royalty analysis. 318 F. Supp. at 1120. The

---

[3] While ATC proposes a royalty rate of 2 to 4 %, which would amount to $0.04 to $0.08 per 545L capacitor sold, Presidio proposes an ongoing royalty of $1.34 per capacitor.

central premise is the hypothetical negotiation between a willing patentee and a willing infringer at the time the infringement began. <u>Interactive Pictures Corp. v. Infinite Pictures, Inc.</u>, 274 F.3d 1371, 1384-85 (Fed. Cir. 2001). This framework changes, however, when the court has to determine the appropriate ongoing royalty *once liability has been established*. In such a case, "the hypothetical negotiation occurs post-judgment; therefore, the 'willing licensee' in this negotiation is an adjudged infringer, unlike the situation described in <u>Georgia-Pacific</u>." <u>Paice LLC v. Toyota Motor Corp.</u> (<u>Paice III</u>), 609 F. Supp. 2d 620, 624 (E.D. Tex. 2009). Thus, the main question post-judgment is what amount of money would reasonably compensate a patentee for giving up his right to exclude and at the same time allow an ongoing willful infringer to make a reasonable profit? <u>See id.</u>; <u>Georgia-Pacific</u>, 318 F. Supp. at 1120 (factor 15). It is to this question that the Court now turns.

> A.   Presidio's proposed $1.34 is not a "royalty" and it is not "reasonable"

As an initial matter, the Court rejects Presidio's suggestion of $1.34 per 545L capacitor sold as an appropriate ongoing royalty. "A reasonable royalty is the amount that a person, desiring to manufacture, use, or sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make, use, or sell the patented article, in the market, at a reasonable profit." <u>Applied Med. Res. Corp. v. U.S. Surgical Corp.</u>, 435 F.3d 1356, 1361 (Fed. Cir. 2006) (citation and internal quotation marks omitted). It is particularly useful where damages are prospective and cannot be proven with certainty. <u>See</u> <u>Hanson v. Alpine Valley Ski Area, Inc.</u>, 718 F.2d 1075, 1078 (Fed. Cir. 1983). What Presidio proposes in its supplemental briefing, however, is an average *lost profit* per unit based on past damages from ATC's infringement, and not a royalty rate. Moreover, as ATC correctly argues, this rate is not "reasonable" because it would amount to 140% of ATC's operating profit and would in effect enjoin ATC from selling the 545L capacitors.[4] <u>See</u> <u>Applied Med. Res. Corp.</u>, 435 F.3d at 1361 (a reasonable royalty must allow the infringer to sell the article at a reasonable profit); <u>Paice III</u>, 609 F. Supp. 2d at 624 (an ongoing royalty must reasonably compensate the patentee and at the same time allow the willful infringer to make a reasonable profit). Accordingly, the Court rejects

---

[4] Mr. Newman, Presidio's own damages expert, admitted at trial that a royalty rate amounting to 50 to 75 % of the profits would be "just unreasonable." (Trial Tr. Day 4, at 192:15-192:18.) According to Mr. Newman, "[t]here's a lot of risk that is undertaken by the licensee in maybe expanding, buying more tooling. So it wouldn't be appropriate . . . to take a lion's share of profits away from ATC in the form of a license." (<u>Id.</u> at 192:18-192:22.) Mr. Newman then suggested that a royalty rate of $0.25 per unit would be reasonable under the circumstances. (<u>Id.</u> at 192:22-193:3.)

Presidio's proposed "royalty" rate of $1.34 per capacitor.

### B. Change in the parties' bargaining positions

The parties argue at length as to whether their respective bargaining positions were strengthened or weakened by the jury's verdict as well as the Court's denial of Presidio's motion for a permanent injunction. It cannot be denied that "[t]here is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement." Amado v. Microsoft Corp. (Amado II), 517 F.3d 1353, 1361-62 (Fed. Cir. 2008); see also Paice II, 504 F.3d at 1317 (Rader, J., concurring) ("But pre-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors."). This "difference," however, is largely due to the threat of an injunction, which "serves as a big stick, essentially framing negotiation in terms of how much an adjudged infringer would pay for a license to continue its infringing conduct." See Paice III, 609 F. Supp. 2d at 624. Where, as here, an injunction is no longer proper, the Court is hard pressed to find in what material respect the situation is different now than it was during trial.[5] In determining the reasonable royalty rate during trial, both parties assumed the '356 patent *was valid and infringed*. The jury's verdict has now confirmed this assumption. See Cummins-Allison Corp. v. SBM Co., 584 F. Supp. 916, 918 (E.D. Tex. 2008) ("[A] jury finding of infringement and no invalidity does not change any logically consistent analysis; rather, it merely confirms the original assumption of those facts. It is inconsistent and unnecessarily confusing to adopt the position that once the assumed facts upon which the expert's analysis of the hypothetical negotiation are confirmed by a verdict, the expert can change his opinion of a reasonable royalty rate."); Ariba, Inc. v. Emptoris, Inc., 567 F. Supp. 2d 914, 918 (E.D. Tex. 2008) ("[I]t is logically inconsistent to argue that a calculation based upon assumptions of infringement and validity would change when those assumptions are replaced by jury findings of the same facts."). Accordingly, with permanent injunction off the table, the bargaining positions of a willing patentee and infringer are substantially the same as they would have been at the time the infringement began.

---

[5] The Federal Circuit itself acknowledged the difference a grant or denial of a permanent injunction makes in determining an ongoing royalty. See, e.g., Amado, 517 F.3d at 1362 ("This is not a case like Paice, however, where the court's task was to assess an appropriate level of damages for ongoing infringement under circumstances in which an injunction was not warranted. Here, Microsoft was enjoined from further infringing activity yet was permitted to continue only by virtue, and with the imprimatur, of the court-ordered stay.").

The cases relied upon by Presidio do not warrant a different conclusion. For example, in Boston Scientific Corp. v. Johnson & Johnson, the district court concluded that the jury's finding of liability in that case would have strengthened the patentee's bargaining position *because of* "the parties' knowledge that [the patentee] could have forced [the infringer's] infringing product off the market for a limited period of time." No. C 02-00790 SI, 2009 WL 975424, at *5 (N.D. Cal. Apr. 9, 2009).[6] Similarly, in Amado v. Microsoft Corp. (Amado III), the district court's analysis was in the context of an injunction that was first *granted* and then *stayed* pending appeal. No. SA CV 03-242 DOC (ANx), 2008 U.S. Dist. LEXIS 110152, at **15-16 (C.D. Cal. Dec. 4, 2008). Indeed, the district court there explained that "[the] factors in support of a stay greatly lessened any bargaining advantage that [the patentee] derived from a finding of infringement and injunction." Id. at *28. In the present case, as already noted, the Court has previously determined that an injunction was not proper. Accordingly, it does not appear to the Court that there is anything, except for the jury's finding of validity and infringement–which both parties' experts have *assumed as given* when proposing their reasonable royalty rates during trial–that would substantially alter the parties' respective bargaining positions in the post-judgment context.

C.  Application of the relevant *Georgia-Pacific* factors

At the outset, the Court agrees with ATC that the appropriate date for the hypothetical negotiation is April 13, 2010, when the Court upheld the jury's finding of validity and infringement, and when the Court denied Presidio's motion for a permanent injunction. The Court next turns to the examination of the relevant Georgia-Pacific factors as a guide in determining whether it should accept the 2 to 4 % royalty rate suggested by ATC, or the 12 % royalty suggested by Presidio.[7]

---

[6] Presidio's argument that the patentee's strengthened bargaining position in Boston Scientific existed "despite the fact that the infringer was not going to have to take its product off the market," (Pl. Supp. Brief on Ongoing Royalty, at 5 [Doc. No. 349]), is groundless. Rather, the district court there expressly noted that the patentee's expert "assumed that [the infringer] would have taken its infringing product off the market after the jury verdict." Boston Scientific, 2009 WL 975424, at *2. The district court embraced this position, and specifically rejected the contrary argument made by the infringer's expert in that case, which assumed the infringer "would have continued to sell its infringing product." See id. at **2-3.

[7] It is unclear whether the Georgia-Pacific factors should control in a post-judgment context. Compare Amado III, 2008 U.S. Dist. LEXIS 110152, at *32 (concluding that the Georgia-Pacific factors were inapplicable in a post-judgment context), with Cummins-Allison, 584 F. Supp. 2d at 918-19 (reasoning that the Georgia-Pacific factors are still relevant in a post-judgment context), Ariba, 567

          *i.*       *Factor 1 (royalties received by Presidio for the licensing of the '356 patent) and Factor 2 (rates paid by ATC for the use of comparable patents)*

The first two <u>Georgia-Pacific</u> factors focus on the comparable royalty rates received by Presidio and paid by ATC. As to Factor 1, this factor is not applicable in this case because Presidio does not license the '356 patent to anyone else. As to Factor 2, there is no information before the Court that would indicate ATC currently pays for the use of any other patents comparable to the '356 patent. Accordingly, these factors do not favor either party.

          *ii.*      *Factor 3 (the nature and scope of the license) and Factor 4 (the licensor's established policy as to licensing)*

The next two factors look at the scope of the license to be granted and the licensor's established policy on licensing. In the present case, Presidio has an established policy of not granting licenses for the '356 patent. This by itself strengthens Presidio's bargaining position because granting a license would require Presidio to abandon its arguably valuable business consideration. Moreover, by granting a license to ATC now, Presidio will also be giving up the right to offer an exclusive license to a third party in the future.[8] Accordingly, both of these factors weigh in Presidio's favor.

          *iii.*      *Factor 5 (the commercial relationship between the licensor and licensee)*

The Court has previously determined that Presidio has failed to show that it and ATC are direct competitors. (<u>See</u> Order on Post-Trial Motions, at 64 [Doc. No. 348].) Accordingly, the Court is not persuaded that this factor weighs in either party's favor.

          *iv.*      *Factor 6 (effect in promoting sales of other products of the licensee)*

Presidio argues ATC has admitted that the sale of the 545L capacitors drives the sale of its other products and is necessary for ATC to maintain continuity with its customers. Presidio, however,

---

F. Supp. 2d at 918 (same), <u>and Orion IP, LLC v. Mercedes-Benz USA, LLC</u>, No. 6:05 CV322, 2008 U.S. Dist. LEXIS 108683, at *14 (E.D. Tex. Mar. 28, 2008) (same). Neither of the parties in this case expressly relies on these factors, although the arguments raised by Presidio (and opposed by ATC) appear to closely track some of them. Accordingly, while not controlling, the Court believes an examination of the relevant <u>Georgia-Pacific</u> factors could be helpful in determining the appropriate royalty rate post-judgment. <u>See Creative Internet Adver. Corp. v. Yahoo! Inc.</u>, 674 F. Supp. 2d 847, 860 (E.D. Tex. 2009) (applying a modified <u>Goergia-Pacific</u> analysis "in light of the changed relationship between the parties"); <u>Boston Scientific</u>, 2009 WL 975424, at *5 (agreeing with the district court in <u>Amado III</u> that the royalty analysis should be different in a post-judgment context, but still proceeding to examine several of the <u>Georgia-Pacific</u> factors).

    [8] The parties appear to agree that the license granted in this case will not be exclusive. This by itself, however, does not appear to weigh in either party's favor.

- 8 -

misapprehends ATC's arguments. In opposing Presidio's motion for a permanent injunction, ATC only indicated that in light of the 545L's "irreplaceable" qualities, an abrupt termination in its sales would severely prejudice ATC. (See Def. Opp. to Pl. Motion for Perm. Inj., at 13 [Doc. No. 323].) Accordingly, ATC requested that if the Court was inclined to impose an injunction, that it provide a grace period of approximately one year to gradually phase out the 545L capacitors. (Id.) The Court finds no indication here that the sale of ATC's other products is dependent on the sale of the 545L capacitors. This factor, therefore, does not weigh in either party's favor.

> v.      Factor 7 (duration of the patent and the term of the license)

Presidio argues that ATC's three-and-a-half years of infringement reduced the period during which Presidio can exploit the '356 patent. There is, however, no merit to this argument. Presidio has produced no evidence demonstrating that ATC's infringement had any effect on Presidio's decision not to practice the '356 patent. Accordingly, this factor also does not weigh in either party's favor.

> vi.      Factor 8 (the established profitability of the product) and Factor 11 (the extent to which the infringer has made use of the invention)

Presidio argues ATC's bargaining position is weakened by the fact that it continues to sell the infringing product at an approximate profit of $1.36 per 545L capacitor. This argument, however, is undercut by Mr. Newman, Presidio's own damages expert, who testified at trial that ATC's operating profit was instead $0.95 per capacitor. Mr. Newman also testified that, in his view, a $0.25 royalty rate per capacitor would be very reasonable for both parties. (Trial Tr. Day 4, at 192:22-193:3.) Similarly, although Presidio is correct in that the demand for the 545L capacitors has been increasing, testimony at trial also showed that the average selling price for those capacitors has been declining during the relevant time. (See, e.g., Def. Opp. to Pl. Supp. Brief on Ongoing Royalty, Ex. 5 [Doc. No. 354-5].) Finally, the Court also rejects Presidio's argument that its bargaining position is strengthened because ATC's sales are not a source of revenue for Presidio. In Amado III, the district court concluded that the patentee's bargaining position was weakened because it did not have a product to sell, such that it needed the infringing product to serve as a profit center. 2008 U.S. Dist. LEXIS 110152, at *23 ("Finally, it was to Amado's advantage to prolong Microsoft's use of the infringing functionality. As noted, Amado had not commercialized the patent, nor were there any other licensees of the patent. Thus, Amado's sole source of profits from the patent was from Microsoft's of the infringing

functionality. This further weakened Amado's advantage derived from the finding of liability."). In this case, because Presidio does not practice the '356 patent and does not have any other licensees, it is similarly depended on the infringing 545L capacitors as the sole source of profit.[9] Balancing all of these factors together, they do not weigh in favor of either party.

D.     Conclusion

Accordingly, based on the above considerations, the Court believes an ongoing royalty of 12% proposed by Presidio at trial is adequate to both compensate Presidio for the continuing infringement and at the same time allow ATC to sell the 545L capacitors at a reasonable profit. See Applied Med. Res. Corp., 435 F.3d at 1361; Paice III, 609 F. Supp. 2d at 624. This rate takes into account the changed factual and legal circumstances after trial, and is "adequate to compensate for the infringement" as required by 35 U.S.C. § 284. The Court also notes that had it been faced with this issue at the start of the trial, it very well might have been inclined to adopt a figure somewhere in-between the 2 to 4 % rate suggested by ATC and the 12 % rate suggested by Presidio. However, in light of the jury's verdict of validity and infringement, and because granting a license would require Presidio to give up its valuable business consideration of refusing to license the '356 patent as well as the right to offer an exclusive license to a third party in the future, the Court believes the rate proposed by Presidio is more reasonable. Any rate below 12 % will give ATC, who is now a willful infringer, a windfall at Presidio's expense. On the other hand, the Court is not convinced that the parties' positions have changed to such an extent as to warrant a departure from what Presidio's own damages expert considered to be a reasonable rate pre-trial. For all of the foregoing reasons, the Court sets the ongoing royalty rate at **12 % of the wholesale price** for each infringing 545L capacitor.

## CONCLUSION

For the foregoing reasons, the Court finds that **$235,172.68** in supplemental damages is adequate to compensate Presidio for ATC's continued infringement between December 1, 2009 (when the trial began) and April 13, 2010 (when the Court denied Presidio's motion for a permanent injunction). The Court also finds that an ongoing royalty at the rate of **12 % of the wholesale price** for each infringing 545L capacitor is reasonable and adequate to compensate Presidio for ATC's

---

[9] Indeed, this is confirmed by the fact that Presidio at trial approximated its lost profits due to infringement using the sale of ATC's 545L capacitors.

continued infringement after April 13, 2010. Finally, having considered Presidio's proposed terms to ensure compliance with the ongoing royalty, and ATC's response thereto, the Court **ORDERS** the parties to comply with the following terms:

(1)     ATC shall provide to Presidio a quarterly certified accounting of all sales of the 545L capacitors that identifies the quantity sold, the date of each sale and the sale price, and the total sales;

(2)     ATC shall allow Presidio to conduct a single annual inspection of ATC's records and documents to ensure compliance with this Order. Such inspection shall be conducted by a neutral CPA and shall be subject to the Protective Order. The inspection will be at Presidio's cost unless the results of the audit show a 5% underpayment, in which case the cost would be paid by ATC; and

(3)     ATC shall notify Presidio of any design changes that may be applied to the 545L capacitors should ATC take the position that such design changes take the modified product outside the scope of the ongoing royalty. This notification provision shall apply whether the modified product is designated as a 545L capacitor or otherwise.

**IT IS SO ORDERED.**

**DATED:  August 5, 2010**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRESIDIO COMPONENTS INC., | CASE NO. 08-CV-335 - IEG (NLS) |
| Plaintiff, | ORDER: |
| | (1) DENYING PRESIDIO'S MOTION FOR PERMANENT INJUNCTION [Doc. No. 306]; |
| | (2) GRANTING IN PART AND DENYING IN PART PRESIDIO'S MOTION FOR POST TRIAL REMEDIES [Doc. No. 307]; |
| | (3) DENYING ATC'S MOTION FOR JMOL OR FOR A NEW TRIAL WITH RESPECT TO PRESIDIO'S FALSE MARKING BEFORE OCTOBER 24, 2008 [Doc. No. 308]; |
| vs. | (4) GRANTING IN PART AND DENYING IN PART ATC'S MOTION FOR JMOL AND FOR A NEW TRIAL [Doc. No. 309]; |
| | (5) GRANTING IN PART AND DENYING IN PART ATC'S MOTION FOR ENTRY OF ATC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO PRESIDIO'S FINES FOR FALSE MARKING [Doc. No. 310]; |
| AMERICAN TECHNICAL CERAMICS CORP., | (6) DENYING ATC'S MOTION FOR ENTRY OF ATC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING INDEFINITENESS [Doc. No. 311]; and |
| Defendant. | (7) DENYING ATC'S MOTION FOR ENTRY OF ATC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING UNENFORCEABILITY OF THE '356 PATENT FOR INEQUITABLE CONDUCT [Doc. No. 312]. |

Currently before the Court are the parties' post-trial motions. Having considered the parties'
arguments, and for the reasons set forth below, the Court issues the following order.

**BACKGROUND**

**I.      The Technology**

In this patent infringement case, Presidio Components Inc. ("Presidio") alleges American
Technical Ceramics Corp. ("ATC") infringed U.S. patent number 6,816,356 ("the '356 patent"), titled
"Integrated Broadband Ceramic Capacitor Array." A capacitor is a device conventionally comprising
two metal plates separated by a non-conductor of electric current. This non-conductive material is
known as the "dielectric," which is usually composed of air or ceramic.

Capacitors are passive electronic components used in cellular phones, video cassette recorders,
televisions, general purpose computers, and audio amplifiers. These devices use capacitors in one of
two ways: (1) to filter out undesirable ripples or spikes in a power supply, or (2) to store energy and
provide charge to transistors on a printed circuit board.[1]

A capacitor is charged by coupling its plates to an electrical source. Since electricity passes
easily through the conductors, but not the dielectric, a positive electrical charge accumulates on one
plate and a negative charge accumulates on the other plate. When charged, the capacitor stores energy
that can be released by connecting the plates via an external path, permitting current to flow from one
plate to the other.  The electrons flow off the negatively charged plate and onto the positively charged
plate, bringing the two plates to equal relative voltage. The amount of energy a capacitor stores is its
"capacitance," which  depends on the orientation and spacing of the conductive plates, and the
properties of the dielectric material.

Frequently, multiple capacitors are connected to form a capacitive network. One way to create
a capacitive network is to build a "multilayer capacitor," which is formed by layering multiple
conductive and non-conductive materials. Each individual layer has a separate capacitance that effects
the overall capacitance of the multilayer capacitor.

///

---

[1] A "transistor" is essentially a switch that turns on and off to regulate the flow of current or
voltage in electrical circuits.

## II.   The '356 Patent

The '356 patent discloses and claims a multilayer capacitor consisting of a network of capacitors. The '356 patent has a total of thirty-four claims, but only claims 1-5, 16, and 18-19 are the asserted claims in this case. Out of those, only asserted claim 1 is an independent claim.[2] The rest of the asserted claims are dependent claims.[3] Asserted claim 1 of the '356 patent claims:

A capacitor comprising:

a substantially monolithic dielectric body;

a conductive first plate disposed within the dielectric body;

a conductive second plate disposed within the dielectric body and forming a capacitor with the first plate;

a conductive first contact disposed externally on the dielectric and electrically connected to the first plate; and

a conductive second contact disposed externally on the dielectric body and electrically connected to the second plate, and the second contact being located sufficiently close to the first contact to form a first fringe-effect capacitance with the first contact.

('356 patent, col. 12:58-13:5.) Asserted claims 2 and 4 also add one or two "insulating layer[s]" disposed between the external contacts and "inhibiting electrical conduction" between those contacts. (Id. col. 13:6-13:9, 13:17-13:25.)

## III.   Factual Background

The application process for the '356 patent spanned over two years. On May 17, 2002, Presidio submitted a parent application to patent the technology underlying the '356 patent with the United States Patent and Trademark Office ("USPTO" or "PTO"). This parent application resulted in U.S. patent number 6,587,327 ("the '327 patent"). On April 14, 2003, Presidio submitted the base application for the '356 patent, which was a continuation in part of the parent application. The USPTO issued the '356 patent on November 9, 2004.

---

[2] An "independent" claim stands and falls on its own. A "dependent" claim, on the other hand, includes all of the requirements of a particular independent claim *plus* additional requirements of its own. As a result, if a particular independent claim is found not to be infringed, the dependent claims corresponding to it cannot be infringed. On the other hand, if an independent claim has been infringed, a separate determination is still necessary to determine whether the additional requirements of its dependent claims have also been infringed.

[3] While all of the asserted dependent claims depend on claim 1, the asserted claims 4 and 5 also depend on claim 3.

During the pendency of Presidio's patent application, ATC initiated development of the 545L series of monolithic, multilayered capacitors. In September 2002, ATC engineers first expressed interest in developing a monolithic capacitor. During development, in April 2003, ATC allegedly dissected and analyzed Presidio's Buried Broadband Capacitors ("BB capacitors"). The BB capacitors were monolithic, multilayered capacitors developed for broadband usage. During the litigation, Presidio conceded the BB capacitors do not embody the claims of the '356 patent. Nonetheless, Presidio asserts the BB capacitors at the very least employ the "substantially monolithic dielectric body" as used in the claims of the '356 patent, and as such served as the background to the inventions ultimately claimed in the '356 patent.

In September 2003, ATC substantially completed the 545L capacitor's design and filed a provisional patent application. In March 2004, ATC reviewed Presidio's published patent application. The parties dispute the importance of ATC's review.  Presidio asserts ATC engineers believed the patent application covered their capacitor. ATC asserts the engineers believed the '356 patent was both invalid and inapplicable to the 545L capacitor.

In September 2004, ATC filed a non-provisional patent application for the 545L capacitor. In February 2006, the USPTO rejected the application, citing the '356 patent as prior art. Notwithstanding this rejection, ATC began selling the 545L capacitor in June 2006. In August 2006, ATC requested the USPTO reconsider the application, arguing the '356 patent does not have orientation insensitivity, which is a feature of the 545L capacitor. That same month, the USPTO reconsidered and held the '356 patent did not bar ATC's application. On July 2007, the USPTO issued U.S. Patent No. 7,248,458 ("the '458 patent") for the 545L capacitor.

Beginning in May 2007, Presidio began marking its BB capacitors with the '356 patent number. On October 24, 2008, Presidio admitted the BB capacitors were not covered by the '356 patent, but claims it marked the capacitors with a mistaken belief they embodied the patent. Prior to the marking, Presidio did not perform a legal analysis. Presidio continued to mark the BB capacitors

1    with the '356 patent until some time in April 2009.[4]

2        On May 17, 2007, Presidio filed an action in this Court against ATC, alleging infringement

3    of the '356 patent (the "2007 action"). On June 9, 2008, the Court granted a joint motion to dismiss

4    the 2007 action without prejudice for lack of standing.

5    **IV.    Procedural Background**

6        Presidio filed the complaint in this case on February 21, 2008, alleging ATC is infringing

7    claims 1-5, 16, and 18-19 ("asserted claims") of the '356 patent by producing the 545L capacitor.

8    [Doc. No. 1]. ATC answered on May 28, 2008, bringing numerous counterclaims against Presidio.

9    [Doc. No. 10]. On June 20, 2008, Presidio filed an answer to ATC's counterclaims. [Doc. No. 21].

10        On June 11, 2008, the Court issued a Claim Construction Order, construing many of the

11    disputed terms of the '356 patent. [Doc. No. 24]. Among others, the Court construed the term "a

12    substantially monolithic dielectric body" as "a dielectric body largely but not wholly without seams

13    from the inclusion of plates within the dielectric body." The Court construed the term "the second

14    contact being located sufficiently close to the first contact to form a first fringe-effect capacitance with

15    the first contact" as "an end of the first conductive contact and an end of the second conductive contact

16    are positioned in an edge-to-edge relationship in such proximity as to form a determinable

17    capacitance." On July 30, 2009, the Court granted ATC's Motion to Resolve a Fundamental Dispute

18    over Claim Scope, finding "determinable capacitance" to mean "a capacity that is capable of being

19    determined in terms of a standard unit." (Order Resolving Fund. Dispute, at 5.) In doing so, the Court

20    rejected Presidio's interpretation that attempted to use the term "insertion loss" as a proxy for a

21    previously rejected term "high frequency performance." (Id. at 4.)

22        On August 25, 2008, the Court issued an order denying ATC's summary judgment motion for

23    a declaration of indefiniteness. [Doc. No. 32]. The parties then filed cross-motions for summary

24    judgment. On April 30, 2009, the Court issued an order on the cross-motions for summary judgment,

25    granting some and denying others. As relevant here, the Court granted summary judgment in favor

26    ────────────

27        [4] Presidio asserts the end date of false marking should be April 23, 2009, which was the date
     of the hearing on the parties' cross-motions for summary judgment at which Presidio's counsel
     represented that Presidio had, prior to that hearing, discontinued any marking utilizing the '356 patent.
28    (See Pl. Opp. to Def. Findings & Conclusions on False Marking, at 1 & n.2; accord Trial Tr. Apr. 23,
     2009, at 29-31.) ATC does not appear to dispute this end date.

of ATC on its counterclaim 5 with regard to false marking that occurred after October 24, 2008, and denied summary judgment for false marking that occurred before October 24, 2008. (MSJ Order, at 9-11.) In determining Presidio's potential liability for false marking, the Court adopted the "continuous act" test set forth in <u>London v. Everet H. Dunbar Corp.</u>, 179 F. 506 (1st Cir. 1910), concluding that "each time Presidio marked a shipment, it committed a false marking offense." (MSJ Order, at 12-13.)

On July 23, 2009, ATC submitted to the USPTO a replacement request for reexamination of the '356 patent. On October 20, 2009, the USPTO granted the request for reexamination, noting there were substantial new questions of patentability with respect to all of the asserted claims in light of nine prior art references identified by ATC. The reexamination proceedings are still ongoing.

The case was tried to a jury in December 2009. The jury returned a verdict finding all of the asserted claims to be valid and infringed. The jury awarded Presidio $1,048,677 in lost profits. The jury also found that Presidio has proven by clear and convincing evidence that ATC's infringement was willful. Finally, the jury found that Presidio's false marking of the BB capacitors prior to October 24, 2008 was not done for the purpose of deceiving the public.

The Court heard oral argument on the parties' post-trial motions on March 12, 2010. After the motions were taken under submission, ATC filed two notices with the Court. First, ATC alerted the Court to the Federal Circuit's recent <i>en banc</i> decision in <u>Ariad Pharms., Inc. v. Eli Lilly & Co.</u>, —
F.3d —, 2010 WL 1007369 (Fed. Cir. Mar. 22, 2010) (en banc), arguing it supported ATC's motion for judgment as a matter of law and motion for a new trial with respect to invalidity for lack of written description in the '356 patent. [Doc. No. 343]. Second, ATC notified the Court of the First Office Action by the USPTO in the reexamination proceedings, which rejected all of the asserted claims of the '356 patent based on anticipation and obviousness. [Doc. No. 346]. Presidio filed responses in opposition to both of these notices. [Doc. Nos. 345, 347].

**LEGAL STANDARD**

For issues not unique to patent law, such as sufficiency of the evidence on issues tried to the jury, the Court applies the law of the regional circuit in which it sits, here the Ninth Circuit. <u>See</u> <u>Duro-Last, Inc. v. Custom Seal, Inc.</u>, 321 F.3d 1098, 1106 (Fed. Cir. 2003) (citations omitted). Otherwise,

1    for all substantive issues of patent law, the Court applies the law of the Court of Appeals for the

2    Federal Circuit. <u>See</u> <u>id.</u> (citations omitted).

3        In the Ninth Circuit, a judgment as a matter of law ("JMOL") pursuant to Federal Rule of Civil

4    Procedure 50(a) is proper only "if the evidence, construed in the light most favorable to the

5    nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's

6    verdict." <u>Pavao v. Pagay</u>, 307 F.3d 915, 918 (9th Cir. 2002) (citation omitted). Phrased otherwise, a

7    JMOL should be granted only if "'there is no legally sufficient evidentiary basis for a reasonable jury

8    to find for that party on that issue'" and the verdict reached by the jury is "'against the great weight

9    of the evidence.'" <u>Hangarter v. Provident Life & Acc. Ins. Co.</u>, 373 F.3d 998, 1005 (9th Cir. 2004)

10    (citations omitted). "'Although the court should review the record as a whole, it must disregard

11    evidence favorable to the moving party that the jury is not required to believe, and may not substitute

12    its view of the evidence for that of the jury.'" <u>Payao</u>, 307 F.3d at 918 (citation omitted). Thus, the

13    Court must keep in mind that "credibility determinations, the weighing of the evidence, and the

14    drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Hangarter</u>,

15    373 F.3d at 1005 (internal quotation marks and citations omitted).

16        The Court may grant a new trial pursuant to Federal Rule of Civil Procedure 59(a) only if "'the

17    verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false,'" or

18    if a new trial is necessary "'to prevent . . . a miscarriage of justice.'" <u>Hangarter</u>, 373 F.3d at 1005

19    (citation omitted). The Court "has the duty to weigh the evidence as the court saw it, and to set aside

20    the verdict of the jury, even though supported by substantial evidence, where, in the court's

21    conscientious opinion, the verdict is contrary to the clear weight of the evidence." <u>Moski v. M.J.</u>

22    <u>Cable, Inc.</u>, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation marks and citations omitted).

23                              **DISCUSSION**

24    **I.**     **Validity**

25        <u>A.</u>     <u>Preliminary matters</u>

26        As an initial matter, the Court addresses ATC's arguments that Dr. Ewell was unqualified to

27    render an opinion as a person of ordinary skill in the art, that he relied on his undisclosed opinion, and

28    that in any event his testimony was legally irrelevant and could not support the verdict of no invalidity.

1   The Court also addresses ATC's argument that Presidio improperly referred to "insertion loss" in its

2   closing argument.

3   The parties have previously agreed that "[t]he level of ordinary skill in the art of the '356

4   patent is medium. The ordinary artisan would hold a masters or similar degree, or the experiential

5   equivalent thereof, in Electrical Engineering or a similar field, and would have at least two years of

6   industry experience in designing multilayer capacitors." (Pretrial Order, at 5 [Doc. No. 182].) ATC

7   argues Dr. Ewell does not meet this criteria because he admitted that he has "never from scratch

8   designed" a capacitor in his entire career. (See Trial Tr. Day 7, at 93:8-93:9.) Presidio responds that

9   Dr. Ewell is well-qualified as an expert witness because he has more than three decades of work

10  experience relating to capacitors, including experience relating to the review of and consultation

11  regarding designs of multilayer capacitors. (See id. at 69:14-73:5.) Moreover, Presidio argues ATC

12  did not object or attempt to voir dire Dr. Ewell at trial.

13  ATC correctly notes that one who is not qualified in the pertinent art may not testify as an

14  expert on technical issues such as validity, anticipation, or scope of the prior art. See Sundance, Inc.

15  v. DeMonte Fabricating Ltd., 550 F.3d 1356, 1364 (Fed. Cir. 2008). However, the Court retains

16  considerable discretion in allowing testimony if the expert witness has "sufficient relevant technical

17  expertise." See SEB S.A. v. Montgomery Ward & Co., Inc., 594 F.3d 1360, 1373 (Fed. Cir. 2010).

18  In the present case, although Dr. Ewell does not meet the requirement agreed to by the parties that a

19  person qualified in the art "would have at least two years of industry equivalent in *designing*

20  multilayer capacitors," Dr. Ewell clearly has "sufficient relevant technical experience." See id. Dr.

21  Ewell testified that he has been working in the field of electronic components, of which the primary

22  component has been multilayer ceramic capacitors, for over thirty years, including ten years at the

23  Hughes Aircraft Company and twenty-five years at the Aerospace Corporation. (Trial Tr. Day 7, at

24  69:16-70:7.) As part of his job, Dr. Ewell served on the technical audit team which evaluated

25  manufactured multilayer capacitors, "along with the designs used to produce the parts and the testing

26  given them to ensure that they were adequately reliable." (See id. at 70:23-71:3.) Accordingly, Dr.

27  Ewell is more than qualified to render an opinion in the pertinent art of designing multilayer ceramic

28  capacitors. Moreover, Presidio correctly points out that ATC did not object or attempt to voir dire Dr.

1    Ewell at trial.[5] For the foregoing reasons, the Court denies ATC's objections to Dr. Ewell's testimony.

2         Likewise, there is no merit to ATC's argument that the Court should ignore Dr. Ewell's

3    testimony as legally irrelevant. ATC argues Dr. Ewell's testimony should be excluded because: (1)

4    he improperly injected an additional requirement limiting the Court's construction of the term "fringe

5    effect capacitance" from a "determinable capacitance" to a "determinable *fringe-effect* capacitance;"

6    (2) he improperly limited "determinable capacitance" to the measurement of a *physical capacitor*; and

7    (3) he improperly required testing of actual samples for determining whether capacitance exists.

8    However, in light of the fact that the '356 patent discusses both parallel capacitance and fringe-effect

9    capacitance, there was no error in referring to "determinable *fringe-effect* capacitance" when

10   discussing the specific limitations of claim 1. Likewise, even assuming as true ATC's allegations that

11   Dr. Ewell limited "determinable capacitance" to the testing of actual physical samples, whether any

12   such limitation was proper in this context was for the jury to determine, not the Court. See Hangarter,

13   373 F.3d at 1005 (noting that at the JMOL stage, the credibility determinations, weighing of the

14   evidence, and drawing of legitimate inferences is the province of the jury, not the judge). Nothing

15   prevented ATC from cross-examining Dr. Ewell as to his allegedly idiosyncratic views, and indeed

16   ATC did so extensively. (See, e.g., Trial Tr. Day 7, at 94:18-98:15, 108:7-112:17, 113:17-116:21.)

17        The Court also rejects ATC's argument that Dr. Ewell relied on undisclosed expert opinion

18   during his testimony. ATC argues Dr. Ewell never opined in his report on the propriety of Dr.

19   Dougherty's testing of the August 2000 capacitors, or that there would be only a "parallel-plate

20   capacitor left" in the fragment after shaving. However, there is sufficient analysis in Dr. Ewell's expert

21   report on the impropriety of the testing done by Dr. Dougherty and why that fails to demonstrate

22   fringe-effect capacitance. (See Pl. Rebuttal Expert Report of Gary J. Ewell, at 65-78 [Doc. No. 320-

23   8].) Dr. Ewell's report also sufficiently covers the other issues objected to by ATC.

24        Finally, there is also no merit to ATC's argument that Presidio improperly referred to

25   _____

26        [5] In its reply, ATC notes it did object to Dr. Ewell's qualifications and fitness as an expert at
     the summary judgment stage. The Court rejected those objections at that time, noting that "[w]hile Dr.

27   Ewell stated he does not design multi-layer capacitors in his current position, his long experience
     regarding capacitors, including evaluating capacitor reliability and compliance with a particular
     specification, qualify him to opine on how a skilled artisan would apply the claim language." (See

28   Order Denying Defendant's Motion for Summary Judgment of Indefiniteness, at 8 [Doc. No. 32].) To
     the extent ATC seeks reconsideration, the Court now reaffirms its prior ruling.

1    "insertion loss" in its closing argument. (See Trial Tr. Day 8, at 59:18-59:24.) Contrary to ATC's

2    argument, Presidio did not attempt to *define* "fringe-effect capacitance" with the term "insertion loss"

3    contrary to the Court's claim construction and *in limine* ruling. Rather, Presidio merely indicated that

4    "insertion loss" has been mentioned during the trial. In light of the fact that the specifications of the

5    '356 patent extensively discuss "insertion loss," there was no error in referring to this term. Moreover,

6    the reference to "insertion loss" was so minute and isolated, there is no reason to believe it was even

7    noticed by the jury, not to mention influenced its decision. Accordingly, the Court denies ATC's

8    objection on this ground as well.

9        **B.    Anticipation[6]**

10       ATC seeks a judgment as a matter of law that certain prior art anticipated the asserted claims

11   of the '356 patent. Anticipation under 35 U.S.C. § 102 "requires a single prior art reference which

12   discloses each and every element of the claimed invention."[7] Dickson Indus., Inc. v. Patent

13   Enforcement Team, L.L.C., 333 Fed. App'x 514, 517 (Fed. Cir. 2009) (citing Akzo N.V. v. U.S. Int'l

14   Trade Comm'n, 808 F.2d 1471, 1479 (Fed. Cir. 1986)). Anticipation is an affirmative defense, which

15   the defendant must demonstrate by clear and convincing evidence. i4i Ltd. Partnership v. Microsoft

16   Corp., — F.3d —, 2010 WL 801705, at **9-10 (Fed. Cir. 2010) (citations omitted). In an anticipation

17   analysis, what a prior art reference discloses is a factual determination that the Court will not overturn

18   unless it was not supported by substantial evidence. Dickson Indus., 333 Fed. App'x at 517-18.

19       *i.    ATC's argument that fringe-effect capacitance is always present*

20       First, ATC argues there is nothing new about "fringe-effect capacitance" because, according

21   to the laws of physics, it is always present in multilayer capacitors wherever two conductive contacts

22   are positioned in an edge-to-edge relationship. Thus, one can always use the universally known

---

23       [6] ATC challenges the jury verdict of no invalidity as to all of the asserted claims 1-5, 16, and
24   18-19. However, as already mentioned, only claim 1 is truly independent. All of the other seven claims
     are dependent at least on claim 1 (and in case of claims 4-5, also on claim 3). Accordingly, in the
25   discussion that follows, the Court will focus mostly on whether ATC has shown that claim 1 is invalid.
     If legally sufficient evidence is present to find that claim 1 is not invalidated, that necessarily means
26   there is sufficient evidence to find that none of the other claims are invalidated.

27       [7] The statute provides that "A person shall be entitled to a patent unless . . . the invention was
     patented or described in a printed publication in this or a foreign country or in public use or on sale
28   in this country, more than one year prior to the date of the application for patent in the United States."
     35 U.S.C. §102(b).

1  equation of C=kA/d to measure the capacitance, no matter how small.[8] ATC contends this was even

2  acknowledged by Dan Devoe and Dr. Ewell.[9]

3     Despite ATC's arguments to the contrary, there was substantial evidence before the jury to

4  conclude that "fringe-effect capacitance" is *not* always present–i.e., that it is not always *determinable*

5  or "*capable of being determined* in terms of a standard unit" as required by the Court's claim

6  construction. For example, Dr. Huebner testified that in order to demonstrate whether this claim

7  limitation is met, one could and should analyze the thickness of the external contacts, the separation

8  distance, and the dielectric. (Trial Tr. Day 4, at 77:14-85:7.) Likewise, Dr. Ewell testified that even

9  if fringe-effect capacitance is always present, such capacitance is not always determinable. (Trial Tr.

10  Day 7, at 108:18-109:9.)

11       *ii. Figueroa patent*

12     ATC argues the capacitor described in Figure 12 of the Figueroa patent, U.S. patent number

13  6,483,692 ("Figueroa patent") anticipates the asserted claims. ATC points to the "striking

14  resemblance" of the Figure 12 of the Figueroa patent to Figure 15A of the '356 patent. According to

15  ATC, "[i]f fringe-effect capacitance is reportedly created in the 2 mil gap of the '356 patent **[132]**,

16  without the thickness of contacts or any of the other parameters being disclosed, then a comparable

17  disclosure of a gap of 2.56 mils or less in Figueroa must also result in fringe-effect capacitance." (Def.

18  Motion for JMOL or New Trial, at 24.)

19

20

21

22

---

23    [8] In the C=kA/d equation, "k" represents the dielectric constant of the insulating material

24  between the plates, "A" represents the area of each of the opposed plates in square meters, "d" represents the distance between the plates, and "C" is the resulting capacitance in farads.

25    [9] ATC also argues another Presidio patent, the Trinh and Daniel Devoe patent, U.S. patent

26  number 6,545,854 ("Trinh patent" or "the '854 patent") unequivocally states that "fringe-effect capacitance is always present . . . ." (See Def. Motion for JMOL or New Trial, Ex. ABP, col. 9:49-9:50.) However, ATC takes this phrase out of context. The '854 patent goes on to state that when the

27  voltage is small, that fringe-effect capacitance is "negligible" in comparison to the overall capacitance, and accordingly is "disregarded." (Id. col. 9:52-9:56.) Thus, a reasonable jury could have concluded

28  that, even if "always present," such fringe-effect capacitance is not always *determinable* as required by the Court's claim construction.



FIG. 12

FIG. 15A

There was legally sufficient evidence before the jury to conclude the Figueroa patent did not anticipate all of the elements of the asserted claims. As Presidio notes, the Figueroa patent never mentions "fringe-effect capacitance" or provides the necessary information needed to conclude whether any such capacitance in Figure 12 exists and/or is determinable. ATC's argument that fringe-effect capacitance must exist in the 2.56 mils or less gap in Figure 12, since it exists in the 2 mil gap in Figure 15A of the '356 patent, is unavailing. Viewing the evidence in favor of the verdict, the jury was free to accept Dr. Ewell's detailed explanation as to why there was insufficient data on whether there was determinable capacitance in Figure 12. (See Trial Tr. Day 7, at 108:7-116:21.)

The cases relied upon by ATC are inapposite. First, in the part of Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1569 (Fed. Cir. 1988), cited by ATC, the Federal Circuit only decided whether a prior reference was enabling. Answering this question in the affirmative, the court noted that the disclosure in the prior art was "at least at the same level of technical detail as the disclosure in the [patent-in-suit]." Id. Similarly, in the part of SRI Int'l, Inc. v. Internet Sec. Sys., Inc., 511 F.3d 1186, 1193-94 (Fed. Cir. 2008), cited by ATC, the court was only concerned with whether a particular reference qualified as a "prior art." In the present case, there has been no suggestion that the Figueroa patent is not enabling or that it does not qualify as prior art. Rather, the issue here is whether the Figueroa patent anticipates the asserted claims of the '356 patent because it teaches or describes "fringe-effect capacitance." See id. at 1192 ("'A patent claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference.'" (citation omitted)). As already noted, the Figueroa patent nowhere mentions the "fringe-effect capacitance," nor does it provide the necessary information needed to conclude whether any such capacitance in Figure 12 exists and/or is determinable.

1    Accordingly, there was legally sufficient evidence for the jury to conclude that the Figueroa

2  patent does not anticipate the asserted claims of the '356 patent because it does not by itself describe

3  each and every limitation of the asserted claim 1. See Dickson Indus., 333 Fed. App'x at 517.

4         iii.    Heron patent

5    ATC next argues the capacitor described in Figure 7 of the Heron patent, U.S. patent number

6  4,931,901 ("Heron patent") anticipates the asserted claims of the '356 patent, at least as illustrated in

7  Figure 10A of the '356 patent. Heron measured fringe-effect capacitance on actual capacitors and also

8  used the standard capacitance formula to estimate capacitance during the design. The fringe-effect

9  capacitance between *internal* electrodes 54a and 54b (and 50a and 50b) was expressly acknowledged

10  by the Heron patent. According to ATC, this anticipates claim 1 of the '356 patent because the internal

11  electrodes in Figure 7 are in turn connected to C-shaped plates that are "arranged on an external

12  surface portion" of the dielectric body as required by the Court's claim construction in this case.

13

14

15

16                          

17

18

19

20

21

22

23    Nonetheless, there was substantial evidence for the jury to find that the Heron patent does not

24  anticipate claim 1 of the '356 patent. First, the Heron patent itself describes only fringe-effect

25  capacitance between *internal* electrodes. There is nothing in Heron that would, by itself, teach fringe-

26  effect capacitance between the *external* points of the C-shaped plates. Moreover, Presidio presented

27  testimony of Dr. Ewell that the Heron patent did not teach fringe-effect capacitance between external

28  contacts. (See Trial Tr. Day 7, at 89:24-90:6, 128:19-128:24, 129:8-129:13, 130:9-130:23.) Although

1    this testimony was contradicted by Dr. Dougherty, the Court must disregard that testimony in

2    determining whether there is "substantial evidence" supporting the jury's verdict. See Pavao, 307 F.3d

3    at 918. Accordingly, in light of Dr. Ewell's testimony, the Court finds there was substantial evidence

4    for the jury to find that the Heron patent does not anticipate the asserted claims of the '356 patent

5    because it does not by itself describe each and every limitation of the asserted claim 1.

6                    iv.    *August 2000 capacitors*

7           ATC next argues the capacitors from Presidio's Lot No. 00126-18A that were sold to JDS

8    Uniphase ("JDSU") in August 2000 ("August 2000 capacitors") also anticipate all of the asserted

9    claims, except claims 2 and 4. Dr. Dougherty confirmed that fringe-effect capacitance existed in the

10   August 2000 capacitors by using three different methods (Walker formula, $C=kA/d$ formula, and

11   capacitance meter). However, to test the capacitance, Dr. Dougherty admitted that he had to "polish

12   back and cut away" almost all of the capacitor, so as to leave only the area where the fringe-effect

13   capacitance was supposed to exist. (See Trial Tr. Day 5, at 159:3-159:22.) By doing so, Dr. Dougherty

14   in effect shaved off almost 90% of the August 2000 capacitor. (See Trial Tr. Day 6, at 42:3-45:11.)

15   In light of this, Presidio argues Dr. Dougherty did not really test the August 2000 capacitor itself, but

16   rather some other new part with different structure and electrical performance. (See Trial Tr. Day 7,

17   at 87:7-88:13.) Moreover, according to Presidio, only parallel capacitance–if any–would have

18   remained in the August 2000 capacitor after the shaving. (See Trial Tr. Day 7, at 88:14-88:23.)

19          Once again, it was up to the jury to decide how much weight to give to the respective

20   testimony by Dr. Dougherty and Dr. Ewell. By finding no anticipation by the August 2000 capacitors,

21   the jury must have believed Dr. Ewell that Dr. Dougherty's method of testing for capacitance in the

22   August 2000 capacitor was improper. Or they could have credited Dr. Ewell's testimony that only

23   parallel capacitance–if any–would have remained in the August 2000 capacitor after shaving. In any

24   event, Dr. Ewell's testimony provides legally sufficient evidence to support either of those

25   conclusions, and it is not the job of the Court to second-guess the jury on the issues of credibility of

26   the witnesses or the weighing of the evidence. See Hangarter, 373 F.3d at 1005. Accordingly, there

27   was legally sufficient evidence for the jury to find that the August 2000 capacitors do not anticipate

28   the asserted claims of the '356 patent. See Dickson Indus., 333 Fed. App'x at 517.

### C.   Obviousness

ATC next argues the asserted claims of the '356 patent were obvious to a person of ordinary skill in the art in light of the prior art. Obviousness is a legal question, whereby the court must determine whether the subject matter of the claimed invention "would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a); see also KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 415-16 (2007); Lucent Tech., Inc. v. Gateway, Inc., 580 F.3d 1301, 1310 (Fed. Cir. 2009). "Underpinning that legal issue are factual questions relating to the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and any relevant secondary considerations [of non-obviousness], such as commercial success, long-felt need, and the failure of others." PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1359-60 (Fed. Cir. 2007) (citations omitted); accord Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966).

The burden at trial is on the patent challenger to show by clear and convincing evidence that "a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so." PharmaStem, 491 F.3d at 1360 (citations omitted). Thus, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." KSR, 550 U.S. at 418 (citing United States v. Adams, 383 U.S. 39 (1966)). Rather, the court must "look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having  ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." Id.

> i.   *Was there a reason to combine the known elements in the fashion claimed by the '356 patent, and a reasonable expectation of success in doing so?*

ATC argues there is no dispute that prior art teaches: (1) multilayer ceramic capacitors having the first five elements of claim 1; (2) the additional elements of dependent claims 5, 16, 18, and 19; (3) presence of fringe-effect capacitance wherever two conductive contacts are positioned in an edge-to-edge relationship; and (4) use of insulating layers as an optional feature partially or completely covering contacts (or parts thereof) to prevent electrical sparking. Thus, wouldn't it be obvious to

combine the first five elements of the asserted claim 1 with fringe-effect capacitance between edges, knowing that the capacitance gets larger as the gap gets closer? Also, wouldn't it be obvious that the fringe-effect capacitance, which is disclosed for *internal* contacts 50a and 50b of the Heron patent, would similarly apply to the *external* pair of C-shaped terminations based on the same edge-to-edge geometry? Wouldn't it be obvious to bring those contacts to the surface? Wouldn't it be obvious that if fringe-effect capacitance existed in a 1 mil gap as disclosed in the Gowen patent,[10] that it would also exist in the 2.56 mils or less gap shown in the Figueroa patent? Wouldn't a person of ordinary skill in the art apply an insulating layer if he wanted to prevent arcing across the surface? According to ATC, knowledge and common sense, as well as market pressure–rather than innovation–would have been the motivation for these combinations.

However, the issue before the Court is much narrower than ATC makes it appear. At trial, the jury was asked only: (1) whether all of the asserted claims of the '356 patent were obvious in light of the combination of the Heron patent with the Aoyagi patent,[11] and (2) whether claims 2 and 4 were obvious in light of the combination of the August 2000 capacitors with the Aoyagi patent. (See Verdict Form, at 3-4 [Doc. No. 298].) Seeing as the Aoyagi patent only teaches an insulating layer across the surface,[12] the combination of it with either the Heron patent or the August 2000 capacitors would not have rendered the '356 patent obvious because, as discussed above, there is sufficient evidence to support the jury finding that neither of those patents teaches a fringe-effect capacitance between the external contacts that is "capable of being determined in terms of a standard unit." Accordingly, if neither the Heron patent nor the August 2000 capacitors by itself teaches such fringe-effect capacitance, a combination with the Aoyagi patent would not have made that any more obvious.

In any event, even if ATC's request for a JMOL as to obviousness based on other combinations is procedurally proper, ATC has not carried its burden of demonstrating that a person of ordinary skill in the art would have had the reason to combine the known elements *and* would have had a reasonable expectation of success in doing so. See PharmaStem, 491 F.3d at 1360. Notably, ATC does not point

[10] U.S. patent number 3,304,475 ("Gowen patent").

[11] U.S. patent number 5,978,205 ("Aoyagi patent").

[12] See Trial Tr. Day 5, at 164:11-165:1, 176:9-178:24.

to any testimony at trial that would suggest any reason to extend the fringe-effect capacitance to the external contacts in Figure 7 of the Heron patent or any motivation to bring the internal contacts to the surface. As the Supreme Court has recently stated, the fact that both of those concepts were "obvious" independently does not make their ultimate combination obvious. See KSR, 550 U.S. at 418-19. Rather, it is

> important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.

Id. In the present case, ATC's rhetorical questions notwithstanding, there was no testimony presented at trial to show any reason for combining those elements.[13] Accordingly, ATC failed to carry its burden of demonstrating obviousness by clear and convincing evidence. See In re Dembiczak, 175 F.3d 994, 999 (Fed. Cir. 1999), abrogated on other grounds by In re Gartside, 203 F.3d 1305 (Fed. Cir. 2000) ("Our case law makes clear that the best defense against the subtle but powerful attraction of a hindsight-based obviousness analysis is rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references." (citations omitted)); In re Rouffet, 149 F.3d 1350, 1359 (Fed. Cir. 1998) (noting that the patent challenger must identify specifically and explain "the reasons one of ordinary skill in the art would have been motivated to select the references and to combine them to render the claimed invention obvious" (citation omitted)).

             *ii.    Obviousness due to contemporaneous conception by others.*

In the alternative, ATC argues obviousness is demonstrated by the fact that similar edge-to-edge design was conceived by Charles Rosier, a JDSU engineer, no later than January 15, 2001, and ATC's engineer Richard Monsorno in August 2001. (See Def. Motion for JMOL, Exs. CL, AGN.) Presidio responds there is no evidence that Mr. Rosier conceived all of the limitations of all of the claims, and, in any event, the jury already rejected any such argument. Likewise, according to

---

[13] As already noted, the only testimony offered at trial by ATC on combining known elements was Dr. Dougherty's testimony on combining the Aoyagi patent with either the Heron patent or the August 2000 capacitors. (See Trial Tr. Day 5, at 164:11-165:1, 176:9-178:24.) However, neither of those combinations would overcome the Court's prior finding that legally sufficient evidence supports the jury's conclusion that *these* references do not anticipate the asserted claims because they do not teach fringe-effect capacitance between external contacts. (See supra Part I.B.iii-iv.)

1  Presidio, there is no evidence that anything conceived by Dr. Monsorno was "remarkably similar to

2  the capacitors in the '356 patent," and, in any event, those designs were presented to the USPTO

3  during the prosecution of the '356 patent, and the USPTO proceeded to issue the '356 patent.

4         The testimony pointed to by ATC is insufficient to establish by clear and convincing evidence

5  that the asserted claims of the '356 patent are rendered obvious by the Rosier and Monsorno drawings.

6  There was extensive testimony by Alan Devoe that raised doubts as to any "contemporaneous

7  conception" by Charles Rosier and whether he invented anything related to the '356 patent. (See, e.g.,

8  Trial Tr. Day 3, at 182:9-185:22; Trial Tr. Day 4, at 3:21-9:1, 15:18-20:19, 25:20-26:5; 32:20-33:3.)

9  As for the Monsorno drawing, ATC fails to point to any testimony at trial that discussed whether it

10  rendered obvious all of the asserted claims. Rather, the only testimony concerned the drawing's

11  alleged "single-piece" construction. (See Trial Tr. Day 5, at 49:19-50:12.) Finally, the only testimony

12  about "fringe-effect capacitance" concerned the Monsorno patent from 1996[14] and *not* the Monsorno

13  drawing from August 22, 2001, depicted in ATC's Exhibit CL. (See Trial Tr. Day 5, at 47:3-48:22.)

14  There is no dispute that the Monsorno *patent* was disclosed to the USPTO during the prosecution of

15  the '356 patent. (See '356 patent, at 1 (listing the Monsorno '926 patent among the "References

16  Cited").) Accordingly, the Rosier and Monsorno drawings are insufficient to establish obviousness.[15]

17         D.    Reexamination proceedings

18         The conclusion that ATC has failed to prove anticipation and obviousness by clear and

19  convincing evidence is not affected by the USPTO's recent reexamination proceedings. As previously

20  noted, on July 23, 2009, ATC submitted a replacement Request for Reexamination of the '356 patent.

21  On October 20, 2009, the USPTO granted the request, noting there were substantial new questions of

22  patentability with respect to the asserted claims in light of nine prior art references identified by ATC.

23  Then, on March 23, 2009, the USPTO issued a First Office Action on the merits, rejecting all of the

24  asserted claims on the grounds of anticipation and obviousness. However, just like its name implies,

25  the First Office Action is only a *preliminary* determination by the USPTO–it is not a "final" action,

---

[14] U.S. patent number 5,576,926 ("Monsorno patent").

[15] ATC's claim of "contemporaneous conception" is further undermined by the jury's express finding that ATC failed to meet its burden of showing that the '356 patent does not "name all actual inventors and only the actual inventors." (See Verdict Form, at 4 [Doc. No. 298].)

1   and the examiner could still change his decision or completely reverse it before issuing the final

2   action. See 37 C.F.R. §§ 1.112, 1.550; accord Heinl v. Godici, 143 F. Supp. 2d 593, 598-99 (E.D. Va.

3   2001). Accordingly, any such determination is *not* persuasive evidence of anticipation or obviousness.

4   See Medtronic, Inc. v. Catalyst Research Corp., 547 F. Supp. 401, 410 (D. Minn 1982); accord

5   Cimcore Corp. v. Faro Techs., Inc., Civil No. 03 CV 2355-B (WMc), 2007 WL 935665, at *2 (S.D.

6   Cal. Mar. 12, 2007) ("The office action is a first office action, not a final rejection by the USPTO.

7   Even if it were a final rejection, until the patentee addresses the rejections with argument or claim

8   amendments and the reexamined patent issues, the prosecution history is incomplete and estoppel has

9   yet to be determined.").

10        E.        Enablement

11        ATC next argues the asserted claims are invalid due to lack of enablement. The enablement

12   requirement is set forth in Section 112, which provides that the patent's specification shall describe

13   "the manner and process of making and using [the invention], in such full, clear, concise, and exact

14   terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly

15   connected, to make and use [the invention]." 35 U.S.C. § 112. "The enablement requirement is

16   satisfied when one skilled in the art, after reading the specification, could practice the claimed

17   invention without undue experimentation." AK Steel Corp. v. Sollar & Ugine, 344 F.3d 1234, 1244

18   (Fed. Cir. 2003) (citation omitted). Factors to be considered in determining whether undue

19   experimentation would be required include: "(1) the quantity of experimentation necessary, (2) the

20   amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the

21   nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the

22   predictability or unpredictability of the art, and (8) the breadth of the claims." In re Wands, 858 F.2d

23   731, 737 (Fed. Cir. 1988) (citations omitted).

24             i.        "Substantially monolithic"

25        First, ATC argues there is no definition of the phrase "substantially monolithic" provided in

26   the specifications of the '356 patent, the term was never heard of or applied before by any of the

27   technical experts in this case, and even if a dielectric body can be "monolithic," there can be no

28   degrees of "monolithicness." ATC argues it would take great time, cost, and effort to determine what

1   the '356 patent means by "substantially monolithic," especially in light of the medium level of skill,

2   and the fact that the '356 patent does not disclose a working example or that Presidio never produced

3   a single capacitor practicing the asserted claims. Thus, according to ATC, undue experimentation

4   would be required, making the asserted claims invalid. See AK Steel, 344 F.3d at 1243-45.

5        ATC, however, cannot show by clear and convincing evidence that the phrase "substantially

6   monolithic" is not sufficiently enabled, let alone that the jury verdict is "'against the great weight of

7   the evidence.'" See Hangarter, 373 F.3d at 1005 (citation omitted). As previously noted, at the JMOL

8   stage, the Court has to disregard evidence favorable to the moving party and must determine if the jury

9   verdict is supported by legally sufficient evidence. See Payao, 307 F.3d at 918. In the present case,

10  Dr. Ewell testified that the phrase "substantially monolithic" is both "definite" and "clear and

11  understandable" to one of ordinary skill in the art. (See Trial Tr. Day 7, at 73:21-74:9.) According to

12  Dr. Ewell, one of ordinary skill in the art could use an objective test to determine whether a multilayer

13  capacitor is substantially monolithic by measuring its reliability when subjected to thermal cycling

14  or to vibration and shocks. (Id. at 74:10-75:2.) Similarly, the phrase was clear and understandable to

15  Dr. Huebner, who would have relied on measuring the multilayer capacitor's durability and its ability

16  to perform as a capacitor. (See Trial Tr. Day 4, at 129:2-130:22.)

17       ATC's objection on the ground that the '356 patent does not mention anything about reliability

18  or durability misses the mark. Section 112 does not require the patent to define each and every word

19  used–for if it did, then every patent would have to be "written as a comprehensive tutorial and treatise

20  for the generalist, instead of a concise statement for persons in the field." See Verve, LLC v. Crane

21  Cams, Inc., 311 F.3d 1116, 1119 (Fed. Cir. 2002). Rather, a patent is sufficiently enabled if a person

22  of ordinary skill in the art could make and use the invention without undue experimentation. See 35

23  U.S.C. § 112; AK Steel, 344 F.3d at 1244. In the present case, the jury was entitled to believe Drs.

24  Ewell and Huebner in that little, if any, experimentation would be necessary to determine what the

25  '356 patent meant by "substantially monolithic." (See, e.g., Trial Tr. Day 4, at 129:2-130:22; Trial Tr.

26  Day 7, at 74:10-75:2.) The '356 patent also has a very detailed background section listing specific

27  examples of known capacitors and explaining the industry's knowledge of their design and

28  application, including detailed technical information, which would help one of ordinary skill in

1   determining what the phrase "substantially monolithic" meant. Moreover, once the Court construed

2   the phrase "substantially monolithic," all of the experts in this case were able to apply the definition

3   to the capacitors and prior art at issue. Cf. Aero Products Int'l, Inc. v. Intex Recreation Corp., 466 F.3d

4   1000, 1016 (Fed. Cir. 2006) ("If a claim is amenable to construction, 'even though the task may be

5   formidable and the conclusion may be one over which reasonable persons will disagree,' the claim is

6   not indefinite." (citation omitted)). Indeed, having reviewed all of the In re Wands factors, only one

7   of them–absence of working examples–potentially weighs in ATC's favor. See 858 F.2d at 737. In

8   light of the above, this is insufficient by itself to find lack of enablement.

9         Finally, the use of the word "substantially" does not make the phrase "substantially

10  monolithic" less enabling. As Presidio notes, the use of the claim term "substantially" has repeatedly

11  been held to be proper, and definite. See, e.g., Kinzenbaw v. Case LLC, 179 Fed. App'x 20, 29-31

12  (Fed. Cir. 2006) ("substantially uniformly distributed" and "substantially on the center line"); Verve,

13  311 F.3d at 119-20 ("substantially constant wall thickness"); Ecolab, Inc. v. Envirochem, Inc., 264

14  F.3d 1358, 1366-67 (Fed. Cir. 2001) ("substantially uniform"); Andrew Corp. v. Gabriel Elec., Inc.,

15  847 F.2d 819, 821-22 (Fed. Cir. 1988) ("substantially equal"). As the Federal Circuit has noted, the

16  term "substantially" is a descriptive term used in patent claims to "avoid a strict numerical boundary

17  to the specified parameter." Ecolab, 264 F.3d at 1367 (term "substantially" used to avoid "the strict

18  100% nonuniformity boundary"); accord Verve, 311 F.3d at 1120 ("Expressions such as

19  'substantially' are used in patent documents when warranted by the nature of the invention, in order

20  to accommodate the minor variations that may be appropriate to secure the invention."). Such usage

21  may indeed be necessary "to provide the inventor with the benefit of his invention" as well as "to

22  distinguish the claimed subject matter from the prior art." See Verve, 311 F.3d at 1120. In the present

23  case, the term "substantially" avoids the strict 100% "monolithicness" of the dielectric, which Dr.

24  Ewell testified is not possible to achieve. (See Trial Tr. Day 4, at 130:4-131:4.)

25             *ii.*   *"Sufficiently close . . . to form a first fringe-effect capacitance"*

26        Second, ATC argues the '356 patent lacks enabling information with respect to the phrase:

27  "sufficiently close . . . to form a first fringe-effect capacitance" because the patent does not disclose

28  the thickness of the contacts, the voltage rating, the dielectric, or the dielectric constant. According

to ATC, due to lack of this information, a person of ordinary skill in the art would not be able to tell whether any given capacitor fell within the scope of the asserted claims. Moreover, ATC argues that Presidio's failure to build a single capacitor practicing the asserted claims, as well as the four years it took ATC to develop its allegedly infringing 545L capacitor, demonstrate that this element cannot be practiced without undue experimentation.

Although ATC raises some good arguments, they are nonetheless insufficient to demonstrate that the jury's verdict was "'against the great weight of the evidence.'" See Hangarter, 373 F.3d at 1005 (citation omitted). Both Dr. Ewell and Dr. Huebner testified that the disputed term was clear and ascertainable. For example, Dr. Huebner testified that to determine whether the contacts were "sufficiently close" to form a fringe-effect capacitance, a person of ordinary skill in the art would analyze the thickness of the external contacts, the separation distance, the dielectric itself, and the dielectric constant. (See Trial Tr. Day 4, at 81:8-81:22.) Similarly, Dr. Ewell testified that one could readily determine by actual physical testing whether this claim limitation was satisfied. (See, e.g., Trial Tr. Day 7, at 111:23-112:3, 114:12-114:17, 115:15-116:21, 119:23-120:12.) Moreover, as already noted, the '356 patent sets forth a very detailed background section listing specific examples of known capacitors and explaining the industry's knowledge of their design and application, including detailed technical information, which would help one of ordinary skill in determining what the disputed phrase meant. Finally, the fact that the Court was able to construe the term to mean "positioned in an edge-to-edge relationship in such proximity as to form a capacity that is capable of being determined in terms of a standard unit" weighs against any indefiniteness. Cf. Aero Products, 466 F.3d at 1016. Thus, similar to the phrase "substantially monolithic," there is really only one In re Wands factor–absence of working examples–weighing in ATC's favor. See 858 F.2d at 737. However, just like with that phrase, this is insufficient by itself to find lack of enablement.

ATC's insistence that Presidio cannot "have its cake and eat it too" by requiring specific details from the prior art references and then ignoring those details when it comes to the '356 patent is misplaced. As Dr. Ewell explained on cross-examination, the details were not necessary for the '356 patent because it *expressly claimed* that a fringe-effect capacitance was there. (See Trial Tr. Day 7, at 114:3-115:14.) On the other hand, the details were necessary to confirm whether that fringe-effect

1  capacitance was also formed in the allegedly anticipating prior art because those references did *not*

2  expressly claim fringe-effect capacitance between external contacts. (See id.) Accordingly, the jury

3  was entitled to credit this testimony, and ATC has failed to demonstrate that the jury's decision was

4  "'against the great weight of the evidence.'" See Hangarter, 373 F.3d at 1005 (citation omitted).

5      Finally, as was discussed with regard to the term "substantially," the use of the term

6  "sufficiently close" does not make the whole claim term less enabling. Just like the terms "about" or

7  "substantially," the term "sufficiently close" appears to be a descriptive term that can be used in patent

8  claims to "avoid a strict numerical boundary to the specified parameter." See Ecolab, 264 F.3d at

9  1367; accord Verve, 311 F.3d at 1120. Indeed, the use of the term may be necessary "to provide the

10  inventor with the benefit of his invention" as well as "to distinguish the claimed subject matter from

11  the prior art." See Verve, 311 F.3d at 1120. In the present case, there was substantial evidence

12  presented to find that the novelty of the '356 patent was precisely the fact that once the external

13  contacts are arranged "sufficiently close," a fringe-effect capacitance is formed. How "sufficiently

14  close" they should be arranged would necessarily depend on the thickness of those external contacts

15  and the type of dielectric used. (See Trial Tr. Day 4, at 81:8-81:22.) To specify any particular distance

16  between the contacts would have been mere "guesswork" and would have unnecessarily limited the

17  scope of the claimed invention. See Verve, 311 F.3d at 1120.

18          *iii.    Conclusion*

19      Accordingly, ATC has not shown by clear and convincing evidence that the use of the phrases

20  "substantially monolithic" and "sufficiently close . . . to form a first fringe-effect capacitance" made

21  the '356 patent invalid due to lack of enablement. ATC has not shown that the jury's verdict in this

22  regard was against the great weight of the evidence.

23      F.    Written description

24      Section 112 also requires that the patent's specification contain a "written description of the

25  invention." 35 U.S.C. § 112. This requirement is independent of the enablement requirement, and is

26  necessary "'so that one skilled in the art can recognize what is claimed.'" Univ. of Rochester v. G.D.

27  Searle & Co., Inc., 358 F.3d 916, 920-23 (Fed. Cir. 2004) (citations omitted). While excessive

28  description is not required, "generalized language may not suffice if it does not convey the detailed

identity of an invention." Id. at 923. The purpose of the written description is to ensure that "the patentee had possession of the claimed invention at the time of the application, i.e. that the patentee invented what is claimed." LizardTech, Inc. v. Earth Res. Mapping, Inc., 424 F.3d 1336, 1344-45 (Fed. Cir. 2005) (citations omitted); accord Ariad, 2010 WL 1007369, at *12 ("In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." (citations omitted)).

As the Federal Circuit sitting *en banc* recently stated, "the hallmark of written description is disclosure." Ariad, 2010 WL 1007369, at *12. The test requires the court to look to the four corners of the specification from the perspective of a person of ordinary skill in the art and inquire whether the specification describes an invention understandable to that skilled artisan and shows that the inventor actually invented the invention claimed. Id. This inquiry is a question of fact and will necessarily vary depending on the context. Id. However, there are "a few broad principles that hold true across all cases." Id. at *13. Thus, "the written description requirement does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement." Id. (citation omitted). Conversely, "a description that merely renders the invention obvious does not satisfy the requirement." Id. (citation omitted). Finally, the Federal Circuit cautioned that "although written description and enablement often rise and fall together, requiring a written description of the invention plays a vital role in curtailing claims that do not require undue experimentation to make and use, and thus satisfy enablement, but that have not been invented, and thus cannot be described." Id. at *14.

In the present case, there is substantial evidence to support the jury's verdict finding no lack of written description. As already noted, the '356 patent has a very detailed background section listing specific examples of known capacitors and explaining the industry's knowledge of their design and application, including detailed technical information. The '356 patent also provides a very detailed description of the invention, accompanied by twenty-three separate figures, that describes how the conductive contacts can be extended to the exterior, how that would affect the overall insertion loss and frequency performance of the capacitor, and what effect it would have on the overall capacitance.

1  (See '356 patent, col. 6:19-12:57.) The claims that follow focus on these innovations by claiming the

2  method of extending conductive contacts to the exterior and positioning them in such proximity to

3  each other so as to form fringe-effect capacitance. (See '356 patent, col. 12:58-16:32.) Thus, unlike

4  Ariad, upon which ATC relies, the scope of the claims in the '356 patent does not "overreach the

5  scope of the inventor's contribution to the field of art as described in the patent specification." See

6  2010 WL 1007369, at **15, 19 (finding lack of written description where the patent-in-suit used broad

7  language to claim "methods comprising the single step of reducing NF-kB activity," while the

8  specification "at best describe[d] decoy molecule structures and hypothesize[d] with no accompanying

9  description that they could be used to reduce NF-kB activity").

10        Finally, ATC's focus on "functional language" in the context of the written description

11  requirement is misplaced.[16] ATC asserts the Federal Circuit in Ariad held that "a vague functional

12  description and an invitation for further research does not constitute written disclosure." See id. at *17.

13  However, the Ariad court in other places indicated that functional language and prophetic examples

14  can in certain circumstances satisfy the written description requirement.[17] See, e.g., id. at *11 ("We

15  have also held that functional claim language can meet the written description requirement when the

16  art has established a correlation between structure and function." (citation omitted)); id. at *18

17  ("Prophetic examples are routinely used in the chemical arts, and they certainly can be sufficient to

18  satisfy the written description requirement."). Moreover, the statement quoted by ATC was made in

19  a context where the only evidence supporting written description was the ex post facto testimony of

20  an expert that a specific inhibitor existed during the relevant time period and "that one of ordinary skill

21  could through experimentation" isolate the necessary inhibitor. See id. at *17 (emphasis added). In

22  contrast, the detailed description section in the present case and the accompanying figures provide

23  sufficient "correlation" between the structure and function to satisfy the written description

24

25        [16] The use of "functional language" is addressed in more detail below in the context of ATC's argument that the '356 patent is invalid due to indefiniteness. (See infra Part I.G.ii.)

26        [17] In addition, to the extent ATC argues the written description requirement is not met because

27  Presidio never reduced the '356 patent to practice, the Federal Circuit unequivocally rejected that argument. See Ariad, 2010 WL 1007369, at *13 ("We have made clear that the written description requirement does not demand either examples or an actual reduction to practice; a constructive

28  reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement." (citation omitted)).

1  requirement. See id. at *11. Accordingly, ATC failed to show by clear and convincing evidence that

2  the jury's verdict finding no lack of written description was "'against the great weight of the

3  evidence.'"[18] See Hangarter, 373 F.3d at 1005 (citation omitted).

4      G.    Indefiniteness

5          The Court previously denied ATC's motion for summary judgment of indefiniteness. [See Doc.

6  No. 32]. ATC now renews its argument, stating that the Court should find the asserted claims

7  indefinite as a matter of law. Whether the claims are indefinite is a legal issue for the court, and not

8  the jury. Biomedino, LLC v. Waters Tech. Corp., 490 F.3d 946, 949 (Fed. Cir. 2007). The definiteness

9  requirement is contained in paragraph 2 of Section 112, which requires that a patent specification

10 conclude with one or more claims "particularly pointing out and distinctly claiming the subject matter

11 which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. A patent claim is sufficiently

12 definite "[i]f one skilled in the art would understand the bounds of the claim when read in light of the

13 specification." Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001)

14 (citation omitted). A claim need not be plain on its face to avoid condemnation for indefiniteness;

15 rather, all that is required is that the claim be "amenable to construction." Id. As the Federal Circuit

16 has reiterated:

17      If a claim is insolubly ambiguous, and no narrowing construction can properly be
        adopted, we have held the claim indefinite. If the meaning of the claim is discernible,
18      even though the task may be formidable and the conclusion may be one over which
        reasonable persons will disagree, we have held the claim sufficiently clear to avoid
19      invalidity on indefiniteness grounds.

20 Id. (citations omitted). "By finding claims indefinite only if reasonable efforts at claim construction

21 prove futile, we accord respect to the statutory presumption of patent validity, and we protect the

22 inventive contribution of patentees, even when the drafting of their patents has been less than ideal."

23 Id. (internal citation omitted).

24 ///

25

26      [18] The Court also rejects ATC's argument that it is entitled to a new trial because the Jury
   Instructions only asked the jury to consider whether the inventors were in "possession of the
27 invention" without specifying that what is required for compliance with the written description is
   "possession as shown in the disclosure." See Ariad, 2010 WL 1007369, at *12. As Presidio points out,
28 the Jury Instructions made it clear that the possession of the invention is to be judged by the
   disclosures in the patent application when filed. (See Jury Instructions, at 47-48 [Doc. No. 297].)

1          *i.        ATC's motion is procedurally proper.*

2          As an initial matter, the Court rejects Presidio's argument that ATC's motion is procedurally

3    improper. Presidio argues the current motion is untimely and improper because: (1) the Court

4    previously deferred judgment on the issue of indefiniteness when it adopted ATC's construction of

5    the disputed claim terms; (2) the Court subsequently denied ATC's motion for summary judgment on

6    the issue of indefiniteness; and (3) after the close of all the evidence, the Court denied ATC's Rule

7    50(a) motion on the issue of indefiniteness. However, Rule 50(b) provides that where the court does

8    not grant a motion under Rule 50(a), which was the case here, "the court is considered to have

9    submitted the action to the jury *subject to the court's later deciding the legal questions raised by the*

10   *motion.*" FED. R. CIV. P. 50(b) (emphasis added). Accordingly, ATC's current motion on the issue of

11   indefiniteness–which is a question of law–is properly before the Court.

12          *ii.       ATC has not met its burden of showing by clear and convincing evidence that
                       the challenged claim terms are indefinite as a matter of law.*

13   

14          ATC argues the claim terms "substantially monolithic" and "sufficiently close . . . to form a

15   first fringe-effect capacitance" are indefinite. First, ATC argues the '356 patent does not disclose a

16   workable, objective test for measuring either of those terms. Second, ATC argues the tests proposed

17   by Presidio would cause the same capacitor to be "sometimes infringing and sometimes not"

18   depending on how the capacitor is used and tested. Third, ATC argues the patent fails to differentiate

19   itself from the prior art identified in Figure 2A. Fourth, ATC argues the claim "sufficiently close . .

20   . to form a first fringe-effect capacitance" is indefinite because the patent in effect uses "functional

21   language" to define the alleged point of novelty.

22          a.        "Substantially monolithic"

23          To the extent ATC's first ground of indefiniteness raises the same arguments as with respect

24   to enablement and written description, those arguments are rejected for the same reasons as set forth

25   above. Specifically, as already noted, the use of the claim term "substantially" has repeatedly been

26   held to be proper and definite. See, e.g., Kinzenbaw, 179 Fed. Appx. at 29-31 ("substantially

27   uniformly distributed" and "substantially on the center line"); Verve, 311 F.3d at 119-20

28   ("substantially constant wall thickness"); Ecolab, 264 F.3d at 1366-67 ("substantially uniform");

     Andrew Corp., 847 F.2d at 821-22 ("substantially equal"). As the Federal Circuit has noted, the term

1  "substantially" is a descriptive term used in patent claims to "avoid a strict numerical boundary to the

2  specified parameter." Ecolab, 264 F.3d at 1367 (term "substantially" used to avoid "the strict 100%

3  nonuniformity boundary"); accord Verve, 311 F.3d at 1120 ("Expressions such as 'substantially' are

4  used in patent documents when warranted by the nature of the invention, in order to accommodate the

5  minor variations that may be appropriate to secure the invention."). In the present case, the term

6  "substantially" avoids the strict 100% "monolithicness" of the dielectric, which Dr. Ewell testified is

7  not possible in any case.[19] (See Trial Tr. Day 4, at 130:4-131:4.)

8      ATC next argues Dr. Ewell's "fracture test" does not cure the indefiniteness of the claim term,

9  but rather confuses it even further. "The scope of claim language cannot depend solely on the

10  unrestrained, subjective opinion of a particular individual purportedly practicing the invention."

11  Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1350 (Fed. Cir. 2005) (citation omitted).

12  Rather, "[s]ome objective standard must be provided in order to allow the public to determine the

13  scope of the claimed invention." Id. According to ATC, these criteria are not satisfied with respect to

14  the term "substantially monolithic" because it is not based on an objective standard, but rather depends

15  on a questionable "fracture test" pursuant to which a capacitor may infringe when used in one activity,

16  but not infringe when used in another. See Paragon Solutions, LLC v. Timex Corp., 566 F.3d 1075,

17  1090-91 (Fed. Cir. 2009); Halliburton Energy Services, Inc. v. M-I LLC, 514 F.3d 1244, 1254-55

18  (Fed. Cir. 2008) ("When a proposed construction requires that an artisan make a separate infringement

19  determination for every set of circumstances in which the composition may be used, and when such

20  determinations are likely to result in differing outcomes (sometimes infringing and sometimes not),

21  that construction is likely to be indefinite.").

22      However, contrary to ATC's arguments, a claim term is not indefinite just because it was

23

24      [19] ATC's argument that none of the experts in this case have heard of the term "substantially
monolithic" prior to this case misses the point. Whether or not the phrase existed is not the issue;
25  rather, the question is whether "one skilled in the art would understand the bounds of the claim when
read in light of the specification." See Exxon, 265 F.3d at 1375 (citation omitted). In the present case,
26  both Dr. Ewell and Dr. Huebner testified that the term was clear and understandable to persons of
ordinary skill in the art. Moreover, a claim term is not indefinite as long as the meaning of the claim
27  is discernible through construction, "even though the task may be formidable and the conclusion may
be one over which reasonable persons will disagree." Id. (citations omitted). In the present case, the
28  Court was able to construe the term "substantially monolithic" by adopting the definition proposed
by ATC. In light of this, whether or not the term was "new" or "unheard of" is legally irrelevant.

1    "intended to cover the use of the invention with various types of [end products]." See Orthokinetics,

2    Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1575-76 (Fed. Cir. 1986) ("That a particular chair

3    on which the claims read may fit within some automobiles and not others is of no moment. The phrase

4    'so dimensioned' is as accurate as the subject matter permits, automobiles being of various sizes."

5    (citation omitted)). In the present case, one skilled in the art can easily use Dr. Ewell's objective

6    "fracture test" to determine whether any resulting capacitor is "substantially monolithic."[20] See id.

7    More importantly, unlike the cases relied upon by ATC, this does not mean that the *same* capacitor

8    will be infringing in one case and not infringing in another; rather, once built, a particular capacitor

9    designed for a particular use will be either "substantially monolithic" or not. (See Trial Tr. Day 4, at

10   129:2-130:22; Trial Tr. Day 7, at 74:10-75:2.) Indeed, in light of Dr. Ewell's testimony that 100%

11   "monolithicness" is not possible in any case, the phrase "substantially monolithic" might very well

12   be "as accurate as the subject matter permits." See Orthokinetics, 806 F.2d at 1576 .

13             b.      "Sufficiently close . . . to form a first fringe-effect capacitance"

14             Similarly, to the extent ATC's first ground of indefiniteness raises the same arguments as with

15   respect to enablement and written description, those arguments are rejected for the same reasons as

16   set forth above. Specifically, the use of the term "sufficiently close" does not make the whole claim

17   term less definite. Just like the terms "about" or "substantially," the term "sufficiently close" appears

18   to be a descriptive term used in patent claims to "avoid a strict numerical boundary to the specified

19   parameter." See Ecolab, 264 F.3d at 1367; accord Verve, 311 F.3d at 1120. Moreover, there was

20   sufficient evidence presented at trial to find that the novelty of the '356 patent was precisely the fact

21   that once the external contacts are arranged "sufficiently close," a fringe-effect capacitance is formed.

22   How "sufficiently close" they should be arranged would necessarily depend on the thickness of those

23   contacts and the type of dielectric used. (See Trial Tr. Day 4, at 81:8-81:22.) To specify any particular

24   distance between the contacts would have unnecessarily limited the scope of the claimed invention,

25   _____

26             [20] In this context, the Court rejects ATC's argument that the Court cannot rely on Dr. Ewell's
      testimony at trial because it constitutes extrinsic evidence that contradicts the intrinsic record. See
27    Phillips v. AWH Corp., 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("[A] court should discount any expert
      testimony 'that is *clearly at odds* with the claim construction mandated by the claims themselves, the
28    written description, and the prosecution history . . . .'" (citation omitted) (emphasis added)). In light
      of the fact that the '356 patent does not anywhere define "substantially monolithic," Dr. Ewell's
      testimony regarding his "fracture test" cannot be "clearly at odds" with the intrinsic record. See id.

1    thereby depriving the inventors of the "benefit of [their] invention." See Verve, 311 F.3d at 1120.

2        ATC next argues Dr. Ewell's proposed "test" for whether a fringe-effect capacitance is

3    "determinable" compounds rather than clarifies the ambiguity. As previously noted, "[t]he scope of

4    claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual

5    purportedly practicing the invention." Datamize, 417 F.3d at 1350 (citation omitted). Rather, "[s]ome

6    objective standard must be provided in order to allow the public to determine the scope of the claimed

7    invention." Id. In the present case, that requirement is satisfied because Dr. Ewell testified that one

8    of ordinary skill in the art can use a capacitance meter–an objective test–to measure whether

9    "determinable" fringe-effect capacitance is present between a particular set of external contacts.[21]

10   (See, e.g., Trial Tr. Day 7, at 111:23-112:3, 114:12-114:17, 115:15-116:21, 119:23-120:12.) Likewise,

11   Dr. Huebner testified that to determine whether the contacts were "sufficiently close" to form a

12   determinable fringe-effect capacitance, a person of ordinary skill in the art could analyze the thickness

13   of the external contacts, the separation distance, the dielectric itself, and the dielectric constant–all of

14   which are objective details. (See Trial Tr. Day 4, at 81:8-81:22.) ATC's own expert, Dr. Dougherty,

15   confirmed the propriety of both of these methods. (See, e.g., Trial Tr. Day 5, at 144:17-146:17.)

16       ATC has also failed to show by clear and convincing evidence that the '356 patent fails to

17   differentiate itself from the prior art identified in Figure 2A. "[W]hether the patent expressly or at least

18   clearly differentiates itself from specific prior art . . . is an important consideration in the definiteness

19   inquiry because in attempting to define a claim term, a person of ordinary skill is likely to conclude

20   that the definition does not encompass that which is expressly distinguished as prior art." Halliburton,

21   514 F.3d at 1252. In the present case, the '356 patent adequately differentiates what is claimed from

22   the prior art depicted in Figure 2A. For example, in describing Figure 10A, which depicts an

23   embodiment of the claimed capacitor, the '356 patent notes that as compared to the capacitor in Figure

24   2A, "the external conductive plates **72** and **74** in the lower section **62** of the device have been extended

25   toward each other so as to create a capacitance between plates **72** and **74** based upon fringe electric

26

27       [21] ATC argues Dr. Ewell's test is indefinite because the same fringe-effect capacitance would be sometimes infringing and sometimes not depending on the "sensitivity" of the capacitance meter used to measure it. See Halliburton, 5143 F.3d at 1254-55. However, the mere fact that one capacitance meter might be more or less sensitive than the other does not make this a situation where the *same capacitor* will be infringing in one case and not infringing in another.

28

1   field extending to and from the adjacent edges of those plates." ('356 patent, col. 7:22-7:26.) In

2   contrast, there is no discussion of any fringe-effect capacitance, much less capacitance that is

3   "determinable," with respect to prior art depicted in Figure 2A. (See id., col. 2:17-2:44.) Likewise,

4   with respect to Figure 2A, there is no discussion of any "external contacts" that are "sufficiently close"

5   to each other. (See id.) Accordingly, the '356 patent sufficiently differentiates the prior art depicted

6   in Figure 2A from what is claimed in the asserted claim 1.

7



PRIOR ART
FIG. 2A

FIG. 10A

16      Finally, ATC's "functional language" argument fares no better. Particular scrutiny is required

17   where a claim is defined "'by what it does rather than what it is.'" Halliburton, 514 F.3d at 1255. The

18   vice of such "functional claiming" occurs "'when the inventor is painstaking when he recites what has

19   already been seen, and then uses conveniently functional language at the exact point of novelty.'" Id.

20   (quoting Gen. Elec. Co. v. Wabash Appliance Corp., 304 U.S. 364, 371 (1938)). The Federal Circuit,

21   however, has held that claim language is not necessarily indefinite for using functional language. See,

22   e.g., Microprocessor Enhancement Corp. v. Texas Instruments Inc., 520 F.3d 1367, 1375 (Fed. Cir.

23   2008). There is nothing intrinsically wrong with using functional language in claims, unless it fails

24   to "provide a clear-cut indication of the scope of the subject matter embraced by the claim." Id.

25   (internal quotation marks and citation omitted). In the present case, the '356 patent differentiates its

26   invention from the prior art by requiring that there be external contacts that are located in such

27   proximity to each other as to form a fringe-effect capacitance. In light of Dr. Ewell's testimony, this

28   provides sufficient description of the scope of the asserted claims. See Halliburton, 514 F.3d at 1256.

    *iii.*    *Conclusion*

Accordingly, ATC has failed to show by clear and convincing evidence that the phrases "substantially monolithic" and "sufficiently close . . . to form a first fringe-effect capacitance" are indefinite as a matter of law.

    H.    <u>Inequitable conduct</u>

Finally, ATC argues the '356 patent is unenforceable due to inequitable conduct. "'A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution.'" <u>McKesson Info. Solutions, Inc. v. Bridge Med., Inc.</u>, 487 F.3d 897, 913 (Fed. Cir. 2007) (citation omitted); <u>see also</u> 37 C.F.R. § 1.56(a) ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section.").

The "materiality" of information withheld during prosecution is judged by the "reasonable examiner" standard, which embraces "'any information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent.'" <u>McKesson</u>, 487 F.3d at 913 (citations omitted). Information concealed from the PTO may be material "even though it would not invalidate the patent." <u>Id.</u> (citation omitted). It is well-established, however, that information or a reference is not material if it is merely cumulative to other information or references considered by the examiner. <u>See id.</u>

As for the "intent" element of the offense, it is "'in the main proven by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred.'" <u>Id.</u> (citation omitted). "'However, inequitable conduct requires not intent to withhold, but rather intent to deceive. Intent to deceive cannot be inferred simply from the decision to withhold information where the reasons given for the withholding are plausible.'" <u>Id.</u> (citation omitted). "In addition, 'a finding that particular conduct amounts to "gross negligence" does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.'"

Id. (citing Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed. Cir.1988) (en banc in relevant part)). "Whenever evidence proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference." Scanner Tech. Corp. v. ICOS Vision Sys. Corp., 528 F.3d 1365, 1376 (Fed. Cir. 2008).

Determination of inequitable conduct is a two-step process. The party asserting inequitable conduct must first prove a threshold level of "materiality" and "intent" by clear and convincing evidence. McKesson, 487 F.3d at 913. The court must then balance the levels of "materiality" and "intent"–with the greater showing of one factor allowing a lesser showing of the other–to determine whether the applicant's conduct before the PTO was "egregious enough to warrant holding the entire patent unenforceable." Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1365 (Fed. Cir. 2008); McKesson, 487 F.3d at 913. "Thus, even if a threshold level of both materiality and intent to deceive are proven by clear and convincing evidence, the court may still decline to render the patent unenforceable." Star Scientific, 537 F.3d at 1365.

### i. Alleged "point of novelty"

The Court first addresses ATC's continued insistence that the "point of novelty" of the '356 patent was the "fringe-effect capacitance" between the capacitor contacts. Contrary to ATC's arguments, in allowing the asserted claim 1, the patent examiner stated:

> The prior art does not teach or fairly suggest (taken in combination with the other claimed features) a capacitor comprising a conductive second contact disposed externally on the dielectric body and electrically connected to the second plate, and the second contact being located sufficiently close to the first contact to form a first fringe-effect capacitance with the first contact . . . .

(See Pl. Opp. to Def. Findings & Conclusions on Inequitable Conduct, Ex. C.) The plain meaning of the above sentence is that the patent examiner considered the combination of all of the limitations of claim 1 to be the point of novelty, not just the "fringe-effect capacitance." Moreover, as Section 1302.14 of the USPTO's Manual of Patent Examining Procedures submitted by ATC provides, "[t]he statement [of allowance] is not intended to necessarily state all the reasons for allowance or all the details why claims are allowed and should not be written so specifically or impliedly state that all the reasons for allowance are set forth." (Def. Reply, Ex. 2 [Doc. No. 331-2].) Indeed, it would have been

1   improper for the examiner to unilaterally limit claim 1 to just "fringe-effect capacitance." See id.

2   ("Where specific reasons are recorded by the examiner, care must be taken to ensure that statements

3   of reasons for allowance (or indication of allowable subject matter) are accurate, precise, and do not

4   place unwarranted interpretations, whether broad or narrow, upon the claims.").

5       Accordingly, the Court rejects ATC's erroneous interpretation of the examiner's reasons for

6   allowance of claim 1 as well as ATC's arguments that rely upon that interpretation.[22]

7           ii.    The Devoe '430 patent

8       The first reference relied upon by ATC in support of its inequitable conduct charge is the

9   Devoe patent, U.S. patent number 5,367,430 ("Devoe '430 patent"). The Devoe '430 patent is titled

10  "Monolithic Multiple Capacitor," and describes that "it is impossible to eliminate all stray capacitance

11  between pairs of electrical conductors in a monolithic ceramic capacitor" and that "[i]t is a further

12  object of the present invention to provide a monolithic multiple capacitor in which stray capacitance

13  between pairs of terminals is used to form useful circuit elements."[23] (See Def. Findings &

14  Conclusions on Inequitable Conduct, Ex. ABS, col. 2:68-3:2, 3:30-3:33 [Doc. No. 312-4].)

15      In granting the reexamination of the '356 patent, the USPTO noted that "a reasonable

16  Examiner would consider [the Devoe '430 patent] important in making a decision as to the

17  patentability of claim 1 of the '356 patent."[24] (Id., Ex. AKI_0022.) This preliminary determination by

18  the USPTO, while not relevant to the issue of patent validity, is surely probative of *materiality*. See

19      [22] Indeed, in its recent grant of reexamination, the USPTO identified the following as the point
20  of novelty of the '356 patent: "a capacitor comprising a conductive second contact disposed externally
    on the dielectric body and electrically connected to the second plate, and the second contact being
21  located sufficiently close to the first contact to form a first fringe-effect capacitance with the first
    contact." (See Def. Findings & Conclusions on Inequitable Conduct, Ex. AKI_0008.)

22      [23] According to ATC, "stray capacitance" is another term for "fringe-effect capacitance."
23
        [24] Presidio challenges ATC's reliance on the reexamination proceedings and on Exhibit AKI,
24  which is the USPTO's Decision Granting Ex Parte Reexamination, arguing that doing so contradicts
    the Court's prior exclusion of that evidence at the motions *in limine* stage. However, contrary to
25  Presidio's argument, the Court only precluded the use of the reexamination proceedings before the
    jury, concluding that even if relevant, the grant of reexamination would likely confuse the jury. (See
26  Order on Pl. MIL: Reexamination of the '356 Patent, at 3 [Doc. No. 252].) Moreover, the question at
    this stage is not whether a prior reference is relevant to patentability or validity, which were the issues
27  addressed in the Court's ruling on Presidio's motion *in limine*, but rather whether "a reasonable
    examiner would substantially likely consider [it] important in deciding whether to allow an application
28  to issue as a patent." See McKesson, 487 F.3d at 913 (citations omitted). Accordingly, the Court
    rejects Presidio's objections on this ground.

Case 3:08-cv-00335-IEG-NLS   Document 397   Filed 11/24/10   PageID.8539   Page 67 of 180

1  McKesson, 487 F.3d at 913 ("'[I]nformation concealed from the PTO may be material even though

2  it would not invalidate the patent.'" (citation omitted)). Indeed, as ATC correctly points out, the

3  standard used by the examiner in granting the reexamination ("a reasonable Examiner would consider

4  [the patent] important in making a decision as to the patentability") is almost identical to the standard

5  for materiality ("information that a reasonable examiner would substantially likely consider important

6  in deciding whether to allow an application to issue as a patent"). Accordingly, there is a substantial

7  likelihood that a reasonable examiner would have considered the Devoe '430 patent material to the

8  application. See McKesson, 487 F.3d at 913.

9        Nonetheless, ATC did not meet its burden of showing intent to deceive by clear and

10  convincing evidence. First, ATC argues that necessary intent can be drawn from the materiality of the

11  '430 patent combined with the fact that Alan Devoe allegedly thought in June 2001 that the capacitors

12  made for JDSU were covered by the '430 patent. (See Def. Findings & Conclusions on Inequitable

13  Conduct, Ex. PM.) However, "the fact that information later found material was not disclosed cannot,

14  by itself, satisfy the deceptive intent element of inequitable conduct." Star Scientific, 537 F.3d at 1366

15  (citation omitted). Rather, ATC had the burden of separately demonstrating intent to deceive during

16  the relevant time. See id. Moreover, the fact that information was known years ago does not mean that

17  it was necessarily recognized as being material at the time the application was filed. In the present

18  case, the fact that the Devoes were allegedly "concerned" about the '430 patent in June 2001 but then

19  forgot to cite it during the patent application process in 2002, without more, amounts at most to "gross

20  negligence" on their part, which is insufficient by itself to support intent to deceive.[25] See Kingsdown,

21  863 F.2d at 876 (en banc in relevant part).

22        More importantly, the Devoes testified at trial that they believed the '430 patent was not

23  relevant to the asserted claims of the '356 patent. For example, Daniel Devoe testified that the '430

24  patent was a "totally different kind of animal" because it dealt with a hearing-aid circuit device

25  intended to operate at a range of a few cycles to 10,000 cycles, while the '356 patent was aimed at the

26

27        [25] ATC's continued reference to the words "conflict - existing patent" in Daniel Devoe's
    notebook is not persuasive. (See Def. Findings & Conclusions on Inequitable Conduct, Ex. UL.) There
    is nothing on the page where those words appear to indicate whether this refers to a perceived conflict

28  with any of the patents relied upon by ATC in its inequitable conduct charge, or whether it refers to
    the '356 patent at all. (See, e.g., Trial Tr. Day 2, at 23:5-24:4, 29:1-30:3, 34:15-34:19.)

much higher range of up to 40 billion cycles. (See, e.g., Trial Tr. Day 2, at 29:13-29:23; 55:24-56:10, 56:24-57:8, 57:20-57:24.) Likewise, Alan Devoe testified that by the time the patent application was finally drafted, the Devoes did not believe the '430 patent was relevant. (See, e.g., Trial Tr. Day 3, at 176:15-177:1.) While the inference of intent to deceive may properly be drawn from indirect and circumstantial evidence, it "must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the *single most reasonable inference* able to be drawn from the evidence to meet the clear and convincing standard." Star Scientific, 537 F.3d at 1366 (citation omitted) (emphasis added). In the present case, the above testimony by the Devoes prevents the Court from concluding that the only inference that can be drawn is that there must have been an intent to deceive the USPTO when the patent applications were filed. The Court cannot say with confidence that ATC has proven by clear and convincing evidence that culpable intent existed at *that* time.[26] See McKesson, 487 F.3d at 913 ("'The intent element of the offense is ... in the main proven by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred.'" (citation omitted)); see also Scanner Tech., 528 F.3d at 1376 ("Whenever evidence proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference.").

### iii.    The Devoe '443 patent

The next reference relied upon by ATC is the Devoe patent, U.S. patent number 6,366,443 ("Devoe '443 patent"). The Devoe '443 patent deals with a "ceramic chip capacitor of conventional volume and external form having increased capacitance from use of closely-spaced interior conductive planes reliably connecting to positionally-tolerant exterior pads through multiple redundant vias." (See Def. Findings & Conclusions on Inequitable Conduct, Ex. ABT.) Among other things, the Devoe '443 patent discloses the aforementioned C=kA/d formula for measuring capacitance between parallel

---

[26] ATC relies on Elk Corp. of Dallas v. GAF Bldg. Materials Corp., 168 F.2d 28, 32 (Fed. Cir. 1999), where the Federal Circuit affirmed the district court's conclusion that intent to deceive existed where the patentee ran a patentability search, discovered a patent that was "of special interest," but never disclosed that patent to the USPTO. That case is inapposite because there the patentee specifically ran the patentability search *with the patent application in mind*. In the present case, however, the reference to the '430 patent occurred a year before the '327 patent application was filed and referred only to the capacitors sold to JDSU, which Presidio contends are different from the invention claimed in the '356 patent and which the jury found did not anticipate the '356 patent.

1    plates.[27] (See id., col. 4:48-4:53.)

2         ATC's sole argument that the Devoe '443 patent was material is that it discloses "fringe-effect

3    capacitance," which is the alleged "point of novelty" of the '356 patent. However, as noted above, the

4    Court rejects ATC's insistence that the "fringe-effect capacitance" *by itself* is the point of novelty.

5    (See supra Part I.H.i.) Nonetheless, even if not a "point of novelty," a prior reference with a potential

6    fringe-effect capacitance would likely be material to a reasonable examiner. See, e.g., Hoffmann-La

7    Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1367 (Fed. Cir. 2003) (finding material patentee's

8    failure to disclose purity results, even though purity was not a claim limitation). In the present case,

9    there was sufficient testimony presented to demonstrate that there might be fringe-effect capacitance

10   between the external electrical connections in Figure 2b of the '443 patent. (See, e.g., Trial Tr. Day

11   2, at 33:1-33:12; Trial Tr. Day 5, at 186:8-188:5.) Accordingly, there is a substantial likelihood that

12   a reasonable examiner would have considered the Devoe '443 patent material to the application. See

13   McKesson, 487 F.3d at 913. However, because this does not relate to any "point of novelty," and

14   because it does not invalidate the '356 patent, there is at most only a medium level of materiality.

15

16                                        

17

18

19                                       Fig. 2b

20         Moreover, there was likely knowledge, at least on behalf of Daniel Devoe, that the '443 patent

21   was relevant so as to give rise to an inference of intent. There was inconsistent testimony at trial

22   regarding potential relevance of the '443 patent. On the one hand, Alan Devoe testified that the Devoe

23   '443 patent was not relevant because it was not intended for "broadband" use, the resulting capacitors

24   were "not surface mountable," and the external vias were merely used for beneficial purposes without

25   really recognizing the "novelty of the invention" that would later crystalize. (See Trial Tr. Day 3, at

26   178:6-178:21.) Likewise, Daniel Devoe testified that the Devoe '443 patent was "a different kind of

27   animal" because although it also uses a high-frequency capacitor, "it is disconnected from the

28

          [27] The C=kA/d formula does not appear in the '356 patent.

                                        - 37 -                          08cv335-IEG (NLS)

1   broadband part that we're arguing about." (See Trial Tr. Day 2, at 60:6-60:15.) On the other hand,

2   Daniel Devoe also testified that the structure of Figure 2b above resembles the structure claimed in

3   the '356 patent. (See id. at 32:4-33:12.) Indeed, Daniel Devoe testified that the '443 patent discloses

4   how to arrange "two connections on the top" and then bring them "close together" to achieve a "better

5   frequency performance." (See id. 61:17-62:3.) At the very least, this presents a close case where

6   Daniel Devoe recognized that the structure of the '443 patent was similar to what is claimed in the

7   '356 patent, and yet decided not to disclose it because he believed it not to be relevant. If that is the

8   case, he had the duty to disclose it to the examiner, and let the examiner determine whether or not the

9   reference was material. See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253,

10  1257 (Fed. Cir. 1997) ("It is axiomatic that 'close cases should be resolved by disclosure, not

11  unilaterally by applicant.'" (citation omitted)). Accordingly, ATC has shown the threshold level of

12  intent. However, in light of the conflicting testimonies as to the relevance the Devoes attached to the

13  '443 patent, there is at most only a low level of intent.

14      *iv.*  *The Trinh '854 patent*

15    The next reference put forth by ATC is the Trinh '854 patent, which is titled "Fringe-Field

16  Non-Overlapping-Electrodes Discoidal Feed-Through Ceramic Filter Capacitor with High Breakdown

17  Voltage." (See Def. Findings & Conclusions on Inequitable Conduct, Ex. AAG.) The Trinh '854

18  patent teaches that "[f]ringe-effect capacitance is always present" between exterior metal terminations

19  of opposite polarity. (Id., col. 9:49-9:52.) It also teaches that when the voltage is small, that fringe-

20  effect capacitance is "negligible" in comparison to the overall capacitance, and is "disregarded." (Id.,

21  col. 9:52-9:56.) On the other hand, in a high voltage multi-layer ceramic capacitor, the '854 patent

22  teaches that "the fringe capacitance commences to be a sizable, measurable, portion of the total

23  capacitance." (Id., col. 9:56-9:59.)

24    As with the Devoe '430 patent, the USPTO's grant of reexamination noted that "a reasonable

25  Examiner would consider [the Trinh '854 patent] important in making a decision as to the patentability

26  of claim 1 of the '356 patent." (Def. Findings & Conclusions on Inequitable Conduct, Ex. AKI_0015.)

27  Accordingly, even though it might not be relevant to patent validity, this demonstrates the Trinh '854

28  patent would likely be material to a reasonable examiner. See McKesson, 487 F.3d at 913.

Nonetheless, ATC cannot show the threshold level of intent by clear and convincing evidence. First, as already noted, there is very little basis to ATC's argument that the words "conflict - existing patent" found in Daniel Devoe's notebook referred to any conflict due to the Trinh '854 patent, or were even related to the '356 patent application. (See, e.g., Trial Tr. Day 2, at 23:5-24:4, 29:1-30:3, 34:15-34:19.) Moreover, the mere fact that there is fringe-effect capacitance disclosed between *internal* plates in the '854 patent does not mean it was or should have been recognized as material to what is claimed in the '356 patent. On the contrary, the Devoes and their patent attorney testified that they believed the '854 patent not to be relevant to the '356 application, in part because it was designed to deal with reliability of voltage breakdown and because it would not make sense to use that invention with the high frequencies at which the BB capacitor and the 545L capacitor operate. (See, e.g., id. at 51:5-53:3; Trial Tr. Day 3, at 70:12-70:18.) In light of this testimony, the Court cannot conclude that the only inference that can be drawn is that there must have been an intent to deceive the USPTO when the patent applications were filed. See Star Scientific, 537 F.3d at 1366. Accordingly, the Court cannot say with confidence that ATC has proven by clear and convincing evidence that culpable intent existed at the relevant time. See McKesson, 487 F.3d at 913.

*v.* The Seaman '884 patent

The last patent relied upon by ATC is the Seaman patent, U.S. patent number 4,661,884 ("Seaman '884 patent"). The Seaman '884 patent was filed by Harry V. Seaman of ATC on March 10, 1986, and is titled "Miniature, Multiple Layer, Side Mounting High Frequency Blocking Capacitor." (See Def. Findings & Conclusions on Inequitable Conduct, Ex. ABU.) The '884 patent was one of the patents cited by the Devoes in their '430 patent. Notably, the Devoe '430 patent acknowledged that the '884 patent "teaches a single capacitor in which external conductive terminals are brought out to be soldered to a circuit board." (Id., Ex. ABS, col. 1:66-2:1.)

Although it is a close question, the Court believes the Seaman '884 patent would have been material to a reasonable examiner. While it is unclear whether the '884 patent discloses fringe-effect capacitance as claimed in the '356 patent, the Devoes' own patent (the '430 patent) acknowledges that the '884 patent teaches about bringing out conductive terminals to the outside of the capacitor, which is an integral part of the '356 patent's claim limitations. Accordingly, there is a substantial likelihood

that a reasonable examiner would have considered the Seaman '884 patent material to the application. See Hoffmann-La Roche, 323 F.3d at 1367 (finding material patentee's failure to disclose purity results, even though purity was not a claim limitation).

Nonetheless, ATC has not shown the necessary level of intent by clear and convincing evidence. ATC argues there was intent to deceive because the '884 patent was cited in the '430 patent, the Devoes were apparently "concerned" about it, and Daniel Devoe admitted the '884 patent discloses fringe-effect capacitance between the contacts. However, as Daniel Devoe testified, the reason the '884 patent was cited in the '430 patent and the reason the Devoes were "concerned" with it was the little groove in the '884 patent that was somewhat similar to the grooves being cut in the '430 patent. (See Trial Tr. Day 2, at 58:4-58:25.) None of that is applicable to the '356 patent. Likewise, it is unclear whether the '884 patent discloses fringe-effect capacitance as claimed in the '356 patent. (See id. at 59:11-59:22.) Accordingly, the Court cannot say with confidence that ATC has proven by clear and convincing evidence that there was intent to deceive. See McKesson, 487 F.3d at 913.

### vi. August 2000 capacitors

ATC also argues the Devoes should have disclosed the sale of the August 2000 capacitors to the USPTO. First, ATC argues that the August 2000 capacitors were material because they anticipate most of the asserted claims as determined by Dr. Dougherty. However, even without deference to the jury's verdict on this issue, it is unclear whether the August 2000 capacitors anticipate the '356 patent. (See, e.g., Trial Tr. Day 6, at 42:3-45:11; Trial Tr. Day 7, at 87:7-88:23.) Moreover, there was testimony that the August 2000 capacitors were merely "generic" capacitors that Presidio makes in large quantities for a number of customers. (See Trial Tr. Day 2, at 63:10-63:18, 64:10-65:2.) In addition, there was testimony that the August 2000 capacitors *were* disclosed to the USPTO through prior art and figures identified as prior art, in particular Figure 2A. (See id. at 64:18-64:22; Trial Tr. Day 7, at 151:10-152:22, 156:25-157:1.) It is well-established that information or a reference is not material if it is merely cumulative to other information or references considered by the examiner. McKesson, 487 F.3d at 913. Accordingly, there is no substantial likelihood that a reasonable examiner would have considered the sale of the August 2000 capacitors material to the application. See id.

///

Case 3:08-cv-00335-IEG-NLS Document 367 Filed 11/24/10 PageID.12345 Page 73 of 180

vii.    *The inventorship dispute*

ATC next argues that there was inequitable conduct due to Presidio's failure to disclose the existence of an inventorship dispute with regard to Chuck Rosier. Misinformation about inventorship can be the basis for a claim of inequitable conduct. See, e.g., PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1321-22 (Fed. Cir. 2000) (finding material patentee's "intentional 'misrepresentations, omissions and half-truths to the PTO,' made as a 'persistent course' of conduct" regarding inventorship). In the present case, however, the jury has rejected any improper inventorship claim, and the Court has already denied ATC's motion for JMOL on that issue. (See Verdict Form, at 4; see also supra Part I.C.ii.) Moreover, as previously noted, there was extensive testimony by Alan Devoe that raised doubts as to whether Charles Rosier invented anything related to the '356 patent. (See, e.g., Trial Tr. Day 3, at 182:9-185:22; Trial Tr. Day 4, at 3:21-9:1, 15:18-20:19, 25:20-26:5; 32:20-33:3.) Accordingly, it is very unlikely that a reasonable examiner would have considered this issue material to the application. See McKesson, 487 F.3d at 913.

Furthermore, even if material, ATC cannot show by clear and convincing evidence the threshold level of intent. Relying on piecemeal portions of the exhibits, ATC argues the Devoes knew of the potential inventorship dispute and therefore should have disclosed it. (See Def. Findings & Conclusions on Inequitable Conduct, Exs. PI, PL, UK, UL.) However, the most that can be concluded from these exhibits is that *at one point* there was talk between the parties about a joint cooperation or ownership agreement, but it was then rejected by Presidio as being unfair. (See, e.g., Trial Tr. Day 4, at 3:21-9:1, 25:20-30:5.) Accordingly, because ATC has failed to show by clear and convincing evidence that the Devoes believed there was any inventorship dispute at the time the patent application was filed, the Court finds there was no intent to deceive. See McKesson, 487 F.3d at 913.

viii.    *Alleged misrepresentations in the specifications*

Finally, ATC argues inequitable conduct charge is supported by the misrepresentations in the specifications of the '356 patent. Use of past tense or prophetic examples to describe an experiment, when that experiment was never actually performed as described, may be a misrepresentation actionable as inequitable conduct. See, e.g., Hoffman-La Roche, 323 F.3d at 1363-66 (upholding a finding of inequitable conduct where "Example VI [was] written in the past tense" and "[f]rom the

- 41 -

1   language used, a reader of the patent would conclude that the protocol was performed and that the

2   [described] results were actually achieved"). In the present case, ATC first argues the use of phrases

3   such as "have been extended" and "have been found" with respect to Figures 10A and 15A of the '356

4   patent suggests that the described steps were actually undertaken and that the described results were

5   actually obtained. According to ATC, this is misleading because Presidio has conceded that it "has

6   not previously designed or manufactured capacitors in accordance with [those figures]." (See Def.

7   Findings & Conclusions on Inequitable Conduct, Ex. ABU.) ATC also argues the failure to disclose

8   the presence of fringe-effect capacitance in Figure 2A amounted to a material misrepresentation.

9          The Court finds that the misrepresentations, if any, in the specifications of the '356 patent

10  would not have been considered material by a reasonable examiner. With respect to the past tense

11  language used, the instances in this case are significantly different from the charged conduct in

12  Hoffman on which ATC relies. In Hoffman, each step of the disputed Example VI, over more than two

13  columns of the patent, was described in the same fashion, using the past tense. 323 F.3d at 1363-64.

14  Indeed, the past tense was used to describe the steps of Example VI on more than 75 occasions, and

15  the patent provided specific numeric measurements used and results obtained, even though it was later

16  admitted that Example VI was never performed as described. Id. In contrast, the '356 patent merely

17  states that in Figure 10A, as opposed to Figure 9A, "the external conductive plates **72** and **74** in the

18  lower section **62** of the device *have been extended* toward each other so as to create a capacitance

19  between plates **72** and **74** based upon fringe electric field extending to and from the adjacent edges

20  of those plates." ('356 patent, col. 7:21-7:26 (italics added).) As Mr. Humphrey testified, a comparison

21  of Figures 9A and 10A from the original application confirms that this is indeed the case–i.e., the

22  conductive plates *in the drawing* "have been extended" from where they were in Figure 9A to where

23  they appear in Figure 10A. (See Trial Tr. Day 3, at 92:1-94:15, 95:2-96:21; see also Pl. Opp. to Def.

24  Findings & Conclusions on Inequitable Conduct, Ex. E.)

25

26

27

28

- 42 -

Similarly, it is very unlikely that a reasonable examiner would have considered the use of past tense in the following sentence, which describes Figure 15A, material: "While the fringe effect capacitances **127**, **129** may be relatively small compared to other overlapping parallel plate capacitances **75** within the capacitor **120**, the fringe effect capacitances **127**, **129** *have been found* to effect the high frequency performance of the capacitor **120**." (See '356 patent, col. 10:3-10:8 (italics added).) Presidio argues that in this context, the phrase "have been found" refers more to a technical theory of operation of the capacitor shown, rather than to any alleged experiments. This is a reasonable inference that the Court is entitled to credit. See Star Scientific, 537 F.3d at 1366; Scanner Tech., 528 F.3d at 1376. Accordingly, the Court cannot say with confidence that ATC has proven by clear and convincing evidence that these phrases would have been considered material by a reasonable examiner.[28] See McKesson, 487 F.3d at 913.

Finally, even if these alleged misrepresentations were material, there has been no showing of intent to deceive the USPTO. Contrary to Hoffman, 323 F.3d at 1363-64, on which ATC relies, this is not the case where the patent describes extensive experiments with specific details that were never conducted as described. Likewise, there was no consistent effort by the Devoes to "hide the ball" as was the case in Semiconductor Energy, also relied upon by ATC. See Semiconductor Energy Lab. Co. v. Samsung Elec. Co., 204 F.3d 1368, 1373, 1377-78 (Fed. Cir. 2000) (upholding a finding of inequitable conduct where the patentee provided a misleadingly incomplete, partial translation of one of the references and a narrow and incomplete concise statement). Rather, as Mr. Humphrey testified,

---

[28] For the reasons discussed previously, the Court also rejects ATC's argument that failure to indicate that there is fringe-effect capacitance in Figure 2A amounted to a misrepresentation.

1  the past tense was used solely to denote what was done to the drawings and to indicate where fringe-

2  effect capacitance would technically be present. Accordingly, ATC has failed to demonstrate by clear

3  and convincing evidence any intent to deceive. See McKesson, 487 F.3d at 913.

4      *ix. Conclusion*

5    Having considered the materiality and intent associated with each one of the grounds relied

6  upon by ATC, the Court must next determine whether the '356 patent as a whole should be declared

7  unenforceable. As previously stated, with respect to each asserted ground, ATC must first prove a

8  threshold level of "materiality" and "intent" by clear and convincing evidence. See McKesson, 487

9  F.3d at 913. In the present case, only with respect to the Devoe '443 patent are both factors satisfied.

10  Accordingly, the Court must next balance the levels of "materiality" and "intent"–with the greater

11  showing of one factor allowing a lesser showing of the other–to determine whether the failure to

12  disclose the '443 patent was "egregious enough to warrant holding the entire patent unenforceable."

13  See Star Scientific, 537 F.3d at 1365; McKesson, 487 F.3d at 913.

14    In the present case, the Court concludes that on balance the equities do not make the Devoes'

15  conduct before the USPTO "egregious enough to warrant holding the entire patent unenforceable."

16  See Star Scientific, 537 F.3d at 1365 (citation omitted). There is only a medium level of materiality

17  based on the alleged similarity between Figure 2b in the '443 patent and the asserted claims of the

18  '356 patent. There is also only a low level of intent because both the Devoes and their patent counsel

19  testified that they believed the '443 patent not to be relevant to the invention claimed in the '356

20  patent, even if some of them recognized the similarities in the structure. (See, e.g., Trial Tr. Day 2,

21  at 60:6-60:15; Trial Tr. Day 3, at 91:1-91:19, 178:6-178:21.) Accordingly, even though threshold

22  levels of both materiality and intent have been shown, the Court exercises its discretion in **DENYING**

23  ATC's motion to hold the '356 patent unenforceable due to inequitable conduct. See Star Scientific,

24  537 F.3d at 1365 ("Thus, even if a threshold level of both materiality and intent to deceive are proven

25  by clear and convincing evidence, the court may still decline to render the patent unenforceable.").

26  **II. Infringement**

27    A. Sufficiency of the evidence supporting the jury's verdict of infringement

28    ATC also moves for a JMOL on the issue of infringement. Because the Court previously

1   granted ATC summary judgment on the issue of infringement under the doctrine of equivalents and

2   on induced and contributory infringement, (see MSJ Order, at 17-18 [Doc. No. 165]), the only issue

3   submitted to the jury was that of literal infringement. Literal infringement first requires the court to

4   interpret the claims to determine their scope and meaning. Dynacore Holdings Corp. v. U.S. Philips

5   Corp., 363 F.3d 1263, 1273 (Fed. Cir. 2004). The court must then compare the properly construed

6   claims to the allegedly infringing device. Id. The patentee must prove that the accused device contains

7   each limitation of the asserted claims. Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1247

8   (Fed. Cir. 2000). "If any claim limitation is absent from the accused device, there is no literal

9   infringement as a matter of law." Id. (citation omitted).

10        First, ATC argues there was no sufficient evidence to demonstrate that the 545L capacitor had

11   a "substantially monolithic dielectric body" as required by the '356 patent, which the Court defined

12   as "a dielectric body largely but not wholly without seams from the inclusion of plates within the

13   dielectric body." ATC argues that Dr. Huebner allegedly admitted "there are no seams" in the 545L

14   capacitor. (See Trial Tr. Day 4, at 112:24-113:14.) However, taking Dr. Huebner's testimony as a

15   whole, he was only indicating that the word "seams" is not used by persons skilled in the art and that

16   the word "substantially" is necessary only because no capacitor can be 100% monolithic. (See, e.g.,

17   id. at 100:18-101:8, 102:19-103:5, 105:17-105:23, 112:18-112:23.) Moreover, assuming the word

18   "seam" referred to a boundary between a plate and the dielectric, as contended by ATC, Dr. Huebner

19   testified there would be 140 seams in the 545L capacitor, and therefore it would be "substantially, but

20   not wholly, without seams."[29] (See id. at 116:18-117:17.) Likewise, assuming the word "seams"

21   referred to defects and/or porosity, Dr. Huebner agreed there were seams in the 545L capacitor, and

22   therefore it was once again "substantially, but not wholly, without seams."[30] (See id. at 128:23-

23

24        [29] Assuming each plate has corresponding 2 seams, Dr. Huebner's testimony was consistent
with the specifications in the '356 patent, which contemplate a capacitor with 30 to 100 layers, and
25   therefore with 60 to 200 seams. (See '356 patent, col. 2:2-2:5.)

26        [30] There was nothing improper with Dr. Huebner defining the word "seam" as referring to a
defect and/or porosity. As Presidio correctly points out, this Court never defined the word "seam."
27   Accordingly, both ATC and Presidio were within their right to offer at trial conflicting expert opinions
defining that term. Moreover, even if the exact words "gaps," "voids," and "porosity" did not appear
28   in Dr. Huebner's report, ATC cannot show any prejudice because Dr. Huebner also testified that the
545L capacitor was "substantially, but not wholly, without seams" according to ATC's own proposed

1   132:20.) Finally, Dr. Huebner testified that despite his view on the appropriateness of the word

2   "seams," he faithfully applied the Court's claim construction. Accordingly, there was sufficient

3   evidence for the jury to credit Dr. Huebner's opinion and to find that the 545L capacitor was

4   "substantially monolithic."[31]

5        Second, ATC argues there was no sufficient evidence to demonstrate that the 545L capacitor

6   had a "fringe-effect capacitance," which the Court initially defined as "a determinable capacitance"

7   and then further defined as "a capacity that is capable of being determined in terms of a standard unit."

8   Presidio, however, points to Dr. Huebner's detailed dissection and analysis of the 545L capacitor in

9   arguing that he *did* conclude there was fringe-effect capacitance that was "determinable." (See Trial

10  Tr. Day 4, at 56:1-67:5, 75:15-85:7.) The Court agrees. Notably, Dr. Huebner testified that he took

11  detailed micrographs of the 545L capacitor, and that he also measured a determinable fringe-effect

12  capacitance in the 545L capacitor by using the C=kA/d formula and inputting the actual thickness of

13  the external contact, the actual separation distance, and a lower and upper boundary for what the

14  dielectric constant might be. (See id. at 120:24-121:24.) Accordingly, there was sufficient evidence

15  for the jury to credit Dr. Huebner's opinion and to find that the 545L capacitor had a "fringe-effect

16  capacitance" between the external contacts.

17       For the foregoing reasons, and because ATC makes no objections with respect to any other

18  claim terms, the Court finds there was sufficient evidence for the jury to conclude that Presidio

19  demonstrated by preponderance of the evidence that the 545L capacitor infringes all of the asserted

20  claims of the '356 patent.

21       B.    Willfulness

22       ATC next challenges the jury's finding of willful infringement. To demonstrate willful

23

24  definition of the word "seam." (See Trial Tr. Day 4, at 116:18-117:17.)

25       [31] The extent to which Dr. Huebner's testimony on cross-examination allegedly contradicted
     his testimony on direct was for the jury to decide. Cf. Doan v. United States, 202 F.2d 674, 680 (9th
26  Cir. 1953) ("It was for the jury who observed him and the manner and emphasis with which he gave
     his answers on direct and cross-examination to weigh and evaluate his testimony and to say whether
27  the quoted statement . . . amounted, as appellant argues, to a withdrawal of his direct testimony . . .
     ."). As long as the verdict is supported by sufficient evidence, which is the case here, the Court will
28  not overturn it "even if it is possible to draw two inconsistent conclusions from the evidence." Landes
     Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987) (citation omitted).

1   infringement, a patentee must show at least "objective recklessness," which is a two-part process:

> [First], a patentee must show by clear and convincing evidence that the infringer acted
> despite an objectively high likelihood that its actions constituted infringement of a
> valid patent. The state of mind of the accused infringer is not relevant to this objective
> inquiry. If this threshold objective standard is satisfied, the patentee must also
> demonstrate that this objectively-defined risk (determined by the record developed in
> the infringement proceeding) was either known or so obvious that it should have been
> known to the accused infringer.

6   In re Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc) (internal citations omitted).

7   The Court evaluates the totality of the circumstances to determine whether an infringement is

8   "willful." ACCO Brands, Inc. v. ABA Locks Mfr. Co., 501 F.3d 1307, 1312-13 (Fed. Cir. 2007).

9   In the present case, even if ATC "acted despite an objectively high likelihood that its actions

10  constituted infringement of a valid patent," Presidio failed to show by clear and convincing evidence

11  that ATC did so with the necessary subjective intent. See Seagate, 497 F.3d at 1371. At trial, ATC

12  presented uncontested testimony from Robert Grossbach, ATC's Vice President of RF Engineering,

13  and John Mruz that they independently concluded there was "nothing new" in the '356 patent. (See

14  Trial Tr. Day 5, at 62:11-64:10; Trial Tr. Day 6, at 85:14-86:9.) Likewise, although the USPTO

15  initially rejected the Mruz patent for the 545L capacitor in light of the '356 patent, the USPTO later

16  reconsidered and allowed the Mruz patent, U.S. patent number 7,248,458 ("Mruz patent"). (See Trial

17  Tr. Day 5, at 39:15-40:7, 64:17-65:10.) None of the arguments made by Presidio are sufficient to

18  demonstrate that the jury's finding of willful infringement was supported by substantial evidence.

19                    i.      Alleged "affirmative duty of due care"

20  Presidio's first argument is that ATC had a duty to investigate and determine whether it had

21  a good faith belief to market the 545L capacitors in light of the '356 patent. However, Presidio relies

22  solely on pre-Seagate case law in support of this proposition. Prior to Seagate, a potential infringer

23  who had actual notice of another's patent rights had "an affirmative duty to exercise due care to

24  determine whether or not he is infringing." See Underwater Devices Inc. v. Morrison-Knudsen Co.,

25  717 F.2d 1380, 1389-90 (Fed. Cir. 1983) (citation omitted); accord nCube Corp. v. Seachange Int'l,

26  Inc., 436 F.3d 1317, 1324 (Fed. Cir. 2006); John Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1364

27  (Fed. Cir. 1998). In Seagate, the Federal Circuit abandoned this approach and overruled the prior

28  cases, concluding that a finding of willfulness "requires at least a showing of objective recklessness."

497 F.3d at 1371 ("Accordingly, we overrule the standard set out in <u>Underwater Devices</u> and hold that proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness. . . . [W]e abandon the affirmative duty of due care . . . ."); <u>accord</u> <u>Eastman Kodak Co. v. Agfa-Gevaert N.V.</u>, 560 F. Supp. 2d 227, 302 (W.D. N.Y. 2008). Accordingly, there was no "affirmative duty of due care" imposed on ATC in this case; rather, the only duty it had to comply with was the duty to not act with objective recklessness. See <u>Seagate</u>, 497 F.3d at 1371.

### ii. Alleged copying

Likewise, there is little merit to Presidio's argument that willfulness is demonstrated by ATC's copying of Presidio's *unpatented* BB capacitors. Evidence of copying may be relevant to <u>Seagate</u>'s second prong, "as it may show what the accused infringer knew or should have known about the likelihood of its infringement." <u>DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.</u>, 567 F.3d 1314, 1336 (Fed. Cir. 2009). At trial, however, Mr. Mruz adamantly denied any copying of the BB capacitors. (<u>See, e.g.</u>, Trial Tr. Day 5, at 65:11-65:20.) Presidio has failed to point to any contrary testimony.[32] Rather, the only testimony before the jury was that ATC at most *tested* Presidio's BB capacitors, as well as DLI's Opti-Caps, while developing its 545L capacitors. (<u>See</u> Trial Tr. Day 6, at 90:19-91:8.) However, as Presidio's own witnesses confirmed, monitoring the marketplace and testing products developed by competitors is a standard practice in the industry. (<u>See, e.g.</u>, Trial Tr. Day 2, at 44:20-44:24, 84:21-85:4, 87:19-88:23.) Accordingly, this factor cannot support the jury's finding of willful infringement.

### iii. Failure to obtain opinion of counsel

Finally, ATC's failure to present an opinion of a patent attorney–while a relevant factor–is not clear and convincing evidence of willfulness. Contrary to ATC's objections, the failure to obtain an

---

[32] Unable to point at what exactly ATC copied, Presidio alleges it was "Presidio's idea of a one-piece, substantially monolithic construction." (<u>See</u> Pl. Opp. to Motion for JMOL, at 30.) However, Mr. Mruz provided extensive testimony on how ATC came up with one-piece design for the 545L capacitors. (<u>See</u> Trial Tr. Day 5, at 49:19-50:12, 52:9-59:20.) Because Presidio has failed to point to any contrary testimony, there is no basis for Presidio's argument that there was "egregious copying" or "sudden emergence" of an infringing product. See <u>Trading Tech. Int'l, Inc. v. eSpeed, Inc.</u>, No. 04 C 5312, 2008 WL 63233, at *2 (N.D. Ill Jan. 3, 2008) ("We agree with plaintiff that in some circumstances pre-patent conduct is relevant to a determination of willfulness, significantly when that pre-patent conduct consists of egregious copying." (citations omitted)); <u>Afros S.p.A. v. Krauss-Maffei Corp.</u>, 671 F. Supp. 1402, 1436-38 (D. Del. 1987) (inferring copying from the "sudden emergence" of the infringing device that had a "nearly identical design" to the patented invention).

opinion of counsel *is* a relevant factor post-<u>Seagate</u>. In <u>Seagate</u>, the Federal Circuit noted that over the

years, its case law has erroneously established that accused infringer's failure to obtain an opinion of

counsel gave rise to an "adverse inference" as to willfulness of infringement. 497 F.3d at 1370. The

<u>Seagate</u> court conclusively rejected any such inference, concluding instead that "there is no affirmative

obligation to obtain opinion of counsel." <u>Id.</u> at 1370-71. However, the Federal Circuit did *not* hold that

failure to obtain opinion of counsel was legally irrelevant. Rather, the court noted that the issue of

willfulness must be analyzed under the "totality of the circumstances" approach. <u>Id.</u> at 1369. Notably,

the Federal Circuit stated that "[a]lthough an infringer's reliance on favorable advice of counsel, or

conversely his failure to proffer any favorable advice, is not dispositive of the willfulness inquiry, *it*

*is crucial to the analysis.*" <u>Id.</u> (emphasis added).

      Case law post-<u>Seagate</u> is split as to whether lack of opinion of counsel is still a valid factor that

can be considered by the jury in determining willfulness of infringement. Many courts seem to have

concluded that, while there is no longer any "adverse inference" from the failure to obtain opinion of

counsel, it is still a factor to be considered in the "totality of the circumstances" approach.[33] A number

of courts, however, have interpreted <u>Seagate</u> differently, concluding that lack of opinion of counsel

cannot be considered by the jury at all.[34] Having considered the issue, the Court agrees with what

---

[33] <u>See, e.g.</u>, <u>Finjan Software, Ltd. v. Secure Computing Corp.</u>, C.A. No. 06-369 (GMS), 2009 WL 2524495, at *15 (D. Del. Aug. 18, 2009) ("While there is no longer an affirmative duty of care that requires an accused infringer to obtain an opinion of counsel, the fact that Secure did not seek any such opinion may be considered in the totality of circumstances surrounding willful infringement."); <u>Creative Internet Adver. Corp. v. YahooA Inc.</u>, No. 6:07cv354, 2009 WL 2382132, at *5 (E.D. Tex. July 30, 2009) (noting that while it is not determinative, "the lack of opinion of counsel is one factor of many that the jury could have taken into account in determining whether Defendant willfully infringed"); <u>GSI Group, Inc. v. Sukup Mfg. Co.</u>, 591 F. Supp. 2d 977, 981 (C.D. Ill. 2008) ("An alleged infringer's decision not to secure an opinion is relevant to show willfulness, but an alleged infringer is not required to secure an attorney opinion letter before marketing a device to avoid a claim of willfulness."); <u>Energy Transp. Group, Inc. v. William Demant Holding AS</u>, C.A. No. 05-422 GMS, 2008 WL 114861, at *1 (D. Del. Jan. 7, 2008) (denying accused infringer's motion in limine and concluding that "nothing in <u>Seagate</u> forbids a jury to consider whether a defendant obtained advice of counsel as part of the totality of the circumstances in determining willfulness"); <u>Cohesive Techs., Inc. v. Waters Corp.</u>, 526 F. Supp. 2d 84, 103 (D. Mass 2007) (noting that "whether the infringer solicited or followed the advice of counsel" was one of the factors to be considered in determining willfulness, <u>vacated in part & rev'd in part on other grounds</u>, 543 F.3d 1351, 1374 (Fed. Cir. 2008).

[34] <u>See, e.g.</u>, <u>Spectralytics, Inc. v. Cordis Corp.</u>, No. 05-CV-1464 (PJS/RLE), 2009 WL 3851314, at *4 (D. Minn. Jan. 13, 2009) (granting motion in limine excluding evidence and argument regarding opinion of counsel, including with respect to the issue of willful infringement); <u>Anascape Ltd. v. Microsoft Corp.</u>, No. 9:06-CV-158, 2008 WL 7182476, at *4 (E.D. Tex. Apr. 25, 2008) (noting

1    appears to be the majority view post-<u>Seagate</u> that lack of opinion of counsel, while not giving rise to

2    an adverse inference, is still a factor that the jury *can* consider when applying the "totality of the

3    circumstances" approach with respect to willfulness of infringement.

4          This one factor, however, is insufficient to demonstrate by clear and convincing evidence that

5    ATC's infringement was willful–i.e., that the objectively-defined risk "was either known or so obvious

6    that it should have been known" to ATC. <u>See</u> <u>Seagate</u>, 497 F.3d at 1371. Moreover, since there is no

7    longer any affirmative duty to investigate, <u>see id.</u>, ATC had no reason to obtain an opinion of counsel

8    once two of its engineers have independently concluded that there was "nothing new" to the '356

9    patent. (<u>See</u> Trial Tr. Day 5, at 62:11-64:10; Trial Tr. Day 6, at 85:14-86:9.)

10                    *iv.    Conclusion*

11          For the foregoing reasons, the jury's finding that Presidio demonstrated willful infringement

12   by clear and convincing evidence is not supported by substantial evidence. Accordingly, because the

13   jury's verdict on this issue was "'against the great weight of the evidence,'" the Court **GRANTS**

14   ATC's motion for JMOL on the issue of willfulness. <u>See</u> <u>Hangarter</u>, 373 F.3d at 1005.

15   **III.    Damages**

16          ATC next moves for a JMOL on the issue of damages. [Doc. No. 309]. Presidio opposes

17   ATC's motion, [Doc. No. 320], and separately moves for: (1) supplemental damages for ATC's

18   continued infringement; (2) enhanced damages due to ATC's willful infringement; (3) pre-judgment

19   and post-judgment interest; (4) recovery of costs; and (5) attorney's fees. [Doc. No. 307]. With respect

20   to recovery of damages, Section 284 provides:

21          Upon finding for the claimant the court shall award the claimant damages adequate to
            compensate for the infringement, but in no event less than a reasonable royalty for the
22          use made of the invention by the infringer, together with interest and costs as fixed by
            the court.
23

24   35 U.S.C. § 284. With regard to attorney's fees, Section 285 provides that "[t]he court in exceptional

25   cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

26          A.     <u>Sufficiency of the evidence supporting the jury's award of damages</u>

27          At trial, Presidio advanced a lost-profits theory under the four-factor <u>Panduit</u> test, which

28   _____

that "the failure to obtain opinion of counsel is not a factor supporting willful infringement").

requires a showing of: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of profit that would have been made." <u>DePuy Spine</u>, 567 F.3d at 1329 (citing <u>Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.</u>, 575 F.2d 1152, 1156 (6th Cir. 1978)). At the conclusion of the trial, the jury awarded Presidio $1,048,677 in lost profits. In its motion, ATC only challenges the sufficiency of the evidence on the first two <u>Panduit</u> factors, as well as the overall amount of damages awarded.

*i.*      *Demand for the patented product*

ATC first argues the award of lost profits was improper because the BB capacitors do not practice the '356 patent, and the '356 patent itself cannot qualify as the patented *product*. The first <u>Panduit</u> factor, however, is not limited to just patented products, but rather asks whether demand existed for a product that is "covered by the patent in suit" *or* that "directly competes with the infringing device." <u>See DePuy Spine</u>, 567 F.3d at 1330 (citing <u>Rite-Hite Corp. v. Kelley Co.</u>, 56 F.3d 1538, 1548-49 (Fed. Cir. 1995) (en banc)). The main inquiry is whether the patentee can demonstrate a "but for" causation traceable to patent infringement. <u>See Rite-Hite</u>, 56 F.3d at 1548.

In the present case, substantial evidence supported the jury's finding that demand existed for the BB capacitors, which compete with the 545L capacitors.[35] For example, Mr. Newman testified about the "head-to-head" competition of these two products, as well as his conclusion that it was essentially a two-competitor market. (Trial Tr. Day 4, at 155:20-156:13, 162:17-162:23, 194:19-197:1, 199:5-201:21.) He indicated that he was aware that the BB capacitors were not covered by the '356 patent. (<u>Id.</u> at 156:14-157:6.) According to Mr. Newman, demand existed for the BB capacitors during the relevant time, primarily due to their "one-piece design." (<u>Id.</u> at 157:10-157:20, 158:14-162:23.) Other evidence at trial supported Mr. Newman's testimony that both customers and manufacturers

---

[35] ATC argues Mr. Newman's analysis was improper because it treated the '356 patent itself as the patented product, even though the '356 patent is neither a capacitor nor a product. However, a review of Mr. Newman's entire testimony demonstrates that he was actually referring to the demand for the *innovations* covered by the '356 patent–such as the BB capacitors' and the 545L capacitors' "one-piece design." (<u>See, e.g.</u>, Trial Tr. Day 5, at 157:10-157:20, 158:14-162:23.)

1  were looking for more reliability provided by a one-piece design.[36] (See, e.g., Pl. Opp. to Def. Motion

2  for JMOL, Ex. G.) Likewise, other evidence supported Mr. Newman's testimony that both ATC and

3  its customers were dissatisfied with the 540L capacitor's two-piece design, and that the sales of the

4  540L capacitors were already declining when ATC started to produce the 545L capacitors. (See, e.g.,

5  Trial Tr. Day 2, at 140:3-140:17; Trial Tr. Day 3, at 116:18.)

6      ATC argues it was improper to consider the BB capacitors because they and the 545L

7  capacitors serve different markets. See BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d

8  1214, 1218-19 (Fed. Cir. 1993) ("The first Panduit factor–demand for the patented

9  product–presupposes that demand for the infringer's and patent owner's products is interchangeable.

10 . . . This analysis assumes that the patent owner and the infringer sell substantially the same product.").

11 According to ATC, the BB capacitors have a higher insertion loss of 0.9 dB at 40 GHz and were

12 designed to compete in the lower level of performance market, while the 545L capacitors have a lower

13 insertion loss of 0.3 dB at 40GHz and were designed to compete in the higher performance market.

14 As an initial matter, however, it is questionable whether the Court can determine consumer demand

15 based solely on specific features of the device at issue. See DePuy Spine, 567 F.3d at 1330 ("[The first

16 Panduit] factor does not require any allocation of consumer demand among the various limitations

17 recited in a patent claim."). There was also substantial evidence before the jury for it to conclude that

18 the BB capacitors and the 545L capacitors competed in the same "one-piece design" market, despite

19 their different insertion loss statistics. (See, e.g., Trial Tr. Day 4, at 155:20-157:6, 162:17-162:23.)

20 Accordingly, the Court finds the first Panduit factor satisfied.

21      ii.    Absence of acceptable noninfringing substitutes

22      ATC next argues that in the hypothetical "but for" market, the consumers would have chosen

23 the noninfringing 540L capacitors over the BB capacitors due to: (1) better insertion loss of the 540L

24 capacitors (0.5 dB at 40 GHz) versus the BB capacitors (0.9 dB at 40 GHz); and (2) standard industry

25 size of the 540L capacitors (0402) versus non-standard size of the BB capacitors (0502). Moreover,

26 _____

27 [36] For example, at trial, Presidio introduced one of ATC's own documents that set forth five
   reasons for embracing ATC's next generation ultra-broadband capacitor, the 545L. (See Pl. Opp. to
   Def. Motion for JMOL, Ex. G.) Among those five reasons were: (1) "[o]ne-piece construction, with

28 its inherently higher reliability" and (2) "smaller size than all counterparts (consumes less space;
   reduces propensity to launch surfaces modes)." (See id.)

1  according to ATC, consumers looking for lower insertion loss could have also resorted to purchasing

2  DLI's Opti-Caps, or ATC's 520L or 530L capacitors. Consumers looking for a one-piece design could

3  have resorted to purchasing ATC's one-piece Monsorno 500S capacitors.

4        However, the "[m]ere existence of a competing device does not make that device an acceptable

5  substitute." TWM Mfg. Co. v. Dure Corp., 789 F.2d 895, 901 (Fed. Cir. 1986). In the present case,

6  most of the alternatives identified by ATC assume that consumers would have preferred a two-piece

7  design with lower insertion loss over a one-piece design with higher insertion loss. However, there

8  was substantial evidence presented for the jury to conclude that this might not be the case, that the

9  desirability of ATC's 540L capacitors was declining, and that the market was moving toward the use

10  of one-piece capacitors. (See, e.g., Trial Tr. Day 4, at 163:23-173:20.) Moreover, a product lacking

11  the advantages of the infringing device "can hardly be termed a substitute acceptable to the customer

12  who wants those advantages." Kalman v. Berlyn Corp., 914 F.2d 1473, 1484 (Fed. Cir. 1990) (internal

13  quotation marks and citations omitted). In the present case, other drawbacks were identified at trial

14  that–if accepted by the jury–would have made many of the capacitors identified by ATC not very

15  desirable alternatives. (See, e.g., Trial Tr. Day 2, at 140:3-140:17; Trial Tr. Day 3, at 116:18; Trial Tr.

16  Day 5, at 5:1-5:16, 110:24-110:25; Pl. Opp. to Def. Motion for JMOL, Ex. J.)

17        Finally, "[a] patentee need not negate every possibility that the purchaser might not have

18  purchased a product other than its own, absent the infringement." Rite-Hite, 56 F.3d at 1545 (citation

19  omitted); accord King Instrument Corp. v. Otari Corp., 767 F.2d 853, 864 (Fed. Cir. 1985) ("[A

20  patentee] need not meet the impossible burden of negating every possibility that a purchaser might not

21  have bought another product or might not have bought any comparable product at all."). Rather, "[t]he

22  patentee need only show that there was a *reasonable probability* that the sales would have been made

23  'but for' the infringement." Rite-Hite, 56 F.3d at 1545; accord King Instrument, 767 F.3d at 864. In

24  the present case, for the reasons set forth above, Presidio has met its burden of showing "reasonable

25  probability" that "but for" the 545L capacitors, the consumers would have purchased the one-piece

26  BB capacitors. Accordingly, the Court finds the second Panduit factor satisfied.

27        *iii.    Calculating lost profits*

28        ATC next alleges a number of errors committed by Mr. Newman in calculating Presidio's lost

- 53 -

08cv335-IEG (NLS)

profits: (1) he did not account for the impact on the sales of BB capacitors caused by the recession; (2) he should have reduced the final amount by 10-20% to reflect the sales of the 545L capacitors that were made to ATC's largest customer, Richardson Electronics, with which ATC has an exclusive agreement; (3) lost profits should be reduced to account for any 540L capacitors that would have been sold in the hypothetical "but for" market at the 2006 manufacturing capacity level of 100,000; (4) it was improper to exclude large customers, rather than large shipments, from the calculations; and (5) based on Presidio's own financial statements, the miscellaneous incremental costs would have accounted for 10% as opposed to Mr. Newman's arbitrary selection of 3%.

The Court rejects all of these objections because there was sufficient evidence presented to the jury to support its lost profits verdict. For example, with respect to Richardson Electronics, although it is true that it buys exclusively from ATC, Mr. Newman testified that the focus should be on the customers that are buying the capacitors from Richardson. (See Trial Tr. Day 4, at 201:22-202:15.) Accordingly, there was evidence for the jury to conclude that with 545L capacitors unavailable, those customers could have purchased directly from Presidio rather from ATC through Richardson. (See id.) Likewise, as was already noted, it was for the jury to decide whether customers in the hypothetical "but for" market would have purchased any additional 540L capacitors. As for excluding largest customers, instead of largest shipments, ATC's own expert testified that this was not necessarily improper. (See Trial Tr. Day 6, at 121:6-121:18.) Finally, the jury was presented with two different ways to adjust for miscellaneous costs, and therefore could reasonably choose to apply Presidio's proposed selection of 3% instead of ATC's selection of 10%.

For the foregoing reasons, substantial evidence in the record supports both the application of the first two Panduit factors and the overall amount of damages awarded. Accordingly, the Court **DENIES** ATC's motion for JMOL with respect to the jury's verdict on lost profits.

B.   Supplemental damages

Presidio moves unopposed for supplemental damages in light of ATC's continued infringement. Under Section 284, a finding of infringement requires the Court to award damages that are "adequate to compensate" the plaintiff. 35 U.S.C. § 284. "'[S]upplemental damages are calculated consistent with the damages awarded in the jury verdict.'" Bard Peripheral Vascular, Inc. v. W.L. Gore

1 & Assocs., Inc., No. CV-03-0597-PHX-MHM, 2009 WL 920300, at *3 (D. Ariz. Mar. 31, 2009)

2 (citation omitted). Accordingly, the Court **ORDERS** that ATC provide an accounting for any sales

3 of 545L capacitors occurring after December 1, 2009. Such accounting shall be submitted to the Court

4 no later than **May 10, 2010**.

5     C.    <u>Enhanced damages</u>

6     In light of the jury's finding of willful infringement, Presidio also moves for enhancement of

7 damages. Upon a finding of infringement, Section 284 requires the court to award "damages adequate

8 to compensate for the infringement." 35 U.S.C. § 284. The same section also gives the court discretion

9 to "increase the damages up to three times the amount found or assessed." <u>Id.</u> However, for the

10 damages award to be increased, the fact-finder must first determine "whether an infringer is guilty of

11 conduct upon which increased damages may be based," such as an act of willful infringement or bad

12 faith. <u>Jurgens v. CBK, Ltd.</u>, 80 F.3d 1566, 1570 (Fed. Cir. 1996); <u>see also</u> <u>In re Seagate Tech., LLC</u>,

13 497 F.3d 1360, 1368 (Fed. Cir. 2007) (en banc) ("Absent a statutory guide, we have held that an award

14 of enhanced damages requires a showing of willful infringement." (citations omitted)). Only once

15 culpable conduct is established, "the court then determines, exercising its sound discretion, whether,

16 and to what extent, to increase the damages award given the totality of the circumstances." <u>Jurgens</u>,

17 80 F.3d at 1570 (citation omitted). Moreover, "an infringer may generally avoid enhanced damages

18 with a meritorious good faith defense and a substantial challenge to infringement." <u>Delta-X Corp. v.</u>

19 <u>Baker Hughes Prod. Tools, Inc.</u>, 984 F.2d 410, 413 (Fed. Cir. 1993) (citation omitted).

20     In the present case, in light of the JMOL on the issue of willfulness, the Court finds that

21 Presidio is not entitled to enhanced damages. Prior to <u>Seagate</u>, the Federal Circuit has explicitly held

22 that "'enhancement of damages *must be* premised on willful infringement or bad faith.'" <u>See</u> <u>Beatrice</u>

23 <u>Foods Co. v. New England Printing & Lithographing Co.</u>, 923 F.2d 1576, 1578 (Fed. Cir. 1991)

24 (citations omitted) (emphasis added). The majority of the *en banc* court in <u>Seagate</u> did not elect to

25 overrule <u>Beatrice Foods</u>, and this Court remains bound by that decision. <u>See</u> <u>Cohesive Tech., Inc. v.</u>

26 <u>Waters Corp.</u>, 543 F.3d 1351, 1374 (Fed. Cir. 2008). <u>But see</u> <u>Sensonics, Inc. v. Aerosonic Corp.</u>, 81

27 F.3d 1566, 1574 (Fed. Cir. 1996) (suggesting that whether to enhance damages despite a finding of

28 non-willfulness is discretionary). Moreover, the Federal Circuit recently reaffirmed that "[a] finding

1  of willful infringement is a *prerequisite* to the award of enhanced damages." <u>i4i Ltd.</u>, 2010 WL

2  801705, at *19 (citing <u>Seagate</u>, 497 F.3d at 1368) (emphasis added); <u>accord</u> <u>DePuy Spine</u>, 567 F.3d

3  at 1337. Accordingly, in light of the Court's conclusion that ATC's infringement was *not* willful, the

4  Court **DENIES** Presidio's request for enhanced damages.

5         D.    Pre-judgment interest

6         Presidio moves for award of pre-judgment interest. Section 284 allows the Court to award pre-

7  judgment interest "where necessary to afford the plaintiff full compensation for the infringement."

8  <u>Gen. Motors Corp. v. Devex Corp.</u>, 461 U.S. 648, 654 (1983) (citing 35 U.S.C. § 284). According to

9  the Supreme Court, "prejudgment interest should ordinarily be awarded" to compensate the plaintiff

10 for the "use of the money between the time of infringement and the date of the judgment." <u>Id.</u> at 655-

11 56 (citing 35 U.S.C. § 284). The interest rate to be used, and whether to use simple or compounded

12 interest, is left fully to the discretion of the court. <u>Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.</u>, 807

13 F.2d 964, 969 (Fed. Cir. 1986). Finally, the court also retains discretion to limit or even deny pre-

14 judgment interest "where the patent owner has been responsible for undue delay in prosecuting the

15 lawsuit." <u>Gen. Motors</u>, 461 U.S. at 656-57 (citations omitted).

16        As an initial matter, the Court rejects ATC's argument of "undue delay." According to ATC,

17 pre-judgment interest is inappropriate because despite knowing that ATC began selling its 545L

18 capacitors in June 2006, Presidio did not bring the suit until May 17, 2007, and even when it did bring

19 the suit, Presidio did not have standing to enforce the '356 patent until May 8, 2008. ATC, however,

20 fails to point to any evidence showing that Presidio knew of ATC's sales as soon as they commenced.

21 Presidio also argues persuasively that its position has always been that it was appropriately named as

22 the plaintiff in this matter from the beginning, and that ATC has not demonstrated otherwise.

23 Accordingly, ATC has failed to demonstrate any "undue delay."

24        Likewise, the Court rejects ATC's argument that the interest should be awarded at the prime

25 rate of 5.9%, rather than the statutory rate of 7%. ATC alleges that "courts routinely award pre-

26 judgment interest at the prime rate, which approximates the actual interest cost of borrowing money

27 for businesses much better than the inflexible statutory rate requested by Presidio," but fails to cite

28 any support for that proposition. (<u>See</u> Def. Opp. to Pl. Motion for Post-Trial Remedies, at 16-17.) On

1    the contrary, California courts have found that a simple interest rate of 7% is usually appropriate to

2    fully compensate the plaintiff for the infringement.[37] <u>See, e.g.</u>, <u>In re Hayes Microcomputer Prod., Inc.</u>

3    <u>Patent Litig.</u>, 766 F. Supp. 818, 824 (N.D. Cal. 1991).

4         Accordingly, the Court awards Presidio pre-judgment interest in the amount of **simple interest**

5    **at seven percent** accruing from the date of first infringement, which in this case is June 2006.

6         E.    Post-judgment interest

7         The parties agree that pursuant to 28 U.S.C. § 1961, "[i]nterest shall be allowed on any money

8    judgment in a civil case recovered in a district court." Post-judgement interest is "calculated from the

9    date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity

10   Treasury yield, as published by the Board of Governors of the Federal Reserve System." 28 U.S.C.

11   § 1961; <u>accord</u> <u>Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.</u>, No. 2:04-cv-01971-MCE-

12   EFB, 2009 WL 981843, at *7 (E.D. Cal. Apr. 13, 2009). Accordingly, Presidio is entitled to post-

13   judgment interest at the current rate.

14        F.    Attorney's fees

15        Presidio also argues it is entitled to attorney's fees pursuant to Section 295, which provides

16   that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35

17   U.S.C. § 285. A determination whether to award attorney fees is a two-step process. <u>Forest Labs., Inc.</u>

18   <u>v. Abbott Labs.</u>, 339 F.3d 1324, 1327 (Fed. Cir. 2003). First, the Court must determine whether the

19   prevailing party has proved by clear and convincing evidence that the case is "exceptional." <u>Id.</u>

20   Second, if the Court finds the case to be exceptional, it must then determine whether an award of

21   attorney fees is "appropriate." <u>Id.</u> at 1328. The Federal Circuit, however, cautioned that Section 285

22   is an *exception* to the American Rule, and as such is "limited to circumstances in which it is necessary

23   to prevent 'a gross injustice.'" <u>Id.</u> at 1329 (reversing the district court's award of attorney fees that was

24   based on "patentee's bad-faith business conduct toward an accused infringer prior to litigation")

25   (citation omitted). Thus, a case is typically considered "exceptional" only if it involves "'inequitable

26   conduct before the Patent Office; litigation misconduct; vexatious, unjustified, and otherwise bad faith

27

28        [37] In California, "[i]n the absence of any legislative act to the contrary, the rate of prejudgment interest is 7 percent." <u>Pacific-Southern Mortgage Trust Co. v. Ins. Co. of North Am.</u> 166 Cal. App. 3d 703, 716 (1985) (citing CAL. CONST. art. XV, § 1).

1     litigation; a frivolous suit or willful infringement.'" Id. (citations omitted).

2         None of the above factors are present here. As the Court already concluded, there was no

3     willful infringement. Likewise, although "[l]itigation misconduct and unprofessional behavior are

4     relevant to the award of attorney fees, and may suffice to make a case exceptional under § 285,"

5     Sensonics, 81 F.3d at 1574 (citations omitted), Presidio has failed to demonstrate this by clear and

6     convincing evidence. The circumstances in the present case do not rise to the level of vexatious,

7     unjustified, or frivolous litigation that have been found to satisfy an award of attorney's fees.[38] See,

8     e.g., Aptix Corp. v. Quickturn Design Sys., Inc., 269 F.3d 1369, 1374075 (Fed. Cir. 2001) (affirming

9     an award of attorney's fees under § 285 for the "extreme litigation misconduct" of falsifying

10     evidence); Eltech Sys. Corp. v. PPG Indus., Inc., 903 F.2d 805, 810-11 (Fed. Cir. 1990) (affirming an

11     award of attorney's fees where the suit was brought and maintained in bad faith). Accordingly,

12     because Presidio failed to show that the present case is "exceptional" as required by Section 285, the

13     Court **DENIES** Presidio's motion for award of attorney's fees.

14        G.     Recovery of costs

15         A successful plaintiff in a patent action may be entitled to recovery of its costs. See 35 U.S.C.

16     § 284; FED. R. CIV. P. 54(d); CIV. L. R. 54.1. ATC does not oppose Presidio's recovery of costs,

17     although it does challenge the propriety of some of the items for which Presidio seeks recovery.

18     Accordingly, the Court **GRANTS** Presidio award of its costs, subject to a later determination of

19     propriety of any specific item of recovery.

20     **IV.**     **False marking**

21        A.     Intent to deceive prior to October 24, 2008

22         ATC separately moves for a JMOL with respect to the jury's finding that Presidio did not have

23     the "intent to deceive" the public with its false marking prior to October 24, 2008. "Intent to deceive

24

---

[38] The only case the Court found that awarded attorney's fees on somewhat similar facts was Cargill, Inc. v. Sears Petroleum & Transport Corp., 388 F. Supp. 2d 37, 77 (N.D. N.Y. 2005) (finding the case "exceptional" where, among other things, the losing party "engaged in a strategy designed to drive up litigation expenses which, given its relative size, it [was] in a much better position to absorb than the [patentee]"). However, in that case, the litigation misconduct was far more "overreaching"and involved a far greater lack of "candor and responsiveness" than what has been demonstrated in this case. See, e.g., id. at 77-79 (listing a multitude of reasons supporting the finding of "vexatiousness," including filing multiple motions, making arguments of little or no legal significance, and continued failure to respond to requests for production of documents).

1  is a state of mind arising when a party acts with sufficient knowledge that what it is saying is not so

2  and consequently that the recipient of its saying will be misled into thinking that the statement is true."

3  Clontech Labs., Inc. v. Invitrogen Corp., 406 F.3d 1347, 1352 (Fed. Cir. 2005) (citation omitted). The

4  Federal Circuit has set forth the following standard:

> Intent to deceive, while subjective in nature, is established in law by objective criteria. Thus, "objective standards" control and "the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent." Thus, under such circumstances, the mere assertion by a party that it did not intend to deceive will not suffice to escape statutory liability. Such an assertion, standing alone, is worthless as proof of no intent to deceive where there is knowledge of falsehood. But in order to establish knowledge of falsity the plaintiff must show by a preponderance of the evidence that the party accused of false marking did not have a reasonable belief that the articles were properly marked (i.e., covered by a patent). Absent such proof of lack of reasonable belief, no liability under the statute ensues.

11  Id. at 1352-53 (internal citations omitted).

12      ATC argues that because the Devoes formed *no* belief as to whether they were properly

13  marking the BB capacitors, there is no way the jury could have found the Devoes had *a* "reasonable

14  belief" that BB capacitors were properly marked. See id. ATC, however, fails to recognize that as a

15  party alleging false marking, it has the burden of establishing "knowledge of falsity" by preponderance

16  of the evidence. See id. ATC can satisfy its burden by affirmatively demonstrating "*lack* of reasonable

17  belief." See id. (emphasis added). Notably, and fatal to ATC's motion, Presidio did not have to show

18  anything, much less that it *did* have a "reasonable belief," unless ATC first met its burden.

19      In any event, there was substantial evidence in the present case to support the jury's finding

20  that the Devoes *did* form a reasonable belief that BB capacitors were covered by the '356 patent. For

21  example, Dan Devoe testified that although he did not inquire as to whether the BB capacitors

22  practiced any of the claims of the '356 patent, he believed that they *did* practice the '356 patent. (Trial

23  Tr. Day 2, at 44:7-44:19.) Likewise, although Lambert Devoe initially testified that Presidio did not

24  "form a belief or understanding whether any particular claim of the '356 patent covered the BB

25  capacitor," he later clarified that Presidio "thought those [marking] decisions were correct," especially

26  in light of a cross-sectional diagram on the front cover of the '356 patent which "looks remarkably

27  similar" to the BB capacitors. (Trial Tr. Day 2, at 131:24-132:3; Trial Tr. Day 3, at 21:18-24:19.)

28  Similarly, Gunter Vorlop testified at his deposition that he believed that Presidio had a patent on its

BB capacitors, and that one of those patents was the '356 patent. (Vorlop Dep., at 207-08 (Jan. 6, 2009), <u>attached to</u> Def. Motion for JMOL on False Marking, Ex. 5.)

For the foregoing reasons, there was sufficient evidence for the jury to find that the Devoes did not understand the intricacies of the marking process at the time the false marking took place, and that they actually believed they *had* to mark their products in order to assert their patents and to protect their rights. In light of this, there was substantial evidence before the jury to find that ATC has failed to demonstrate that prior to October 24, 2008, the Devoes lacked a "reasonable belief" that the '356 patent covered the BB capacitors. <u>See</u> <u>Clonetech</u>, 406 F.3d at 1352-53. Accordingly, the Court **DENIES** ATC's motion for JMOL on the issue of false marking.

    B.    <u>Amount of the fine</u>

Section 292 provides: "Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented, for the purpose of deceiving the public . . . [s]hall be fined not more than $ 500 for every such offense." 35 U.S.C. § 292(a). This Court previously adopted the "continuous act" test set forth in <u>London</u>, 179 F. 506, concluding that "each time Presidio marked *a shipment*, it committed a false marking offense." (MSJ Order, at 12-13 (emphasis added).) The Federal Circuit subsequently clarified that Section 292 provides for false marking fines of any amount up to $500 *per article*. <u>See</u> <u>Forest Group, Inc. v. Bon Tool Co.</u>, 590 F.3d 1295, 1304 (Fed. Cir. 2009). The <u>Bon Tool</u> court noted, however, that the statute gives the court discretion to strike an appropriate balance "between encouraging enforcement of an important public policy and imposing disproportionately large penalties for small, inexpensive items produced in large quantities." <u>Id.</u> For example, the Federal Circuit explained that "[i]n the case of inexpensive mass-produced articles, a court has the discretion to determine that a fraction of a penny per article is a proper penalty." <u>Id.</u>

At this stage of the proceedings, the Court is faced with two questions: (1) how many of the BB capacitors were "falsely marked" in violation of the statute, and (2) what should be the amount of the fine for each violation. With regard to the first question, the Court rejects ATC argument that there was a million BB capacitors shipped between October 24, 2008 and April 23, 2009. This figure is based mostly on a single statement made by Lambert Devoe on cross-examination. (<u>See</u> Trial Tr.

Day 2, at 123:14-123:17.) Rather, the Court adopts Presidio's figure of 483,385, which is based on Presidio's statements of the actual number of capacitors shipped.[39] (See Pl. Opp. to Def. Findings & Conclusions on False Marking, Ex. D.) However, because the document submitted by Presidio only has data starting from December 10, 2008, the Court will adjust this number proportionally to account for the capacitors sold between October 24, 2008 and December 9, 2008. By Court's calculations, that would be 168,290 additional capacitors sold,[40] bringing the total to 651,675 units.

In this context, the Court also rejects Presidio's proposal that the Court only assess fines for those capacitors that were *shipped* with a falsely marked label. As ATC correctly points out, during the relevant time, Presidio also advertised the BB capacitors in its catalog and on its website as practicing the '356 patent. (See, e.g., Trial Tr. Day 2, at 125:16-126:18; Def. Findings & Conclusions on False Marking, Exs. 12, RD, AHY_0004). Under Section 292, liability is imposed for "mark[ing] upon," "affix[ing] to," as well as for "us[ing]" the patent in advertising. See 35 U.S.C. § 292(a). Accordingly, just because Presidio did not *mark* all of the shipped BB capacitors with the '356 patent does not change the fact that it violated the statute by *using* the '356 patent in advertising all of those BB capacitors.[41] Accordingly, the Court finds that Presidio committed **651,675 separate offenses** for

---

[39] ATC does not really challenge the accuracy of this figure. The only objection comes from the fact that the figure only covers the BB capacitors shipped from December 10, 2009 until April 23, 2009. As is discussed further, this omission is easily correctable by adjusting the 483,385 figure proportionally for the 47 missing days between October 24, 2009 and December 9, 2009.

[40] The parties appear to agree that the figure "483,385" corresponds to the time period between December 10, 2009 and April 23, 2009, which amounts to 135 days. The parties also appear to agree that the figure does not include the 47 days between October 24, 2009 and December 9, 2009. Accordingly, by dividing 483,385 units by 135 days, and then multiplying by 47 days, the Court determines that a proportional number of units sold during the earlier period amounts to 168,290.

[41] To be used "in advertising," the false marking must have occurred in a medium or through a channel designed to promote the unpatented product to consumers. See, e.g., Inventorprise, Inc. v. Target Corp., No. 09-CV00380, 2009 WL 3644076, at *4 (N.D. N.Y. Nov. 2, 2009) ("The term 'advertising' implies an act soliciting the general public regarding the product." (citation omitted)); Chamilia, LLC v. Pandora Jewelry, LLC, No. 04-CV-6017 (KMK), 2007 WL 2781246, at *10 (S.D. N.Y. Sept. 24, 2007) ("'Advertising' is defined as 'the action of calling something ... to the attention of the public especially by means of printed or broadcast paid announcements.'" (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993)); Accent Designs, Inc. v. Jan Jewelry Designs, Inc., 824 F. Supp. 957, 968-69 (S.D. N.Y. 1993) ("If every word and clause in the statute is to be given effect, the expression 'uses in advertising' cannot refer to any and all documents by which the word 'patent' is brought to the attention of the public; it can only refer to use of the word 'patent' in publications which are designed to promote the allegedly unpatented product, namely, advertisements."). In the present case, there can be no doubt that using the '356 patent in connection

the 651,675 BB capacitors shipped between October 24, 2008 and April 2009.

Finally, with respect to the amount of the fine, the Court rejects the suggestions from both of the parties.[42] In determining the amount of the fine, the Court must strike an appropriate balance between enforcing the public policy embodied in the statute and not imposing a disproportionately large fine for relatively small violations. See Forest Group, 590 F.3d at 1304. In the present case, the Court believes a fine of $0.35 per unit suggested by ATC's own expert, Dr. Kennedy, appears to do just that. (See Def. Findings & Conclusions on False Marking, Ex. AIJ_0009.) On the one hand, by penalizing Presidio at a rate of about 32% of Presidio's overall average sales price of $1.07 per BB capacitor, (see id.), the fine is substantial enough to enforce the public policy embodied in the statute and to deter any similar violations in the future. On the other hand, by not imposing a disproportional liability for what appears to be an "inexpensive mass-produced article," the fine serves its deterrent function without over-penalizing Presidio. Accordingly, the Court adopts a fine of **$0.35 per unit**, which brings the total amount of the fine for false marking to **$228,086.25**.

## V.     Permanent injunction

Presidio next moves for a permanent injunction in light of the jury's verdict finding the '356 patent to be valid and infringed. The decision to grant or deny injunctive relief rests within the equitable discretion of the district court, and such discretion "must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 394 (2006). Accordingly, to be entitled to a permanent injunction, a plaintiff must satisfy the traditional four-factor test by demonstrating:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Id. at 391 (citations omitted). A patentee who does not practice the claimed invention can still obtain

---

with the BB capacitors in a catalog and on the website was designed to help promote the BB capacitors to the public, and therefore amounts to "advertising."

[42] ATC suggests punishing Presidio with a hefty fine of $1.00 for each BB capacitor shipped, while Presidio argues the fine should be literally "a fraction of a penny" per article.

1    an injunction, provided the above four-factor test is satisfied. See Broadcom Corp. v. Qualcomm Inc.,

2    543 F.3d 683, 703 (Fed. Cir. 2008) (citations omitted).

3        A.     Irreparable injury

4            i     Presumption of irreparable injury

5        In their moving papers, the parties appear to dispute whether Presidio is entitled to a

6    presumption of irreparable injury in light of the jury's finding that the '356 patent is valid and

7    infringed. Presidio alleges numerous courts have granted permanent injunctions in similar

8    circumstances, by following the Federal Circuit's pronouncement that "[i]n matters involving patent

9    rights, irreparable harm has been presumed when a clear showing has been made of patent validity and

10    infringement." See Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1247 (Fed. Cir. 1989) ("This

11    presumption derives in part from the finite term of the patent grant, for patent expiration is not

12    suspended during litigation, and the passage of time can work irreparable harm."). ATC argues that

13    many of those cases were decided before the Supreme Court clarified the state of the law with respect

14    to permanent injunctions in eBay, 547 U.S. 388.

15        The parties also cite to conflicting post-eBay Federal Circuit case law on this issue. On the one

16    hand, Presidio argues the Federal Circuit has recently indicated that "[i]t remains an open question

17    'whether there remains a rebuttable presumption of irreparable harm following eBay.'" See Broadcom

18    Corp. v. Qualcomm Inc., 543 F.3d 683, 702 (Fed. Cir. 2008) (quoting Amado v. Microsoft Corp., 517

19    F.3d 1353, 1359 n.1 (Fed. Cir. 2008)). On the other hand, ATC argues that in a more recent, but

20    nonprecedential, decision the Federal Circuit stated that the old presumption "is no longer the law."

21    See Automated Merchandising Sys., Inc. v. Crane Co., 2009 WL 4878643, at *3 (Fed. Cir. Dec. 16,

22    2009) (unpublished opinion); see accord Graceway Pharms., LLC v. Perrigo Co., — F. Supp. 2d —,

23    2010 WL 892195, at *3 (D. N.J. Mar. 8, 2010) (noting the split). At oral argument, however, Presidio

24    conceded that it was not relying on any presumption of irreparable injury in this case. Accordingly,

25    the Court need not decide this question.

26        ii.     No irreparable injury

27        The question of presumption aside, Presidio's assertion of irreparable injury can be broken

28    down into several distinct arguments. First, Presidio alleges that ATC and it are direct competitors

who compete in the same market for some of the same customers. As previously noted, however, there

was conflicting testimony at trial on whether the BB capacitors and the 545L capacitors competed for

the same customers, and whether this was solely a two-competitor market. At most, Presidio has only

shown that: (1) *some* of ATC's customers for the 545L capacitors are the same as Presidio's customers

for the BB capacitors; (2) the two products are sold in *some* of the same markets; and (3) Presidio was

*at times* seen as ATC's only true competitor. In opposition, ATC has presented evidence that: (a) the

BB capacitors are only competitive at the lower level of performance market (i.e., insertion loss of 0.9

dB at 40GHz) at lower prices; (b) at that level they really compete only with DLI's Opticap and

Millicap; and (c) ATC's 545L capacitors are more superior (insertion loss of 0.3 dB at 40GHz), and

ATC offers them at a higher price. In light of this testimony, the Court cannot say that Presidio has

carried its burden of demonstrating that ATC and it were direct competitors. See Adv. Cardiovascular

Sys., Inc. v. Medtronic Vascular, Inc., 579 F. Supp. 2d 554, 558 (D. Del. 2008) ("Courts awarding

permanent injunctions typically do so under circumstances where plaintiff practices its invention and

is a direct market competitor."); Amado v. Microsoft Corp., Case No. SA CV 03-242 DOC (ANx),

2007 U.S. Dist. LEXIS 96487, at *39 (C.D. Cal. May 13, 2007) (finding no irreparable injury where

the evidence at trial demonstrated that the patentee did not compete with the alleged infringer, did not

sell a product covered by the patent, and was no longer even attempting to commercialize or license

the patent), affirmed in relevant part, 517 F.3d 1353, 1360-61 (Fed. Cir. 2008).

　　　　Second, even if the Court accepts Presidio's allegations of a two-competitor market, that does

not automatically lead to the conclusion that there is irreparable injury. Rather, Presidio still has to

provide at least some data on any specific sales or customers lost, or what its share of the market is.

See, e.g., Adv. Cardiovascular Sys., 579 F. Supp. 2d at 558 (finding no irreparable injury where, *inter*

*alia*, the patentee "has not identified any specific customers it has lost, or stands to lose, directly as

a result of [the infringing sales]"); Am. Calcar, Inc. v. Am. Honda Motor Co., Case No. 06cv2433

DMS (CAB), 2008 U.S. Dist. LEXIS 106476, at **2-3 (S.D. Cal. Nov. 18, 2008) (finding no

irreparable injury where the patentee's arguments were purely speculative and where the patentee

failed to submit any evidence to support its assertion that "'it has not been able to pursue relationships

with other companies'" (citation omitted)); Praxair, Inc. v. ATMI, Inc., 479 F. Supp. 2d 440, 443-44

1    (D. Del. 2007) (finding no irreparable injury, despite a jury finding of validity and infringement, where

2    the patent holder "has not provided or described any specific sales or market data to assist the court,

3    nor has it identified precisely what market share, revenues, and customers [the patentee] has lost to

4    [the infringer]" (citations omitted)). In the present case, aside from vague and conclusory allegations,

5    Presidio has provided no such data.[43] (See generally Pl. Motion for Perm. Inj., at 15-18.) Likewise,

6    Presidio has not provided any support for its alleged loss of good will and reputation in the

7    marketplace. See, e.g., Am. Calcar, 2008 U.S. Dist. LEXIS 106476, at *3 (finding no irreparable

8    injury where the alleged reputation harm was "purely speculative"); Praxair, 47 F. Supp. 2d at 444

9    (concluding that the patentee's "desire to become a monopoly supplier in its product's market is hardly

10   unique, and is not conclusive evidence of any factor").

11        Third, to the extent Presidio argues that irreparable injury can be established solely on the basis

12   of the statutory right to exclude, see 35 U.S.C. § 154(a)(1), that argument is foreclosed by the Supreme

13   Court's decision in eBay. See 547 U.S. at 392 (rejecting the Federal Circuit's approach, pursuant to

14   which the "statutory right to exclude alone justifies its general rule in favor of permanent injunctive

15   relief"); accord IMX, Inc. v. LendingTree, LLC, 469 F. Supp. 2d 203, 225 (D. Del. 2007).

16        Finally, Presidio's unwillingness to license the '356 patent does not change the Court's

17   determination. In eBay, 547 U.S. at 393, the Supreme Court stated that the patentee's "willingness to

18   license its patents" and "its lack of commercial activity in practicing the patents" cannot be used as

19   categorical bars to finding irreparable injury. However, nothing in eBay precludes the Court from

20   considering these as part of the totality of factors in determining whether the plaintiff carried its

21   burden in demonstrating that it will suffer an irreparable injury. In the present case, Presidio's failure

22   to practice the '356 patent weighs against the finding of irreparable injury. On the other hand,

23   Presidio's unwillingness to license the '356 patent weighs in favor of finding irreparable injury. See

24   Adv. Cardiovascular Sys., 579 F. Supp. 2d at 560-61 ("[P]ermanent injunctions are typically granted

25   in two-competitor situations where the patentee has demonstrated an unwillingness to part with the

26

27        [43] In this regard, Presidio's reliance on I-Flow Corp. v. Apex Med. Techs., Inc., No. 07cv1200
     DMS (NLS), 2010 WL 141402 (S.D. Cal. Jan. 8, 2010), is misplaced. In that case, Judge Sabraw
     expressly found that "Plaintiff has demonstrated it lost market share, the right to control its patent
28   license agreement, and its competitive advantage as a result of Defendants' conduct," which was
     sufficient to find irreparable injury. Id. at *1. Presidio failed to demonstrate those things here.

1  exclusive right" (citations omitted)). However, the "unwillingness to license" is not sufficient by itself

2  to outweigh the other factors discussed above that weigh against the finding of irreparable injury.

3        B.      Adequacy of money damages

4        Section 283 provides that "[t]he several courts having jurisdiction of cases under this title *may*

5  grant injunctions in accordance with the principles of equity to *prevent* the violation of any right

6  secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283 (emphases added).

7  "Under some circumstances, awarding an ongoing royalty for patent infringement in lieu of an

8  injunction may be appropriate." Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1314 (Fed. Cir.

9  2007). However, the decision to award an ongoing royalty would usually come *after* the court has

10  applied the four-factor test and determined that an injunction should not issue. Id. at 1314-15.

11        "While money damages are generally considered inadequate to compensate for the violation

12  of a patentee's right to exclude, [the patentee] nonetheless [has] a burden to iterate *specific reasons*

13  why [the] infringement can not be compensated for with a money award." Praxair, 479 F. Supp. 2d

14  at 444 (citation omitted) (emphasis added). In the present case, Presidio has not carried its burden.

15  Presidio argues that the effects of future infringement cannot be fully measured in dollars, but fails

16  to explain why money damages would not adequately compensate it for any alleged "lost market

17  share" or any future lost opportunities. See id. (rejecting similar arguments). As already noted,

18  Presidio's "desire to become a monopoly supplier [of innovative solutions] in its product's market is

19  hardly unique, and is not conclusive of any factor." See id. In addition, "'loss of market share and

20  price erosion are *economic* harms and *are* compensable by money damages.'" See Graceway, 2010

21  WL 892195, at *6 (citation omitted).

22        Many of Presidio's arguments to the contrary are based on its assertion that injury to

23  "tangential benefits"–such as reputation and good will–cannot be compensated with monetary

24  damages. See, e.g., Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 975-76 (Fed. Cir. 1996) (" Years

25  after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's)

26  exclusive position by an award of damages and a permanent injunction."); Atlas Powder Co. v. Ireco

27  Chems., 773 F.2d 1230, 1233 (Fed. Cir. 1985) ("The patent statute further provides injunctive relief

28  to preserve the legal interests of the parties *against future infringement* which may have market effects

1   never fully compensable in money."); Fisher-Price, Inc. v. Safety 1st, Inc., 279 F. Supp. 2d 526, 528

2   (D. Del. 2003) ("In addition, there are certain tangential benefits associated with patent rights, such

3   as a marketplace reputation for enforcing one's patents, the value of which cannot be quantified in

4   monetary damages." (citation omitted)). However, as previously noted, Presidio provides no evidence

5   that it lost or will lose any specific customers or sales due to ATC's infringement, or that it has

6   suffered any "lost market share" or "price erosion." Likewise, there is no evidence demonstrating that

7   Presidio's reputation as a provider of unique solutions has been damaged by the infringement. In any

8   event, the Court believes that Presidio can be adequately compensated for any "tangential benefits

9   associated with patent rights," including any damage to reputation and good will, by an "ongoing

10   royalty," which is appropriate in cases where the patentee does not practice the patent in suit or the

11   infringing product serves the public interest, both of which are true here. See Paice, 504 F.3d at 1314.

12        Finally, the Court is not persuaded by Presidio's argument that awarding it damages instead

13   of an injunction would essentially force Presidio to grant a license to ATC after it has made a strategic

14   choice not to license its patent. See 3M Innovative Props. Co. v. Avery Dennison Corp., Case No. 01-

15   1781 (JRT/FLN), 2006 WL 2735499, at *1 (D. Minn. Sept. 25, 2006) (noting that the court would "not

16   disturb [patentee's] determination that its business interests will not be served by the licensing of this

17   product"). If this was the unequivocal rule in every case, then the Court would be forced to grant every

18   request for a permanent injunction whenever the patentee refused to license the claimed invention.

19   Rather, this is at most only one factor that the Court can consider in determining the adequacy of

20   monetary damages. In the present case, even if the Court agrees with Presidio that an ongoing royalty

21   would amount to a *de facto* "license," that by itself does not outweigh the other factors discussed

22   above that weigh in favor of finding adequacy of monetary damages.

23       C.    Balance of hardships

24        The balance of hardships in this case tips in Presidio's favor. On the one hand, in light of the

25   fact that Presidio does not practice the '356 patent or has any intention to do so in the future, the only

26   harm that it will suffer is based on the already-rejected "tangential benefits." On the other hand, ATC

27   asserts that an abrupt termination of the 545L capacitor product line would be detrimental to its

28   business and to the business of its customers. However, as Presidio correctly points out, "'[o]ne who

1    elects to build a business on a product found to infringe cannot be heard to complain if an injunction

2    against continuing infringement destroys the business so elected.'" <u>Broadcom</u>, 543 F.3d at 704

3    (citation omitted). Accordingly, the Court cannot accept as a hardship the mere fact that ATC would

4    have to abruptly stop selling its infringing 545L capacitors. Moreover, if ATC's argument is to be

5    believed, with 545L capacitor off the market, its 540L capacitor should generate a good demand,

6    thereby minimizing potential damages to ATC.

7        D.    Public interest

8        The public interest factor in this case tips in ATC's favor. "Successful exploitation" of the

9    patent by the infringer does not allow the infringer to avoid a permanent injunction. <u>See</u> <u>Broadcom</u>,

10   543 F.3d at 704. Rather, public interest is implicated only where the product at issue is of unusual

11   social benefit. <u>See</u> <u>Adv. Cardiovascular Sys.</u>, 579 F. Supp. 2d at 560. In the present case, ATC argues

12   persuasively that enjoining the sale of 545L capacitors will hurt important government, military,

13   space, and infrastructure projects, as well as many critical civilian industries. Presidio's arguments to

14   the contrary are unavailing. According to Presidio, the grant of an injunction would serve the

15   following three public interests: (1) "[t]he interest in maintaining a strong patent system;" (2) "the

16   interest in fair and healthy competition;" and (3) "the interest in discouraging future wrongdoing." <u>I-</u>

17   <u>Flow Corp.</u>, 2010 WL 141402, at *7. However, those three public interests are always present in a

18   patent case! If they were sufficient by themselves for an injunction to issue, then a patentee would be

19   entitled to an injunction any time a patent is found to be valid and infringed. The Supreme Court has

20   rejected any such notion, noting that each of the factors in the traditional four-factor test must be

21   separately analyzed. <u>See</u> <u>eBay</u>, 547 U.S. at 391-94.

22       E.    Conclusion

23       Accordingly, because Presidio has failed to carry its burden in demonstrating that it will suffer

24   an irreparable injury in the absence of an injunction or that money damages are inadequate to

25   compensate it, and because the public interest tips in ATC's favor, the Court **DENIES** Presidio's

26   motion for a permanent injunction.

27       Having declined to issue an injunction, the Court must next consider whether an imposition

28   of an "ongoing royalty" will be appropriate. "Under some circumstances, awarding an ongoing royalty

for patent infringement in lieu of an injunction may be appropriate." Paice 504 F.3d at 1314. However, such a remedy is not always warranted. See id. at 1314-15 ("But, awarding an ongoing royalty where 'necessary' to effectuate a remedy, . . . does not justify the provision of such relief as a matter of course whenever a permanent injunction is not imposed."). Rather, "the district court may wish to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty. Should the parties fail to come to an agreement, the district court could step in to assess a reasonable royalty in light of the ongoing infringement." Id.

Accordingly, the Court **ORDERS** that the parties submit supplemental briefing on whether the Court should allow them to negotiate their own license agreement, or whether the Court should impose a specific amount of "ongoing royalty." Because this is Presidio's motion, Presidio shall file the first brief no later than **April 26, 2010**. ATC shall file a response no later than **May 10, 2010**. Presidio shall file any reply no later than **May 17, 2010**.

### CONCLUSION

To the extent ATC also seeks a new trial on the issues of validity, infringement, lost profit damages, [Doc. No. 309], and false marking before October 24, 2008, [Doc. No. 308], the Court **DENIES** those motions for the same reasons as set forth above. Having reviewed the parties' arguments and the evidence adduced at trial, the Court cannot say that "'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false,'" or that a new trial is necessary "'to prevent . . . a miscarriage of justice.'" See Hangarter, 373 F.3d at 1005.

For the foregoing reasons, the Court rules as follows:

(1)     Presidio's Motion for Permanent Injunction is **DENIED**. Presidio shall file a supplemental brief no later than **April 26, 2010** on whether the Court should allow the parties to negotiate their own license agreement, or whether the Court should impose a specific amount of "ongoing royalty." ATC shall file a response no later than **May 10, 2010**. Presidio shall file any reply no later than **May 17, 2010**.

(2)     Presidio's Motion for Post Trial Remedies is **GRANTED IN PART and DENIED IN PART**. Specifically, the Court **DENIES** Presidio's request for enhanced damages and attorney's fees. On the other hand, the Court **GRANTS** Presidio's request for supplemental damages, and for award

of pre-judgement and post-judgment interest and costs. With respect to supplemental damages, the Court **ORDERS** that ATC provide an accounting for any sales of 545L capacitors occurring after December 1, 2009. Such accounting shall be submitted to the Court no later than **May 10, 2010**. With respect to the pre-judgment interest, the Court awards Presidio pre-judgment interest in the amount of **simple interest at seven percent** accruing from the date of first infringement, which in this case is June 2006. The Court also awards Presidio post-judgment interest at the currently applicable rate.

(3)   ATC's Motion for JMOL or for New Trial with Respect to Presidio's False Marking Before October 24, 2008 is **DENIED**.

(4)   ATC's Motion for JMOL and for New Trial is **GRANTED IN PART and DENIED IN PART**. Specifically, the Court **GRANTS** ATC's motion with respect to willfulness of infringement. In all other respects, the Court **DENIES** ATC's motion.

(5)   ATC's Motion for Entry of ATC's Proposed Findings of Fact and Conclusions of Law with Respect to Presidio's False Marking is **GRANTED IN PART and DENIED IN PART**. The Court finds that Presidio committed **651,675 separate offenses** between October 24, 2008 and April 2009 for the 651,675 BB capacitors shipped during that time, and that the appropriate fine should be **$0.35 per unit**. Accordingly, the total amount of the fine for false marking is **$228,086.25**.

(6)   ATC's Motion for Entry of ATC's Proposed Findings of Fact and Conclusions of Law Regarding Indefiniteness is **DENIED**.

(7)   ATC's Motion for Entry of ATC's Proposed Findings of Fact and Conclusions of Law Regarding Unenforceability of the '356 Patent for Inequitable Conduct is **DENIED**.

**IT IS SO ORDERED.**

DATED:  April 13, 2010

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11 | PRESIDIO COMPONENTS INC.,

12 |                              Plaintiff,

13 |     vs.

14 | AMERICAN TECHNICAL CERAMICS CORP.,

15 |                            Defendant.

16

CASE NO. 08-CV-335 - IEG (NLS)

ORDER ON PLAINTIFF'S MOTION IN LIMINE: REEXAMINATION OF THE '356 PATENT

[Doc. No. 202]

17
18
19
20
21
22
23
24

     On November 12, 2009, the Court heard oral argument on the parties' motions in limine. The Court's ruling on each motion was announced from the bench and is memorialized in the Minute Order entered on the docket on the same day. [Doc. No. 250]. However, the Court indicated at the hearing that a separate written order will be issued regarding Plaintiff's Motion in Limine: Reexamination of the '356 Patent ("Plaintiff's Motion in Limine 4"). [Doc. No. 202]. Having considered the parties' arguments, and for the reasons set forth below, the Court reaffirms its prior ruling and GRANTS IN WHOLE Plaintiff's motion to exclude any evidence relating to the reexamination of the '356 patent.

25

**BACKGROUND**

26
27
28

     On July 23, 2009, American Technical Ceramics Corp. ("ATC") submitted to the United States Patent and Trademark Office ("USPTO") a replacement request for reexamination of the patent-in-suit, U.S. Patent Number 6,816,356 ("the '356 patent"). On October 20, 2009, the USPTO granted the

request for reexamination with respect to claims 1-5, 16, and 18-19. (See Def. Mem. of P. & A. in opposition to Pl. MIL 4, Ex. 1, at 22.) In Plaintiff's Motion in Limine 4, Presidio moves to exclude any evidence relating to the reexamination on the ground that it is not relevant to this lawsuit and is also unfairly prejudicial to Presidio.

## DISCUSSION

A.    Parties' arguments

Presidio seeks to exclude all evidence relating to the reexamination proceedings of the '356 patent. First, Presidio argues that the grant of reexamination is irrelevant to this case because it is not probative of unpatentability. Second, Presidio asserts that despite the grant of reexamination, "there is only an approximate 12% likelihood that all of the patented claims will be cancelled." Third, Presidio argues that even if relevant, evidence of the reexamination proceedings should be excluded as unfairly prejudicial. Finally, according to Presidio, granting its motion in limine will also ensure a sustainable jury verdict in the case.

On the other hand, ATC argues that evidence of the reexamination proceedings should not be excluded. According to ATC, it does not intend to argue that the '356 patent is invalid simply because of the grant of reexamination. Rather, ATC wants to use "very specific determinations and findings made by the [USPTO] in the Order Granting Reexamination that are directly relevant and highly probative of specific issues underlying ATC's inequitable conduct and invalidity defenses." These include: (1) "non-cumulativeness of the reexamination references in the prior art in the original prosecution" and (2) "importance of their consideration to a reasonable examiner, i.e., their materiality to patentability." Moreover, according to ATC, specific USPTO's determinations are also highly probative on the evaluation of the relevant Graham obviousness factors and regarding willfulness.

B.    Analysis

Presidio argues persuasively that "the grant by the examiner of a request for reexamination is not probative of unpatentability." See Hoechst Celanese Corp. v. BP Chemicals Ltd., 78 F.3d 1575, 1584 (Fed. Cir. 1996). "The grant of a request for reexamination, although surely evidence that the criterion for reexamination has been met (i.e., that a 'substantial new question of patentability' has been raised, 35 U.S.C. § 303), does not establish a likelihood of patent invalidity." Id. (citation

1    omitted). On the contrary, although it appears that the USPTO grants about 92% of the requests for

2    reexamination, in only 12% of cases does that reexamination result in all claims being cancelled. See

3    UNITED STATES PATENT AND TRADEMARK OFFICE, EX PARTE REEXAMINATION FILING DATA -

4    DECEMBER 31, 2007, ¶¶ 5a, 10b; see accord   Hoechst Celanese Corp. v. BP Chemicals Ltd., 846 F.

5    Supp. 542, 547 (S.D. Tex. 1994), aff'd, 78 F.3d 1575 (Fed. Cir. 1996). There is thus a "substantial

6    likelihood" that, despite the grant of reexamination, the USPTO will uphold the patentability of some

7    or all of Presidio's claims. See Amphenol T&M Antennas, Inc. v. Centurion Int'l Inc., No. 00 C 4298,

8    2002 WL 32373639, at *1 (N.D. Ill. Jan. 17, 2002).

9          Moreover, even if the reexamination proceedings are somehow relevant on the issues of

10    obviousness or willfulness, they are nevertheless unfairly prejudicial. See FED. R. EVID. 403. As noted

11    above, because the reexamination proceedings before the USPTO are still incomplete and based solely

12    on the evidence provided by ATC in its replacement request for reexamination, there is very little

13    probative value to the grant of reexamination. On the other hand, the prejudicial effect as well as

14    potential for jury confusion is great.[1] Thus, because the prejudicial potential of the evidence

15    "substantially outweigh[s]" any probative value, it should be excluded. See FED. R. EVID. 403.

16          ATC's arguments to the contrary are unpersuasive. In Molins PLC v. Textron, Inc., 48 F.3d

17    1172, 1179 (Fed. Cir. 1995), on which ATC relies, the Federal Circuit merely stated that "the result

18    of a [USPTO] proceeding that assesses patentability in light of information not originally disclosed

19    can be of strong probative value in determining whether the undisclosed information was material"

20    (emphasis added). In the present case, however, the USPTO's reexamination proceedings are still

21    incomplete and based solely on the evidence submitted by ATC, and therefore there is no "result" that

22    ATC can rely upon. See 3M Innovative Prop. Co. v. Dupont Dow Elastomers LLC, No. 03-3364

23    MJD/AKB, 2005 WL 2216317, at *2 (D. Minn. Sept. 8, 2005) ("On the other hand, admission of

24    evidence of an incomplete reexamination would have low probative value, would distract from the

25

26          [1] The Court notes that pursuant to ATC's own motion in limine, the Court has already excluded
from trial any reference to the "presumption of validity." (See Def. MIL 1.) Contrary to ATC's
27    arguments, however, this weighs in favor of granting Plaintiff's Motion in Limine 4. With any
reference of the "presumption of validity" excluded, allowing the jury to hear about incomplete
28    USPTO proceedings will be unfairly prejudicial to Presidio, and could potentially confuse the jury as
to who has what burden throughout the trial.

core issues of the case, and would be highly prejudicial." (citations omitted)).

None of the other cases cited by ATC as supporting its position apply at this juncture. For example, Lucent Tech., Inc. v. Gateway, Inc., No. 07-CV-2000-H (CAB), 2007 U.S. Dist. LEXIS 95934 (S.D. Cal. Oct. 30, 2007) dealt with considering the grant of reexamination at the *summary judgment* stage, rather than having that evidence presented to the jury. As for Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc., No. C 03-1431 SBA, 2006 WL 1330003, at *4 (N.D. Cal. May 15, 2006), although the court there did find that a limiting instruction could alleviate the potential prejudice, the court also relied on the moving party's failure to include the argument in its original motion as a basis for denying it without prejudice at the *summary judgment* stage.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Presidio's motion to exclude from trial all evidence relating to the reexamination proceedings of the '356 patent. This does not, however, preclude ATC from arguing to the jury that the nine references discussed by the USPTO in its grant of reexamination were non-cumulative or important to a reasonable examiner. ATC just has to do it based on separate and independent evidence, rather than on the grant of reexamination itself.

**IT IS SO ORDERED.**

DATED:  November 13, 2009

_Irma E. Gonzalez_
**IRMA E. GONZÁLEZ, Chief Judge**
**United States District Court**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRESIDIO COMPONENTS, INC.,<br><br>                    Plaintiff,<br><br>    vs.<br><br>AMERICAN TECHNICAL CERAMICS CORP.,<br><br>                    Defendant. | CASE NO. 08cv335 - IEG - NLS<br><br>ORDER DENYING ATC'S ARGUMENT REGARDING PROPOSED ADDITIONAL ADMITTED AND UNCONTESTED FACTS<br><br>[Doc. No. 185.] |

     At the Pretrial Conference, a week after the parties lodged their Proposed Pretrial Order, defendant American Technical Ceramics Corp. ("ATC") submitted under seal an "Argument Regarding Proposed Additional Admitted and Uncontested Facts." (Doc. No. 185.) Presidio submitted an opposition on June 15, 2009. On June 1, 2009, the Court signed and entered the Pretrial Order. As such, ATC's argument is DENIED AS MOOT.

     Furthermore, the Court directs the parties to meet and confer regarding any additional admitted and uncontested facts. <u>No later than two weeks prior to trial</u>, the parties shall submit any additional stipulations as appropriate.

**IT IS SO ORDERED.**

**DATED: August 6, 2009**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PRESIDIO COMPONENTS, INC., | ) | Civil No. 08cv335 IEG (NLS) |
| Plaintiff, | ) ) | **ORDER DENYING ATC'S MOTION TO COMPEL PLAINTIFF TO COMPLY WITH THE COURT'S ORDER AND TO PRODUCE DOCUMENTS** |
| v. | ) ) ) | |
| AMERICAN TECHNICAL CERAMICS CORPORATION, | ) ) | |
| Defendant. | ) ) | [Doc. No. 78] |
| | ) | |
| AMERICAN TECHNICAL CERAMICS CORPORATION, | ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) | |
| PRESIDIO COMPONENTS, INC., | ) ) | |
| Counterdefendants. | ) ) | |

## I.    INTRODUCTION

This is a patent infringement case involving U.S. Patent No. 6,816,356 ("The '356 patent"). Presidio Components, Inc. ("Presidio") filed suit against American Technical Ceramics Corporation ("ATC") alleging infringement of the '356 patent. (Doc. No. 1 at ¶ 10.) ATC filed a counterclaim alleging, inter alia, tortious interference with contractual relations. (Doc. No. 10 at pp. 11-12.)

ATC filed the motion presently before the Court to Compel Plaintiff to Comply with the Court's Order and to Produce Documents (herein "Motion to Compel"). (Doc. No. 78.) This motion is

1  appropriate for adjudication on the papers submitted and the Court previously vacated the hearing date.

2  (Doc. No. 146.)

3  **Relevant Facts**

4      ATC's present Motion to Compel stems from its prior Motion to Compel [Presidio] to Produce

5  Documents and Respond to Interrogatories.  (Doc. No. 42.)  On November 10, 2008, the Court issued an

6  Order Granting in Part and Denying in Part ATC's Motion to Compel [Presidio] to Produce Documents

7  and Respond to Interrogatories (herein "Order").  (Doc. No. 58.)  The Court ordered Presidio to produce

8  documents responsive to ATC's Requests for Production (herein "RFP") Nos. 52 through 55 by

9  November 12, 2008, and to produce all other required discovery by November 24, 2008.  (*Id.*)  ATC

10  asserts that Presidio did not comply with the Court's Order.

11      In addition to the deadlines set by the Court's Order on ATC's previous motion to compel, the

12  Court's First and Second Amended Scheduling Order Regulating Discovery and Pretrial Proceedings

13  (herein "Scheduling Order") set the deadline to complete fact discovery for December 5, 2008, and the

14  expert discovery deadline for March 9, 2009.  (Scheduling Order, as Modified, Doc. Nos. 37, 65.)  The

15  operative Scheduling Order provides, in relevant part:

16      "*Completed* means that all discovery under Rules 30-36 of the Federal Rules of Civil
        Procedure must be initiated in a sufficient period of time in advance of the cut-off date,
17      *so that it may be completed* by the cut-off date, taking into account the times for services,
        notice, and response as set forth in the Federal Rules of Civil Procedure.  All disputes
18      concerning discovery shall be brought to the attention of the Magistrate Judge no later
        than thirty (30) days following the date upon which the event giving rise to the discovery
19      dispute occurred.  Counsel shall meet and confer pursuant to the requirements of Fed. R.
        Civ. P. 26 and Local Rule 26.1(a)."

20

21  (Scheduling Order, Doc. No. 14 at 2.)

22      On March 16, 2009—one week after expert discovery closed and on the last day to file all

23  pretrial motions—ATC filed the present Motion to Compel.  (Doc. No. 78.)  ATC's motion concerns

24  RFPs Nos. 1-3, 7, 8, 69, and Interrogatory ("ROG") no.1.  (*See id.*)  The motion is not timely and the

25  record indicates that ATC did not conduct a proper meet and confer before filing the motion.  Therefore,

26  the Motion is Denied.

27  ///

28  ///

**II.     DISCUSSION**

**ATC'S MOTION IS UNTIMELY**

 RFPS 1-3, 7, and 8

  The Scheduling Order requires that the parties bring any discovery dispute to the Court's attention within 30 days of the event giving rise to the dispute.  The Court ordered Presidio to produce documents responsive to RFPs 1-3, 7, and 8 by November 24, 2008.  (*See* Order at 1.)  Therefore, the deadline for filing this motion was December 24, 2008.

  In support of its Motion to Compel, ATC explained that since December 5, 2008—the fact discovery cut-off date—it had "been actively communicating through letter correspondence, email, and meet and confer sessions regarding Presidio's non-compliance with the Court's November 10 Order." (Memo Ps&As Mot. to Compel at 1.)  Yet, despite its awareness of an ongoing discovery dispute as early as December 5, and the Court's requirement that discovery disputes be brought to its attention no later than 30 days following the date upon which the event giving rise to the discovery dispute occurs, ATC waited nearly four months—precisely 112 days—to file this motion.  (Notice of Mot. to Compel, Doc. No. 78.)

  ATC completely disregarded the Court's scheduling orders and did not present the Court with good cause to justify the extreme delay.  Accordingly, the motion to compel is denied as untimely.

 RFP 69

  ATC's motion regarding RFP 69 is likewise untimely.  RFP 69 seeks documents regarding Presidio's damages claims.  (Memo Ps&As Mot. to Compel at 3.)  In its November 10, 2008 Order, the Court denied without prejudice ATC's motion to compel a response to RFP 69.  (Order at 6.)  In so doing, the Court invited ATC to renew its request *if* Presidio failed to include information responsive to RFP 69 in the report of its damages expert and prior to the expert's deposition.  (*Id.*)  The deadline for submitting expert reports in this case was January 23, 2009.  (Scheduling Order, as Modified, Doc. No. 65.)

  As explained above, the Court requires that all discovery motions be brought within 30 days of the event giving rise to the discovery dispute.  Presidio's damages expert, Glenn Newman, prepared a thirty-five (35) page report and included an exhibit describing every document he considered and relied

1   on in performing his damages analysis in this case.  (Memo Ps&As in Opp'n at 7; *see also* Opp'n, Ex.

2   A.)  The date Mr. Newman submitted his report—January 23, 2009—started the clock running on ATC's

3   30 day time limit to file related discovery motions.  Thus, ATC's deadline for filing this motion was

4   February 23, 2009.  Not only did ATC fail to file its motion on time, it did not do so until the final date

5   to file all pretrial motions, which was more than one week after expert discovery closed entirely.[1]

6       ROG 1

7       ATC's motion to "compel Presidio to supplement its response to ROG 1" is similarly untimely.

8   (Reply at 6.)  Furthermore, the parties do not dispute that Presidio provided a response to ROG 1 and

9   also provided ATC with a declaration confirming that Presidio performed a reasonable search and

10  produced all relevant documents.  (Memo Ps&As in Supp. at 11; Opp'n at 15; Reply at 6.)  The

11  information before the Court indicates that Presidio has fully complied with its obligations.

12  Accordingly, the Court denies ATC's request for an order compelling Presidio to provide it with

13  additional information.

14      ATC has made no showing that it acted diligently in bringing these discovery motions before the

15  Court, nor has it provided good cause to excuse its noncompliance with the Scheduling Order.  For the

16  foregoing reasons, the Court denies ATC's Motion to Compel Presidio to Comply with the Court's Order

17  and Produce Documents.

18  **FAILURE TO CONDUCT AN APPROPRIATE MEET AND CONFER**

19      Civil Local Rule 26.1(a) requires counsel for the moving party to arrange a meet and confer

20  before the court will entertain a discovery motion.  *See* CivLR 26.1(a).  Local Rule 26.1 further states

21  that: "Under no circumstances may the parties satisfy the meet and confer requirement by exchanging

22  written correspondence." *Id.*  The record indicates that ATC failed to arrange for and engage in an

23  appropriate meet and confer before filing this discovery motion.  The record reveals the following:  On

24  Friday, March 13, 2009, at 5:29 p.m.—i.e., after the close of business on the last business day before the

25  weekend—counsel for ATC sent Presido's counsel an e-mail asking to meet and confer on Monday,

26  March 16, 2009 (the deadline for filing all pretrial motions), regarding unresolved discovery issues.

27

28

---

[1]The Court's Second Amended Scheduling Order set March 9, 2009, as the date for completion
of all expert discovery.  [Doc. No. 65.]

(Memo Ps&As in Opp'n at 6; Opp'n, Ex. C.)  Given the short notice, no meet and confer took place before ATC called the Court and requested a hearing date for the present motion.  (*Id.*; Opp'n, Ex. D.)  On March 17, 2009, attorney Timur Slonim signed ATC's Certification of Compliance with Civil Local Rule 26.1 (herein "Certification").  (Doc. No. 81-2.)  ATC's certification provides, in pertinent part:

> Pursuant to CivLR 26.1, counsel for Presidio and ATC have met and conferred concerning ATC's present motion to compel Presidio to comply with the Court's Order and to produce documents . . . . Mr. Slonim served letters on January 9 and February 23, 2009 again requesting that Presidio provide the discovery mandated by the Court's Order. Presidio responded by claiming to be in compliance with the Order and that all documents have been produced.  In view of the deadline to file any motions on or before March 16, 2009, ATC made an additional request for a meet and confer on that date which Presidio refused to have.  Accordingly, ATC has filed this Motion to Compel.

(*Id.* at 2.)  In its Opposition to ATC's motion, Presidio contends ATC failed to conduct the required meet and confer prior to filing the present motion.  (Memo Ps&As in Opp'n at 6.)  In its Reply, ATC refers to its Rule 26.1 Certification as evidence that an adequate meet and confer took place.  (Reply at 2 n. 7.)

ATC's belated attempt to arrange a meet and confer prior to filing this motion did not satisfy the requirements set by the Local Rule.  Still, Presidio responded to Mr. Slonim's eleventh hour request via letter on March 16, 2009, and did not refuse to meet and confer.  (Opp'n, Ex. D.)  Rather, Presidio responded to the after-hours email the following business day and asked ATC to identify the outstanding discovery issues so that the parties could engage in a meaningful meet and confer.  (*Id.*)

ATC's demand for a meet and confer after hours on the Friday before a Monday motions filing deadline does not comply with the letter or spirit of the Local Rule.  *See* Fed. R. Civ. P. 37(a)(1).  Furthermore, Mr. Slonim's representation that Presidio's counsel "refused" to have an additional meet and confer prior to the filing of this motion misrepresents the record.

Accordingly,  for all of the reasons stated above, ATC's Motion to Compel Presidio to Comply with the Court's Order and Produce Documents is **DENIED** in its entirety.

**IT IS SO ORDERED.**

DATED:  May 20, 2009

Hon. Nita L. Stormes
U.S. Magistrate Judge

08cv335 IEG (NLS)

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PRESIDIO COMPONENTS, INC.,<br><br>                                    Plaintiff,<br><br>    vs.<br><br>AMERICAN TECHNICAL CERAMICS CORP.,<br><br>                                    Defendant. | CASE NO. 08cv335 - IEG - NLS<br><br>ORDER DENYING DEFENDANTS MOTION FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIMS<br><br>[Doc. No. 118.] |

In this patent infringement action, after completion of claims construction, close of discovery, and issuance of two summary judgment orders, defendant American Technical Ceramics ("ATC") now moves for leave to amend its answer and counterclaims.  (Doc. No. 118.)  ATC seeks to: (1) include an interference with prospective economic advantage claim; (2) insert false marking claims based on additional patent designations; and (3) add a 28 U.S.C. § 1498 immunity defense.[1]  Plaintiff Presidio Components ("Presidio") opposed and ATC replied.  For the reasons set forth below, the Court DENIES ATC's motion.

**BACKGROUND**

On February 21, 2008, Presidio filed a complaint alleging ATC infringed U.S. Patent Number 6,816, 356 (the "356 patent").  ATC brings numerous counterclaims, however, only two are relevant

---

[1] Section 1498 states, in relevant part, "Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture."  28 U.S.C. §1498.

1   to this proceeding.  Counterclaim Four alleges Presidio interfered with ATC's contractual relations

2   by publishing a news release announcing a previous incarnation of this action.  Counterclaim Five

3   alleges Presidio falsely marked its Buried Broadband ("BB") capacitors with the '356 patent.

4         On July 14, 2008, the Court issued a claim construction order, construing the '356 patent's

5   disputed terms.  (Doc. No. 24.)  On August 25, 2008, the Court denied ATC's motion for summary

6   judgment of indefiniteness.  (Doc. No. 32.)  Fact discovery closed on December 5, 2008 and expert

7   discovery closed on March 9, 2009.  (Doc. No. 65.)

8         On April 30, 2009, the Court entered an order regarding the parties' cross-motions for

9   summary judgment.  In that order, the Court found the California litigation privilege bars ATC's

10   Counterclaim Four.  Further, the Court limited its review of Counterclaim Five to the '356 patent, the

11   only patent mentioned in the counterclaim.

12         Presently, ATC seeks to make three amendments to its answer and counterclaims.  First, ATC

13   seeks to include a claim for interference with prospective business advantage.  Second, ATC seeks

14   damages for Presidio's alleged false marking of the BB capacitors with U.S. Patent No. 6,366,443;

15   U.S. Patent No. 6,587,327; U.S. Patent No.  6,970,341; U.S. Patent No. 7,057,776; and the phrase

16   "patent pending."  Third, ATC seeks to include an affirmative defense of immunity under 28 U.S.C.

17   § 1498.  The motion is amendable to disposition without oral argument.  Local Civil Rule 7.1(d)(1).

18                **LEGAL STANDARD**

19         If a court has already issued a pretrial scheduling order, the party seeking to amend the

20   pleadings must first satisfy Federal Rule of Civil Procedure 16.  Johnson v. Mammoth Recreations,

21   975 F.2d 604, 608 (9th Cir. Cal. 1992).  The scheduling order limits "the time to join other parties,

22   amend the pleadings, complete discovery, and file motions," and "may be modified only for good

23   cause and with the judge's consent." Fed. R. Civ. P. 16(b) (2008).  A party satisfies the "good cause"

24   standard only by showing the deadline "cannot reasonably be met despite the diligence the party

25   seeking the extension." Johnson, 975 F.2d at 609 (citation omitted).  If the amending party shows good

26   cause, the party must then demonstrate the amendment is proper under Rule 15.  Id. at 608.

27         After service of the responsive pleadings, Rule 15 permits a party to amend "only by leave of

28   court or by written consent of the adverse party . . . ."  Fed. R. Civ. P. 15(a)(2).  This leave "shall be

1    freely given when justice so requires."  Id.  "There are several accepted reasons why leave to amend

2    should not be granted, including . . . undue delay, prejudice to the [opposing party], futility of

3    amendment, and that the party has previously amended the relevant pleading."  Advanced

4    Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc., 989 F. Supp. 1237, 1241 (N.D. Cal. 1997) (citing

5    DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987)).

6                                         **DISCUSSION**

7          For the sake of clarity the Court addresses the proposed amendments in order.

8    **A.      Interference with Prospective Economic Advantage**

9          ATC seeks to add a claim for tortious interference with prospective economic advantage to

10   Counterclaim Four.  In its April 30, 2009 order, the Court found the California litigation privilege

11   barred ATC's Counterclaim Four because the allegedly tortious press release was a protected

12   communication.  The privilege similarly bars a claim for interference with prospective economic

13   advantage.  As such, the Court DENIES ATC's motion to amend Counterclaim Four as futile.

14   **B.      False Marking**

15         Currently, ATC's Counterclaim Five alleges Presidio falsely marked its BB capacitor with the

16   '356 patent.  ATC seeks to add claims Presidio falsely marked the BB capacitor with four other

17   patents and a patent pending designation.

18   i.     Parties' Arguments

19         ATC believes its motion is timely because of recent discovery concerning the extent of

20   Presidio's false marking and Presidio's underlying intent.  Further, ATC asserts Presidio will not

21   suffer prejudice because they have already assessed the extent of the false marking.  ATC notes its

22   expert, Dr. Dougherty, found Presidio falsely marked the BB capacitors with the '327 patent, the '356

23   patent, the '341 patent, the '776 patent, the '443 patent, and "patent pending" designation.  According

24   to ATC, Presidio's rebuttal expert conceded false marking with the '356 patent and '327 patent.

25

26         Presidio argues ATC has known for over a year that Presidio marked its BB capacitors with

27   the disputed patent designations, but has unduly delayed amendment, citing Roberts v. Arizona Board

28   of Regents, 661 F.2d 796, 798 (9th Cir. 1981).  Presidio asserts it will suffer prejudice because, if

1   allowed, the amendment will necessitate further claims construction proceedings and further

2   discovery.  For example, Presidio believes it will need to re-depose ATC's expert.

3   ii.      Analysis

4        Other courts have denied motions for leave to amend that are filed at a late stage in the

5   proceedings.  In Roberts v. Arizona Bd. of Regents, 661 F.2d 796, 798 (9th Cir. 1981), the court

6   upheld the denial of a motion for leave to amend where discovery was nearly complete and a motion

7   for summary judgment was pending before the district court.  See also Diersen v. Chicago Car

8   Exchange, 110 F.3d 481 (7th Cir. 1997) (affirming a denial of a motion for leave to amend where the

9   motion was brought after the court had already granted a motion for summary judgment); Evans v.

10   McDonald's Corp., 936 F.2d 1087, 1091 (10th Cir. 1991) (discussing negative consequences that

11   occur if the liberal federal pleading rules are employed to allow plaintiffs to ascertain bases of their

12   claims at the last minute, including wasted resources and prejudicial delay).

13        In the instant case, the motion would unduly prejudice Presidio and waste judicial resources.

14   ATC brought the motion during the pendency of the parties' cross-motions for summary judgment,

15   months after the close of discovery.  Aside from the timing, Presidio has focused discovery solely on

16   defending a claim for false marking the '356 patent.  If allowed, the amendment will require Presidio

17   to conduct extensive discovery to evaluate the alleged false marking with the other patent

18   designations, including the re-deposition of experts and Presidio employees.  Further, both parties

19   agree the Court would have to conduct additional claim construction proceedings for each of the

20   newly included patents, raising concerns of judicial economy.  At this stage of the proceedings – with

21   the pretrial conference only a few weeks away – reopening discovery and conducting additional claim

22   construction proceedings would cause undue prejudicial delay.  This additional burden on Presidio

23   outweighs any benefit gained by consolidating ATC's false marking claims into one action.  ATC can

24   bring these additional claims in another action if it raises them at a more appropriate procedural stage.

25   **C.      The 28 U.S.C. § 1498 Immunity Defense**

26   i.      Parties Arguments

27        ATC seeks to assert partial immunity under 28 U.S.C. §1498.  ATC believes its motion is

28   timely because it only recently discovered Presidio bases damage calculations on all 545L capacitor

sales.  ATC believes its sales to the federal government trigger section 1498 immunity, a defense that requires minimal discovery: evaluation of the face of the contracts.  Crater Corp. v. Lucent Techs., Inc., 255 F. 3d 1361, 1368 (Fed. Cir. 2001).

Presidio asserts ATC knew it intended to seek lost profits damages in February 2008.  Presidio claims it has consistently based its lost profits claim on the total sales of the infringing 545L capacitor.  Presidio argues ATC knew of the claim and knew of its own government contracts; therefore, it should have raised the immunity defense in its original answer.  If the Court allows the amendment, Presidio believes it will have to conduct discovery to determine the applicability of section 1498.

ii.     Analysis

ATC's undue delay in filing this affirmative defense weighs against granting the motion.  In evaluating undue delay, courts inquire "whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading."  AmerisourceBergen Corp. v. Dialysist West, Inc., 465 F.3d 946, 953 (9th Cir. 2006) (quoting Jackson v. Bank of Hawaii, 902 F.2d 1385, 1388 (9th Cir. 1990)).  The Ninth Circuit has held "that an eight month delay between the time of obtaining a relevant fact and seeking a leave to amend is unreasonable."  Id.  In this case, Presidio alleged it suffered "loss of sales and profits" due to ATC's sale of the 545L capacitor fourteen months prior to the instant motion.  (Compl. at 3.)  This unambiguous language notified ATC that Presidio sought lost profits damages, triggering ATC's burden to raise the section 1498 defense.  ATC stretches credulity, and contradicts the plain language of the complaint, when it claims it lacked notice lost profit damages were based on all sales of the 545L capacitors.  The fourteen months between the filing of the complaint and the motion for leave to amend constitutes undue delay.

Further, the amendment would unduly prejudice Presidio by forcing excessive additional discovery and unnecessary delay.  The burden of conducting additional discovery does not automatically constitute undue prejudice warranting denial of a motion to amend.  State Farm Mut. Auto. Ins. Co. v. CPT Medical Services, P.C., 246 F.R.D. 143 (E.D.N.Y. 2007).  However, in this instance, ATC seeks to introduce a new immunity defense at a late stage in the proceedings.  If the Court allows the amendment, Presidio would have to rehash much of its discovery to determine the applicability of section 1498, including re-deposition of experts, further document requests, and third

1  party discovery.  If ATC had raised this issue at the proper time, the parties could have conserved

2  resources by not having to revisit ground already covered.  ATC has not shown the additional

3  discovery will be limited to the face of the government contracts.  In fact, ATC has not even submitted

4  any of the contracts in support of its motion.  The Court DENIES ATC's motion because granting the

5  motion would unfairly prejudice Presidio.

6                                              **CONCLUSION**

7        For the foregoing reasons, the Court DENIES ATC's motion for leave to amend.

8  **IT IS SO ORDERED.**

9  **DATED:  May 19, 2009**

10                                    **IRMA E. GONZALEZ, Chief Judge**
11                                    **United States District Court**

- 6 -                                                    08cv335 - IEG - NLS

1

2

3

4

5

6

7

8  **UNITED STATES DISTRICT COURT**

9  **SOUTHERN DISTRICT OF CALIFORNIA**

10

PRESIDIO COMPONENTS, INC.,                )    Civil No. 08cv335 IEG (NLS)
                                          )
              Plaintiff,                   )    **ORDER GRANTING IN PART AND**
                                          )    **DENYING IN PART AMERICAN**
v.                                         )    **TECHNICAL CERAMICS**
                                          )    **CORPORATION'S MOTION FOR**
AMERICAN TECHNICAL CERAMICS               )    **LEAVE OF COURT TO ALLOW**
CORPORATION,                              )    **DEPOSITIONS OF PRESIDIO'S**
                                          )    **EXPERT WITNESSES**
              Defendant.                   )
_____   )
                                          )    [Doc. No. 70]
AMERICAN TECHNICAL CERAMICS               )
CORPORATION,                              )
                                          )
              Counterclaimant,             )
                                          )
v.                                         )
                                          )
 PRESIDIO COMPONENTS, INC.,               )
                                          )
              Counterdefendants.           )
_____   )

21

22

23  **I.    INTRODUCTION**

24        This is a patent infringement case involving U.S. Patent No. 6,816,356 ("The '356 patent").

25  Presidio Components, Inc. ("Presidio") filed suit against American Technical Ceramics Corporation

26  ("ATC") alleging infringement of the '356 patent.  [Doc. No. 1 at ¶ 10.]  ATC filed a counterclaim

27  alleging, inter alia, tortious interference with contractual relations.  [Doc. No. 10 at pp. 11-12.]

28

1    Defendant/Counterclaimant ATC filed a Motion for Leave of Court to Allow Depositions of four

2    expert witnesses designated by Plaintiff/Counterdefendant Presidio.  [Doc. No. 70.]  Because ATC has

3    already taken more than ten (10) depositions in this case, Rule 30 requires ATC to obtain permission

4    from either Presidio or the Court to take any additional depositions.  Fed. R. Civ. P. 30(a)(2)(A)(i).  In

5    addition to seeking leave to take the expert depositions, ATC also requests that the expert discovery

6    deadline and deadline for filing summary judgment motions be extended in order for ATC to take the

7    requested depositions and prepare summary judgment motions after hearing the experts' testimony.[1]  *Id.*

8    at 1.  Finally, one of the expert depositions that ATC seeks leave to take would be a second deposition

9    of Dr. Ewell.  Presidio opposes ATC's motion.  [Doc. No. 72.]

10   **II.    RELEVANT FACTS**

11    The original scheduling order applicable to this case was filed September 20, 2007.[2]  [*See* Case

12   No. 07cv893-IEG, Doc. No. 22.]  On June 2, 2008, the parties filed a Joint Motion to Amend the

13   Scheduling Order to extend all remaining deadlines in the case for thirty days.  [Doc. No. 13.]  On June

14   3, 2008, the Court issued a Scheduling Order Regulating Discovery and Other Pretrial Proceedings in

15   this case.  [Doc. No. 14.]  On September 26, 2008, the parties filed a Joint Motion for Extension of Time

16   to Complete Discovery and to Amend the Scheduling Order, asking to extend remaining deadlines for a

17   period of seven weeks.  [Doc. No. 35.]  On October 1, 2008, the Court granted the joint motion and

18   issued a First Amended Scheduling Order.  [Doc. No. 37.]  Then, on December 16, 2008—after the

19   conclusion of fact discovery—the parties filed a third joint motion, this time asking that the Court again

20   modify the scheduling order and extend pretrial discovery deadlines so that they could complete expert

21   discovery.  [Doc. No. 64.]  The Court granted the motion and extended the deadline for submitting

22   expert reports until January 23, 2009, the deadline for submitting supplemental expert reports until

23   February 16, 2009, and the expert discovery cutoff until March 9, 2009.  [Doc. No. 65.]  On February

24   20, 2009, ATC filed this motion for leave to depose four of Presidio's expert witnesses.  [Doc. No. 70.]

25

26    ────────────────

[1]ATC filed its Motion for Summary Judgment on March 16, 2009 [Doc. No. 77].  The request to
27   extend the summary judgment motion deadline is denied as moot.

28    [2]After a Claims Construction hearing and Order Construing Claims, the parties jointly moved to
dismiss the first filed case and agreed that all proceedings in that case should apply in this second filed
case.  The court entered an order to that effect.  [Case No. 07cv893-IEG, Doc. No. 66.]

1    To date, ATC has taken one expert deposition (Dr. Godshalk) on claim construction issues,

2 which pursuant to Patent L.R. 4.3 does not count against the presumptive ten deposition limit set by

3 Rule 30(a)(2)(A)(i), and eleven other depositions. *See* Fed. R. Civ. P. 30(a)(2)(A)(i), Mem Ps&As at 5.

4 Presidio, on the other hand, has taken at most eight depositions, including experts, and argues that it

5 purposely "tailored its discovery strategy" to ensure that it would not exceed the presumptive ten

6 deposition limit. Opp'n at 5.

7    ATC seeks the Court's permission to depose the following four expert witnesses designated by

8 Presidio: (1) Dr. Wayne Huebner, technical expert; (2) Dr. Gary Ewell, technical expert; (3) Mr. Glenn

9 Newman, damages expert; and (4) Mr. Richard Killworth, Esq., patent prosecution practice and

10 procedure expert. Memo Ps&As at 2. ATC, likewise, has designated a damages expert, a patent

11 prosecution and procedure expert, and a technical expert. *Id.* Presidio elected to forego the deposition

12 of one of ATC's three experts so that it would not run afoul of the ten deposition limit. Opp'n at 5, n. 3.

13 **III.    LEGAL STANDARDS**

14    Federal Rule of Civil Procedure 26 governs the scope and limits of all discovery and is

15 particularly instructive as to how parties should plan for discovery. *See* Fed. R. Civ. P. 26(a)(2),(b),(f).

16 Rule 26 requires the parties to confer and develop a discovery plan "stat[ing] the parties' views and

17 proposals on . . . what changes should be made in the limitations on discovery imposed under these

18 rules . . . ." Fed. R. Civ. P. 26(f)(3)(E).

19    Rule 30 governs when a party needs permission to take a deposition and provides in relevant

20 part: "A party must obtain leave of court, and the court must grant leave to the extent consistent with

21 Rule 26(b)(2): if the parties have not stipulated to the deposition and. . .the deposition would result in

22 more than 10 depositions being taken under this rule or Rule 31 . . . [or] the deponent has already been

23 deposed in the case . . . ." Fed. R. Civ. P. 30(a)(2)(A)(i-ii). The Advisory Committee Note to Rule

24 30(a)(2)(A) guides counsel for the parties to consider enlarging or reducing the number of depositions

25 permitted by Rule 30 at the initial planning meeting and again at scheduling conferences in order to

26 "eliminat[e] the need for special motions" such as the present motion. Fed. R. Civ. P. 30(a)(2)(A)

27 advisory committee notes, 1993 Amendments.

28 ///

When considering a motion for leave to take more than ten depositions, the Court must grant leave to the extent consistent with Rule 26(b)(2), which provides pertinent part:

> [T]he court must limit the frequency or extent of use of the discovery methods otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(c).

## IV.   DISCUSSION

ATC argues that Patent L.R. 4.3[3] and the Case Management Order in this action exempt expert depositions from the ten deposition limit prescribed by Fed. R. Civ. P. 30. *See* Memo Ps&As at 5.  In support of its argument, ATC quotes a portion of the Patent Local Rule that provides: "Fed. R. Civ. P. 30 applies to depositions taken pursuant to Patent L.R. 4.3, except as to experts." As Presidio points out, the portion of the Patent Local Rule quoted by ATC must be read in conjunction with the rest of the rule which allows for the further deposition of a claims construction expert "on all substantive issues." *Id.* Thus, as Presidio contends, the Patent Local Rule could be read to provide an exception only to that portion of Federal Rule 30 that precludes a witness from being deposed more than once without leave of court.  *See* Fed. R. Civ. P. 30(a)(2)(A)(ii); Opp'n at 6.  On the other hand,  Patent L.R. 4.3 could be read to exclude expert witnesses from the presumptive ten deposition limit of Rule 30, particularly in light of the complexity of many patent cases and the absence of case law or commentary to Rule 30 itself as to whether expert witnesses are included in the ten deposition limit.  *See* Opp'n at 6-7.[4]  The Court need not decide the issue here.  Rather, it need only follow Rule 30(b)(2)'s directive that leave to take additional depositions be granted to the extent consistent with Rule 26(b)(2).

---

[3] Patent L.R. 4.3 Completion of Claim Construction Discovery:  ". . . Fed. R. Civ. P. 30 applies to depositions taken pursuant to Patent L.R. 4.3, except as to experts.  An expert witness identified in a party's Joint Hearing Statement pursuant to Patent L.R. 4.2.c, may be deposed on claim construction issues.  The identification of an expert witness in the Joint Hearing Statement may be deemed good cause for a further deposition on all substantive issues."  Patent L.R. 4.3.

[4] Expert depositions are governed by Fed. R. Civ. P. 26(b)(4)(A) which provides in pertinent part: "A party may depose any person who has been identified as an expert whose opinions may be presented at trial . . . ."  The ten deposition limit in Rule 30(a)(2)(A)(i), however, is directed to depositions taken under Rule 30 and 31; not depositions of experts taken under Rule 26(b)(4).  Expert depositions may or may not be subsumed in Rule 30(a)(1)'s broad reference to "any person."

1        **Depositions of Dr. Huebner, Mr. Newman, and Mr. Killworth**

2        ATC argues that the discretionary factors identified in Rule 26(b)(2) support a decision granting

3 it leave to take the depositions of Presidio's four designated expert witnesses. Memo Ps&As at 6-8. In

4 support of its argument, ATC claims that: (1) the experts' opinions and the bases for those opinions are

5 not discoverable from any other source; (2) expert discovery only opened on February 17, 2009,

6 therefore, ATC has not had an opportunity to obtain the information it now seeks; and (3) the resolution

7 of this case will turn on the subjects Presidio's experts testify about, thus, without the opportunity to

8 depose these witnesses ATC will be denied its right to a fair trial. *Id.* at 7-8.

9        ATC is mistaken that the expert's opinions and bases therefore are not otherwise discoverable.

10 Rule 26(a)(2)(B) requires that each of Presidio's testifying experts prepare and submit a complete and

11 detailed report stating the testimony that they plan to present at trial, as well as the bases for that

12 testimony. Accordingly, the opinions of these experts should already be known to ATC. Rule 26(b)(4)

13 does permit depositions of testifying experts after the expert's report is prepared, but the purpose of this

14 rule is to reduce the length of expert depositions, or ideally, entirely eliminate the need to take an

15 expert's deposition. *See* Fed. R. Civ. P. 26(a)(2) advisory committee notes, 1993 Amendments.

16        On the other hand, in cases where expert testimony is central to the claims, such as in the present

17 case, expanded discovery of expert trial witnesses often will result in better cross-examination and

18 rebuttal at trial. *Id.* at 26(b)(4) advisory committee notes, 1993 Amendments. Depositions of expert

19 witnesses has become standard practice in most courts. *See* Fed. R. Civ. P. 26(b)(4)(a) advisory

20 committee notes, 1993 Amendments. Allowing depositions of Dr. Huebner, Mr. Newman, and Mr.

21 Killworth would be neither unreasonably cumulative nor duplicative since ATC has not deposed any of

22 these expert witnesses, and no other experts have testified on the subjects that these experts will testify

23 about. *See* Fed. R. Civ. P. 26(b)(2). In addition, Presidio has not offered any evidence that any of the

24 requested depositions would be unreasonably cumulative or duplicative, or could be obtained from a

25 more convenient and less burdensome source.

26        Though it is true that ATC could not depose Presidio's designated experts before each expert's

27 written report was prepared, ATC is incorrect in its assertion that "expert discovery only opened . . . on

28 February 17, 2009." Memo Ps&As at 7. Presidio's initial expert reports on infringement and damages

1   were due on January 23, 2009.  *See* Amended Scheduling Order [Doc. No. 65].  Accordingly, ATC

2   could have noticed these depositions in January when the initial expert reports were submitted.

3   Moreover, when the parties sought the third modification to the scheduling order on December 16, 2008,

4   ATC had taken ten depositions and was well aware of the anticipated number of expert reports and their

5   corresponding due dates.  Memo Ps&As at 4, Ex. A.  Thus, it is misleading for ATC to argue the "issue

6   of expert depositions only became ripe now" and "could not have brought it to the Court's attention

7   earlier." *Id.* at 4.

8          Particularly troubling is ATC's statement that "it saw no need to engage in hypothetical

9   discussions with Presidio regarding the presumptive 10-deposition limit" until the eve of the case's

10   discovery deadline.  *Id.* at 2.  In fact, such discussions are exactly what the rules governing discovery

11   anticipate.  Rule 16 states that provisions to modify the number or length of depositions permitted under

12   the rules should be considered before the initial scheduling order is issued.  *See* Fed. R. Civ. P. 16

13   advisory committee notes, 1993 Amendments.  In fact, the objective of Rule 30 is to highlight the

14   obligation of counsel to develop a "mutual cost-effective plan for discovery in the case."  Fed. R. Civ.

15   P. 30 advisory committee notes, 1993 Amendments.  "Consideration should normally be given at the

16   planning meeting of the parties under Rule 26(f) and at the time of a scheduling conference under Rule

17   16(b) as to enlargements or reductions in the number of depositions, eliminating the need for special

18   motions." *Id.*  ATC, as the party requesting more depositions, should have raised the issue with Presidio

19   or the Court as soon as it became aware of the strong likelihood that this case would require more than

20   ten depositions.  However, it is unlikely the depositions would go forward without a court order given

21   Presidio's view of the ten deposition limit.  Therefore, the Court cannot conclude ATC had ample

22   opportunity to obtain the information.

23          Despite ATC's failure to appropriately plan for and time discovery in this case, when

24   considering the need for expert discovery in light of the principles articulated in Rule 26(b)(2), the likely

25   benefit of the requested discovery outweighs the burden or expense of going forward with the

26   depositions primarily because of the importance of expert testimony in patent cases.  "Rule 26(b)(4) was

27   designed to permit the parties to prepare adequately for cross-examination prior to trial and to avoid any

28   surprises or other delays during the trial." *Weekley v. Transcraft, Inc.,* 113 F.R.D. 683, 684 (1987).

1    Furthermore, because the expense of taking these expert depositions is borne by the party seeking

2    discovery—ATC—the burden on Presidio is less critical than ATC's need for the depositions.  *See* Fed.

3    R. Civ. P. 26(b)(4)(C)(i) advisory committee notes, 1993 Amendments.  After fully considering the

4    criteria in Rule 26(b)(2) and the circumstances of the case, permitting a limited number of specified

5    expert depositions is consistent with the principles stated in the rule.

6           **Second Deposition of Dr. Ewell**

7          Rule 30(a)(2)(A)(ii) requires a party to obtain leave of court before deposing a person that has

8    already given a deposition in the case.  Absent a showing of good cause, generally the court will not

9    require a witness to appear for another deposition.  *See Cuthbertson v. Excel Indus., Inc.,* 179 F.R.D.

10    599, 604-605 (D. Kan. 1998) (quoting *Sentry Ins. v. Shivers, et. al.,* 164 F.R.D. 255 (D. Kan. 1996)).

11    ATC is requesting leave to depose Presidio's expert, Dr. Ewell, a second time.  Reply at 6.[5]

12          ATC deposed Dr. Ewell on August 1, 2008, and the main topic of the deposition was the

13    declaration he submitted in opposition to ATC's motion for summary judgment.  Opp'n at 4.  Now ATC

14    wants to depose Dr. Ewell in connection with the rebuttal report he recently submitted regarding validity

15    of the '356 patent.  Memo Ps&As at 1.  ATC argues that it should not be foreclosed from taking Dr.

16    Ewell's deposition a second time because additional depositions of expert witnesses are permitted when

17    a deposition is taken in consideration of a subsequent expert report.  *Id.* at 6.  ATC cites to *Ice Corp. v.*

18    *Hamilton Sundstrand Corp.,* 2007 U.S. District LEXIS 39699 *1, (D. Kan. May 30, 2007), as support

19    for its position.  *Ice Corp.*, however, involved facts quite different to those at issue here.  In *Ice Corp.*,

20    the expert witness submitted his initial report on January 15, 2007, and was deposed April 4, 2007.  *Id.*

21    On April 16, 2007, the expert submitted a supplemental report containing new opinions not stated in the

22    January report and not the subject of questioning at his deposition.  *Id.* at *3-4.  In contrast, Dr. Ewell's

23    rebuttal report addresses the '356 patent—the same subject about which he gave a declaration and

24    deposition previously.  *See* Doc. No. 23, Ex. 4; *see also* Doc. No. 31.[6]

25    *///*

26

27    [5]This is not a request by ATC for a "further deposition" of Dr. Ewell pursuant to Patent L.R. 4.3. Dr. Ewell was not designated and did not give a deposition as a claims construction expert.

28    [6]ATC has not demonstrated either that it did not, or could not cover the topic of invalidity during Dr. Ewell's first deposition.

1   The other case ATC cites to support its argument, *Express One Int'l, Inc. v. Sochata*, is also

2   inapposite.  In *Express One*, the court granted leave permitting a second deposition because the subject

3   of the first expert deposition was solely jurisdictional.  2001 WL 363073 *1, 3 (N.D. Tex. March 2,

4   2001).  In contrast, Dr. Ewell's first deposition was about the same substantive issue—the '356

5   patent—that ATC wants to question him about now.  Memo Ps&As at 1.

6   In seeking leave from the Court to depose Dr. Ewell again, ATC has not demonstrated that the

7   benefit of subjecting Dr. Ewell to a second deposition would outweigh the burden and expense.  Further,

8   ATC has failed to show it will be prejudiced at trial, having already deposed Dr. Ewell in connection

9   with a summary judgment motion.  Accordingly, ATC's Motion for Leave to allow a second deposition

10   of Dr. Ewell is denied.

11   **Sanctions**

12   ATC argues that it should be granted fees and costs for having to bring this motion for leave of

13   court. *Id.* at 9.  While the Court agrees that special motions such as the present one can generally be

14   avoided, Presidio's objection to ATC exceeding the clear limits on depositions as set by the Federal

15   Rule 30 is substantially justified given the ambiguity in the Rules as to whether the ten deposition limit

16   applies to experts.  Moreover, ATC could have raised the issue at any time during the numerous

17   scheduling conferences in this case.  Pursuant to Rule 37 and its requirement that the Court "must not"

18   order sanctions if "the opposing party's . . . objection was substantially justified," ATC's request is

19   denied.  Fed. R. Civ. P. 37(a)(5)(A)(ii).

20   **IV.   CONCLUSION**

21   For the foregoing reasons, it is hereby ordered that:

22   (1) ATC's Motion for Leave to Allow Depositions of Presidio's Experts is **Granted** with respect

23   to Dr. Huebner, Mr. Newman, and Mr. Killworth, Esq.;

24   (2) ATC must bear the expense of the experts' fees for the preparation for and taking of

25   depositions;

26   (3) ATC's Motion for Leave to Allow the Deposition of Dr. Ewell is **Denied**; and

27   ///

28   ///

1  (4) ATC may take the depositions of Dr. Huebner, Mr. Newman, and Mr. Killworth after the

2 expert discovery deadline.

3   **IT IS SO ORDERED**

4 DATED:  March 25, 2009

5

6          Hon. Nita L. Stormes
           U.S. Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

       08cv335 IEG (NLS)

1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                        **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   PRESIDIO COMPONENTS, INC.,            )   Civil No. 08cv335 IEG (NLS)
                                           )
12                        Plaintiff,       )   **ORDER GRANTING IN PART AND**
                                           )   **DENYING IN PART PRESIDIO'S**
13   v.                                    )   **MOTION TO COMPEL**
                                           )
14   AMERICAN TECHNICAL CERAMICS           )
     CORPORATION,                          )   [Doc. No. 60]
15                                         )
                          Defendant.       )
16   _____  )
                                           )
17   AMERICAN TECHNICAL CERAMICS           )
     CORPORATION,                          )
18                                         )
                          Counterclaimant, )
19                                         )
     v.                                    )
20                                         )
      PRESIDIO COMPONENTS, INC.,           )
21                                         )
                          Counterdefendants.)
22   _____  )

23        Plaintiff, Presidio Components, Inc. ("Presidio") filed this motion to compel Defendant

24   American Technical Ceramics Corp. ("ATC") to provide responses to certain requests for production

25   ("RFPs"). Presidio's motion to compel also requests ATC to produce Mr. Joseph Tierney for deposition

26   in his capacity as an ATC 30(b)(6) designee. ATC opposes, arguing that it properly responded to all the

27   subject discovery requests by: (1) specifically responding to the request; (2) stating that no documents

28   were available; or (3) agreeing to produce responsive documents by January 16, 2009; and (4) further

     agreeing to supplement these responses if any additional responsive documents are located. (Opp'n, Ex.

                                              1                        08cv335 IEG (NLS)

2 at 2-3.) Finally, ATC agreed to produce Mr. Tierney for deposition on January 20, 2009. In Presidio's

reply to ATC's opposition, Presidio continues to challenge the adequacy of ATC's search and

production of documents insofar as ATC limits its production of documents relevant to the counterclaim

by excluding internal ATC documents and documents generated before January 1, 2007. The Court took

this matter under submission without oral argument.

**Relevant Facts**

ATC's counterclaim for interference with contractual relations is the central issue in the motion

to compel responses to certain RFPs. ATC's counterclaim alleges that during the spring of 2007,

Presidio knew that ATC had ongoing relationships and supply contracts for its 545L capacitors with a

number of companies. (Answer ¶ 58.) ATC argues, that at the same time, Presidio's customers began

expressing interest in ATC's 545L capacitor and as a result Presidio felt threatened about potential

market loss and increased competition. (*Id.*at ¶ 60.) ATC believes that Presidio filed this patent

infringement lawsuit with the intent to interfere with ATC's existing customer relationships. (*Id.*) On

June 26, 2007, Presidio issued a news release publicizing the lawsuit and expressing Presidio's desire to

end all future sales of ATC's 545L series products and collect damages for already sold capacitors. (*Id.*

at ¶ 61.) According to ATC, when Presidio filed this lawsuit and issued the news release, ATC

experienced a significant decrease in sales of its 545L capacitors. (*Id.* at ¶ 63-64.) In RFPs 3,7, and 10,

Presidio requests documents relevant to ATC's claim that Presidio interfered with certain ATC business

relations. (Memo P.&A. at 4.) Presidio expects that responsive documents will either support or refute

ATC's allegation. (*Id.* at 5.)

For the following reasons, the Court **GRANTS in part** and **DENIES in part** Presidio's motion

to compel.

**Documents Relating to Presidio's Alleged Interference with Contractual Relations**

In RFPs 3, 7, and 10, Presidio seeks documents relating to ATC's contractual relations with

customers ATC alleges Presidio interfered; including correspondence and contracts with those

customers. (Mem. P.&A. at 4-5.) The RFPs read as follows:

RFP 3:     All documents and things that refer or relate to all contractual
relations between ATC and those entities with whom Presidio
allegedly interfered, including but not limited to all
correspondence, agreements, and contracts with those entities.

RFP 7:    All documents that refer or relate [*sic*] each and every person employed by those entities having a contractual relation with ATC that was purportedly interfered with by Presidio, with whom ATC has had any contact since January 1, 2007.

RFP 10:    Of the customers having a contractual relation with ATC that was allegedly interfered with by Presidio, produce all documents consisting of or referring to a communication [*sic*] between any employee of such customers and ATC *since January 1, 2007* (emphasis supplied).

(*Id.* at Ex. B.)

ATC states that it has already produced documents responsive to the above, and has further agreed to supplement those productions in the event additional responsive documents are located after a reasonable search. (Opp'n at 2; Opp'n, Ex. 2.) Moreover, ATC agreed to produce all communications since January 1, 2007, between ATC and the customers with which Presidio allegedly interfered, including communications about products other than the 545L capacitor. (*Id.*) ATC anticipated producing the documents on or before January 16, 2009. (*Id.*)

In its Reply in Support of Plaintiff's Motion to Compel ('Reply'), Presidio claims that based on RFPs 3, 7, and 10, ATC should be compelled to produce:

[A]ll documents relating to and communicated between those customers with whom Presidio allegedly interfered, regardless of whether they relate to the 545L capacitor. This includes, but is not limited to all communications with these customers. This also includes all internal ATC documents relating to these customers, including but not limited to all sales information, internal communications, and employee notes. Such responsive documents are not limited only to those generated after January 1, 2007.

(Reply at 3-4.) Presidio, however, did not serve specific discovery requests like the one identified above.

**RFPs 7 and 10**

ATC first served responses to these requests on October 24, 2008. (Memo P.&A., Ex. B.) At that time ATC generally objected to RFP No. 3 because Presidio failed to provide any limit to the date range of the documents Presidio sought. (Memo P.&A., Ex. B at 1, ¶ 14.) By contrast, RFPs 7 and 10 include the language: "since January 1, 2007." (*Id.* at 5, ¶ 19; p, 7 ¶ 21.) ATC's interpretation that these two demands seek documents created after January 1, 2007, is wholly reasonable, and it is not the Court's responsibility to redraft Presidio's discovery demands when presented with a Motion to Compel. The responding party need only produce the documents demanded when the discovery was propounded. ATC cannot be ordered to turn over documents that Presidio did not specifically ask for until it filed its

1  Reply. (*See* Reply at 3-4.)

2     The same analysis applies to Presidio's broad request in RFPs 7 and 10 for ATC's internal

3  documents relating to the pertinent customers. Presidio's RFPs do not ask for all of ATC's

4  documents—both internal and external—that relate to these customers. (Memo P.&A., Ex. B.) Instead,

5  RFP 7 asks for a narrow category of documents regarding people employed by these customers "with

6  whom ATC has had any contact since January 1, 2007," and RFP 10 seeks documents between or

7  referring to communications *between* ATC and these customers. (*Id.*) The Court will not compel ATC to

8  respond with documents that were never asked for.

9     Therefore, the Court **DENIES** Presidio's motion to compel further responses to RFPs 7 and 10

10 beyond what ATC has agreed to and the Court now **ORDERS** produced by January 30, 2009.

11 **<u>RFP 3</u>**

12    As drafted, RFP 3 does not support ATC's decision to limit its production to documents created

13 after January 1, 2007. However, due to Presidio's failure to restrict its request to a reasonable time

14 frame, RFP 3 is overly broad. At a minimum Presidio should limit the request to documents created

15 within two years of the date—May 17, 2007—Presidio filed the patent infringement suit against ATC.

16 (*See* Pl.'s Comp., Ex. D.) Although ATC's counterclaim alleges that Presidio interfered with the

17 existing relationships between ATC and the subject customers, requiring ATC to search for, and

18 produce documents going back any further than the spring of 2005 does not appear "reasonably

19 calculated to lead to the discovery of admissible evidence" relevant to Presidio's defense to ATC's

20 counterclaim. (Answer at 11; Fed. R. Civ. P. 26(b)(1).)

21    Similarly, RFP 3 is not drafted in such a restrictive manner that it would exclude ATC's internal

22 documents relating to the contractual relations between ATC and the subject customers. Presidio

23 included the specific language: "refer or relate to all contractual relations...." (Memo P.&A., Ex. B.)

24 ATC's interpretation that RFP 3 only asks for communications *between* ATC and the affected customers

25 does not follow the plain language of Presidio's request.

26    Therefore, Presidio's motion to compel responses to RFP 3 is **GRANTED**. ATC shall produce

27 responsive documents on or before February 25, 2009.

28 ///

4

**Documents Mentioning or Referring to Fringe Effect and Fringe Effect Capacitance**

RFPs 13-15 seek documents mentioning or referring to fringe, fringe effect, fringe effect capacitance, and derivatives of those words. In its letter dated December 16, 2008, ATC confirmed that it had searched its files for documents containing the above words and derivatives of those words. (Opp'n, Ex. 2.) Accordingly, ATC produced documents following that search. ATC reconfirmed this search and corresponding production in its Opposition.[1] (*Id.* at 3.)

Therefore, the Court **DENIES** Presidio's motion to compel responses to RFPs 13-15.

**30(b)(6) Deposition of Mr. Joseph Tierney**

ATC agreed to produce Mr. Tierney for deposition as a 30(b)(6) witness on January 20, 2009, and this deposition should go forward. Therefore the Court **GRANTS** Presidio's motion to compel Mr. Tierney's 30(b)(6) deposition.

**Presidio's Alleged Noncompliance with the Court's Order on November 10, 2008**

ATC's Opposition to Plaintiff's Motion to Compel also asks the Court to order compliance with an order granting a motion to compel in a previous discovery dispute. (Opp'n at 1.) ATC claims that Presidio, in violation of this Court's order, has not produced certain JDSU capacitor samples from 2000-2003. (*Id.*) Although ATC's opposing brief is not the proper procedural vehicle to request the Court's assistance, the Court is troubled by any allegation that a party has not complied with an earlier order. This order will serve as a reminder that the Court may issue any manner of sanctions provided for in 37(b)(2) for a party's failure to obey the Court's previous discovery orders. FED. R. CIV. P. 37(b)(2).

**IT IS SO ORDERED.**

DATED: January 23, 2009

Hon. Nita L. Stormes
U.S. Magistrate Judge
United States District Court

_____

[1]Neither Presidio's moving papers or Reply provide the Court with ATC's responses to these RFPs. ATC clearly represents that files have been searched and all responsive documents produced to Presidio. Because the Court has no information indicating otherwise, there is no basis to grant this motion.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRESIDIO COMPONENTS, INC., | ) Civil No. 08cv335 IEG (NLS) |
| Plaintiff, | ) |
| v. | ) **ORDER:** |
| | ) **(1) GRANTING PRESIDIO'S MOTION** |
| AMERICAN TECHNICAL CERAMICS | ) **TO QUASH DEFENDANT'S** |
| CORPORATION, | ) **OBJECTIONS TO DISCLOSURE TO** |
| Defendant. | ) **EXPERTS [Doc. No. 34]; and** |
| | ) **(2) DENYING ATC'S MOTION TO** |
| AMERICAN TECHNICAL CERAMICS | ) **DISQUALIFY DR. EWELL** |
| CORPORATION, | ) **[Doc. No. 41].** |
| Counterclaimant, | ) |
| v. | ) |
| PRESIDIO COMPONENTS, INC., | ) |
| Counterdefendants. | ) |

Plaintiff Presidio Components, Inc. (Presidio) filed a motion to quash certain objections of Defendant American Technical Ceramics Corp. (ATC) to Presidio's disclosure of experts. Presidio argues that ATC's objections are frivolous and lack reasonable justification, and are meant to unduly delay this lawsuit. ATC opposes the motion. In conjunction with its opposition to the motion to quash, ATC filed a motion to disqualify Presidio's designated expert, Dr. Ewell. ATC argues that Dr. Ewell should be disqualified due to a conflict of interest and appearance of impropriety. Presidio opposes the motion to disqualify.

1

1    The Court reviewed all records related to both motions and determined it could decide the

2    motions based on the papers and without oral argument.  For the reasons set forth below, the Court

3    **GRANTS** Presidio's motion to quash and **DENIES** ATC's motion to disqualify Dr. Ewell.

4    **<u>Relevant Facts.</u>**

5    Presidio told ATC on August 11, 2008 that it intended to disclose to its expert witnesses

6    confidential and/or attorney's eyes only information that ATC produced in discovery.  Mem. Ps&As,

7    Ex. A.  The three experts, Dr. Gary Ewell, Dr. Wayne Huebner and Mr. Glenn Newman, each executed

8    an agreement to be bound by the Protective Order.  Presidio sent ATC a detailed curriculum vitae (CV)

9    for each of the experts.  Those CVs disclose each expert's title, job responsibilities and affiliations.  *Id.*

10   Presidio claims they also disclose each expert's employment, consulting history for the past five years

11   and the subject matter of any consultations.  ATC disagrees that Dr. Huebner's CV discloses the subject

12   matter of his consultations for the past five years.

13   In brief, Dr. Gary Ewell has extensive experience regarding testing of multi-layer capacitors.  He

14   intends to provide testimony regarding the validity of the '356 patent and infringement of the '356

15   patent by ATC's 545L capacitor.  Dr. Ewell has already been deposed in this case.  Dr. Wayne Huebner

16   is an expert in multi-layer capacitors and the materials used in them, including ceramics.  He may

17   provide testimony regarding infringement of the '356 patent by ATC's 545L capacitor.  Mr. Glenn

18   Newman is a CPA expected to provide expert financial testimony.

19   On August 25, 2008, ATC objected to the disclosure to Presidio's three experts of information

20   that ATC had designated confidential and attorney's eyes only.  Mem. Ps&As, Ex. B.  ATC objected

21   because (1) the CVs did not disclose the past five years of consulting work for the three experts or the

22   subject matter of their engagements; and (2) there is no need to disclose the information to both Drs.

23   Ewell and Huebner.

24   On September 2, 2008, Presidio identified a single additional consultation for Dr. Ewell and one

25   for Dr. Huebner that were not listed in their CVs.  Presidio gave ATC a detailed list of every

26   consultation with which Mr. Newman had any connection over the last five years.  Mr. Newman

27   specifically represented that he had no conflict with any party involved in this matter.  Mem. Ps&As,

28   Ex. C.  After receiving this new information, ATC withdrew its objection to Mr. Newman having access

1   to confidential information regarding ATC's sales, finance and marketing, so that he may prepare

2   Presidio's damages report. *Id.* ATC maintained the objection, however, regarding Mr. Newman's

3   access to its confidential technical documents. *Id.* Presidio acknowledged that ATC withdrew its

4   objection, and does not appear to argue that Mr. Newman should have access to ATC's confidential

5   technical information. In addition, ATC raised a new objection that Dr. Ewell may have a conflict of

6   interest due to his employment with the Aerospace Corporation. Mem. Ps&As, Ex. D.

7        The three issues remaining for this Court to resolve are whether (1) Dr. Huebner should have

8   access to ATC's confidential information as a result of incomplete disclosure; (2) access to ATC's

9   multilayer capacitor confidential information should be allowed for Presidio's two technical experts,

10  Drs. Huebner and Ewell; and (3) Dr. Ewell should be disqualified for a conflict of interest or an

11  appearance of impropriety due to his affiliation with the Aerospace Corporation.

12  **Discussion.**

13       **1.    Dr. Huebner's Access to ATC's Confidential Information.**

14       ATC complains that the supplemental disclosure of consulting work for Dr. Huebner did not cure

15  Presidio's initial alleged non-compliance with the disclosure requirements. ATC says that the

16  consulting history provided in Dr. Huebner's CV includes only a selected list of companies for which he

17  consulted and does not specify "the subject matter of such engagements." The CV also mentions "72

18  research contracts" sponsored by different named entities, but again does not specify the subject matter

19  of that research. Without such information, ATC argues it cannot determine whether Dr. Huebner is in a

20  position to inadvertently use or disclose its confidential information. ATC asks that the Court compel

21  Presidio to make an additional disclosure regarding Dr. Huebner's consulting work in the last five years

22  and state its subject matter.

23       The Protective Order requires that a party that wishes to disclose confidential information to an

24  expert notify all counsel, in writing, of the intent to disclose. "[T]he notice shall also include the

25  person's resume, curriculum vitae or other information ***adequate*** to disclose the person's employment

26  and consulting history for the past five (5) years, including the subject matter of such engagements."

27  Protective Order, Opp'n Ex. 1 ¶ 10(b) (emphasis added).

28       This Court finds that Dr. Huebner's CV, along with the supplemental letter from Presidio to

1   ATC, provides ATC with the necessary information to determine if there is any risk of disclosure of

2   ATC's confidential information by Dr. Huebner.  Dr. Huebner's CV includes information on his

3   education, academic experience, honors and awards, professional societies, publications, conferences,

4   books, patents, research accomplishments, Ph.D students, M.S. students, support to associates and

5   professors, teaching techniques, courses taught, professional service and personal service.  Mem.

6   Ps&As, Ex. A.  The CV discloses the identities of companies for which he performed research contracts

7   and consultations.  *Id.* at 12, 23.  While the subject matters of Dr. Huebner's engagements are not listed

8   next to each specific company identified, the other sections of his CV identify the subject matter of his

9   research and work.  Further, ATC has not objected to any of the companies identified.

10          Also, Presidio has already confirmed that Dr. Huebner has no other consulting history for the

11   past five years except for a single additional consultation, which Presidio already identified to ATC.

12   Mem. Ps&As, Ex. C.  Finally, if Dr. Huebner did disclose confidential information to a prohibited

13   person or entity under the protective order, ATC has a remedy to address that disclosure because Dr.

14   Huebner executed an agreement to be bound by the Protective Order and is thus bound by its terms.

15          The Court finds Dr. Huebner's CV, and Presidio's additional disclosure about his CV, to provide

16   information adequate to disclose Dr. Huebner's consulting history, including subject matters, for the

17   past five years.  Therefore, this Court finds no grounds to order Presidio to make an additional

18   disclosure tying the subject matter of Dr. Huebner's work to a specific company, nor grounds to compel

19   Presidio to make an additional disclosure regarding Dr. Huebner's consulting work in the last five years.

20          **2.       Access to ATC's Confidential Information for Presidio's Two Technical Experts.**

21          ATC objects to the duplicative disclosure of its confidential information to Presidio's two

22   technical experts, Drs. Ewell and Huebner.  ATC relies on *Carpenter Tech. Corp. v. Armco, Inc.*, 132

23   F.R.D. 24, 28 (E.D. Pa. 1991), where the court refused to grant access to confidential information for

24   both in-house counsel because the plaintiff did not satisfactorily explain why they must both have

25   access.  ATC also relies on *In re Papst Licensing, GmbH, Patent Litig.,* 2000 U.S. Dist. LEXIS 6374

26   (E.D. La. 2000), which held that a patent prosecutor seeking access to an adversary's confidential

27   information presented too great a risk of inadvertent disclosure because that attorney acted as a

28   competitive decisionmaker regarding the company's patent prosecutions.  Here, ATC is concerned that

1    because each expert will likely be assisted by others, the risk of inadvertent disclosure through others is

2    even greater, given the larger number of recipients.  ATC argues that Presidio's "unexplained need for

3    multiple access must be balanced against ATC's need to reasonably protect its Confidential

4    Information."  Opp'n, p.5.

5         The Court disagrees with use of ATC's proposed balancing test to determine whether the

6    confidential information should be disclosed.  First, ATC assumes that Presidio, by using two technical

7    experts, will seek to present duplicative infringement testimony at trial.  Opp'n, p.5.  At this point, the

8    Court finds no basis on which to make such an assumption.  Presidio represents that Dr. Ewell, who has

9    extensive experience regarding the testing of multi-layer capacitors, will testify regarding validity of the

10   '356 patent and infringement of the '356 patent by the 545L capacitor.  Presidio's Reply, p.14.  Presidio

11   represents that Dr. Huebner, who has extensive experience regarding multi-layer capacitors and the

12   relationship between capacitor performance and materials used in them, including ceramics, may testify

13   regarding the use of materials and ceramics for use in multi-layer capacitors and infringement of the

14   '356 patent by the 545L capacitor.  *Id.* at 14-15.  Presidio selected Drs. Huebner and Ewell based on

15   their respective, and different, expertise.

16        Second, the Court does not agree with ATC that Presidio needs to explain to ATC why its

17   technical experts need to access ATC's confidential information.  ATC acknowledges that its

18   confidential information is relevant to the issue of infringement.  Opp'n, p.6.  Further, case law

19   recognizes that the commercial success of an infringing product, failure of other products and copying

20   may be relevant to the issue of validity.  *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18

21   (1966) (finding commercial success and internal failures may be relevant to the obviousness or non-

22   obviousness of the product); *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1351 (Fed. Cir. 2002)

23   (stating "copying may have relevance not on infringement but on validity as one of a number of 'indicia

24   of obviousness or nonobviousness'").

25        Third, ATC's need to reasonably protect its confidential information is already addressed by

26   both experts executing agreements to be bound by the Protective Order.  Because both experts are bound

27   by the terms of the Protective Order, if there is an improper disclosure, ATC has remedies.  Finally,

28   ATC bases its argument on case law that relates to the disclosure of confidential information to in-house

1  counsel and outside counsel that prosecute patent applications.  The Court finds the cases inapposite

2  because disclosure to counsel in those cases hinged on whether the counsel at issue were competitive

3  decisionmakers.  Here, the two technical experts are not competitive decisionmakers for Presidio.

4       For these reasons, the Court finds that Presidio's two technical experts may access ATC's

5  confidential and attorney's eyes only information.

6       **3.       Disqualification of Dr. Ewell.**

7       ATC moves to disqualify Dr. Ewell as ATC's expert.  Dr. Ewell has already participated

8  substantively in this case.  He submitted a declaration in support of Presidio's opposition to ATC's

9  motion for summary judgment, and ATC deposed him regarding his declaration.  ATC says that in his

10  deposition, Dr. Ewell testified  he is retired from full-time employment but currently works part-time for

11  Aerospace Corporation.[1]  ATC understands Dr. Ewell to be a current, part-time Aerospace employee.

12  Opp'n, p.7 n.5.  It also understands that Aerospace Corporation is part of the U.S. Government because

13  it believes Dr. Ewell to be a "government auditor and tester."  Opp'n, p.7.  ATC argues that Dr. Ewell's

14  engagement as Presidio's expert witness poses both a personal and an organizational conflict of interest,

15  because Dr. Ewell is "a government inspector . . . taking sides in a private dispute between two current

16  government suppliers."  Opp'n, pp.8, 9.  Further, ATC argues that due to Dr. Ewell's "employment by

17  the Government" and service as Presidio's witness, ATC will be denied a fair trial.

18       Presidio argues that ATC has fabricated a potential conflict of interest regarding Dr. Ewell and

19  his employment with Aerospace Corporation.  First, it argues that, as Dr. Ewell stated in his deposition,

20  he is no longer an Aerospace employee.  Second, Presidio says that ATC cannot point to a single project

21  or contract that could possibly result in a conflict of interest.  Further, Dr. Ewell has confirmed under

22  oath that there is no current conflict, nor could there be a future conflict, due to his relationship with

23  Aerospace Corporation. Finally, Presidio argues that ATC will not be prejudiced at trial because Dr.

24  Ewell has never been a government employee, as the Aerospace Corporation is not a branch of the U.S.

25  Government.

26  / / /

27

28       [1]ATC cites to Dr. Ewell's deposition and includes portions of it as Exhibit 5 to its motion, but
does not include in the exhibit the page they cite to for this quote.

**A.    Conflict of Interest.**

Aerospace Corporation has specific policies governing personal conflicts of interest:

> 6.  The corporation's standard of conduct includes any potential or apparent conflicting interest in, profit from, or personal business relationship with, any organization that has a contractual ***or business*** relationship with The Aerospace Corporation or its customers, or has a proposal pending for any contract or subcontract.
>
> ***6.1 Organizations of interest also include those over which the corporation may exercise some degree of review or oversight in the course of performing its contracts for Government customers, including without limitation, those principal associate contractors of the Air Force Space and Missile Systems Center and other U.S. Government organizations that interface with the corporation on a regular basis and who are included in the corporation's Conflict of Interest Listing available online at*** ***http://infodev2.aero.org/hr/resources/COI_listing.pdf.***

Ex. 7, Aerospace Employee Conduct - Conflict of Interest (emphasis in original).

Aerospace Corporation also has specific policies governing organizational conflicts of interest:

> Organizational conflicts of interest are those that can arise as a result of the corporation doing business with contractors that compete against each other or performing services for customers over which Aerospace may also exercise oversight responsibility in performing its traditional role for its government customers.  It is the fundamental policy of The Aerospace Corporation that, where an organizational conflict of interest cannot be eliminated or mitigated to the satisfaction of the parties involved, the corporation will decline to accept or will recuse itself from performing the conflicted services.

Ex. 9, Aerospace Organizational Conflict of Interest.

ATC argues that a personal conflict of interest stems from Dr. Ewell's "personal business relationship with" Presidio because he is profiting from Presidio as its expert witness.  It says this relationship is improper because Aerospace "exercise[s] some degree of review or oversight [over Presidio] in the course of performing its contracts for Government customers," due to Presidio supplying capacitors to large government defense contractors.  Opp'n, p.9.  ATC argues there is also an organizational conflict because Dr. Ewell's involvement in this case deviates from his responsibility to avoid conflicts of interest and appearances of impropriety.

The Court does not find a personal conflict of interest based on Dr. Ewell's past employment with or current consulting services for Aerospace Corporation.   First, Dr. Ewell retired from Aerospace more than one year ago.  Presidio Reply, Ex. C, Ewell Decl. ¶ 4.  Before he accepted to serve as

1    Presidio's expert witness, he confirmed there would be no conflict of interest or appearance of conflict

2    of interest based on the fact that he was formerly an Aerospace employee.  *Id.* at ¶ 9.  Dr. Ewell

3    disclosed to Aerospace that he was considering serving as Presidio's expert witness for this matter, and

4    Aerospace did not disapprove.  *Id.*

5           Second, Dr. Ewell currently provides only limited consulting services for Aerospace.  *Id.* at ¶ 5.

6    He is paid hourly for those services.  *Id.*  Those consulting services "relate solely to government

7    specifications for satellite applications.  None of the consulting services . . . relate to commercial

8    projects."  *Id.* at ¶ 6.  In particular, none of these services have related to or involved ATC, Presidio, or

9    their products.  *Id.* at ¶ 7.  Further, ATC does not cite to any convincing evidence that Dr. Ewell is

10   actually a part-time Aerospace employee.  It only points to Dr. Ewell's statement that on Monday

11   through Thursday of the week he was deposed, he had done some work for Aerospace--which to ATC--

12   did "not even sound like part-time or 'limited consulting services' as Presidio claims."  ATC Reply, p.3.

13   ATC's impression alone is not enough to conclude that because Dr. Ewell worked for four days on an

14   Aerospace commitment, he is somehow an Aerospace employee.  There is no other evidence suggesting

15   that Dr. Ewell does this amount of work for Aerospace every week, or that he receives a salary from

16   Aerospace, or is otherwise "employed" by Aerospace.  Notably, at the deposition ATC did not follow up

17   this line of questioning with further questions regarding Dr. Ewell's current work for Aerospace.

18          Third, the Court is unsure of how, as ATC contends, Aerospace Corporation exercises oversight

19   over Presidio based on Presidio supplying capacitors to government customers.  ATC does not

20   definitively identify which Aerospace customers do business with Presidio, and how Aerospace might

21   oversee Presidio for the products at issue.  ATC's general allegations are insufficient to show that

22   Presidio's retainer of Dr. Ewell violates Aerospace's personal conflict of interest provisions.

23          Finally, even if Dr. Ewell could be considered an Aerospace employee, he could still serve as an

24   expert witness.  Aerospace permits its employees "to engage in other outside business activities, which

25   can be rewarding both professionally and monetarily, provided there is no conflict with the

26   corporation's mission and contractual obligations."  Presidio Reply, Ex. E, Aerospace Corporation

27   Standards of Business Conduct.  And, while he was an Aerospace employee, Dr. Ewell served as an

28   expert witness on two occasions.  *Id.* at ¶ 10.

1    Regarding the organizational conflict of interest, those may arise from the corporation doing

2    business with competing contractors or the corporation performing services for customers over which it

3    exercises oversight.  First, this provision does not apply here because Dr. Ewell is not an Aerospace

4    employee.  Second, ATC has not definitively shown that Aerospace Corporation exercises oversight

5    over ATC and Presidio for the products at issue.

6    Based on the information before it, the Court finds that no conflict of interest exists regarding

7    Presidio's retainer of Dr. Ewell as one of its technical experts.

8    **B.    Status as Government Employee.**

9    ATC argues that due to Dr. Ewell's "employment by the Government" and service as Presidio's

10   witness, ATC will be denied a fair trial because the jury will hear that a "government agent" tested

11   ATC's 545L capacitor and found it to infringe Presidio's patent application that the government had

12   granted.  ATC points to Presidio referring to Dr. Ewell's experience auditing capacitors for the

13   Government at oral argument for the summary judgment motion.  *See* Ex. 11 at 25:16-19 and 42:15-22.

14   Central to ATC's argument is its assertion that the Aerospace Corporation is a government

15   entity. The Aerospace Corporation is a Federally Funded Research and Development Center (FFRDC).

16   Opp'n, Ex.5, Tr. p.29.  FFRDCs are

17            unique independent nonprofit entities sponsored and funded by the U.S.
             government to meet specific long-term technical needs that cannot be met
18            by any other single organization.  FFRDCs typically assist government
             agencies with scientific research and analysis, systems development, and
19            systems acquisition.  They bring together the expertise and outlook of
             government, industry, and academia to solve complex technical problems.
20

21   Opp'n, Ex. 6.  While they are part of the private sector, FFRDCs enjoy a special relationship with the

22   U.S. Government, which allows them access to some of the Government's sensitive and proprietary

23   data.  48 C.F.R. 35.017(a)(2).  FFRDCs are "to be free from organizational conflicts of interest," but

24   they may work for entities other than the sponsoring entity, if that work is not otherwise available in the

25   private sector.  *Id.*  Here, the United States Air Force sponsors the Aerospace FFRDC.  Opp'n, Ex. 6.

26   Aerospace Corporation "provides scientific and engineering support for launch, space, and related

27   ground systems" and "supports long-term planning and the immediate needs of our nation's military and

28   reconnaissance space programs."  *Id.*

1      Based on the information contained on the Aerospace Corporation's website, as well as the

2 explanation in the Code of Federal Regulations, the Aerospace Corporation does not appear to be an

3 express branch of the U.S. Government.  Therefore, the Court does not find a basis to disqualify Dr.

4 Ewell due to a former or current status as a government employee.  Finally, to the extent ATC seeks to

5 exclude Presidio from referring to Dr. Ewell as a "government tester," "agent of the government" or

6 "government employee," ATC can seek that relief through a motion in limine.  This Court finds that a

7 possible reference to such a status is insufficient to warrant an outright disqualification of Dr. Ewell as

8 Presidio's witness.

9 **Sanctions.**

10      Presidio argues that ATC's objections are both unjustified and made for an improper purpose,

11 justifying sanctions.  Presidio believes ATC should be sanctioned because it forced Presidio to incur

12 unnecessary expenses related to bringing this motion.

13      The protective order states that if the court grants a motion to quash based on the showing that a

14 party's objections were

15         clearly unjustified or have been made for an improper purpose (e.g., to
16         unnecessarily encumber or retard the case development process, or to
impose unnecessary expenses and burdens on other parties), this Court
may subject the objecting party to sanctions, including requiring the
17         objecting party to reimburse the party intending to disclose . . . for the
attorneys' fees and costs incurred by the party intending to disclose in
18         bringing such motion to quash.

19 Protective Order, Opp'n Ex. 1 ¶ 10(b).

20      While Presidio has prevailed on its motion, this Court does not find that ATC's objections were

21 clearly unjustified or made for an improper purpose.  Therefore, the Court denies Presidio's request for

22 sanctions.

23      The Court **GRANTS** Presidio's motion to quash and **DENIES** ATC's motion to disqualify Dr.

24 Ewell.

25      **IT IS SO ORDERED.**

26 DATED:  November 18, 2008

27

28                 Hon. Nita L. Stormes
U.S. Magistrate Judge

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                  **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | | |
|---|---|---|
| PRESIDIO COMPONENTS, INC., | ) | Civil No. 08cv335 IEG (NLS) |
| Plaintiff, | ) | **ORDER GRANTING IN PART AND** |
| v. | ) | **DENYING IN PART ATC'S MOTION** |
| | ) | **TO COMPEL PLAINTIFF TO** |
| AMERICAN TECHNICAL CERAMICS | ) | **PRODUCE DOCUMENTS AND** |
| CORPORATION, | ) | **RESPOND TO INTERROGATORIES** |
| Defendant. | ) | [Doc. No. 42] |
| | ) | |
| AMERICAN TECHNICAL CERAMICS | ) | |
| CORPORATION, | ) | |
| Counterclaimant, | ) | |
| v. | ) | |
| PRESIDIO COMPONENTS, INC., | ) | |
| Counterdefendants. | ) | |

22      The Court held a telephonic discovery conference with counsel for plaintiff Presidio

23 Components, Inc. (Presidio) and defendant American Technical Ceramics Corporation (ATC) to discuss

24 the requests in ATC's motion to compel. The Court heard each side's arguments for every set of

25 discovery requests. During the conference the Court issued several orders regarding the specific

26 requests. The Court **GRANTED in part** and **DENIED in part** ATC's motion to compel. This written

27 order now memorializes the specific orders the Court issued during the conference. Unless otherwise

28 noted, Presidio shall perform everything the Court has ordered by ***November 24, 2008***.

1

**Background.**

ATC seeks documents from Presidio's research projects that involve "fringe-effect capacitance,"[1] which is a recited claim limitation and the alleged point of novelty in claim 1 of the '356 patent.  ATC also seeks Presidio's knowledge of prior art, its sales and marketing documents and customer lists for Presidio's Buried Broadband and Integrated Broadband capacitors.  ATC also asks the Court to appoint a third-party computer consultant to gather electronically stored information (ESI) from Presidio's computer system.

Presidio contends that it has responded to ATC's requests in explicit detail, and stated several times that certain categories of documents do not exist.  It has already agreed to produce additional information for certain categories.  Further, the requests are overbroad because the only relevant documents are those that relate to fringe-effect capacitance as it relates to the '356 patent.  Presidio argues against appointing a third-party to gather its ESI.

**RESEARCH AND DEVELOPMENT DOCUMENTS**

> **1.    RFPs 1, 3, 8: All Laboratory Notebooks, Inventor Files and Other Research and Development Documents Regarding Multilayer Capacitors from 2000-2003.**

RFPs 1, 3 and 8 require all documents relating to Presidio's records of the "inventorship" process, including laboratory notebooks, inventor files, invention disclosures, prototypes, and research, design and development files regarding ceramic capacitors from 2000-2003.  ATC also expects test and inspection records.  Presidio provided some documents in response to these RFPs.

The Court ordered Presidio to produce all excerpts from lab notebooks from 2001 to 2003 that reference fringe-effect capacitance.

> **2.    ROG 1 and RFP 2:  Documents and Information Regarding Conception, Diligence, and First Reduction to Practice of Each Alleged Invention of the '356 Patent.**

ROG 1 requests Presidio to describe the dates and circumstances relating to the conception, diligence and first reduction to practice of each alleged invention disclosed or claimed in the '356 patent.  RFP 2 seeks all documents relating to the diligence Presidio alleges that it demonstrated

---

[1]A fringe-effect capacitor is a device that stores electric charge and re-routes it within an electrical surface, and is formed by positioning the ends of two conductors in an edge-to-edge relationship.  Mem. Ps&As, p.3.

1 regarding the subject matter of each claim. Presidio says it responded to ROG 1 and provided all

2 documents in response to RFP 2.

3       The Court ordered Presidio to make a reasonable search for any additional documents that relate

4 to an actual (physical) reduction to practice or constructive reduction to practice, produce any

5 outstanding documents to ATC, and provide a declaration stating that a reasonable search was done and

6 all documents have been produced, or will be produced.

7       **3.       ROG 13 and RFPs 18-20: All Documents and Information Regarding "Fringe-Effect Capacitance".**

8

9       ROG 13 requests a written response describing "the tests, test fixtures, methods, equipment

10 and/or procedures for determining whether capacitors have a 'fringe-effect capacitance.'" RFP 19 seeks

11 all documents related to ROG 13. RFPs 18 and 20 seek all documents relating to the analysis, design,

12 testing, operation, or use of all Presidio capacitors having a fringe-effect capacitance, including

13 Presidio's filter feedthrough capacitors.

14       The Court ordered Presidio to provide a narrative response to ROG 13. The Court denies the

15 remaining RFP requests. Presidio has produced all documents related to fringe-effect capacitance as

16 they relate to claim 1 of the '356 patent. RFPs 18 and 20 are overbroad.

17       **4.       RFP 9: All Documents Regarding Trinh's Multilayer Ceramic Capacitors Thesis.**

18       RFP 9 seeks all documents related to the research and preparation of Presidio's current employee

19 Hung Trinh's Masters thesis, "An Electrodeposition Method for Terminals of Multilayer Ceramic

20 Capacitors." The request includes but is not limited to results of patent searches and other categories of

21 documents. Presidio produced the thesis. Presidio claims the thesis has nothing to do with the '356

22 patent although it does refer to fringe-effect capacitance.

23       The Court ordered Presidio to produce any of the 500 patents--to the extent they are in Presidio's

24 possession, custody or control--that Trinh was aware of while researching his Masters' thesis and that

25 relate to ceramic multilayer capacitors.

26       **5.       RFP 7: JDS Uniphase Documents from 2000-2003.**

27       RFP 7 seeks all documents relating to Presidio's dealings with JDS Uniphase concerning

28 multilayer capacitors. ATC focuses the request on 2000-2003. Presidio has not produced any internal

1   emails in response to this RFP.

2       The Court ordered Presidio to do another search for any responsive documents, including a

3   search for any outstanding internal emails.  The search shall include separate searches for the terms

4   "JDS," "JDSU," "JDS Uniphase," "Chuck," "Rosier," "Fejzuli" and "Bastin."  Presidio shall then

5   produce the documents to ATC, or confirm that all have already been produced.

6       **6.**     **ROG 12: Presidio's Pre-Suit Research and Development Regarding the Capacitors
7**            **Shown in Figures 2A, 4A, 9A and 10A of the '356 Patent.**

8       ROG 12 asks ATC to prepare and "provide a claim chart identifying whether each element of

9   each asserted claim is present or missing" in a list of figures in the '356 patent and other patents.  This

10   essentially seeks information regarding Presidio's prior research, development and analysis with respect

11   to the capacitors shown in Figures 2A, 9A and 10A of the '356 patent, and from Figure 4A, which

12   corresponds to Figure 7 of Monsorno U.S. Patent No. 5,576,926.  Presidio maintains this information is

13   privileged and further that ATC is asking it to prepare an invalidity analysis with regard to certain pieces

14   of prior art.

15       The Court denied this request without prejudice to seeking it through expert discovery.

16   **PRIOR ART AND PRESIDIO'S RELATED PATENTS AND APPLICATIONS**

17       **7.**     **ROG 9: First Sale, Offer for Sale, and Publication of Each Alleged Invention
18**            **Disclosed in the '356 Patent.**

19       ROG 9 requires a description of the circumstances related to the first sale, offer for sale and/or

20   first public use of any alleged invention disclosed or claimed in the '356 patent, including the date any

21   such invention was first described in a printed publication.  Presidio claims it has not sold or offered for

22   sale a product covered by the claims of the '356 patent.

23       The Court ordered Presidio to provide a narrative response to ROG 9, including the date any

24   invention disclosed or claimed in the '356 patent may have been described in a printed publication.

25       **8.**     **ROG 10 and RFPs 13, 23, 60: Prior Use, Knowledge, Sales, Offers for Sale,
26**            **Publications and Patents Related to Ceramic Capacitors.**

27       RFP 13 seeks all documents that refer or relate to prior art or potential prior art to the '356

28   patent, including patents, publications, prior knowledge, public uses and sales and offers for sale.  ROG

Case 3:08-cv-00335-IEG-NLS Document 58 Filed 11/10/08 Page 5 of 8

1    10 asks Presidio to identify the prior art known to anyone involved with prosecution of the '356 patent

2    or its related U.S. and foreign patent applications and patents, and to describe the basis for not

3    disclosing this prior art to the PTO while prosecuting the '356 patent. RFP 23 seeks all documents

4    relating to the prosecution histories of any Presidio patent having at least one common inventor with the

5    '356 patent. RFP 60 requests documents relating to customer or distributor requests, preferences or

6    requirements relating to Presidio's multilayer capacitors.

7         The Court ordered Presidio to supplement its response to ROG 10 to indicate that they have

8    reviewed their files relating to the '356 and '327 patents and produced all prior art relating to those

9    patents. Presidio need not respond further to RFPs 13 and 23. Regarding RFP 60, Presidio shall search

10   for and produce any responsive documents, including a search for customer or distributor requests based

11   on customer specifications.

12   **DOCUMENTS REGARDING SALES, MARKETING AND MARKET FOR ITS CAPACITORS**

13        **9.    RFPs 52-55: Sales, Profits, Customers and Financial Statements.**

14        RFPs 52-55 seek Presidio's financial statements and tax returns because they are relevant to

15   Presidio's damages claim, including determining a reasonable royalty. Presidio had already agreed to

16   produce responsive documents, including documents that show every sale to every customer.

17        The Court ordered Presidio to produce the responsive documents by ***November 12, 2008***.

18        **10.    RFP 37: Value of the '356 Patent.**

19        RFP 37 requests all documents relating to any value assigned to the '356 patent and/or its related

20   patents, alone or together with other patents or technology.

21        The Court ordered Presidio to review the minutes of the Board of Directors or other company

22   meetings to determine if there are any discussions of the value of the '356 patent, and if so, produce the

23   minutes of those meetings to ATC. The Court also ordered Presidio to conduct any other searches that

24   might reveal responsive documents and to produce those documents to ATC.

25        **11.    RFPs 51, 56, 58, 59: Market for Capacitors and Presidio's Market Share and
          Marketing.**

26

27        RFPs 51, 56, 58 and 59 request all documents relating to the market for capacitors (including

28   Presidio's multilayer capacitors and ATC's 545L capacitor and Presidio's relationship with distributors.

1    The Court ordered Presidio to make a thorough search of all emails between Presidio principals

2    Daniel Devoe, Alan Devoe, or Lambert Devoe and any customers or distributors, for emails that

3    compare Presidio's capacitors using the '356 patent and ATC's 545 L capacitor.  Presidio shall also

4    provide all marketing materials related to the Buried Broadband and Integrated Broadband Capacitors,

5    and all marketing that compares its Buried Broadband and Integrated Broadband Capacitors with ATC's

6    545L capacitors.

7        **12.    ROG 3 and RFPs 34, 57, 69: Damages and Reasonable Royalty.**

8        ROG 3 requests a written description of all categories of damages to which Presidio contends it

9    is entitled, including a reasonable royalty, lost profits, costs, attorneys fees and the amount and basis on

10   which it is sought.  RFP 69 seeks all documents supporting, refuting or relating to the monetary relief

11   Presidio seeks.  RFPs 34 and 57 seek all documents relating to royalty or licensing rates and/or

12   arrangements relating to capacitors.

13       The Court denied ATC's request without prejudice to renewing this request for the information,

14   if the information is not provided in the report of Presidio's damages expert and prior to the deposition

15   of Presidio's damages expert.

16       **13.    ROG 6 and RFPs 35, 36: Presidio's Efforts to License Capacitors.**

17       ROG 6 and RFPs 35 and 36 seek information and documents regarding Presidio's efforts to

18   license or take a license to any technology concerning capacitors or any other patent or application

19   Presidio claims to own.

20       The Court ordered Presidio to supplement its response to ROG 6 and RFPs 35 and 36, as

21   Presidio detailed it would during the discovery hearing.

22   **PRESIDIO'S FALSE MARKING, TORTIOUS INTERFERENCE, ENGAGEMENT OF**
     **COUNSEL AND WILLFULNESS ALLEGATIONS.**

23

24       **14.    RFP 42: Presidio's References to ATC and Analysis of ATC's 545L Capacitor.**

25   RFP 42 seeks all documents and things referring to ATC's 545L and other capacitors.

26       The Court ordered Presidio to search its emails to determine whether any documents refer to

27   ATC's 545L capacitor and to provide those documents.

28   / / /

1    **15.    RFP 48: Funding and Engagement Agreement with Counsel.**

2    RFP 48 seeks all documents related to any funding, direct or direct, or provided or received, by

3    Presidio, that relates to the '356 patent and/or this civil action.

4    The Court denied this request without prejudice.

5    **16.    ROGS 4, 5 and RFP 71: Presidio's Knowledge of ATC's Alleged Infringement and Notice to ATC.**

6

7    ROG 4 asks Presidio to identify and describe all dates and circumstances of Presidio providing

8    actual and/or constructive notice of the '356 patent or of the alleged infringement to ATC. ROG 5 asks

9    Presidio to describe the date and circumstances under which Presidio first became aware that ATC was

10    allegedly infringing any claim of the '356 patent. RFP 71 seeks all documents supporting, refuting or

11    related to Presidio's contention that ATC's infringement has been willful.

12    The Court ordered Presidio to supplement its response to ROG 5 and explain how and/or when it

13    became aware of ATC's 545L capacitor. Regarding any documents that relate to Presidio's testing and

14    analysis of ATC's 545L capacitor, Presidio shall bring its privilege log up to date.

15    **17.    RFPs 25-27: Documents Regarding Presidio's Marking of Its Products with the '356 Patent Number.**

16

17    RFPs 25 and 26 request documents sufficient to identify when Presidio's commercial product

18    was first marked with the '356 patent number, and to show or negate continued marking from that time

19    until present. RFP 27 requests all documents relating to Presidio's analysis and conclusions concerning

20    when and which products to mark with the '356 patent. Presidio has responded to RFPs 25 and 26.

21    The Court ordered Presidio to provide a declaration from its person most knowledgeable whether

22    any further responsive documents exist as to RFP 27.

23    **<u>Neutral Officer to Discover Presidio's ESI.</u>**

24    ATC asked the Court to appoint a computer forensic expert who specializes in electronic

25    discovery as a neutral Officer of the Court, to create, at ATC's expense, a "mirror image" of the ESI

26    stored on Presidio's computers, according to a certain protocol. Presidio responded that appointing the

27    neutral would present an extensive hardship on Presidio's day-to-day operations and would be an

28    egregious infiltration of Presidio's business and technology.

1    The Court denied ATC's request to appoint a neutral to mirror-image, search and review

2  Presidio's ESI.

3    **IT IS SO ORDERED.**

4  DATED:  November 10, 2008

5

6                                                    _Nita L. Stormes_
                                                     Hon. Nita L. Stormes
7                                                    U.S. Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

08cv335 IEG (NLS)

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PRESIDIO COMPONENTS, INC., | ) | Civil Action No.  08cv335 IEG (NLS) |
| Plaintiff, | )<br>) | **ORDER DENYING DEFENDANT'S** |
| v. | )<br>) | **MOTION FOR SUMMARY JUDGMENT OF INDEFINITENESS** |
| AMERICAN TECHNICAL CERAMICS CORPORATION, | )<br>)<br>) | (Doc No. 18.) |
| Defendant. | )<br>)<br>) | |
| _____ | )<br>) | |

Presently before the Court is Defendant's Motion for Summary Judgment of Indefiniteness. For the following reasons the Court DENIES Defendant's motion.

## BACKGROUND

**I.     Factual Background**

The disputed patent is entitled "Integrated Broadband Ceramic Capacitor Array." A capacitor is a device conventionally comprised of two metal plates separated by a non-conductor of direct electric current.  This non-conductive material is known as a "dielectric."  Dielectric material includes air or ceramic.

A capacitor is charged by coupling its plates to an electrical source.  Since electricity passes easily through the metal plates—which are electrical conductors—but not the dielectric, a positive electrical charge accumulates on one plate and a negative charge accumulates on the other plate.  Or,

1   put another way, electrons are introduced on one of the metal plates and electrons are depleted on the

2   other.   When thus charged, the capacitor stores energy which can then be released by connecting the

3   plates via an external path and permitting current to flow from one plate to the other.   The electrons

4   will flow off the negatively charged plate and to the positively charged plate, bringing the two plates

5   to equal relative voltage.   Two types of capacitors are utilized in the '356 patent, parallel plate

6   capacitors (left) and fringe effect capacitors (right).

7

8      

9

10

11       The '356 patent discloses and claims a capacitor consisting of a network of capacitors.   The

12   geometry and spacing of the multiple conductive and non-conductive layers of the multilayer capacitor

13   forms multiple parallel-plate capacitors and fringe-effect capacitors.

14       The embodiment pictured below demonstrates the positioning of conductive plates inside the

15   dielectric body (e.g., structures 10 and 11) as well as "fringe-effect capacitor" which is formed by

16   positioning the ends of two conductors in an edge-to-edge relationship (e.g., the space between 72 and

17   74 below).

18

19

20

21   

22

23

24

25

26

27

28

## II.    Procedural Background

On June 11, 2008, Defendant moved this court for summary judgment, seeking a holding that claims 1-5, 16, 18 and 19 of the 356 patent are indefinite under 35 U.S.C. § 112, second paragraph, which requires that "the specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. (Doc. No. 18.)

On the same day as Defendant filed its motion, the Court construed several disputed terms associated with the 356 patent, including many at issue in the present motion.

From Claim 1, the Court construed **substantially monolithic dielectric body** as "a dielectric body largely but not wholly without seams from the inclusion of plates within the dielectric body."

From Claim 1, the Court construed **the second contact being located sufficiently close to the first contact to form a first fringe-effect capacitance with the first contact** as "an end of the first conductive contact and an end of the second conductive contact are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance."

From Claim 3, the Court construed **the second contact being located sufficiently close to the first contact on the second side of the dielectric body to form a second fringe-effect capacitance with the first contact** as "another end of the first conductive contact and another end of the second conductive contact are present on the second side of the substantially monolithic dielectric body and are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance."

From Claim 19, the Court construed **the dielectric body has a hexahedron shape** as "the substantially monolithic dielectric body has six sides."

On July 11, 2008, Presidio filed its opposition to Defendant's motion, along with a declaration from expert Dr. Gary Ewell. (Doc. No. 23.) On July 18, 2008, ATC filed its reply. (Doc. No. 26.) The Court heard oral argument on August 8, 2008.

//

//

-3-

**LEGAL STANDARD**

**I.    Summary Judgment**

Summary judgment is proper where the pleadings and materials demonstrate that "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A material issue of fact is a question that a trier of fact must answer to determine the rights of the parties under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.  Summary judgment may be granted in favor of a moving party on an ultimate issue of fact where the moving party carries its burden of "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

The moving party bears "the initial responsibility of informing the district court of the basis for its motion."  Celotex, 477 U.S. at 323.  To satisfy this burden, the moving party must demonstrate that no genuine issue of material fact exists for trial.  Id. at 322.  However, the moving party is not required to negate those portions of the non-moving party's claim on which the non-moving party bears the burden of proof.  Id. at 323.  To withstand a motion for summary judgment, the non-movant must then show that there are genuine factual issues which can only be resolved by the trier of fact.  Reese v. Jefferson School Dist. No. 14J, 208 F.3d 736, 738 (9th Cir.2000) (citing Fed. R. Civ. P. 56; Celotex, 477 U.S. at 323).  The nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact.  see Nissan Fire & Marine Ins. Co., v. Fritz Cos., 210 F.3d 1099, 1103 (9th Cir. 2000).  The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion, but conclusory allegations as to ultimate facts are not adequate to defeat summary judgment.  Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1180 (9th Cir. 2002).  The court is not required "to scour the record in search of a genuine issue of triable fact," Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996), but rather "may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein."  Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).

**II.    Indefiniteness**

Proof of indefiniteness requires an accused infringer to show by clear and convincing evidence

-4-

1   that a skilled artisan could not discern the boundaries of the claim based on the claim language, the

2   specification, and the prosecution history, as well as her knowledge of the relevant art area.

3   Halliburton Energy Services, Inc. v. M-I LLC, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008).  Put another

4   way, a "claim is indefinite if its legal scope is not clear enough that a person of ordinary skill in the art

5   could determine whether a particular [apparatus] infringes or not."  Geneva Pharmaceuticals, Inc. v.

6   Glaxosmithkline PLC, 349 F.3d 1373, 1384 (Fed. Cir. 2003).

7           The definiteness requirement does not compel absolute clarity.  Only claims not amenable to

8   construction or insolubly ambiguous are indefinite."  Datamize, LLC v. Plumtree Sfotware, Inc., 417

9   F.3d 1342, 1347 (Fed. Cir. 2005).  If the meaning of the claim is discernable, even though the task may

10  be formidable and the conclusion may be one over which reasonable persons will disagree, the Federal

11  Circuit has held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.  Id.  That is,

12  a claim is not indefinite due to alleged ambiguity when the meaning is ascertained from the description

13  in the specification.  Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd., 401 F.3d 1367, 1371

14  (Fed. Cir. 2005) (claim not indefinite due to ambiguity when meaning readily ascertained from the

15  description in the specification).

16          The Federal Circuit has explained that determination of claim indefiniteness is a legal

17  conclusion that is drawn from the court's performance of its duty as the construer of patent claims.

18  Exxon Research and Eng'g Co. v. United States, 265 F.3d 1371, 1376 (Fed. Cir. 2001).  In making

19  such a determination, a Court may consider or reject certain extrinsic evidence in resolving disputes

20  en route to pronouncing the meaning of claim language.  In so doing, the court is not crediting certain

21  evidence over other evidence or making factual evidentiary findings, rather, the court is looking to the

22  extrinsic evidence to assist in its construction of the written document.  Id.

23          As several district courts have observed, however, while the Federal Circuit has described the

24  indefiniteness inquiry as a question of law, where evidence beyond the claims and written description

25  may be reviewed, factual issues are likely to arise.  See Hako-Med USA, Inc. v. Axiom Worldwide,

26  Inc., 2008 WL 2943367, *8 (M.D. Fla. July 29, 2008) (where evidence on indefiniteness consisted of

27  contradictory expert opinion, summary judgment as to indefiniteness improper); Enzo Life Sciences,

28  Inc. v. Digene Corp., 305 F.Supp.2d 406, 408 (D. Del. 2004) (recognizing inherent tension in case law

    surrounding the appropriateness of resolving indefiniteness questions as a matter of law); System

1   Management Arts Inc. v. Avesta Tech., Inc., 137 F.Supp.2d 382, 399 (S.D.N.Y. 2001) (collecting cases

2   and discussing tension in case law regarding indefiniteness as a question of law; concluding question

3   of indefiniteness must be evaluated under ordinary standards applicable to a summary judgment

4   motion; ultimately finding extrinsic evidence was sufficient to give rise to a genuine issue of material

5   fact as to indefiniteness).

6       Here, the Court considers the question of indefiniteness under the ordinary standards applicable

7   to summary judgment motion and bearing in mind the burden of proof on the party alleging invalidity.

8                                    **DISCUSSION**

9   **I.      Challenge to Claim 1**

10          a.      Background

11      Claim 1 describes the following integrated capacitor (terms challenged on indefiniteness

12  grounds are bolded):

13              A capacitor comprising: **[1] a substantially monolithic dielectric body**;

14              a conductive first plate disposed within the dielectric body;

15              a conductive second plate disposed within the dielectric body and
16              forming a capacitor with the first plate;

17              a conductive first contact disposed externally on the dielectric body and
                electrically connected to the first plate; and

18
                a conductive second contact disposed externally on the dielectric body
19              and electrically connected to the second plate, and **[2] the second
                contact being located sufficiently close to the first contact** to form
20              **[3] a first fringe-effect capacitance** with the first contact.

21          b.      Indefiniteness

22      ATC argues Claim 1 is indefinite because it contains three indefinite claim elements,

23  specifically, those identified above: (i) a substantially monolithic dielectric body; (ii) the second contact

24  being located sufficiently close to the first contact to form a first fringe-effect capacitance with the first

25  contact; (iii) a first fringe-effect capacitance.

26              i.      "a substantially monolithic dielectric body"

27                  1.      Parties' Argument

28      ATC asserts that the evidence thus forth has established that the term "substantially monolithic

    dielectric body," even as construed by the Court, is indefinite, in turn making Claim 1 indefinite.  ATC

                                        -6-

1   notes that the '356 patent does not expressly define the phrase "substantially monolithic dielectric

2   body" and that Presidio's initial expert in this case, Dr. Goldshalk, admitted there is no objective test

3   in the technical literature or elsewhere to determine whether a dielectric body is substantially

4   monolithic.

5          Presidio relies on the declaration of its new expert Dr. Gary Ewell—a technical consultant with

6   at least twenty years experience in the field of multilayer capacitors, including a recent emphasis on

7   capacitor reliability testing—who asserts the term substantially monolithic dielectric body, as defined

8   by the Court, is clear and understandable to a person trained in the art.  He explains that when multiple

9   capacitors are sintered, as described and claimed in the '356 patent, the results in voids, gaps, and

10   seams, rendering the structure–an array of capacitors—"substantially monolithic."  That is, monolithic,

11   but to a lesser degree than a single capacitor.  Dr. Ewell describes this "monolithicness" as a comment

12   on the structure's physical integrity, i.e., its ability to resist fracturing when subjected to the normal

13   range of forces involved in placing the component on a substrate and then to normal stresses involved

14   in its application by the user.  In accordance with this definition, Dr. Ewell proposes a test for

15   determining whether a particular dielectric body is "substantially monolithic" or not.  He posits that

16   a sample in question would be put through the normal manufacturing and testing sequence as well as

17   higher-level electronic assembly.  If the internal gaps, voids, and seams are so small or minor within

18   the parts that the samples remain integral under those conditions and do not fragment or break into

19   pieces, then the body would be considered "substantially monolithic."  If the samples did fragment or

20   shatter, then the body would not be considered "substantially monolithic."  (See Doc. No. 23,

21   Presidio's Opp'n, Ex. 5, Declaration of Gary James Ewell, pg. 2-5.)

22          In its reply, ATC rejects Dr. Ewell's proposed test, arguing there is no causal link between

23   whether a capacitor is "substantially monolithic" and whether the capacitor stays intact under certain

24   usage conditions.  ATC also finds Dr. Ewell's test insufficiently defined; ATC points out that Dr. Ewell

25   does not provide specific conditions in either his declaration or deposition which would outline the

26   parameters of the proposed reliability testing.

27                    2.    Court's Construction

28          This Court's Claim Construction Order construed the term **substantially monolithic dielectric**

**body** as "a dielectric body largely but not wholly without seams from the inclusion of plates within the

-7-

1 dielectric body." This was the Court's conclusion, based on examination of the patent as well as

2 testimony of Defendant's expert, Dr. Joseph P. Dougherty, as to "the ordinary and customary meaning

3 of a claim term," i.e., "the meaning that the term would have to a person of ordinary skill in the art in

4 question at the time of the invention, as of the effective date of the patent application." Phillips v.

5 AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005). This was the construction advanced in the

6 alternative by ATC—whose primary argument at the Claim Construction Hearing was (as it is now)

7 that this claim term is indefinite.

8     ATC essentially contends the Court's construction did not cure the indefiniteness problem since

9 a term of degree like substantially cannot be applied to the concept of "monolithicness." Further, even

10 in the words of the Court's construction, argues ATC, a skilled artisan is without guidance as to

11 whether a structure is largely but not wholly without seams.

12                             3.     Analysis

13     The use of the word "substantially" in claim language does not by itself render a claim fatally

14 indefinite. See e.g., Pave Tech, Inc. v. Snap Edge Corp., 952 F.Supp. 1284, 1292 (N.D. Ill. 1997) (term

15 "substantial," when considered in light of entire claimed invention, was as accurate as subject matter

16 permitted, and provided sufficient guidance to one skilled in the art); James River Corp. of Virginia

17 v. Hallmark Cards, 915 F.Supp. 968, 989 (E.D. Wisc. 1996) (word "substantially" in the term

18 "substantially integrated" was sufficiently defined, since one skilled in the art could recognize the

19 difference between prior art and the claimed invention).

20     Instead, as the Federal Circuit has explained, the key consideration is whether the language

21 provided sufficient guidance to one skilled in the art as to the scope of the claimed invention. See

22 Verve, LLC v. Crane Cams, Inc., 311 F.3d 1116, 1120 (Fed. Cir. 2002) ("It is well established that

23 when the term 'substantially' serves reasonably to describe the subject matter so that its scope would

24 be understood by persons in the field of the invention, and to distinguish the claimed subject matter

25 from the prior art, it is not indefinite.").

26     At the outset, the Court notes its rejection of ATC's challenge to Dr. Ewell's qualifications.

27 While Dr. Ewell stated he does not design multi-layer capacitors in his current position, his long

28 experience regarding capacitors, including evaluating capacitor reliability and compliance with a

particular specification, qualify him to opine on how a skilled artisan would apply the claim language.

Dr. Ewell's declaration suggests someone skilled in the art would be able to apply the claim language "a substantially monolithic dielectric body" so as to determine whether a particular device was inside or outside the scope of Claim 1 by performing the reliability testing he frequently conducts and which he asserts would be familiar to a skilled artisan. While Dr. Ewell's testimony is less than complete—he does not define parameters of the testing regime endorsed—Defendant has not specifically rebutted Dr. Ewell's assertions concerning the accuracy or prevalence of such reliability testing. Dr. Dougherty's statement at the time of claim construction merely faulted the specification for failing to teach the difference between a substantially monolithic and non-monolithic dielectric body. No subsequent statement from Dr. Dougherty has been made in reference to the type of testing described by Dr. Ewell. (See Doc. No. 18, Rule 4.2 Statement of Dr. Joseph P. Dougherty In Support of ATC's Claim Construction, Ex. 8, pg. 22-23.)

Under the circumstances, ATC has failed to demonstrate by clear and convincing evidence that the language of the claim is insolubly ambiguous, and Defendant's motion for summary judgment of indefiniteness must fail.

  ii. <u>the second contact being located sufficiently close to the first contact to form a first fringe-effect capacitance with the first contact"</u>
    1. <u>Parties' Argument</u>

ATC argues this term is indefinite since there is no workable objective standard for determining what degree of closeness is sufficient, the term "sufficiently close" does not distinguish the invention from prior art, and "sufficiently close . . . to for a fringe-effect capacitance" is improperly functional since it attempts to define the invention in terms of what it accomplishes as opposed to what it is. ATC asserts that a fringe-effect capacitance is always present wherever two electric conductors are positioned in an edge-to-edge relationship meaning there is no minimum distance at which the fringe-effect capacitance suddenly appears. Accordingly, ATC argues such a term—which simply recites the first and second conductive contacts located "sufficiently close" to form a fringe-effect capacitance—is ambiguous. ATC points out that Presidio's prior expert admitted there was not enough data in the patent to define the fringe-effect capacitance reflected in the patent's drawings. Similarly, ATC claims that "sufficiently close to form a fringe-effect capacitance" fails to distinguish the alleged invention from specific prior art identified in the '356 patent since none of the figures provide values of the gap widths for the fringe-effect capacitances represented. Further, ATC argues the language is indefinite

-9-

because Presidio has used "functional language," that is, Presido has defined its invention by what it is intended to do, i.e., form a fringe-effect capacitance by locating contacts sufficiently close, rather than what it is, i.e., structural dimensions of the contacts.

Presidio argues the term is definite based on the Court's construction of "sufficiently close" as a proximity close enough to form a "determinable capacitance." Presidio further asserts that whether a fringe-effect capacitance is determinable, can be tested and there is an objective workable standard that one skilled in the art would employ to do so. Dr. Ewell's declaration sets forth an objective test for determining whether or not two edges are "sufficiently close to form a determinable capacitance": If the first and second contacts are close enough such that the capacitance formed affects the insertion or data loss of the network or array of capacitors, then it is determinable and falls within the scope of this claim term. (See Doc. No. 23, Presidio's Opp'n, Ex. 5, Declaration of Gary James Ewell, pg. 5-8.)

ATC asserts Dr. Ewell's construction is inconsistent with the Court's Claim Construction Order in which this Court rejected a definition of "sufficiently close" which would have incorporated an effect on high frequency performance. In addition, ATC faults Dr. Ewell for failing to provide a specification for how testing regarding the determinability of the capacitance formed by the fringe effect capacitor would be conducted.

2. Court's Construction

The Court held the term **the second contact being located sufficiently close to the first contact to form a first fringe-effect capacitance with the first contact** means "an end of the first conductive contact and an end of the second conductive contact are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance."

3. Analysis

In his declaration, Dr. Ewell states that as defined by the Court, whether an edge-to-edge capacitance is "determinable" depends on whether the presence of such a fringe-effect capacitance has an effect on the performance of the entire capacitor array. He asserts that one of ordinary skill in the art would be able to make such a determination through testing involving samples of each family of array designs. Each design would seek to vary the strength of the fringe effect capacitor by varying the spacing of the external surface conductors forming the capacitor. The artisan could then electrically measure the properties of the various groups of samples and associate the change in electrical

-10-

1    properties, effect on insertion loss, and effect on data loss from group to group, with the variation in

2    the design of the fringe-effect capacitor.  If the capacitor change resulted in a specific change in the

3    array's electrical properties, then it would be determinable.  These changes in the array's properties

4    caused by fringe-effect capacitors, explains Dr. Ewell, distinguishes the '356 patent from prior art.

5          Dr. Ewell's testimony does not contradict the Court's Claim Construction but merely reflects

6    his opinion as to how the claim term as defined by the Court would be understood by a skilled artisan.

7    Once again, Dr. Dougherty's statement, delivered at the time of claim construction, contains no directly

8    contradictory claims regarding the propriety of such testing or whether it would reveal a

9    "determinable" capacitance.  (See Doc. No. 18, Rule 4.2 Statement of Dr. Joseph P. Dougherty In

10   Support of ATC's Claim Construction, Ex. 8, pg. 29-30.)

11         The Court also rejects ATC's functionality argument.  The Federal Circuit has held that claim

12   language is not necessarily indefinite for using functional language.  Microprocessor Enhancement

13   Corp. v. Texas Instruments Inc., 520 F.3d 1367, 1375 (Fed. Cir. 2008).  There is nothing intrinsically

14   wrong with using functional language in claims, unless it fails to provide a clear-cut indication of the

15   scope of subject matter embraced by the claim.  See id.  As discussed above, the specification and Dr.

16   Ewell's testimony provide sufficient description of the scope of the claim.

17         With respect to this challenged term, ATC has failed to demonstrate by clear and convincing

18   evidence that the language of the claim is insolubly ambiguous, and Defendant's motion for summary

19   judgment of indefiniteness as to this term must also fail.

20              iii.     "a first fringe-effect capacitance"

21                   1.     Parties' Argument

22         ATC argues the term "first fringe-effect capacitance" is indefinite since the patent does not

23   define how to identify which fringe-effect capacitance is the "first."

24         Presidio argues the first and second contacts may be one of an arbitrary number of fringe-effect

25   capacitors along the surface of the monolithic array of capacitors.

26                   2.     Court's Construction

27         As discussed above, the Court held the term **the second contact being located sufficiently**

28   **close to the first contact to form a first fringe-effect capacitance with the first contact** means "an

     end of the first conductive contact and an end of the second conductive contact are positioned in an

1 edge-to-edge relationship in such proximity as to form a determinable capacitance."

2 //

3

4            3.     Analysis

5     Dr. Ewell's explains that one of ordinary skill in the art would understand the word "first" in

6 the claim language as relating to the first of an arbitrary numbering of multiple fringe-effect capacitors.

7 Dr. Ewell's declaration is consistent with the Court's Claim Construction Order which treats the

8 numbering of the fringe effect capacitors formed by the contacts as arbitrary.

9     Defendant's motion for summary judgment of indefiniteness on this term also fails.

10 **II.**    **Challenge to Claims 2-5, 16, 18, and 19**

11     a.     Background

12     Claims 2-5, 16, 18, and 19 are all dependent on Claim 1. Accordingly, ATC argues Claims 2-5,

13 16, 18, and 19 are indefinite because they do not cure the deficiencies of Claim 1 which is itself

14 indefinite.

15     As discussed above, the Court rejects Defendant's contention that summary judgment for

16 indefiniteness is appropriate as to Claim 1, thus the Court does not find dependant claims indefinite

17 based on Claim 1.

18     However, in addition to the arguments above, ATC argues certain of the claims are indefinite

19 for additional reasons. Specifically, ATC identifies (1) Claim 3; (2) Claim 18; and (3) Claim 19.

20     b.     Indefiniteness

21        i.     Claim 3

22     ATC argues that in Claim 3, the term "the second contact being located sufficiently close to

23 the first contact on the second side of the dielectric body to form a second fringe-effect capacitance

24 with the first contact" is indefinite for the same reasons discussed with respect to use of "sufficiently

25 close" in Claim 1.

26     The analysis for this term and the challenged term in Claim 1 is identical.

27     For the reasons discussed above, the Court finds Defendant's motion for summary judgment

28 of indefiniteness on this term fails.

//

//

### ii.   Claim 18

#### 1.   Parties' Argument

ATC argues the use of the term "the ceramic body" in Claim 18 makes the claim indefinite since there is no prior recitation of "a" ceramic body, meaning the term "the" ceramic body lacks an antecedent basis and has no reasonably ascertainable meaning.

Presidio maintains that dependent Claim 18 and the term the ceramic body" refers to the dielectric body recited in independent Claim 1. Presidio notes there is nothing else in Claim 1 to which the term the ceramic body could refer. Presidio cites Dr. Ewell's declaration and his assertion that one skilled in the field would understand that the ceramic body in claim 18 refers to the dielectric body recited in Claim 1.

#### 2.   Analysis

The failure to provide explicit antecedent basis does not always render a claim indefinite. Manual of Patent Examining Procedure ("MPEP") § 2173.05(e). If the claim is reasonably ascertainable by those skilled in the art, then the claim is not indefinite. Energizer Holdings Inc. v. International Trade Comm'n, 435 F.3d 1366, 1369 (Fed. Cir. 2006).

Dr. Ewell states that one of ordinary skill in the art would immediately understand the phrase "the ceramic body" in Claim 18 is referring to the "dielectric body" in Claim 1 based on the practice of many writers and manufacturers to use the terms interchangeably. Dr. Ewell's declaration is supported by Claim 18's dependance on Claim 1 and the '356 patent's express mention of ceramic as a dielectric.

Defendant's motion for summary judgment of indefiniteness on this term also fails.

### iii.   Claim 19

#### 1.   Parties' Argument

ATC argues that while Claim 19 purports to claim a dielectric body having a particular shape, the term "hexahedron" is indefinite because while stating the number of sides, it does not define any shape. ATC notes that several shapes have six sides.

Presidio argues the claim term defines a structure that is a hexahedron shape and also a

-13-

1  capacitor.   Accordingly, someone learned in the art would understand that what is claimed is a

2  capacitor with six sides, not counting very minor additional sides formed by the surfaces of external

3  conductive layers.  Presidio cites Dr. Ewell's declaration, which notes that all commercially available

4  monolithic dielectric bodies manufactured in the United States have at least six sides.

5                                   2.       Court's Construction

6       The Court construed the term **the dielectric body has a hexahedron shape** as "the monolithic

7  dielectric body has six sides.

8                                   3.       Analysis

9       The parties' briefs have centered on the question of whether the Court's construction ("the

10  monolithic dielectric body with six sides") would also include a monolithic dielectric body with more

11  than six sides, i.e. six sides and two additional sides.

12       This inquiry is further afield than the definiteness issue presently before the Court, with the

13  parties' arguments apparently previewing issues of infringement.

14       The declarations of both experts implicitly concede that a skilled artisan could determine

15  whether a dielectric body has six sides.  Accordingly, Defendant's motion for summary judgment of

16  indefiniteness on this term also fails.

17                                   **CONCLUSION**

18       For the foregoing reasons, the Court concludes ATC has not shown by clear and convincing

19  evidence that the challenged terms are indefinite, the Court DENIES Defendant's motion for summary

20  judgment.

21

22  **IT IS SO ORDERED.**

23

24

25  **DATED: August 22, 2008**

26                                   _Irma E. Gonzalez_

27                                   **IRMA E. GONZALEZ, Chief Judge**
                                     **United States District Court**

28

-14-

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRESIDIO COMPONENTS, INC., | Civil Action No. 08cv335 IEG (NLS) |
| Plaintiff, | CLAIM CONSTRUCTION ORDER |
| v. | |
| AMERICAN TECHNICAL CERAMICS CORPORATION, | |
| Defendant. | |

Presently before the Court is the construction of disputed terms of the asserted claims of U.S. Patent No. 6,816,356 ("the '356 patent").

## BACKGROUND

The disputed patent is entitled "Integrated Broadband Ceramic Capacitor Array." A capacitor is a device conventionally comprised of two metal plates separated by a non-conductor of direct electric current. This non-conductive material is known as a "dielectric." Dielectric material includes air or ceramic.

A capacitor is charged by coupling its plates to an electrical source. Since electricity passes easily through the metal plates—which are electrical conductors—but not the dielectric, a positive electrical charge accumulates on one plate and a negative charge accumulates on the other plate. Or, put another way, electrons are introduced on one of the metal plates and electrons are depleted on the

1  other.   When thus charged, the capacitor stores energy which can then be released by connecting the

2  plates via an external path and permitting current to flow from one plate to the other.   The electrons

3  will flow off the negatively charged plate and to the positively charged plate, bringing the two plates

4  to    equal    relative                                             voltage.



8  PARALLEL PLATE CAPACITOR

9  Below is an example of a typical "parallel plate capacitor" described above and utilized in the

10  356 patent.  The capacitor is formed by positioning two conductive plates in parallel and separating

11  them by a dielectricic.

12  One other type of capacitor utilized by the subject patent is a "fringe-effect capacitor."  A

13  "fringe-effect capacitor" is formed by positioning the ends of two conductors in an edge-to-edge

14  relationship.  Here is an illustration.



20  FRINGE-EFFECT CAPACITOR

21  The ability of a capacitor to store charge per unit of voltage applied across its plate is its

22  "capacitance." Capacitance depends on the spacing of the conductive plates and the specific properties

23  of the dielectric material used.

24  The '356 patent discloses and claims a capacitor consisting of a network of capacitors.  The

25  geometry and spacing of the multiple conductive and non-conductive layers of the multilayer capacitor

26  forms multiple parallel-plate capacitors and fringe-effect capacitors.

27  Below is an embodiment of the capacitor described by the '356 patent.  The capacitor contains

28  several conductive plates positioned inside the dielectric body (e.g., structures 10 and 11).  The

positioning of these plates form parallel plate capacitors.  A fringe-effect capacitor is formed in the

1  space between 72 and 74.



FIG. 1OA

The parties seek construction of numerous limitations contained in the patent's claims.  The following chart lists the disputed terms as well as the parties' positions on proposed construction.

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|------|----------------------------------|------------------------------|
| 1 | Substantially Monolithic Dielectric Body | A largely, but not necessarily wholly one-piece dielectric body | A dielectric body largely but not wholly without seams from the inclusion of conductive plates within the dielectric body |
| 2 | A Conductive First Contact Disposed Externally on the Dielectric Body and Electrically Connected to the First Plate | A conductive material arranged on an external surface portion of the substantially monolithic dielectric body having an electrical connection with the first plate | A conductive layer for attaching the capacitor (recited in the preamble) to an external conductor, the conductive layer being present on an external surface portion of the substantially monolithic dielectric body and touching the conductive first plate to establish electrical connection |
| 3 | A Conductive Second Contact Disposed Externally on the Dielectric Body and Electrically Connected to the Second Plate | A conductive material arranged on an external surface portion of the substantially monolithic dielectric body having an electrical connection with the second plate | A conductive layer for attaching the capacitor (recited in the preamble) to an external conductor, the conductive layer being present on an external surface portion of the substantially monolithic dielectric body and touching the conductive second plate to establish electrical connection |

-3-

| 4 | The Second Contact Being Located Sufficiently Close to the First Contact to Form a First Fringe-Effect Capacitance with the First Contact | Forming a capacitance between or proximate opposed ends of the first and second conductive contacts which affects the high frequency performance of the capacitor as a whole | An end of the first conductive contact and an end of the second conductive contact are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance. |
| 5 | The Second Contact Being Located Sufficiently Close to the First Contact on the Second Side of the Dielectric Body to Form a Second Fringe-Effect Capacitance with the First Contact. | Forming a capacitance between or proximate opposed ends of the first and second conductive contacts on a second side of the substantially monolithic dielectric body which affects the high frequency performance of the capacitor as a whole | Another end of the first conductive contact and another end of the second conductive contact are present on the second side of the substantially monolithic dielectric body and are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance. |
| 6 | The dielectric body has a hexahedron shape | The dielectric body has six major surfaces | The substantially monolithic dielectric body has six sides. |

## LEGAL STANDARD

In construing claims, the Court must look first to the language of the claims themselves. Middleton, Inc. v. Minnesota Mining & Mfg. Co., 311 F.3d 1384, 1387 (Fed. Cir. 2002). To that end, "the words of a claim 'are generally given their ordinary and customary meaning.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005). The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." Id. More specifically, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, as of the effective date f the patent application." Id. at 1313.

The specification is "'always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996); accord Yoon Ja Kim v. Conagra Foods, Inc., 465 F.3d 1312, 1318 (Fed. Cir. 2006). Phillips invited courts "to rely heavily on the written description [in the specification] for guidance as to the meaning of the claims." 415 F.3d at 1317. For example, the specification may show that the inventor assigned a meaning to a claim term that differs from the claim's ordinary meaning, and, in that case, "the inventor's lexicography governs." Id. at 1316; accord Anderson Corp. v. Fiber Composites, LLC, 474 F.3d 1361

-4-

1   (Fed. Cir. 2007).

2          Under Federal Circuit precedent, a patentee's choice of embodiments can shed light on the

3   intended scope of the claim, but a patent claim term is not limited merely because the embodiments

4   in the specification all contain a particular feature.  On the other hand, a construction that excludes a

5   preferred embodiment is rarely, if ever, correct.  C.R. Bard, Inc. v. United States Surgical Corp., 388

6   F.3d 858, 865 (Fed Cir. 2004) (internal citations and quotations omitted).  The decision whether to limit

7   a claim to the embodiments in the specification "depends in each case on the specificity of the

8   description of the invention and on the prosecution history." Cultor Corp. v. A.E. Staley Mfg. Co., 224

9   F.3d 1328, 1331 (Fed Cir. 2000).  The mere fact that a specification discloses a single embodiment is

10  not enough.  Liebel-Flarsheim Co. v. Medrad, 358 F.3d 898, 907 (Fed. Cir. 2004).

11         The court should rely on extrinsic evidence "[o]nly if a disputed claim term remains ambiguous

12  after analysis of the intrinsic evidence."  Pickholtz v. Rainbow Technologies, Inc., 284 F.3d 1365,

13  1372-73 (Fed. Cir. 2002).  Extrinsic evidence is defined as "'all evidence external to the patent and

14  prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'"

15  Phillips, 415 F.3d at 1317 (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed

16  Cir. 1995), aff'd 517 U.S. 370 (1996)).  Extrinsic evidence is separate from the patent, prepared for

17  litigation purposes, and not necessarily reflective of the perspective of an ordinary person skilled in the

18  art. Id. at 1318.  A court must not use extrinsic evidence "to vary, contradict, expand, or limit the claim

19  language from how it is defined, even implicitly, in the specification or [prosecution] history."  Dow

20  Chem. Co. v. Sumitomo Chem. Co., Ltd., 257 F.3d 1364, 1373 (Fed. Cir. 2001).

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

    //

                                            -5-

**CLAIM CONSTRUCTION**

**I.      Disputed Term 1: Substantially Monolithic Dielectric Body**

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|------|----------------------------------|------------------------------|
| 1 | Substantially Monolithic Dielectric Body | A largely, but not necessarily wholly one-piece dielectric body | A dielectric body largely but not wholly without seams from the inclusion of conductive plates within the dielectric body |

        i.      Parties' Arguments

        Presidio argues this term, "a substantially monolithic dielectric body" should be defined as "a largely, but not necessarily wholly, one piece dielectric body."  Presidio relies on lay dictionary definitions for asserting "substantially" means "of ample or considerable amount" and "monolithic" means "consisting of one piece."  Presidio explains that this definition captures the idea that the capacitor is not wholly a monolithic dielectric body because conductive structures may be placed on an external surface of the dielectric body, or inside the dielectric body.  In support they cite portions of the patent specification which state that a dielectirc body "includes a series of conductive plates arranged in a substantially parallel and opposed configuration in one region of the body" and that "conductive structures may be one or more conductive plates positioned inside the dielectric body . . . . [Or] the conductive structures may be placed either on an external surface of the dielectric body, or inside the dielectric body . . . ."  (the '356 patent, at col. 4, ln. 29-58.)

        ATC suggests the claim language, "a substantial monolithic dielectric body," is indefinite or, alternatively, ought to be construed to mean "a dielectric body largely but not wholly without seams from the inclusion of plates within the dielectric body."  At the claim construction hearing, ATC presented the testimony of Dr. Joseph P. Dougherty, who explained that a monolithic capacitor is formed by "sintering" (i.e. fusing) together multiple conductive and dielectric layers into a single block and then dipping that structure into a conductive liquid to form conductive contacts.  Dr. Dougherty stated that, in his experience, there are no degrees of monolithicness; rather, a capacitor is either monolithic or it is not.  As for the term, "substantially monolithic dielectric body," Dr. Dougherty said the term would mean nothing to a skilled artisan.  However, in Dr. Doughtery's Rule 4.2 statement,

-6-

1    he suggests the Court adopt the alternative construction put forth by ATC, explaining that the sintering

2    of conductive plates forms the "seams" mentioned in ATC's construction and it is these seams which

3    makes the dielectric body not entirely (i.e. only substantially) monolithic.  ATC says the concept of

4    seams is understood by skilled artisans based on its use in another Presidio patent to define the meaning

5    of an "essentially" monolithic structure. (ATC's Opening Brief at 12, citing Presidio's U.S. Patent NO.

6    6,661,639 from a different patent family which states that "[t]he resulting capacitor is a plated,

7    essentially monolithic structure . . . .  By essentially we refer to the presence of the internal

8    metallizations that create a partial boundry or seam within the structure . . . .").

9        ii.    Analysis

10       As an initial matter, the Court declines to address ATC's indefiniteness argument at this point

11   with respect to this and other disputed terms and concludes such analysis would be more appropriate

12   at the summary judgment stage.  See Kowalski v. Ocean Duek Corp., 2007 WL 4104259, *3 (D.

13   Hawai'i, November 19, 2007); Intergraph Hardware Technologies Co. v. Toshiba Corp., 508

14   F.Supp.2d 752, 773 n.3 (N.D. Cal. August 2, 2007); Lisle Corp. v. A.J. Mfg. Co., 289 F.Supp.2d 1048,

15   1050 (N.D. Ill. 2003) (noting that in the vast majority of cases, claim indefinitness is decided in

16   connection with a summary judgment motion); STX Inc. v. Brine, Inc., 37 F.Supp.2d 740, 754 (D.Md.

17   1999) (stating that "it would be error to collapse claim construction . . . into a statutory indefiniteness

18   analysis.").

19

20       The term "substantially monolithic dielectric body" is not defined in the '356 patent and the

21   Court finds the term remains ambiguous even after examination of specifications, embodiments, and

22   other intrinsic evidence.  Accordingly, the Court finds the use of extrinsic evidence appropriate in

23   construing this disputed phrase.

24       The Court finds some guidance on how to interpret the disputed term by referencing the use

25   of the term "monolithic" as used to characterize an entire multilayer capacitor structure.  For instance,

26   in the '356 patent section titled "Background of the Invention," the concept of monolithic ceramic

27   structure is discussed. ('356 patent, col. 1, 2.) This discussion comes in the context of describing prior

28   art, a structure shown in figure 2A, termed a "multilayer ceramic capacitor." The specification explains

     that such a structure is formed by stacking layers of a powdered ceramic dielectric material and holding

those layers together by applying an organic binder.  After all layers have been stacked and conductive structures are printed on top of various layers to form the desired capacitance, the layers are compressed and diced into capacitors.  At this point, the capacitors are heated to drive off the organic binder and fuse the powdered ceramic material into a "monolithic" structure.  (Id., at col. 2, ln 12.)  Later, in the summary of invention for the '356 patent, it is explained that the disclosed embodiments have "substantially monolithic dielectric body" formed from a plurality of ceramic tape layers laminated together and fired to form a sintered or fused monolithic ceramic structure.  (Id., at col. 4, ln 61-65.)  The McGraw Hill Dictionary of Scientific and Technical Terms similarly defines a monolithic ceramic capacitor as a "capacitor that consists of thin dielectric layers interleaved with staggered metal-film electrodes . . . compressed and sintered to form a solid monolithic block."

The use of the term "monolithic" in both the background section of the '356 patent and this technical dictionary suggests that, contrary to Presidio's assertion, an experienced artisan would not discount a dielectric body's "monolithicness" based on the presence of conductive plates inside the dielectric.  Further, as ATC persuasively argues, the addition of conductive contacts to the exterior of the dielectric body would have no impact on whether the dielectric body itself is monolithic.

Dr. Dougherty testified that the degraded "monolithicness" of the dielectric body referenced by the disputed claim term would be understood by a capacitor designer to refer to seams caused by metal plates protruding out of the dielectric body.  Presido's briefing, while stating the extrinsic evidence in general is less reliable than intrinsic evidence, gives no reason to discount Dr. Doughtery's assertion.  Presidio's reliance on a non-technical dictionary definition to refute Dr. Doughtery, a learned artisan, is unpersuasive.

    iii.    Construction

Based on the forgoing, the Court construes the term "substantially monolithic dielectric body" as "a dielectric body largely but not wholly without seams from the inclusion of plates within the dielectric body."

//

//

//

**II.    Disputed Term 2: A Conductive First Contact Disposed Externally on the Dielectric Body and Electrically Connected to the First Plate**

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|------|----------------------------------|------------------------------|
| 2 | A Conductive First Contact Disposed Externally on the Dielectric Body and Electrically Connected to the First Plate | A conductive material arranged on an external surface portion of the substantially monolithic dielectric body having an electrical connection with the first plate | A conductive layer for attaching the capacitor (recited in the preamble) to an external conductor, the conductive layer being present on an external surface portion of the substantially monolithic dielectric body and touching the conductive first plate to establish electrical connection |

The major differences between the parties' construction involves alternative construction for four separate sub-phrases within the disputed term:

    **i.    the "conductive first contact" is conductive "material" versus a "conductive "layer."**

        a.    Parties' Arguments

Presidio argues the conductive first contact should be construed as a conductive "material." In support, Presidio cites the summary of invention, which teaches that multiple conductive structures may be formed on the exterior of the capacitor.  (See '356 patent, col. 4:52-56 ("conductive structures may be one or more conductive plates positioned inside the dielectric body [or] placed [] on an external surface of the dielectric body . . .").  By envisioning the use of multiple conductive structures, Presidio argues this specification makes clear that the first contact is not necessarily of uniform composition, i.e., a single layer.  Precidio asserts that attempting to define the term "contact" to a single structure of uniform construction is an attempt to define the term more precisely than is warranted by the claim.

ATC argues "conductive first contact" should be construed as a "a conductive layer" because the specification does not disclose an instance of a multi-layer contact.  ATC cites 37 C.F.R. § 1.84(h)(3) which requires that a "cross section set out . . . all of the materials as they are shown in the view from which the cross section is taken."  And which states that "parts in cross section must show proper material(s) by hatching with regularly spaced parallel oblique strokes . . . ."  ATC also notes that in every instance in which a "contact" is shown in a cross-section, the contact is shown as having a

uniform composition, i.e., a uniform cross hatching. ATC argues this construction is consistent with the only description in the specification of how contacts are created, which is "dipping" the device in a conductive material ('356 patent, col. 2, lines 13-16). In the alternative, ATC suggests modifying Presidio's construction so that a contact would be defined as "a single conductive material of uniform composition."

       b.      Analysis

The summary of invention teaches that conductive structures used in the invention may be one or more conductive plates and explains that such structures may be placed on an external surface of the dielectric body. (col 4, 52-56). The language of the specification includes no limitation that such structures be comprised of only a single layer. Nor does the Court construe the language of 37 C.F.R. 1.84(h)(3) to require that structures hatched in the same manner be of uniform construction. All the regulation directs is that a particular cross-hatch be applied to demonstrate that a particular part or structure exists, not that it must be of "uniform construction." Finally, ATC's reference to the description of how contacts are created is inapposite, as the dipping procedure described therein references prior art. (See '356 patent, col. 2., lines 13-16.) Accordingly, the Court declines to limit the claim language as suggested by ATC and construes "the conductive first contact" as "a conductive material." Because the claim language may be construed by reference to the specification, extrinsic evidence is not appropriate in construing this disputed phrase.

    **ii.**    **the contact must be attachable to an external conductor**

       a.      Parties Argument

Relying on a alleged admission by Presidio's expert, Dr. Godshalk, ATC asserts the contact would have to be attachable to a conductor to be a useful device.

       b.      Analysis

There is no language in the claim term that speaks to any relationship between the conductive first material and an external conductor. Dr. Goldshalk did testify that to make the capacitor a useful device, a conductive structure of the capacitor must attach to an external conductor. However, Dr. Godshalk did not testify that the claim language requires that the conductive first material be attachable to an external conductor. Accordingly, the Court rejects ATC's proposed language.

-10-

1    iii.    "disposed externally on" means "present on" versus "arranged on"

2          a.    Parties Argument

3    Another difference between the parties' construction of the claim is on the issue of whether

4  "disposed eternally on" (as between the conductive first contact, i.e. 12 in the figure 10A above, and

5  the dielectric body) should be construed as "present on," meaning physically touching, or "arranged

6  on," which would cover an indirect form of connection.  ATC notes that the Federal Circuit has stated

7  that "on" means "in physical contact with" in the case Senmed, Inc. v. Richard-Allan Med. Indus., Inc.,

8  888 F.2d 815 (Fed. Cir. 1989) disapproved on other grounds by Cardinal Chem. Co. v. Morton Int'l,

9  Inc., 508 U.S. 83 (1993).  ATC also cites the Federal Circuit's decision which interpreted the phrase

10 "mounted on" denotes a form of attachment, not simply an electrical connection."  Asyst Tech. Inc.

11 v. Emtrak, 402 F.3d 1188, 1194 (Fed. Cir. 2005).

12         Presidio, citing a lay dictionary definition, contends that the definition of "disposed on," is

13 "arranged on."  Presidio claims Senmed is inapposite since the court based its decision on evidence that

14 during prosecution of the patent-in-suit, the prosecuting attorney took inconsistent positions.

15 Presumably, argues Presidio, had no prosecution history estoppel been present, the term "on" would

16 have been appropriately defined as not requiring physical contact.  Similarly, Presidio argues that the

17 citation to Asyst Tech is also unavailing because the claim term in dispute there was "mounted on" and

18 the context of its use in the specifications made it clear that it was used in those instances to mean

19 securely fixed to objects.  Here, the disputed term is "disposed on" which has a broader connotation.

20         b.    Analysis

21         ATC's argument that the Federal Circuit decisions in Senmed and Asyst require "on" be

22 construed as "in physical contact with" is unpersuasive.  No language in the specification implies such

23 a requirement.  While the embodiments consistently show the contact physically touching the dielectric

24 body, it is improper to rely solely on these embodiments to impose limitations on the claim language.

25 See C.R. Bard, 388 F.3d at 865 (""Under our precedent, a patentee's choice of embodiments can shed

26 light on the intended scope of the claim, but a patent claim term is not limited merely because the

27 embodiments in the specification all contain a particular feature.").  Accordingly, the Court construes

28 "disposed externally on" consistent with definition set forth by Presidio as "arranged on."

-11-

iv.     **"electrically connected to the first plate" means "having an electrical connection with the first plate" versus "touching the conductive first plate to establish an electrical connection"**

a.     <u>Parties Argument</u>

ATC argues physical touching is required between the contact and the first plate because that is the way that the contact and plate are repeatedly and consistently referenced in the specification and figures.

b.     <u>Analysis</u>

Similar to the Court's conclusion above, while several of the embodiments describe contacts forming a common connection point for each plate extending to that side.  (See e.g., '356 patent, col 6, line 25-28; col. 9, line 46-47), such embodiments do not compel a limitation of the claim language. <u>See</u> <u>C.R. Bard</u>, 388 F.3d at 865.  The language simply does not suggest such a requirement Accordingly, the Court construes "electrically connected to the first plate" as "having an electrical connection with the first plate."

v.     **Construction**

Based on the forgoing, the Court construes the term "a conductive first contact disposed externally on the dielectric body and electrically connected to the first plate" as "a conductive material arranged on an external surface portion of the substantially monolithic dielectric body and having an electrical connection with the first plate."

**III.   A Conductive Second Contact Disposed externally on the Dielectric Body and Electrically Connected to the Second Contact**

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|------|--------------------------------|----------------------------|
| 3 | A Conductive Second Contact Disposed Externally on the Dielectric Body and Electrically Connected to the Second Plate | A conductive material arranged on an external surface portion of the substantially monolithic dielectric body having an electrical connection with the second plate | A conductive layer for attaching the capacitor (recited in the preamble) to an external conductor, the conductive layer being present on an external surface portion of the substantially monolithic dielectric body and touching the conductive second plate to establish electrical connection |

As the parties conceded, this claim term should be defined consistent with the previous

-12-

term.   Accordingly, consistent with the reasoning and discussion above, the Court construes the
term "a conductive second contact disposed externally on the dielectric body and electrically
connected to the second plate" as "a conductive material arranged on an external surface portion of
the substantially monolithic dielectric body and having an electrical connection with the second
plate."

**IV.    The Second Contact Being Located Sufficiently Close to the First Contact to Form a
First Fringe-Effect Capacitance with the First Contact**

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|------|--------------------------------|------------------------------|
| 4 | The Second Contact Being Located Sufficiently Close to the First Contact to Form a First Fringe-Effect Capacitance with the First Contact | Forming a capacitance between or proximate opposed ends of the first and second conductive contacts which affects the high frequency performance of the capacitor as a whole | An end of the first conductive contact and an end of the second conductive contact are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance. |

i.    Parties' Arguments

Presidio asserts the claim term should be defined as "forming a capacitance between or
proximate opposed ends of the first and second conductive contacts which affects the high frequency
performance of the capacitor as a whole."  Presidio explains that the '356 patent solves the high
frequency problems of earlier capacitors and cites instances in the specification where the '356 patent
mentions that certain fringe capacitance may affect the very high frequency performance of the device.
(See e.g., '356 patent, col. 4, ln. 55, 60.)

ATC asserts the disputed term should be interpreted as "an end of the first conductive contact
and an end of the second conductive contact are positioned in an edge-to-edge relationship in such
proximity as to form a determinable capacitance."  ATC argues its construction is consistent with the
plain meaning of the claim and argues Presidio's construction should be rejected since claim 1 does
not recite any limitations or effects on high-frequency performance. At the claim construction hearing,
Dr. Dougherty testified that the '356 patent does not explain how forming a fringe-effect capacitance
would have a measurable effect on the high frequency performance of the capacitor.  Further, ATC
argues this is an improper functional definition since it is impermissible to define an invention by

-13-

"what it does rather than what it is" when no parameters are provided.  <u>Halliburton Energy Services, Inc. v. M-I LLC</u>, 514 F.3d 1244, 1255-1256 (Fed. Cir. 2008).

    ii.    <u>Analysis</u>

    The effect on high frequency performance is not mentioned in claim 1 and nowhere in the specification is the effect on high frequency performance explained.  There is simply no justification for introducing the language advanced by Presidio into the construction of the disputed claim term.

    iii.    <u>Construction</u>

    The Court construes the term "the second contact being located sufficiently close to the first contact to form a first fringe-effect capacitance with the first contact" as "an end of the first conductive contact and an end of the second conductive contact are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance."

**V.**    **The Second Contact Being Located Sufficiently Close to the First Contact on the Second Side of the Dielectric Body to Form a Second Fringe-Effect capacitance with the First Contact**

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|------|----------------------------------|------------------------------|
| 5 | The Second Contact Being Located Sufficiently Close to the First Contact on the Second Side of the Dielectric Body to Form a Second Fringe-Effect capacitance with the First Contact. | Forming a capacitance between or proximate opposed ends of the first and second conductive contacts on a second side of the substantially monolithic dielectric body which affects the high frequency performance of the capacitor as a whole | Another end of the first conductive contact and another end of the second conductive contact are present on the second side of the substantially monolithic dielectric body and are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance. |

    As the parties conceded, this claim term should be defined consistent with the previous term.  Accordingly, consistent with the reasoning and discussion above Court construes "the second contact being located sufficiently close to the first contact on the second side of the dielectric body to form a second fringe-effect capacitance with the first contact" as "another end of the first conductive contact and another end of the second conductive contact are present on the second side of the substantially monolithic dielectric body and are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance."

**VI.    The dielectric body has a hexahedron shape**

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|------|--------------------------------|----------------------------|
| 6 | The dielectric body has a hexahedron shape | The dielectric body has six major surfaces | The substantially monolithic dielectric body has six sides. |

     i.     <u>Parties' Argument</u>

Presidio proposes the term be defined as "the dielectric body has six major surfaces." Presidio argues that structures that are not hexahedrons were contemplated by the claim term, otherwise the claim language would not include the term "shape." Presidio adds that the majority of the figures in the '356 patent have channels and other features that define more than six sides. (See e.g., Figs. 9a, 10A, 11A, 12A, 20A). Presidio argues it would be impermissible to adopt a construction that would exclude these embodiments.

ATC proposes the following construction: "the substantially monolithic dielectric body has six sides." ATC says hexahedron is a mathematical term which is precise, namely, a three-dimensional object with 6 sides or faces. As such, there should be no room for a definition that calls for six major surfaces with the option for other "minor" surfaces or additional major surfaces. ATC notes that Dr. Godshalk (Plaintiff's expert) admitted that the '356 patent does not disclose an objective standard for determining the difference between "major" and "minor" surfaces.

     ii.     <u>Analysis</u>

Where the '356 patent does not teach how to distinguish between a "major" and "minor" surface, the disputed term's use of the term "shape" does not expand the definition of hexahedron to include all objects with six major surfaces. The two dimensional views of dielectric bodies in the embodiments cited by Presidio do not establish an expansion of the claim language. Accordingly, Presidio's proposed construction is rejected.

     iii.     <u>Construction</u>

The Court construes the disputed term "the dielectric body has a hexahedron shape" as "the substantially monolithic dielectric body has six sides."

**CONCLUSION**

Having reviewed the amended joint claim chart and the patents-in-suit, the Court **CONSTRUES** the disputed terms as follows:

I.   **Substantially Monolithic Dielectric Body**: a dielectric body largely but not wholly without seams from the inclusion of plates within the dielectric body.

II.  **A Conductive First contact Disposed Externally on the Dielectric Body and Electrically Connected to the First Plate:** a conductive material arranged on an external surface portion of the substantially monolithic dielectric body and having an electrical connection with the first plate.

III. **A Conductive Second Contact Disposed Externally on the Dielectric Body and Electrically Connected to the Second Plate:** a conductive material arranged on an external surface portion of the substantially monolithic dielectric body and having an electrical connection with the second plate.

IV.  **The Second Contact Being Located Sufficiently Close to the First Contact to Form a First Fringe-Effect Capacitance with the First Contact:** an end of the first conductive contact and an end of the second conductive contact are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance.

V.   **The Second Contact Being Located Sufficiently Close to the First Contact on the Second Side of the Dielectric Body to Form a Second Fringe-Effect Capacitance with the First Contact:** another end of the first conductive contact and another end of the second conductive contact are present on the second side of the substantially monolithic dielectric body and are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance.

VI.  **the dielectric body has a hexahedron shape**: the substantially monolithic dielectric body has six sides.

**IT IS SO ORDERED.**

**DATED:  June 11, 2008**

**IRMA E. GONZALEZ, Chief Judge**

**United States District Court**

-16-